**MTD**
MARK F. FERRARIO, ESQ.
Nevada Bar No. 1625
JACOB BUNDICK, ESQ.
Nevada Bar No. 9772
GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
Telephone:  (702) 792-3773
Facsimile:  (702) 792-9002
Email:  ferrariom@gtlaw.com
         hicksja@gtlaw.com

DANIEL J. TYUKODY, ESQ.
Admitted *Pro Hac Vice*
COLIN W. FRASER, ESQ.
Admitted *Pro Hac Vice*
GREENBERG TRAURIG LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone: 310.586.7723
Email: tyukodyd@gtlaw.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DANIEL CHECKMAN, Individually And On Behalf Of All Others Similarly Situated,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>ALLEGIANT TRAVEL COMPANY, MAURICE J. GALLAGHER, JR., SCOTT SHELDON, STEVEN E. HARFST, and JUDE I. BRICKER,<br><br>　　　　Defendants. | **Case No: 2:18-cv-01758-APG-PAL**<br><br>**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>*[Filed concurrently with: (1) Motion to Strike, (2) Request for Judicial Notice; (3) Declaration of Colin W. Fraser.]* |

Defendants Allegiant Travel Company ("Allegiant" or the "Company"), Maurice J. Gallagher, Jr. ("Gallagher"), Scott Sheldon ("Sheldon"), Steven E. Harfst ("Harfst"), and Jude I. Bricker ("Bricker") (collectively, the "Individual Defendants" and along with Allegiant, "Defendants"), by and through their undersigned counsel of record, respectfully submit this memorandum in support of their Motion to Dismiss Plaintiffs' Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Amended Complaint" or "AC") pursuant to Fed R. Civ. P. 8, 9(b) and 12(b)(6), as well as the Private Securities Litigation Reform Act (the "Reform Act" or "PSLRA"), 15 U.S.C. §§ 78u-4 & 5 (2012). This Motion is made upon the papers and pleadings on file herein, declaration of Colin Fraser, the attached points and authorities, and such oral argument as the Court may entertain at the hearing on this matter.

## I.    <u>INTRODUCTION</u>

The Amended Complaint is the kind of abusive case Congress had in mind when it adopted the Reform Act, which emphasized the district courts' vital role in discouraging frivolous securities class actions.[1] The Amended Complaint lacks most of the essential elements that are required to plead a Section 10(b) case,[2] starting with the most fundamental element of all, namely an actionable false statement. It also fails to adequately plead both scienter, and loss causation.

The supposedly false statements in the Amended Complaint consist of those like the one that begins the purported class period, where Allegiant said, "'the safety of its passengers and crew was always [its] number one priority.'" ❡ 191.[3] The Amended Complaint offers its opinion that was not the

---

[1] *See* H.R. Rep. No. 104-369, at 32 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730 ("This legislation impalements needed procedural protections to discourage frivolous litigation"); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1016 n.11 (S.D. Cal. 2005) ("[T]he purpose of all of the [Reform Act's] heightened pleading requirements [is] to weed out meritless lawsuits at the pleading stage.").

[2] "There are six elements to a securities fraud claim under § 10(b) and Rule 10b–5: (1) a material misrepresentation or omission; (2) scienter (*i.e.*, a wrongful state of mind); (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation (often established in 'fraud-on-the-market' cases via a presumption that the price of publicly-traded securities reflects all information in the public domain); (5) economic loss; and (6) loss causation." *Loos v. Immersion Corp.* 762 F.3d 880, 886-87 (9th Cir. 2014) (*citing Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).

[3] All "❡" references are to the corresponding paragraph in the AC. Throughout this brief, all emphasis has been added; occasionally, we delete certain emphasis added by Plaintiffs in the AC, which is duly noted. When citing some of the longer paragraphs in the AC (one goes on for 10 pages) we provide appropriate page numbers in parentheses.

case, citing in supposed support almost three years of news articles about Allegiant, along with the opinions of nine anonymous Former Employees ("FEs") who disagree with the way Defendants ran the Company.

But the only opinion that matters is that of the Federal Aviation Authority ("FAA"), because as the AC recognizes, "[a]ircraft maintenance and safety are regulated by the FAA." ¶ 67.  *See also* ¶ 2 ("[O]ne of the biggest costs of an airline's operating cost is aircraft maintenance, which is regulated by the FAA with *standards that apply to all airlines*.").  Plaintiffs do not (and cannot) allege that the FAA had any significant issues with Allegiant during Plaintiffs' overly-long, nearly three-year purported class period.[4]

**Plaintiffs fail to plead an actionable false statement for three main reasons**:

First, this is a "fraud on the market" securities case under *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988), that carries with it the presumption that the market efficiently incorporates material information into the stock's price in a relatively short period of time.[5]  A significant portion of the AC consists of nearly three years of newspaper headlines focused on Allegiant's alleged safety and maintenance issues, and the AC notes securities analysts' attention to these issues. Thus, it comes as no surprise that there was barely any stock price movement after Plaintiffs say the "truth was revealed" (¶ 216) by a CBS *60 Minutes* broadcast that aired on April 15, 2018 (the "Broadcast").  The Broadcast repeated what had been said in prior newspaper articles regarding Allegiant, analyzed "public records" available from the FAA, and offered critical commentary.  As a matter of law, an actionable false statement cannot be based upon previously disclosed public information.  *See In re Merck & Co. Sec. Litig.*, 432 F. 3d 261, 270-71 (3d Cir. 2005).  Following the Broadcast, Allegiant's stock price dropped an immaterial amount, which is what one would expect pursuant to the efficient market theory.

Second, the only type of "false statement" alleged in the Amended Complaint is of the kind that Allegiant ran "a safe operation" ¶ 192, which constitutes an inactionable statements of opinion, or "puffery."

---

[4] *See In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1092-93 (9th Cir. 2002) (15-month class period "unusually long").

[5] *See also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008) ("[U]nder the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public.").

Third, at best the AC amounts to nothing more than a mismanagement claim which does not suffice to state a securities claim pursuant to *Santa Fe Indus. v. Green*, 430 U.S. 462, 478-79 (1977). *See Kramer v. Time Warner, Inc.,* 937 F.2d 767, 776 (2d Cir. 1991) (the goal of the federal securities laws is "disclosure, not substantive review by federal courts of corporate affairs.").

The Amended Complaint also fails to adequately plead "scienter," or a willful intent to deceive. Under the Reform Act, Plaintiffs were required to "state with particularity *facts* giving rise to a *strong inference* that the defendant acted with the required state of mind" for "*each* act or omission alleged to violate" Rule 10b-5. 15 U.S.C. § 78u-4(b)(2). The Supreme Court has interpreted this "strong inference" standard as requiring that the "inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be *cogent and compelling*, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324 (2007). Plaintiffs' core theory of fraud is that Allegiant said it cared about safety but really did not, which is about as far from pleading "cogent and compelling" "facts" as one can imagine. The AC acknowledges that senior Allegiant officers themselves sometimes piloted Allegiant's planes, and the Court can take judicial note of the fact that Allegiant's CEO, Maurice Gallagher, owned around 20% of Allegiant's outstanding stock throughout the purported class period.[6] For the most personal reason of all, and for obvious financial reasons, Allegiant and the Individual Defendants had every reason to be intensely focused on safety, as indeed the sparsely pled facts alleged in the AC shows them to have been.

Finally, Plaintiffs fail to adequately plead the required element of loss causation which requires that there be a corrective disclosure of some prior undisclosed fact which revealed the fraud to the market, *see Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005), because " [a] negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *In re Omnicom Grp. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010).

In short, the Amended Complaint lacks an actionable false statement, its theory of scienter is absurd, and it fails to satisfy the loss causation requirement. It should be dismissed with prejudice because it is an utterly frivolous case that cannot be saved by amendment.

---

[6] The AC observes that even after Gallagher's largest class period stock sale, he "continued to hold 'more than 3.3 million shares, which is approximately 20% of the current outstanding shares as of March 10, 2016.'" ¶ 175 n. 27.

## II.      THE HEIGHTENED PLEADING STANDARD APPLICABLE TO SECURITIES CASES

Private securities class actions are unique because they are reviewed pursuant to the "[e]xacting pleading requirements" of the Reform Act.  *Tellabs*, 551 U.S. at 313.  Congress enacted the Reform Act to deter abusive securities lawsuits and facilitate their dismissal at the pleading stage.  *Id.* at 320 ("[The Reform Act was] designed to curb . . . 'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers.'" (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006))).

The Reform Act requires Plaintiffs to "specify each statement alleged to have been misleading, [and the] reasons why the statement is misleading . . . with particularity."  15 U.S.C. § 78u-4(b)(1). Where a plaintiff's allegations are based on "information and belief" as they are here,[7] "the complaint shall state with particularity *all facts* on which that belief is formed."  *Id.*

Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* § 78u-4(b)(2)(A).  That state of mind is "scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'"  *Tellabs*, 551 U.S. at 313 (citation omitted). To satisfy that standard, the allegations must raise an inference of scienter that must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.* at 314.  And Plaintiffs must plead this strong inference of scienter as to *each* defendant.  *See, e.g.*, *In re Impac Mortg. Holdings Sec. Litig.*, 554 F. Supp. 2d 1083, 1099 (C.D. Cal. 2008).

Uniquely in securities cases, a court must consider *all* reasonable inferences to be drawn from the complaint, *including those unfavorable to a plaintiff.  Gompper v. VISX, Inc.,* 298 F.3d 893, 896-97 (9th Cir. 2002); *see also Tellabs*, 551 U.S. at 324 ("[A] court must consider plausible nonculpable explanations for the defendant's conduct.").

In short, "[t]he heightened pleading requirements of the . . . Reform Act are an unusual deviation from the usually lenient requirements of federal rules pleading.  In few other areas are motions to dismiss . . . so powerful."  *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001).

---

[7] *See* the AC's unnumbered introductory paragraph.

### III.   THE AMENDED COMPLAINT'S FACTUAL ALLEGATIONS

Allegiant "operates an ultra-low-cost passenger airline" (¶ 2) that "offered low-cost air transportation to travelers in small cities … to top leisure destinations in states like Nevada, Florida and Arizona." ¶ 56.  In the earliest days of the class period, its fleet consisted largely of MD-80's, which was an older "fuel guzzling airplane" that could be flown profitably in the right circumstances.  ¶ 59.  These older aircraft required more maintenance costs than newer aircraft, which Allegiant reported "in each earnings report" and "each quarter during the Class Period."  ¶ 11.

Allegiant's focus on safety and its maintenance costs was a topic "frequently discussed during Allegiant's conference calls," ¶ 67, and the AC reports numerous exchanges between Allegiant's management and securities analysts discussing these issues.[8]

The Amended Complaint divides itself into three time-periods over its nearly three-year class period, starting with the first six months of June 8 through December 31, 2015 (¶¶ 158-62), the next three months of January 2016 through March 2016 (¶¶163-76), and then a final period extending over two years, March 2016 through April 2018 (¶¶ 177-89).

**June 8 to December 31, 2015**.  The Amended Complaint begins on June 8, 2015, with Allegiant's statement that "the safety of its passengers and crew was 'always [its] number one priority'" (¶ 191), which was made in response to the fact that one of its flights had undergone an emergency landing at the St. Pete-Clearwater Airport.  ¶ 159.  *The Amended Complaint does not allege that anyone was seriously injured in this incident, or in any other incident discussed anywhere in the AC*.

Next, the AC provides nearly three pages of headlines and descriptions of articles about Allegiant involving safety and maintenance issues published in various media, particularly the *Tampa Bay Times*. While Allegiant regrets any inconvenience imposed on its passengers, many of the incidents cited demonstrate attention to safety, including ground maintenance that unfortunately delayed flights.[9]

---

[8] *See e.g.,* ¶ 160 (conference call discussing results for the third quarter of 2015 ("3Q15"); 167 (4Q15 conference call); ¶192 (4Q15 conference call).

[9] *E.g.,* ¶ 159 (p. 40) (June 24, 2015 article in the *Tampa Bay Times* that "reported that Allegiant cancelled another flight from St. Pete-Clearwater International Airport due to unspecified "maintenance issues"); *Id.* (report of a flight making "an unscheduled stop in Utah … for a 'possible maintenance issue'").

Another article reports the fact that senior Allegiant executives themselves piloted the planes.[10]

**January through March 2016**.  The next period consisting of just three months, begins with the story of "Greg Marino, a formerly retired airline mechanic who worked at Allegiant's facility in Sanford, Florida *for just two weeks*," who quit for reasons that included his opinion that Allegiant "had a worrisome culture."  ¶ 163.  His story was featured in the *Tampa Bay Times*, to which Allegiant responded in a letter to the editor:

> Allegiant maintenance practices in all of our bases are part of an FAA-approved program.  Maintenance is performed in accordance with all aircraft and engine manufacturer recommendations and in accordance with all standards of the airline industry....There is nothing more valuable to all of us at Allegiant than the safety of our passengers and our crew members. These people are our family.... For an individual with such limited insight into our operations to make broad, unfounded allegations about the quality of our maintenance practices is an insult to the more than 600 men and women who work hard every day to maintain our fleet. ¶ 164.

Securities analysts took note of Allegiant's issues during this period, and the "very first question posed" by an analyst at Allegiant's 4Q15 conference call held on January 27, 2016 concerned "some of the headlines that come out trying to decipher between what a real safety issues at the airline and what's maybe overhyped by the media."  ¶ 167.  To this, Jude Bricker responded, "It's a safe operation" and Gallagher added that,

> we are in negotiations with our pilots and particularly the Teamsters have a history of . . . making sure all of your peccadilloes are out there.... So every airline has operational issues.  And as I tell our people, the systems are set up to deal with problems.... But we've invested tremendously in safety systems over the last few years.  The FAA has suggested as many as seven voluntary safety systems and we are in all of them.  We have a
>
> terrific SMS program if you are familiar with that.  ¶ 167 (Plaintiffs' emphasis deleted).[11]

---

[10] ¶ 159 (p. 40) ("Greg Braden, Allegiant's Vice President of Operations, and Michael Wuerger, Allegiant's Director of Flight Safety" piloted a plane that made an emergency landing in Fargo, North Dakota).

[11] The SMS program refers to mandatory protocols established by the FAA, which allow a mechanic to report safety concerns and initiate an FAA inspection.  *See* 14 C.F.R. Part 5 (2018); *see also Certification and Voluntary Safety Programs*, Federal Aviation Administration,

The AC then goes on to state that an investment fund affiliated with the Teamsters was attempting to "convince Allegiant's Board to establish a new standalone safety committee" (¶¶ 168-69), and the "Aviation Mechanics Coalition, Inc. a subgroup of the International Brotherhood of Teamsters Airline Division" had issued a "report [that] stated in a conclusory fashion" that Allegiant had various issues leading to "98 separate and preventable maintenance issues" over the course of about four months. ¶ 173. Allegiant responded, "The Teamsters Aviation Mechanics Coalition has never inspected a single Allegiant aircraft and has no firsthand knowledge of our operation…. Allegiant is a safe airline, and our robust maintenance program goes above and beyond manufacturer and FAA recommendations and guidelines." ¶ 174.

**March 2016 to April 2018**. The final period of over two years marks a time when Allegiant did many of the things that the AC alleges Allegiant should have done. On May 12, 2016, Allegiant announced that "two independent directors would regularly meet with operations and maintenance personnel and report back to the Board. Additionally, senior operations personnel would make presentations to the Board at each quarterly meeting." ¶ 178. Allegiant also announced on July 2016 that "it would accelerate the acquisition of Airbus A320s to retire its MD-80 fleet by mid-2019 instead of by the end of 2020 or into 2021." ¶ 179.

During this period, the AC alleges that "[n]ews outlets continued to report that Allegiant's aircraft experienced aborted takeoffs and emergency landings from March 2016 through 2017" (¶ 177), although it does not cite any specific story. Instead, this section focuses upon Allegiant's business decision, announced on August 29, 2017, to develop a resort in Florida. ¶ 184. On "information and belief" Plaintiffs attempt to cobble together the acceleration of the retirement of older aircraft with the proposed resort project,[12] but the source of this illogical "belief" is FE 1, who worked at Allegiant for just six

---

https://www.faa.gov/about/initiatives/atos/air_carrier/cert_volun_safety_program/ (last modified Oct. 13, 2017) ("SMS programs establish open and free communication within an organization" and "provide[] the organizational framework to support a sound safety culture.").

[12] "Upon information and belief, Allegiant decided to develop the $450 million Sunseeker Resort due to its commitment to the accelerated retirement of obsolete aircraft, which it relied upon. Defendants' refusal to invest further resources into aircraft it intended to retire, together with Defendants' need to fund its new resort as financing was uncertain, caused Defendants to continue their fraudulent scheme." ¶¶ 187-88.

months, and who draws an erroneous conclusion based upon an exchange between two people, neither of whom had relevant knowledge of what they were talking about. *See infra* at 15.

**The "60 Minutes" Broadcast and Thereafter**.  Plaintiffs then allege "the truth was revealed" (¶ 216) as a result of the Broadcast that repeated incidents previously reported in the *Tampa Bay Times* and other publications throughout the class period, acknowledged that its analysis was based on years-old "[p]ublic documents" such as maintenance and safety reports,[13] and featured an interview with "Daniel Wells, a captain for Atlas Air, . . .  [who] is president of Teamsters Union 1224 which represents pilots from Allegiant and nine other airlines." ¶ 221 (pp. 65 & 68).  The Broadcast omitted any reference to what the FAA had already told CBS, namely that its review of Allegiant "did not find any systemic safety or regulatory problems, but did identify a number of less serious issues, which Allegiant addressed."[14]

## IV.  ARGUMENT.

**A.**     **The Amended Complaint Fails to Plead An Actionable False Statement or Omission.**

**1.**     **An Actionable False Statement or Omission Cannot Be Based Upon Previously Disclosed Public Information**.

The AC fails to allege an actionable misstatement for the reasons set forth in *Merck*, where the Third Circuit concluded that a stock drop following a *Wall Street Journal* story about Merck's revenue recognition practices was inactionable because Merck had previously provided information sufficient to calculate the effects of its practices:

> In effect, [plaintiff] is arguing that investors and analysts stood in uncomprehending suspension for over two months until the *Journal* brought light to the market's darkness…. [Plaintiff] is trying to have it both ways: the market understood all of the good things that Merck said about its revenue but was not smart enough to understand the co-payment disclosure.  An efficient market for good news is an efficient market for bad news.  The *Journal* reporter simply did the math on June 21; the efficient market hypothesis suggests that the market made these basic calculations months earlier.

---

[13] Allegiant files mandatory "service difficulty reports" with the FAA to self-report any problems experienced by its aircraft, as well as mandatory mechanical interruption summary reports to document flight interruptions caused by mechanical difficulties. ¶ 221; *see also* 14 C.F.R. 135.417 (2018) (requiring airlines to deliver monthly reports of flight incidents to the FAA).

[14] Fraser Decl. at ¶ 10, Ex. 8.

*Merck,* 432 F.3d at 270-71.  The AC expressly relies upon the fraud on the market presumption (¶ 232), which means that as in *Merck*, Plaintiffs cannot rely upon information that was already in the public domain in order to state a claim.  Yet, that is all the AC really consists of.

## 2. The AC's "Puzzle-Pleading" Style Fails to Give Adequate Notice of Which Statements Plaintiffs Contend Were False and Why.

Because the underlying premise of Plaintiffs' scienter theory is absurd—Allegiant didn't really care about safety but said it did—Plaintiffs cannot say what exactly was fraudulent about any particular statement, and instead resort to the condemned practice of "puzzle-pleading," which involves highlighting certain words in various statements, and then saying they were all fraudulent based upon the same generalized litany of reasons.  *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1073-75 (N.D. Cal. 2001) (stating that "[t]he fact that certain sections . . . have been highlighted is not a reliable guide to determining which statements are alleged to be false" and noting that "puzzle-pleading" violates the Reform Act's requirement that the pleader "craft a complaint in such a way that a reader can, without undue effort, divine precisely which statements (or portions of statements) are alleged to be false or misleading, and the reason or reasons why each statement is false or misleading). [15]

Symptomatic of the AC's puzzle-pleading approach are paragraphs that quote nearly identical language from each of Allegiant's 2015, 2016 and 2017 Form 10-K's, where under the heading "Aircraft Maintenance," Allegiant stated:

> Technicians employed by us have appropriate experience and hold required licenses issued by the FAA.  We provide them with comprehensive training and maintain our aircraft in accordance with FAA regulations. . . . Our management closely supervises all maintenance functions performed by our personnel and contractors employed by us, and by outside organizations. In addition to the maintenance contractors we presently

---

[15] *See also McCasland v. FormFactor Inc.*, No. C 07-5545 SI, 2008 WL 2951275, at *7 (N.D. Cal. Jul. 25, 2008) (dismissing complaint that "contravene[d] applicable pleading standards by juxtaposing the same series of generic conclusions against each set of block quotes, without differentiation or specificity."); *Shuster v. Symmetricom, Inc.*, No. C 94-20024 RMW (PVT), 1997 WL 820967, at *1 (N.D. Cal. Jun. 25, 1997) ("The Complaint as it now stands is a rambling set of allegations which is almost impossible to effectively review. . . Plaintiff sets forth lengthy quotes from various releases by defendants' officers and a securities analyst but does not make clear what portion of each quote constitutes a false representation"); *In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1089 (N.D. Cal. 2003) ("Plaintiffs seem to believe that by throwing as many allegations at the Court and defendants as possible, one will somehow slip by the Court and 'stick.' This practice is utterly unacceptable, and . . . has wasted the Court's time.").

utilize, we believe there are sufficient qualified alternative providers of
maintenance services that we can use to satisfy our ongoing maintenance
needs.  ¶¶ 194, 202, 207.

Following each of these 10-K statements, Plaintiffs provide an identical litany of why the "*emphasized
statements* [i.e., bolded/italicized] were false and misleading," namely: (1) the maintenance department
was "grossly understaffed"; (2) "maintenance technicians were inexperienced and insufficiently trained,"
leading to experienced mechanics feeling "pressured" and "overwhelmed"; (3) "Allegiant had a culture
which put profits before safety, lagging industry standards"; and (4) the aforementioned business
practices violated Allegiant's Code of Ethics." ¶¶ 200, 205, 209 (the "Litany").  But these are all just
statements of opinion that do not contest the factual correctness of the "emphasized" statements in the
Form 10-K's, such as the fact that Allegiant employed persons with the required FAA licenses, that
Allegiant provided training, and that its aircraft were maintained in accordance with FAA regulations.  In
fact, numerous assertions by the FEs support the factual correctness of Allegiant's statements.[16]

One of the main problems with puzzle-pleading is that it is unfair to the Individual Defendants
such as Bricker and Gallagher (who are the only Individual Defendants who are alleged to have spoken
(*see infra* at 12-13) of precisely what they are charged with fraudulently misstating.  In Bricker's case, it
apparently consists of seemingly innocuous statements like, Allegiant ran "a safe operation" over a
number of years (¶ 192), and his opinion that it was still doing so when he spoke with analysts and the
press (¶¶ 167, 171).  In Gallagher's case it apparently consists of statements like, "this industry, all it
ultimately sells is safety" (¶ 192).  But, what *specifically* was *actually* false about these (and similar)
statements, *and* known by that Individual Defendant to be false, *and* the *facts* that support a "cogent and
compelling" inference of fraud arising from those statements, is left to the imagination.

### 3. Plaintiffs' Attempt to Bootstrap Inactionable Mismanagement Claims Into a Securities Claim Must Fail.

---

[16] Several of the FEs complain about Allegiant hiring people "fresh out of school" (FE1 ¶ 111), but no
one says those persons lacked the required FAA credentials.  None of the FEs say they allowed what they
believed to be an unsafe aircraft in the air—in fact they strongly deny it (*e.g.*, FE 4 ¶ 94).  Moreover, far
from alleging indifference, the AC is replete with references to the intense focus that Allegiant's senior
management—particularly Mr. Gallagher—paid to safety and maintenance issues.  *See e.g.*, ¶¶ 160, 167,
170, 182, 192, 199.

The opinions offered in the Litany about understaffing, poor hiring, and a "lagging" culture constitute an attempt to bootstrap allegations of mismanagement into a securities claim. *See Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 977 (N.D. Cal. 2015) ("[T]he securities laws do not create a federal remedy for corporate misconduct," and there is a "clearly established rule that a plaintiff may not bootstrap a claim for internal corporate mismanagement or breach of fiduciary duty by alleging that the corporation or its directors failed to disclose that mismanagement or breach." (quoting *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682 (D. Colo. 2007))); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 563, 574 (S.D.N.Y. 2014) (rejecting claims based upon "grossly deficient quality controls" because "[a]llegations of corporate mismanagement. . . are not actionable"), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).[17] Not only are the corporate mismanagement allegations non-actionable, but the AC does not even make a strong case for mismanagement, as it reports that Allegiant was one of the nation's most profitable airlines throughout the class period. ¶¶ 66 n.15; 204; 221 (p. 61:3-5).

Even the titled subsections under the AC's general heading of "Substantive Allegations" are redolent of nothing more than alleged mismanagement: "VI. Allegiant's Maintenance Crews Were Understaffed" (¶¶ 60-100); "VII. Allegiant Maintenance Workers Were Inexperienced, Unqualified and Insufficiently Trained" (¶¶ 101-34); and "VIII. Allegiant Had A Culture Which Put Profits Before Safety, Lagging Industry Standards—Allegiant Would Put Ducks On Its Wings If It Could (¶¶ 135-57)." Obviously, very colorful language, but this has nothing to do with pleading a legally sufficient securities claim.

### 4. The Challenged Statements Consist of Inactionable Statements of Opinion Or "Puffery."

The Litany's assertion that there was a violation of Allegiant's Code of Ethics, where the "emphasized" statements consist of the following—"remain 'honest, fair and accountable in all business dealings'; provide safe working conditions'; be a responsible and responsive corporate citizen in a moral,

---

[17] *See also Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 681-82 (D. Colo. 2007) ("Plaintiff fails to recognize the now clearly established rule that a plaintiff may not 'bootstrap' a claim for internal corporate mismanagement or breach of fiduciary duty by alleging that the corporation or its directors failed to disclose that mismanagement or breach.").

ethical and beneficial manner'… and 'pursue growth and earnings objectives while adhering to ethical standards'" ¶ 198—is symptomatic of what is fundamentally wrong with the Amended Complaint.

A host of cases have held that because "a code of ethics is inherently aspirational, it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all." *Andropolis,* 505 F. Supp. 2d at 685-86.  This reflects the fact that such codes constitute non-actionable "puffery." *See In re Anadarko Petroleum Corp. Class Action Litig.*, 957 F. Supp. 2d 806, 820-21, 823 (S.D. Tex. 2013) (citation omitted) (statements about Andarko's "commitment to safety," dedication to the environment, and "safety-first culture" were not actionable because they were "too untethered to anything measurable, to communicate anything that a reasonable person would deem to be important to a securities investment decision"); *In re Ford Motor Co. Securities Litigation*, 381 F.3d 563, 570 (6th Cir. 2004) (Ford's "commitment to safety" and identification as the "worldwide leader in automotive safety" were "mere corporate puffery or hyperbole"); *City of Pontiac Policemen's & Firemen's Ret. Sys. V. UBS AG,* 752 F.3d 173, 183 (2d Cir. 2014) ("It is well-established that general statement about reputation, integrity, and compliance with ethical norms are inactionable 'puffery.'").

### **5.**    **The Non-Speaking Individual Defendants–Sheldon and Harfst–Must Be Dismissed Pursuant to the Supreme Court's *Janus* Decision.**

Two of the Individual Defendants—Scott Sheldon, who was CFO throughout the class period and COO for a portion of it (¶ 27), and Steven Harfst, who served as COO from December 2014 to January 2016 (¶ 28)—are not alleged to have made *any statement* in the 77-page Amended Complaint during the nearly three-year proposed class period.  Thus, the case against them must be dismissed pursuant to the Supreme Court's decisions in *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011).  In *Janus*, the Court held that "[o]ne 'makes' a statement by stating it…. For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it…. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—*and only by*—the party to whom it is attributed."  *Id.* at 142-43.

In this case, neither Sheldon nor Harfst are alleged to have made any allegedly actionable statement at all, and the allegations against them are of the "group-pleading" variety[18] that were deemed insufficient under the Reform Act even prior to *Janus*.[19]

**B.    Plaintiffs Fail To Plead "Cogent and Compelling" Facts Establishing A "Strong Inference" of Scienter.**

Plaintiffs rely upon two principal sets of allegations to support their attempted pleading of "cogent and compelling" "facts" sufficient under *Tellabs*, the first being the allegations of the Former Employees (¶¶ 69-157), and the second being Gallagher's—*and only Gallagher's*—occasional sales of Allegiant stock during the nearly three-year class period.  ¶¶ 210-18.  Neither set of allegations come close to satisfying the requisite pleading standards. [20]

**1.    The Former Employees Do Not Help In Satisfying the "Cogent and Compelling" Standard.**

In the Ninth Circuit, "a complaint relying on statements from confidential witnesses must pass two hurdles to satisfy pleading requirements.  First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability

---

[18] *See, e.g.*, ⎷ 240 ("Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class").

[19] *See Swartz v. KPMG, LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (citation omitted) ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together but 'require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.'"); *Teamsters Local 617 Pension & Funds v. Apollo Group, Inc.*, 633 F. Supp. 2d 763, 809 (D. Ariz. 2009) (citation omitted) ("group pleading is no longer viable under the PSLRA").

[20] Plaintiffs also attempt to allege scienter based upon the resignation of Steve Harfst as COO but "a plaintiff must allege sufficient information to differentiate between a suspicious change in personnel and a benign one" and the inference that a company "forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009).

and personal knowledge.  Second, those statements which are reported by confidential witnesses with *sufficient reliability and personal knowledge* must themselves *be indicative of scienter*."  *Zucco*, 552 F.3d at 995 (citations omitted).

There is nothing in any of the FE allegations that comes close to satisfying these standards, in fact, considered as a whole they strongly suggest the opposite.  Most of the allegations are made by one employee (FE 1) who worked at Allegiant for roughly *six months,*[21] and another (FE 8) who may not have worked at Allegiant at all during the class period, and even if so, only briefly.  Only FEs 8 and 9 are alleged to have had any direct contact with the Individual Defendants, and both of them report an attention to safety and maintenance by the Individual Defendants, not its absence.  *E.g.*, ¶¶ 35, 45, 133, 153.  In FE 8's case that consisted of "daily briefings[s] to report on the status of aircraft" (¶ 133) that Gallagher usually attended, and in FE 9's case, it was through "only a few" times that he or she attended "monthly reliability meetings to discuss new and ongoing reliability issues and mechanical problems with the fleet . . . attended by upper management."  ¶ 153.  Neither FE 8 nor FE 9 alleges that anyone at these meetings (much less any of the Individual Defendants) made comments that indicated anything other than a commitment to safety and proper maintenance of the fleet.  As to the seven remaining FEs who do not claim to have had any direct contact with Allegiant's senior executive officers, they generally state something along the lines they were "sure" Gallagher and other Allegiant executives knew about maintenance issues with the fleet,[22] which is what one would expect of any airline's senior executive officers.

Generally, the FEs complain about workloads and staffing,[23] below market pay,[24] and a bad culture,[25] which FE 2, who worked 4.5 years on the night shift in Orlando, "attributed [to] Allegiant

---

[21] FE 6 also worked for just six months. ¶¶ 35, 40.

[22] *E.g.*, ¶¶ 78, 98, 127, 130 & 157.

[23] *E.g.*, ¶ 72 (FE 1 "understaffed 'at all times'" during his six-month tenure); ¶ 87 (FE 3 "understaffed" at Mesa, Arizona during his eight months with the Company); ¶91 (FE 4 "understaffed" at Las Vegas during his ten months with the Company); ¶ 96 (FE 5 "understaffed, creating possible safety hazards")

[24] *E.g.*, ¶ 133 (FE 8 "below market hourly rates").

[25] *E.g.*, ¶ 83 (FE 2 understaffing led to bad culture); ¶ 138 (FE 1 "'cultural problem with upper management'").

management's ability to coerce maintenance workers into cutting corners because the workers were not unionized until 2018." ⁋ 86.  Plaintiffs rely primarily on FE 1, who worked for six months and complains about "'complainers that effectively did not want to work,'" and "employees [who] refused to follow direction and instead opted to file an internal Air SMS to the safety department." ⁋ 114.  Pursuant to FAA Regulations, an SMS effectively grounds the plane until the issue can be resolved[26] which suggests the opposite of indifference to safety.[27]

During his brief time period with Allegiant, FE 1 allegedly "came up with a plan" regarding whom and how to train, which got rejected by Allegiant's Director of Curriculum and Instruction who, not unreasonably responded, "'I'm the training director.  I will decide who gets the training.'" ¶ 111.  It was during this time that FE 1 became the apparent source of the AC's half-baked notion that the decision to purchase more modern aircraft had something to do with the planned Sunseeker resort, the breathtaking illogic of which makes it worth quoting in full:

> According to FE 1, he received *direct confirmation* from Toro [FE 1's immediate supervisor] during a 2017 Town Hall that Allegiant was allocating resources to fund the Sunseeker resort instead of investing in aircraft maintenance.  When someone asked why Sanford employees were receiving such a small annual raise, Toro said raises were impacted by "ventures we're trying to go ahead and get paid so we can build this into a better company."  A comment was made, "Okay, I understand, the heck with putting airworthy aircraft out, let's just take the money and stick it in a swimming hole," to which Toro replied, "It's not just taking the money and putting it into a hole in the ground." ⁋ 82.

Rather than providing "direct confirmation" of FE 1's preposterous theory, Toro is clearly disagreeing with the questioner's fundamental premise that Allegiant's planned investment in the resort came at the expense of maintenance, saying, "'It's *not* just taking money and putting it into a hole in the ground.'" ⁋ 82.  This is not a "direct confirmation" of anything FE 1 or the Amended Complaint unreasonably concludes, and is illustrative of the general principle that statements by witnesses who are "not positioned

---

[26] *See supra* at n.7. In addition to the SMS program, Allegiant also participated in the FAA voluntary Aviation Safety Action Program (¶ 164), which "provides a vehicle whereby employees . . . can identify and report safety issues to management and to the FAA for resolution, without fear that the FAA will use reports accepted under the program to take legal enforcement action against them, or that companies will use such information to take disciplinary action." *See* FAA Advisory Circular 120-66B.

[27] *See also* ⁋ 145 (FE 3 aircraft maintenance technician who worked at Mesa, Arizona for 1.5 years who noted that "[s]ome items … require immediate grounding" and who reports no instances where such items were ever ignored).

to know the information alleged," that contain "unreliable hearsay," or that set forth "conclusory assertions" are not sufficiently reliable to meet the Reform Act's requirements. *Zucco*, 552 F.3d at 996; *see also Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1141 (W.D. Wash. 2006) (factual allegations by confidential witnesses must be sufficiently detailed so courts can discern "whether a confidential witness is speaking from personal knowledge, or merely regurgitating gossip and innuendo." (quoting *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003))).  Neither FE 1, nor Toro, is alleged to have had any contact with the Individual Defendants (or any part of Allegiant's upper management) such that they could competently comment on how the decision to start purchasing newer aircraft was related to the decision to develop a resort property—if at all—nor the implied premise that because of these two unrelated things, Allegiant found it necessary to skimp on essential safety maintenance.  "Water-cooler" talk is not a sufficient basis to state a claim under the Reform Act.

The other major contributor is FE 8, who apparently *did not work for Allegiant during the class period*, or at best overlapped for a very short time, leaving Allegiant "sometime during the summer of 2015") (¶ 43), with the class period beginning on June 8, 2015  (¶ 1).  Pre-class period conduct is generally considered to be irrelevant to the scienter analysis,[28] and in this case, what little of relevance that FE 8 says is only helpful to Defendants.  FE 8 was hired in 2010 "as a 'fix-it' person to improve Allegiant's maintenance department" (¶ 128), which contradicts the notion that Allegiant was indifferent to such issues.  His relationship with the Company allegedly deteriorated after FE 8 recommended in 2014—a year prior to the start of the class period—that "the Company invest $40 million into an IT project to improve maintenance work and compliance" which was "deemed too expensive."  ¶ 152. Rather than doing things "the way they should be done," Allegiant supposedly "spent $20 million trying to piecemeal it."  *Id.*  That describes a mismanagement claim which is symptomatic of all the FE allegations.

---

[28] *See Zucco*, 552 F.3d at 996 (rejecting as unreliable testimony of confidential witnesses who "were not employed by Digimarc during the time period in question")*; Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 980 (N.D. Cal. 2015) (similar)

### 2. The Few Alleged Stock Sales By Gallagher Do Not Satisfy Ninth Circuit Pleading Standards, And The Absence of Such Sales By All Other Individual Defendants Strongly Detracts From A "Cogent and Compelling" Inference of Scienter.

Plaintiffs try to establish scienter because Gallagher—*but no other Individual Defendant*—sold Allegiant stock on essentially three occasions over the nearly *three-year class period*, the length of which itself discounts the value of these allegations.  *See Fischer v. Vantive Corp.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (inference of scienter lessened due to "unusually long class period of sixty-three weeks").[29]

The fact that not one of the other three Individual Defendants is alleged to have sold *even a single share* of stock also diminishes any "cogent and compelling" inference of scienter.  *See Webb v. SolarCity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018) ("Neither Rive nor Kelly are alleged to have sold any SolarCity stock during the class period and we have recognized that a lack of stock sales can detract from a scienter finding."); *Ronconi*, 253 F.3d at 436 ("One insider's well-timed sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made.").[30]  In addition, Allegiant's judicially noticeable SEC filings establish that Jude Bricker and Scott Sheldon both actually *increased* their ownership of Allegiant stock during the class period.[31]  *See Webb,* 884 F.3d at 856 (inference of scienter diminished where co-defendants "purchased

---

[29] *See also In re Hertz Global Holdings Inc.*, 905 F.3d 106, 120 (3d Cir. 2018) ("Courts have regularly concluded that an inference of scienter from insider trading is lessened when, as here, the class period is well over a year."); *Yates v. Mun. Mortg. & Equity, LLC,* 744 F.3d 874, 891 (4th Cir. 2014) (citation omitted) ("[A] lengthy class period makes it difficult to infer intent from the mere fact of a stock sale, as it is not unusual for insiders to trade at some point during their tenure with a company."); *Teachers Retirement Sys. of Louisiana v. Hunter*, 477 F.3d 162, 185 (4th Cir. 2007) (quoting 15 U.S.C. § 78u-4(b)(1)) (discounting insider trading allegations in light of "an exceedingly long putative class period" of nearly four years).

[30] *See also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (citation omitted) ("The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public 'so that they could sell their stock at a huge profit.'"); *Tripp v. Indymac Fin., Inc.,* 2007 WL 4591930 at *4-5 (C.D. Cal. Nov. 29, 2007) (dismissing for lack of scienter where some defendants sold no stock).

[31] Scott Sheldon's stock holdings increased from 6,812 shares on June 1, 2015 to 19,278 by the May 9, 2018 end of the class period. Fraser Decl., ¶ 3, Ex. 1.  Jude Bricker's stock holdings increased from 6,572 as of April 24, 2015 to 16,258 as of May 8, 2017 (after which public filings are no longer available because he was no longer an Allegiant executive).  *Id.*, ¶ 4, Ex. 2.

17

1    additional stock during the class period"). The Individual Defendants' pattern of continued holdings and

2    the limited stock sales by only one of them negates a strong inference of scienter. *In re Silicon Graphics*

3    *Inc. Sec. Litig.*, 183 F. 3d 970, 986-87 (no strong inference of scienter where "[c]ollectively the officers .

4    . . retained 90 percent of their available holdings").

5         Regarding Gallagher's essentially three sales over the long class period, one was actually a series

6    of sales executed over about a two-week period of time pursuant to Gallagher's 10b5-1 trading plan.

7    "Trades made pursuant to a Rule 10b5–l trading plan do not give rise to a strong inference of scienter."

8    *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 585 (citation omitted).[32] His last sale on March 6, 2018

9    occurred "through the exercise of stock options" (¶ 215) that were about to expire,[33] and a host of case

10   law establishes that the exercise of near-expiring stock options is inherently not suspicious. *See In re*

11   *Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 247 (8th Cir. 2008) (no inference of scienter where executives

12   "sold 'in the money' shares held in options about to expire").[34]

13        Gallagher's first sale on March 9, 2016 is not suspicious under any Ninth Circuit standard, as the

14   AC points out that he "continued to hold – 'approximately 20%'" of the Company thereafter. (¶ 175), and

15   this sale represented only 8.6% of Gallagher's total Allegiant holdings of over 3.3 million shares.[35]

16   Although the AC says Gallagher "suspiciously sold" these shares, Plaintiffs' first alleged corrective

17   disclosure occurs over a year later (i.e., April 13, 2018 (¶ 219), which suggests that there was no

18   improper inside information that prompted the March 2016 sale. Only allegations of "unusual" or

19   "suspicious" trading can support a strong inference of scienter. *Ronconi*, 253 F.3d at 435. Insider selling

20   becomes suspicious only when "it is dramatically out of line with prior trading practices at times

21   ───────────────

22   [32] *See also Glaser v. The9, Ltd.*, 772 F. Supp. 2d, 573, 592 ("[I]t is well established that trades under
     10b5-1 plan do not raise a strong inference of scienter.") (internal quotes omitted); *In re*

23   *IAC/InterActiveCorp Sec. Litig.*, 478 F.Supp.2d 574, 604 (S.D.N.Y. 2007) (citation omitted) ("Because
     [defendant's stock] sales were part of a periodic divestment plan, the timing and amount of the sales do
     not raise a strong inference of scienter.").

24   [33] Fraser Decl., ¶ 5, Ex. 3 (Form 4 filed March 8, 2018); *id.*, ¶ 9, Ex. 7 (Schedule 14A Proxy Statement).

25   [34] *See also In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1037-38 (D. Minn. 2009) (sales

26   unsuspicious where defendant's "stock sales [were] explained largely by the expiration date of the
     options [defendant] exercised"); *In re Astea Int'l Inc. Sec. Litig.*, Civil Action No. 06-1467, 2007 WL

27   2306586, at *14 (E.D. Penn. Aug. 9, 2007) (declining to infer scienter when CEO exercised options that
     were due to expire soon).

28   [35] Fraser Decl., ¶ 5, Ex. 3 (March 11, 2016 Form 4).

calculated to maximize the personal benefit from undisclosed inside information." *In re Silicon Graphics*, 183 F.3d at 987 (9th Cir. 1999) (citation omitted).

The alleged amounts Gallagher traded in 2017 and 2018 also are non-suspicious under a long line of Ninth Circuit law.  Gallagher's sale on March 6, 2018, amounted to a mere 0.43% of Gallagher's total stock holdings.[36]  The sales pursuant to Gallagher's 10b-5 plan represented only 6.3% of Gallagher's Allegiant holdings.[37]  These amounts are all significantly below those the Ninth Circuit has held to be insufficient to raise a strong inference of scienter.[38]  Plaintiffs do not allege these transactions were out of line with Gallagher's prior trading practices, as required: "For individual defendants' stock sales to raise an inference of scienter, plaintiffs must provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period." *Zucco*, 552 F.3d at 1005 (*citing Fischer v. Vantive Corp.*, 283 F.3d 1079, 1095-96 (9th Cir. 2002)).  In fact, throughout the purported class period, Gallagher held between 19.7% and 21.3% of Allegiant common stock.[39]

The allegations of insider trading do not raise a "strong inference" of scienter, particularly when considering the possible "opposing inference[s]" to be drawn from the pattern of trading in this case. *Tellabs*, 551 U.S. at 314-15.  And when those insider trading allegations are added to the FE mismanagement claims, the required "holistic analysis" does not support Plaintiffs' highly implausible theory of scienter grounded in Defendants alleged indifference to safety.[40]

---

[36] Fraser Decl., ¶ 5, Ex. 3 (Form 4 filed March 8, 2018); *id.*, ¶ 9, Ex. 7 (Schedule 14A Proxy Statement); AC, ¶ 175 n.27.

[37] Fraser Decl., ¶ 5, Ex. 3 (January 2, 2018 & January 17, 2018 Form 4s).

[38] *See, e.g.*, *Silicon Graphics*, 183 F.3d at 987 (no inference of scienter with sales of 75.3% of holdings); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093-96 (9th Cir. 2002) (no inference of scienter where chairman sold 74% of holdings, CEO sold 17%, CFO sold 32%, and other officers sold between 26% and 55%); *Metzler*, 540 F.3d at 1067 (no strong inference where CFO sold 100%, CEO sold 37% and COO did not sell any shares); *Ronconi*, 253 F.3d at 435-36 (no strong inference of scienter where general counsel sold 98%, CFO sold 17%, and CEO sold 10%); *Tripp v. IndyMac Fin. Inc.*, 2007 WL 4591930, *4 (C.D. Cal. Nov. 29, 2007) ("[T]he Individual Defendants retained such a large percentage of their stock that an inference of scienter is functionally negated.").

[39] Fraser Decl., ¶¶ 6-9, Exs. 4-7 (Allegiant's Schedule 14A Proxy Statements from 2015 through 2018).

[40] *See Tellabs*, 551 U.S. at 324 (a "court must consider plausible, nonculpable explanations for the defendants' conduct."); *Metzler Inv. GmbH v. Corinthian Colleges*, 540 F.3d 1049, 1069 (9th Cir. 2008) (a holistic analysis "cuts both ways"); *Gompper*, 298 F.3d at 896-97 (uniquely in securities cases, the

**C.      Plaintiff Fails to Adequately Plead Loss Causation.**

Loss causation requires a plaintiff to "prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura,* 544 U.S. at 346.  Where, as here, plaintiffs allege they were "damaged upon the revelation of [] alleged corrective disclosures" (¶¶ 226, 216), the disclosure must "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." *Omnicom,* 597 F.3d at 511 (citation omitted).[41]  "When plaintiffs plead a causation theory based on market revelation of the fraud, this court naturally evaluates whether plaintiffs have pleaded or proved the facts relevant to their theory." *Mineworkers' Pension Scheme v. First Solar*, 881 F.3d 750, 754 (9th Cir. 2017) (citation omitted).  Plaintiffs' loss causation theory is expressly based on market revelation of a fraud, as they claim "the *truth was revealed . . .* concerning Defendants' fraudulent scheme" by the Broadcast.  ⁋ 216.[42]

The Amended Complaint fails to adequately allege that the Broadcast is a corrective disclosure event because "a negative journalistic characterization of previously disclosed facts *does not constitute a corrective disclosure* of anything but that journalists' opinions." *Omnicom*, 597 F.3d at 512.[43]  In *Omnicom*, notwithstanding a 24% drop in Omnicon's stock price following publication of a *Wall Street Journal* article that summarized prior public statements concerning Omnicon's accounting, and added critical commentary from two accounting professors (one of whom said the accounting "raised a red

---

court is required to make the most plausible inference from the facts alleged, and *not* the one that necessarily favors plaintiffs).

[41] *See also Bonanno v. Cellular Biomedicine Grp., Inc*., No. 15-cv-01795-WHO, 2016 WL 2937483, at *5 (N.D. Cal. May 20, 2016) (citation omitted) ("[A] corrective disclosure that is derived entirely from public sources is insufficient."); *In re Blue Earth, Inc. Sec. Class Action Litig.*, No. CV 14-08263-DSF, 2015 WL 12001274 (C.D. Cal. Nov. 3, 2015) ("Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time." (quoting *Meyer v. Greene*, 710 F.3d 1189, 1197-98 (11th Cir. 2013))).

[42] In making the loss causation assessment, the court applies Rule 9(b)'s standard that "a party must state with particularity the circumstances constituting fraud or mistake." *See Oregon Public Employees Retirement Fund v. Apollo Group Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) (the heightened pleading standard of Rule 9(b) "applies to all elements of a securities fraud action, including loss causation.").

[43] *See also Teachers' Retirement Sys.*, 477 F.3d at 187 (a disclosure that "merely attributes an improper purpose to previously disclosed facts" is not corrective); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 363 (S.D.N.Y. 2008) ("mere negative characterization of existing facts" insufficient to establish loss causation).

flag"), the Second Circuit held that plaintiffs had not adequately pled loss causation because "none of these matters even purported to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint concerning the [accounting] transaction." *Id.* at 511. Similarly, in this case the Broadcast republished previously reported facts, analyzed "public records," and added the commentary of self-professed experts, one of whom was the head of the Teamsters pilots' union for Allegiant, who worked at a competing airline. Indeed, the Broadcast begins with an incident on Allegiant flight 353 on July 20, 2017 that Fox19 contemporaneously reported,[44] and then reviews other incidents reported by the *Las Vegas Review Journal* in an August 29, 2015 article.[45]  The Broadcast itself begins by stating that its reporting was based on what  "can be found in public documents."[46].

Because the Broadcast did not reveal anything new, the market treated it as a non-event and the alleged resulting stock drop was a less than 3% decline (¶ 222), an amount courts have held to be immaterial.[47]  Loss causation requires plausibly alleging that the "share price fell *significantly*" as a result of the disclosure.  *Dura*, 544 U.S. at 347.[48]

Plaintiffs also try to treat as a corrective disclosure CBS's announcement on April 13, 2018, that it would air the Broadcast two days in the future, following which Allegiant's shares fell around 8.59%. ¶¶ 219-20.  But CBS's announcement revealed nothing about any fraud, only that CBS would run a story.

---

[44] *Compare* Fraser Decl., ¶ 15, Ex. 13 (Fox19 article) *with id.*, ¶ 13, Ex. 11 (transcript of the Broadcast) at 3.

[45] Fraser Decl., ¶ 16, Ex. 14.

[46] Fraser Decl., Ex. 11 (Broadcast transcript at 1); *see also* ¶ 221 (p. 61) ("*Public documents* show an alarming number of aborted takeoffs, cabin pressure loss, emergency descents, and unscheduled landings. Yet for the most part, Allegiant's difficulties have managed to stay under the radar of the flying public") (some emphasis by Defendants deleted).

[47] *See, e.g.*, *Apollo Grp., Inc.*, 633 F. Supp. 2d at 821 ("modest 2.7 percent drop" insufficient to plead loss causation); *Eng v. Edison Int'l*, No. 3:15-cv-01478-BEN-KSC, 2017 WL 1857243, at *4 (S.D. Cal. May 5, 2017) ("scanty" stock price drops of between 0.79 and 2.71% insufficient to establish loss causation).

[48] Overall, U.S. stock markets were down the day following the Broadcast (Monday, April 16, 2018), with the Nasdaq and the Dow decreasing 0.5% and the S&P 500 Index down 0.3%.  (Fraser Decl., ¶ 12, Ex. 10).  Allegiant's stock price recovered 96% of the alleged loss within 10 days of the Broadcast, closing at $157.25 on April 26, 2018 (up 10.88 points from the April 15, 2015 disclosure). (Fraser Decl., ¶ 11, Ex. 9).  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062, 1064 (9th Cir. 2008) (holding "modest" 10% post-disclosure drop insufficient to plead loss causation where stock quickly recovered).

The loss causation requirement ensures that plaintiffs will recover only for losses *attributable to the fraud* so that defendants do not become insurers against market losses. *Dura*, 544 U.S. at 345. A mere "risk" or "potential" for fraud is insufficient to establish loss causation. *Metzler,* 540 F.3d at 1064.

A similar problem affects the end of the purported class period, which Plaintiffs try to extend to May 9, 2018 (from its original terminus of April 13, 2018) because the Office of Inspector General for the U.S. Department of Transportation announced an audit of the FAA's investigation of Allegiant's maintenance practices, which allegedly caused Allegiant's share price to fall around 2%. ¶ 223. This announcement offers nothing revelatory of fraud because it does not pertain to anything *Defendants* said (or anything "corrective" of such statements), but instead involves one branch of the government investigating another, the ultimate conclusion of which is unknown. *See Loos*, 762 F.3d at 890 n.3 (announcement of a government investigation, "standing alone and without any subsequent disclosure of actual wrongdoing, does not reveal to the market the pertinent truth of anything, and therefore does not qualify as a corrective disclosure." (quoting *Meyer v. Greene,* 710 F.3d 1189, 1201 n.13 (11th Cir. 2013))).

## V.  THE SECTION 20(a) CLAIM MUST BE DISMISSED.

Section 20(a) of the Reform Act provides joint and several liability for controlling persons who aid and abet securities violations. 15 U.S.C. § 78t(a). Unable to plead a Section 10(b) claim against any defendant, Plaintiff's Section 20(a) "control person" claim necessarily fails. *See Heliotrope General, Inc. v. Ford Motor Co*., 189 F.3d 971, 978 (9th Cir. 1999) (citation omitted) ("To be liable under section 20(a), the defendants must be liable under another section of the Exchange Act."); *Zucco Partners, LLC*, 552 F.3d at 990 (citation omitted) ("Section 20(a) claims may be dismissed summarily if a plaintiff fails to adequately plead a primary violation of section 10(b).").

## VI.  CONCLUSION.

This is an entirely frivolous case, lacking all of the essential elements of a Section 10(b) claim, that simply ignores statutory pleading requirements as interpreted by the Supreme Court and the Ninth Circuit. Although it fails in many ways, the AC's attempted pleading of scienter is particularly ridiculous, and no number of allowances of leave to amend will ever result in Plaintiffs' irrational theory one day becoming "cogent and compelling." Although there is a general rule that parties should be

allowed to amend their pleadings, it does not extend to cases in which any amendment would be "an exercise in futility."  *Fischer v. Vantive Corp.*, 283 F.3d 1079, 1097 (9th Cir. 2002).  This is such a case.

Dated: December 7, 2018                    **GREENBERG TRAURIG LLP**

By: /s/ Jacob Bundick
Jacob Bundick
Mark F. Ferrario
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
Telephone:  (702) 792-3773
Facsimile:  (702) 792-9002
Emails:  ferrariom@gtlaw.com
            hicksja@gtlaw.com
*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of December, 2018, a true and correct copy of the foregoing **DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** was submitted for filing with the Clerk of the Court using the Odyssey eFileNV Electronic Service system and served on all parties with an email address on record, pursuant to Administrative Order 14-2 and Rule 9 of the N.E.F.C.R.

The date and time of the electronic proof of service is in place of the date and place of deposit in the U.S. Mail.

/s/ Delilah A. Phiefer
_____
An employee of Greenberg Traurig, LLP