# EXHIBIT "12"
## Copy of Amended Complaint

# EXHIBIT "12"
## Copy of Amended Complaint

1    Patrick R. Leverty
     **LEVERTY & ASSOCIATES LAW CHTD**
2    832 Willow Street
3    Reno, Nevada 89502
     Telephone: (775) 322-6636
4    Facsimile: (213) 322-3953
5    Email: pat@levertylaw.com

6    *Liaison Counsel for Plaintiffs*
7
8    [additional counsel listed on signature page]

9              UNITED STATES DISTRICT COURT
10                  DISTRICT OF NEVADA

11   
12   DANIEL CHECKMAN, Individually          **Case No:  18-CV-01758-APG-PAL**
     And On Behalf Of All Others Similarly
13   Situated,                               **AMENDED CLASS ACTION**
                                             **COMPLAINT FOR VIOLATIONS**
14          Plaintiffs,                       **OF THE FEDERAL SECURITIES**
                                             **LAWS**
15
16        v.                                 **JURY TRIAL DEMANDED**

17   ALLEGIANT TRAVEL COMPANY,
     MAURICE J. GALLAGHER, JR.,
18   SCOTT SHELDON, STEVEN E.
19   HARFST, and JUDE I. BRICKER,

20          Defendants.
21
22

23        Lead Plaintiff Charles Brendon and Named Plaintiff Daniel Checkman
24   (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly
25   situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against
26   Defendants (defined below), alleges the following based upon personal knowledge as
27   to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other
28   matters, based upon, inter alia, the investigation conducted by and through Plaintiffs'

attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Allegiant Travel Company ("Allegiant" or the "Company"), analysts' reports and advisories about the Company, information readily obtainable on the Internet, and interviews with former employees of Allegiant. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Allegiant between June 8, 2015 and May 9, 2018, both dates inclusive (the "Class Period"). Plaintiffs seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     Allegiant operates an ultra-low-cost passenger airline called Allegiant Air. Its business model was enormously profitable: acquire antiquated, second-hand passenger jets for a few million dollars and operate them as cheaply as possible to transport vacation travelers from under-served, small and mid-size cities, where Allegiant faced less competition, to leisure destinations throughout the United States.

3.     During the Class Period, Allegiant recorded sixty consecutive quarters of profit, including in 2008, as the country fell into recession and oil skyrocketed above $145 per barrel. The business model was so successful that Allegiant was reportedly the most profitable airline in the world at one point during the Class Period.

4.     But the U.S. airline industry is intensely competitive. Analysts and investors evaluate whether an airline will be a good investment by studying its ability to control costs and enhance revenue. This is particularly true for an airline such as

- 2 -

Allegiant, which draws its revenue from one-way fares as low as $29 and add-on fees. Because one of the biggest costs of an airline's operating cost is aircraft maintenance, which is regulated by the Federal Aviation Administration (the "FAA") with standards that apply to all airlines, airline executives who keep their airline's operating costs below industry average, and can increase revenue per passenger, are viewed as successful managers.[1]

5.     Defendants improperly cut corners to reduce Allegiant's maintenance and labor related operating costs by: **(1)** running skeleton maintenance crews that were too few in numbers to adequately perform maintenance, which created an environment where maintenance workers felt pressured and threatened to (i) disregard maintenance items outside of the scope of a work order, which ran contrary to Allegiant's self-described "normal procedures," (ii) falsely certify that maintenance tasks had been performed, (iii) skip maintenance inspections but report they had been performed, and (iv) rush maintenance tasks to keep up with the large work load, which could pose a safety hazard; **(2)** hiring unqualified and inexperienced maintenance personnel as well as failing to provide comprehensive training for maintenance personnel, which created an environment leading to (i) experienced mechanics feeling overwhelmed and pressured to somehow complete repairs on time; (ii) mechanics falsely certifying that certain tasks were being completed; and (iii) substandard repairs being made; and **(3)** implementing a culture that compromised maintenance, and in turn, safety and reliability, for profits, which lagged industry standards.

6.     To this end, and unbeknownst to Allegiant investors, Defendants made materially false and misleading statements during the Class Period that Allegiant had sufficient maintenance personnel to "satisfy [Allegiant's] ongoing maintenance

---

[1] Allegiant characterizes the FAA as "primarily regulat[ing] flight operations and safety, including matters such as airworthiness and maintenance requirements for aircraft, pilot, mechanic, dispatcher, and flight attendant training and certification[.]"

Amended Class Action Complaint for Violations of the Federal Securities Laws

needs[,]" employed maintenance technicians with "appropriate experience[,]" provided maintenance technicians with "comprehensive training[,]" ran a "safe operation," believed it had "mechanically reliable" aircraft, embraced a "culture" which focused on "safety and reliability[,]" and complied with its Code of Ethics.

7.     From June 2015 through March 2016, local news organizations reported numerous incidents of Allegiant planes being cancelled, delayed, forced to make emergency landings, with smoke filling their cabins, and aborting takeoffs, all due to aircraft maintenance and repair issues. These headlines seized the attention of Allegiant's CEO, CFO, and COOs. At that time, Defendants routinely maintained that the Company was committed to safety. Defendants downplayed reports criticizing Allegiant's reliability and safety, characterizing them as misleading because they were fueled by a pilot's union eager to strike its first labor contract with the airline. At the same time, Defendants continued to try to curtail growing maintenance costs for Allegiant's obsolete aircraft.

8.     Even as Defendants widely downplayed and refuted these negative news reports, Allegiant's then-COO suddenly resigned on January 15, 2016, less than thirteen months after taking the job. Then, on March 9, 2016, Gallagher suspiciously sold $47.8 million in Allegiant stock. It was disclosed soon thereafter that Gallagher booked a nearly $3 million bonus for 2015, a figure far above his usual payout, as Allegiant's profits soared to $220 million—more than 2 ½ times above the nearly $87 million it earned in 2014.

9.     Allegiant stated in the summer of 2016 that it would accelerate the acquisition of Airbus A320 to retire its MD-80 fleet, which it blamed for its maintenance and reliability woes.[2] Then, in November 2016, Allegiant reported it would "[a]ggressive[ly] focus on 'other' revenue[,]" now that Allegiant was forced to change its business model and transition to more costly A320s.

---

[2] Used Airbus A320s were also to blame.

- 4 -

10.   Faced with the reality that Allegiant's lucrative business model was being jeopardized, Allegiant executives were under enormous pressure. Allegiant continued to lead shareholders to believe it was committed to hiring sufficient maintenance staff, employing qualified and experienced maintenance personnel, investing in comprehensive training for maintenance workers, focusing on reliable equipment and a safe operation, and promoting a safety culture which did not lag industry standards. This was false. Rather, Defendants continued to skimp on maintenance costs.

11.   Defendants closely tracked maintenance and related labor expenses as it was core to their operation. Allegiant's business model relied on antiquated aircraft purchased at bargain basement prices, which put them at a competitive price advantage provided they kept maintenance and repair costs low. Indeed, Allegiant reported maintenance and repair expenses in each quarter during the Class Period. These expenses cost Allegiant tens of millions of dollars per year. Around 11% of the cost per passenger was attributed to maintenance in FY 2016.

12.   Investors who purchased Allegiant stock as high as $238.13 during the Class Period have suffered millions in damages. By contrast, Allegiant insiders, like Gallagher, were able to offload their Allegiant shares at artificially inflated prices immediately before a *60 Minutes* broadcast revealed to investors what Defendants knew was a troubled airline with serious, undisclosed maintenance issues.

13.   Upon information and belief, Gallagher learned that *60 Minutes* was investigating Allegiant and interviewing sources for an unflattering story concerning Allegiant's aircraft maintenance and safety record. Between August 2017 and November 2017, CBS made Freedom of Information Act ("FOIA") requests to the FAA for Allegiant's maintenance records. In the months leading up to *60 Minutes'* broadcast, it was disclosed that Gallagher set up a 10b5-1 stock trading plan, which he disclosed to the Company as of December 30, 2017. Gallagher suspiciously sold

- 5 -

over $35 million in Allegiant securities from December 28, 2017 to March 6, 2018,[3] before *60 Minutes'* report on Allegiant was aired on April 15, 2018.[4]

14.    In an attempt to unearth new revenue sources as Allegiant's cash-cow model began to run dry, Allegiant announced it would enter the hospitality business with the construction of the 22-acre Sunseeker Resort—a proposed $450 million resort in Port Charlotte, Florida. Analysts and investors have been leery of an ultra-discount airline's foray into the hotel and resort business. Allegiant more recently announced it intends to foot the costs of construction with cash flow, with the possibility of financing—something former employees could surmise in 2017 when Allegiant refused to invest in the maintenance of planes it intended to retire in order to fund its expensive swimming hole experiment in Southwest, Florida. Defendants were further incentivized to maintain their fraudulent scheme to fund this new venture, particularly given Defendants' penchant for cutting costs.

15.    Various former Allegiant employees, some of whom had personal interactions with senior Allegiant executives, stated that maintenance and safety issues were reported to Allegiant management throughout the Class Period.

16.    According to these former employees and certain news sources, (i) Gallagher received monthly and weekly reliability reports of Allegiant planes and equipment and was well-aware of the causes of maintenance issues dogging Allegiant throughout the Class Period; (ii) Gallagher attended monthly meetings regarding maintenance and reliability of aircraft; (iii) Gallagher was sent weekly reports governing the same; (iv) senior Allegiant executives who reported to Gallagher and Sheldon, and Sheldon himself, attended regular Town Hall events in 2017 and 2018 with Allegiant maintenance personnel where maintenance staffing and training issues

---

[3] This includes shares sold pursuant to, and outside the stock trading plan.

[4] According to *60 Minutes*, Allegiant objected to the release of its mechanical interruption summary reports, which was only overruled by the FAA six days after *60 Minutes* interviewed a representative from the FAA. Further, Allegiant and Gallagher refused to appear for an interview.

were discussed; (v) Defendants closely tracked and attempted to refute negative safety news articles on the Company from throughout the Class Period, demonstrating they were aware of the true cause of Allegiant's reliability issues; (vi) Gallagher sent company-wide emails throughout the Class Period to refute claims made in news articles concerning Allegiant's maintenance issues; (vii) Allegiant executives and maintenance workers attended a February 2018 conference where high-level Allegiant executives acknowledged that Gallagher and others knew of various maintenance staffing and training issues; (viii) Allegiant's Reliability Control Board reportedly held monthly meetings to discuss maintenance issues, which Gallagher sometimes attended; (ix) Allegiant's operations were small enough for Defendants to closely track them as Allegiant only had around 90 airplanes in service and about 13 operating bases during the Class Period; (x) two independent directors regularly met with operations and maintenance personnel from 2016 onward and reported back go the Board of Directors (the "Board"), while senior operations personnel made presentations to the Board at each quarterly board meeting; (xi) ~~Defendants, particularly Gallagher, would have been acutely aware of Allegiant's safety issues given Gallagher's history with ValuJet, a discount airliner that faced regulatory and public scrutiny after a flight crashed and killed all 110 people on board due to violations of safety protocols~~.

17.    On April 13, 2018, CBS News announced it would air a *60 Minutes* segment on Sunday, April 15, 2018, criticizing Allegiant's safety and maintenance record. On this news, Allegiant's stock tanked, falling $14.20 per share or over 8.59% to close at $151.05 per share on April 13, 2018 on unusually heavy volume.

18.    On April 15, 2018, CBS News aired a *60 Minutes* report revealing that: (i) Allegiant aircraft had a high number of serious mechanical incidents from mid-2015 through October 2017; (ii) Allegiant lacks the infrastructure and adequate number of personnel to sufficiently maintain their aircraft; and (iii) Allegiant has discouraged employees from reporting safety and maintenance issues; (iv) Allegiant

- 7 -

1   had a poor safety culture. The broadcast also criticized the FAA's oversight of
2   Allegiant. On this news, shares of Allegiant continued to fall $4.65 per share or over
3   3% to close at $146.40 per share on April 16, 2018 on unusually heavy volume.

4       19.    Then, on May 9, 2018, the U.S. Department of Transportation, Office of
5   Inspector General, in response to requests from several Congressional officeholders,
6   announced it would audit how the FAA investigated allegations of "improper
7   maintenance practices." On this news, shares of Allegiant fell $3.30 per share or over
8   2% to close at $159.10 on May 9, 2018.

9   **II.    JURISDICTION AND VENUE**

10       20.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a)
11   of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated
12   thereunder by the SEC (17 C.F.R. §240.10b-5).

13       21.    This Court has jurisdiction over the subject matter of this action under
14   28 U.S.C. §1331 and §27 of the Exchange Act.

15       22.    Venue is proper in this Judicial District pursuant to §27 of the Exchange
16   Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Allegiant maintains its principal
17   executive offices in this District, at 1201 N. Town Center Drive, Las Vegas, Nevada
18   89144, and a significant portion of Defendants' actions, and subsequent damages,
19   occurred within this District.

20       23.    In connection with the acts, conduct and other wrongs alleged in this
21   Complaint, Defendants, directly or indirectly, used the means and instrumentalities of
22   interstate commerce, including but not limited to, the United States mail, interstate
23   telephone communications and the facilities of the national securities exchange.

24   **III.    PARTIES**

25       24.    Lead Plaintiff Brendon and Named Plaintiff Checkman, as set forth in
26   their previously-filed PSLRA certifications incorporated by reference herein, Dkt.
27   Nos. 1-1, 14-2, purchased Allegiant securities at artificially inflated prices during the
28

Amended Class Action Complaint for Violations of the Federal Securities Laws

1   Class Period and suffered damages as a direct and proximate result of Defendants'
2   wrongdoing alleged herein.

3          25.    Defendant Allegiant is a Nevada corporation with its principal executive
4   offices located in Las Vegas, Nevada. Allegiant offers air transportation between
5   under-served cities to leisure destinations in the United States. The Company's
6   securities are traded on NASDAQ under the ticker symbol "ALGT."

7          26.    Defendant Maurice "Maury" J. Gallagher, Jr. ("Gallagher") has served
8   as Allegiant's Chief Executive Officer ("CEO") since 2003 and was designated
9   Chairman of the Board in 2006. Gallagher had personal and intimate knowledge of
10  Allegiant's safety and maintenance data from the start of the Class Period.

11         27.    Defendant Scott Sheldon ("Sheldon") was Allegiant's Chief Financial
12  Officer ("CFO") from May 2010 to present. Defendant Sheldon served as Allegiant's
13  interim Chief Operating Officer ("COO") from May 2017 until he officially assumed
14  the role as of October 24, 2017. Sheldon had personal and intimate knowledge of
15  Allegiant's safety and maintenance data from the start of the Class Period.

16         28.    Defendant Steven E. Harfst ("Harfst") was Allegiant's COO from
17  December 2014 until his sudden resignation on January 15, 2016. Harfst had personal
18  and intimate knowledge of Allegiant's safety and maintenance data from the start of
19  the Class Period.

20         29.    Defendant Jude I. Bricker ("Bricker") served as Allegiant's COO from
21  January 22, 2016 until May 26, 2017. Bricker was an Executive Vice President at
22  Allegiant from January 2017 until May 26, 2017. He also served as Senior Vice
23  President of Planning at Allegiant from April 2012 until January 2017. He joined
24  Allegiant in May 2006 as Manager of Fleet Planning and served as Director of Fleet
25  Planning beginning in 2007, before being promoted to Vice President of Corporate
26  Finance and Treasurer in 2010. Bricker resigned from Allegiant in May 2017 and was
27  appointed as CEO of Sun Country Airlines in July 2017. Bricker had personal and
28

Amended Class Action Complaint for Violations of the Federal Securities Laws
069

1   intimate knowledge of Allegiant's safety and maintenance data from the start of the

2   Class Period.

3       30.     Defendants Gallagher, Sheldon, Harfst, and Bricker are collectively

4   referred to hereinafter as the "Individual Defendants."

5       31.     Each of the Individual Defendants:

6       (a)     directly participated in the management of the Company;

7       (b)     was directly involved in the day-to-day operations of the Company at the

8       highest levels;

9       (c)     was privy to confidential proprietary information concerning the

10      Company and its business and operations;

11      (d)     was directly or indirectly involved in drafting, producing, reviewing

12      and/or disseminating the false and misleading statements and information

13      alleged herein;

14      (e)     was directly or indirectly involved in the oversight or implementation of

15      the Company's internal controls;

16      (f)     was aware of or recklessly disregarded the fact that the false and

17      misleading statements were being issued concerning the Company; and/or

18      (g)     approved or ratified these statements in violation of the federal securities

19      laws.

20      32.     The Company is liable for the acts of the Individual Defendants and its

21  employees under the doctrine of *respondeat superior* and common law principles of

22  agency because all of the wrongful acts complained of herein were carried out within

23  the scope of their employment.

24      33.     The scienter of the Individual Defendants and other employees and

25  agents of the Company is similarly imputed to the Company under *respondeat*

26  *superior* and agency principles.

27      34.     The Company and the Individual Defendants are referred to herein,

28  collectively, as the "Defendants."

- 10 -

## IV.    FORMER ALLEGIANT EMPLOYEES

35.    Former Employee 1 ("FE 1")[5] was employed by Allegiant as a Line Maintenance Supervisor from July 2017 to March 2018. He worked the night shift at Allegiant's maintenance facility at the Orlando Sanford International Airport in Sanford, Florida. FE 1 reported to Michael Bata, the Assistant Base Manager at the Orlando facility. The Assistant Base Manager reported to Michael "Scotty" Adams, the Base Manager. The Base Manager reported to Allegiant's Regional Maintenance Director, Kevin Beitzel, who was replaced by Jeff Greubel. Allegiant's Regional Maintenance Director reported to Allegiant's Managing Director of Maintenance and Operations, Christopher McCartney. McCartney reported to Christian Toro, a Vice President of Maintenance at Allegiant, who FE 1 believed reported to CFO Scott Sheldon. Bata took over as Base Manager near the end of 2017 and James King was then named Assistant Base Manager. When the Assistant Base Managers and Base Managers were not available, particularly at night and on weekends after Base Managers had gone home, FE 1 reported to corporate. FE 1 also made complaints to William Zack, Regional Manager Material Control. FE 1 attended regular Town Hall meetings in 2017 and 2018 where Sheldon, Toro (Vice President of Maintenance) and McCartney (Managing Director of Maintenance and Operations) were in attendance. FE 1 attended a February 2018 conference with senior Allegiant executives, including McCartney and Gallagher.

36.    Former Employee 2 ("FE 2") was employed by Allegiant as a Lead Mechanic from November 2012 until August 2017. FE 2 worked the night shift at Allegiant's maintenance facility at Orlando-Sanford International Airport in Sanford, Florida. FE 2 reported to four supervisors, who quit or were fired with great frequency. FE 2 stated he went through 12 supervisors on the night shift in five years; They quit or were fired every three to six months. FE 2's supervisors reported to the

---

[5] This Complaint does not list the names of former employees to protect their privacy.

1  Base Manager, who ultimately reported to Toro, who was then the Managing Director
2  of Maintenance and Operations. Toro was replaced by McCartney, who assumed the
3  role of Managing Director of Maintenance and Operations.

4       37.     Former Employee 3 ("FE 3") was employed by Allegiant as an Aircraft
5  Maintenance Technician from February 2016 to October 2017. FE 3 worked at
6  Allegiant's facility at the Phoenix-Mesa Gateway Airport in Mesa, Arizona. FE 3
7  reported to John Burnett, the Base Operations Manager. FE 3 believed Burnett
8  reported to McCartney.

9       38.     Former Employee 4 ("FE 4") was an Aircraft Maintenance Technician
10 for Allegiant from January 2016 to November 2016. FE4 worked the night shift at
11 Allegiant's maintenance facility in Las Vegas, Nevada, to prepare aircraft to fly by
12 the morning.

13      39.     Former Employee 5 ("FE 5") was a Supervisor of Maintenance Control
14 for Allegiant from April 2014 to June 2017. FE 5 worked in an operations center on
15 Allegiant's main campus in Las Vegas, Nevada. FE 5 reported to Barry Fitzgerald,
16 the Director and Maintenance Control and Planning. Fitzgerald, who has since left
17 Allegiant, reported to the Vice President level. FE 5 was responsible for handling
18 aircraft problems that arose while the plane was in operation.

19      40.     Former Employee 6 ("FE 6") was employed by Allegiant as a Mechanic
20 and as an Aircraft Configuration Control Analyst from September 2015 to April
21 2016. FE 6 spent 23 years building planes at the McDonnell-Douglas factory, where
22 he worked extensively on MD-80 aircraft. FE 6 worked as a Mechanic for the first
23 two weeks of his employment. FE 6 was then transferred to corporate headquarters to
24 assume the Analyst position after FE 6 was critical of workers' repair work. FE 6
25 believed FE 6's supervisor reported to a maintenance supervisor, who reported to the
26 maintenance or station manager.

27      41.     Former Employee 7 ("FE 7") was employed by Allegiant as Manager of
28 Airworthiness Regulatory Compliance from May 2015 until April 2016. FE 7's direct

supervisor was Kenneth Brumfield, Allegiant's Director of Quality and Chief Inspector. Brumfield reported to Christian Toro, Allegiant's Managing Director of Maintenance and Operations. Toro reported to Kurt Carpenter, Vice President of Maintenance and Engineering.

42.     FE 7 is noted for his statements that Allegiant was "very good about communicating to the employees at all levels." According to FE 7, Gallagher, Bricker and other Allegiant executives teleconferenced with employees once a month to share information. FE 7 stated that Gallagher was "very engaged in the airline himself." FE 7 stated he was "sure" that Gallagher and Allegiant Vice Presidents would know if a significant safety problem occurred with an airplane, such as grounding of an airplane.

43.     Former Employee 8 ("FE 8") was employed by Allegiant as a Base Operations Manager from around May or June of 2010 until sometime in the summer of 2015. FE 8 oversaw the Line Maintenance Department. Between 2010 to about 2012, FE 8 reported to Kurt Carpenter, the Vice President of Maintenance. Then, from about 2012 to 2013, FE 8 reported to Jesse Peek, Director of Maintenance. From 2013 to 2015, FE 8 again reported to Carpenter. FE8 said that Peek reported to Carpenter, who reported to Chris Bauer, then-Senior Vice President of Line Maintenance/Operations, who reported directly to Gallagher and worked closely with Andrew Levy, an Executive Vice President.

44.     FE 8 stated that Allegiant's senior executives had visibility on maintenance. **First**, Gallagher received three different regularly occurring reports that tracked the number of aborted take-offs, flight diversions, delays, and major incidents due to mechanical problems. FE 8 stated, "[o]bviously, if we had a rejected takeoff or any incident that occurred . . . like an emergency evacuation . . . [Gallagher] would have been aware of it." **Second**, Allegiant leadership had daily conference calls to discuss reliability issues, and Gallagher occasionally participated in these calls. **Third**, Gallagher at times attended Reliability Control Board ("RCB") meetings, held

Amended Class Action Complaint for Violations of the Federal Securities Laws

once a month, to review "chronic histories" of aircraft, including engine issues and cost of manpower to address those issues. Executives alerted to issues from RBC meetings included Gallagher, Levy, Bauer, and Toro, who was then Director of Quality. FE 8 recalled that RCB reports were sent to Gallagher. FE 8 attended RCB meetings when Gallagher was in attendance. **Fourth**, Gallagher was "intimately aware" of what was happening at the Company, including the fleet's high number of mechanical problems; Sheldon would have also been aware of Allegiant's reliability problems from requests for money to deal with them. **Fifth**, during the earlier periods of FE 8's employment, desks at Allegiant's headquarters were set up in a low-budget, open-concept space. According to FE 8, Gallagher would have been aware of anything his Vice Presidents were discussing since he sat so close to them. Also, back then, the Vice President of Line Maintenance "was always in close proximity to Maury [Gallagher]." Carpenter sat close to Gallagher, Levy was relatively close to Gallagher, as was Toro, after he replaced Carpenter.

45.     Former Employee 9 ("FE 9") was a Lead Aircraft Technician at Allegiant from February 2008 until July 2015. FE 9 was based at the Phoenix-Mesa Gateway Airport in Mesa, Arizona. FE 9 reported to John Burnett, the Base Operations Manager. According to FE 9, Allegiant held monthly reliability meetings to discuss mechanical problems, which were attended by upper management of maintenance, tech service employees, and those in charge of reliability, including the then-CFO, who occasionally attended.

## V.    BACKGROUND

### A. Allegiant's CEO Gains Control of Allegiant in Bankruptcy

46.     Allegiant Air was founded in 1997 in Fresno, California, serving as a regional carrier that offered scheduled service between Fresno and Las Vegas.

47.     In December 2000, Allegiant filed for bankruptcy. Gallagher, the airline's major creditor, gained control of the business during reorganization.

- 14 -

1
2

       B. ~~Allegiant's CEO Co-Founded ValuJet, a Low-Cost Carrier Which~~
          ~~Overlooked FAA Safety Regulations to Maintain Profitability~~

3    48. ~~Gallagher has over 35 years' experience in the airline industry.~~

4    49. ~~In 1993, Gallagher co-founded ValuJet Airlines, Inc. (a predecessor to~~
5  ~~AirTran Airways, Inc.) and served as an officer and director of ValuJet from 1993~~
6  ~~until 1997.~~

7    50. ~~ValuJet suffered a high-profile accident on May 11, 1996 when a flight~~
8  ~~from Miami to Atlanta crashed into the Florida Everglades, killing all 110 people on~~
9  ~~board.[6] The plane vanished into the muck after impact. Only fragments of both the~~
10 ~~plane and passengers were recovered. Investigators determined that a major in-flight~~
11 ~~fire was triggered by chemical oxygen generators that were improperly placed in the~~
12 ~~plane's cargo hold.~~

13   51. ~~The National Transportation Safety Board ("NTSB") issued a report~~
14 ~~which revealed numerous flaws. ValuJet was faulted for improperly overseeing its~~
15 ~~maintenance subcontractor and contract maintenance program to ensure compliance~~
16 ~~with maintenance, maintenance training, and hazardous materials requirements and~~
17 ~~practices.[7]~~

18   52. ~~According to an article in the Fall 1998 edition of *Midwest Today*,~~
19 ~~ValuJet's business model was to blame for the crash: it offered discount fares,~~
20 ~~acquired old second-hand planes, paid employees below prevailing wages, and~~
21 ~~outsourced and subcontracted out maintenance to keep costs down.[8]~~

22 _____

23 [6] *In-Flight Fire and Impact with Terrain Valujet Airlines Flight 592 DC-9-
24 32,N904VJ*, NATIONAL TRANSPORTATION SAFETY BOARD,
   https://www.ntsb.gov/investigations/AccidentReports/Pages/AAR9706.aspx (last
25 visited Oct. 21, 2018) (hereinafter "*NTSB Report Summary*").
   [7] *See NTSB Report Summary.*
26 [8] Neal Lawrence, *DANGER IN THE SKIES, The shocking truth about airplane safety,*
27 *and how a former U.S. Inspector General, "Maximum Mary" Schiavo from the*
   *Midwest, took on powerful airline interests*, MIDWEST TODAY, Fall 1998, *available at*
28 http://www.midtod.com/98autumn/airline.phtml (hereinafter "*Danger in the Skies*").

53.     ~~According to that article, and another by CNN dated June 17, 1996, ValuJet was in the middle of a 120-day FAA safety review at the time of the crash.[9] The day after the crash, the FAA and Secretary of Transportation assured travelers that ValuJet was safe to fly. But the U.S. Inspector General for the Department of Transportation, Mary Schiavo, disagreed, publicly criticizing such assertions; an FAA report prepared before the crash stated that ValuJet had "ineffective (maintenance) control and procedures."[10] The FAA temporarily grounded ValuJet. Shortly thereafter, Schiavo abruptly resigned from her post. In the aftermath of the crash, ValuJet's stock price plunged. In 1997, the struggling ValuJet announced a merger with AirWays Corp., parent of AirTran Airways.[11]~~

54.     ~~Given the aforementioned, Gallagher understood the importance of safety and maintenance of aircraft and would have closely monitored such issues at~~ Allegiant.

**C. ~~Allegiant's Business Model was Modelled After ValuJet~~**

55.     ~~In 2001, Gallagher restructured Allegiant with a low-cost model eerily similar to ValuJet.~~ Allegiant offered ultra-low fares, operated inexpensive second-hand planes, paid workers below market wages, and relied on contractors to perform some of its maintenance work. [12]

---

[9] *Events and developments related to the crash of ValuJet Flight 592*, CNN (Jun. 17, 1996), http://www.cnn.com/US/9606/17/valujet.timeline/ (last visited Oct. 21, 2018) (hereinafter "*CNN Timeline of ValuJet Crash*"); *see also Danger in the Skies*.
[10] *See CNN Timeline of ValuJet Crash.*
[11] *ValuJet, AirtTran merging*, CNN, July 10, 1997, https://money.cnn.com/1997/07/10/deals/valujet/.
[12] "Line maintenance" was generally performed by Allegiant and its third-party contractors. "Line maintenance" is live maintenance performed on an aircraft while it is in its operating environment, i.e., outside the hangar. "Major maintenance" and "component and engine overhaul" was performed by outside organizations.

Amended Class Action Complaint for Violations of the Federal Securities Laws

### 1. Allegiant's Low-Cost-Fare, Low-Aircraft-Utilization Model

56. Allegiant's business model was also "unique." Allegiant offered low-fare air transportation to travelers in small cities—generally at under-served airports with limited or no service and lower fees—to top leisure destinations in states like Nevada, Florida and Arizona. Leisure cities included Las Vegas, N.V., Orlando/Sanford, F.L., Ft. Lauderdale, F.L., Tampa Bay, F.L., and Phoenix/Mesa, A.Z.[13] The focus on leisure travelers created a more seasonal business with increased flight frequencies in summer months.

57. Allegiant's use of inexpensive, obsolete planes allowed it to turn a profit with ultra-low fares and low aircraft-utilization rates.

58. In the airline industry, an airline's profitability often hinges on a manager's ability to lower operating costs, and increase the airline's aircraft utilization rate—the average number of hours an airplane remains in flight. Generally, pricier planes require higher utilization rates for an airline to break even.

59. Allegiant planes only needed to fly (5) five hours a day to achieve a low unit cost while other carriers required 12-13 hours. As Bricker stated in June 2015 at a bond conference, "that's the secret sauce right there."[14] Bricker explained:

> So if you're flying to Vegas, we have about 17 airplanes there. If you're flying on Tuesday, they'll all be parked. We don't fly any flight, zero flights on Tuesdays out of Vegas. If you're flying on a Sunday, chances are you won't see any of our aircrafts because they're out flying.

---

[13] As of 2016, half of Allegiant's capacity touched either Las Vegas or Orlando, while its next two largest markets were Tampa Bay and Phoenix. *See* Raymond James Institutional Investors Conference with Speaker Jude I. Bricker, Allegiant's Chief Operating Officer, March 8, 2016.

[14] Bricker made these comments at a June 11, 2015 high yield bond and syndicated loan conference, further touting how this strategy enabled Allegiant to achieve stellar returns of $3.5 million per aircraft per year. *See* Barclays High Yield Bond and Syndicated Loan Conference with Speaker Jude I. Bricker, Allegiant's Treasurer, June 11, 2015.

Amended Class Action Complaint for Violations of the Federal Securities Laws

And this one makes it all possible and I think this is sort of the buffer of our business, the mode around our business as it pertains to our competition.

\* \* \*

*The idea is that unit costs are low and it doesn't matter how often we operate, they will still be low. In order to do that, we have to have really efficient fleet purchase transactions. So this brings us around to our used aircraft philosophy. So I'll give you some numbers here to kind of think about. Delta is really keen also on the MD-80 and the reason is, an MD-80 is worth about $3 million in service, and on a transaction base it's worth about $750,000.* For that airplane, we generate about $3.5 million of EBITDA annually. That's pretty good returns. *And that airplane really only needs to fly about five hours a day.*

Now, it's a fuel guzzling airplane, so it burns about 950 gallons an hour as compared to a modern airplane coming off the line of the same gates, as 737-800 burn about 720 gallons, 730 gallons an hour. So we spend about 25% more per mile flown on gas with the MD-80. *But the key there is that if we change the utilization, it doesn't really matter. So we go back to the cost, the MD-80 in service for us because we invest in the new seats, et cetera. It's about $3 million. 737-800 rolling off the line probably is over $40 million. Some carriers are paying $45 million. So that dynamic we think is a great opportunity for us, and we need to continue to push down our purchase prices so that allows us to continue to operate the airplanes sort of for these very focused dispatched philosophy.*

\* \* \*

*This is the same slide, we've been – I've been showing this slide since we went public and it really is trying to dispel this philosophy around the standard [ultra-low cost carrier] model, which is brand new airplanes flown 12 hours, 13 hours a day in order to get low unit cost. We get low unit cost without that philosophy because we have these cheap airplanes.*

60.    In light of the aforementioned, Allegiant's business model was heavily reliant on low-cost aircraft.

- 18 -

## 2. Allegiant Faced Little Competition Because It Operated Inexpensive, Obsolete Planes

61.    As Bricker explained in June 2015, Allegiant has no competition in "about 90% of the markets [it] serve[d]." Many other airlines simply could not compete with Allegiant's low fixed costs and low fares in less-trafficked cities with smaller populations.

62.    Even other low-cost carriers, such as Spirit Airlines and Frontier Airlines, could not compete in many of Allegiant's markets. As Bricker explained at a March 2016 Raymond James conference, those carriers' more expensive, newer planes required them to "focus[] on big city-big city connectivity which helps them drive the high utilization that they require in order to achieve their unit cost goal."

63.    Allegiant's obsolete MD-80s cost around $3 million, which was signficantly less than the $40 million paid by other airlines for newer aircraft with similar seating capacity.

64.    In light of the aforementioned, Allegiant's business model was heavily reliant on low-cost aircraft.

### 3. Allegiant Nickel-and-Dimed Passengers to Increase Revenue

65.    Allegiant earned revenue from low price fares, as low as $29, one-way, and various ancillary fees, including baggage fees, booking fees, allocated seating and vacation packages.

66.    In 2009, Gallagher divulged that the advantages of this pricing structure was psychological: "We collect $110 from you at the end of your trip. If I tried to charge you $110 up front, you wouldn't pay it. But if I sell you a $75 ticket and you self-select the rest, you will."[15]

---

[15] *Heard of Allegiant Air? Why It's the Nation's Most Profitable Airline*, FAST COMPANY, Sept. 1, 2009, https://www.fastcompany.com/1325762/heard-allegiant-air-why-its-nations-most-profitable-airline (last visited Oct. 21, 2018).

Amended Class Action Complaint for Violations of the Federal Securities Laws

### 4. Allegiant's Maintenance and Related Expenses Were Closely Watched by Allegiant Executives and Were Material to Investors

67.     Allegiant's attention to safety, maintenance, and the quality of their airplane equipment was core to its operations for the following reasons:

- Allegiant had a low-cost, low-utilization business model that relied on inexpensive, obsolete planes, which required far greater maintenance than newer planes;[16]
- Public perception of an airline's maintenance and safety record affect its profitability. A record of poor maintenance, reliability and safety may turn away customers, adversely impacting profits;[17]
- Aircraft maintenance and safety are regulated by the FAA;
- Aircraft maintenance, particularly for older planes, requires significant investment in maintenance infrastructure;
- Maintenance expenses were a material component of Allegiant's operating costs:
    - i.   Maintenance expenses were reported in each earnings report during the Class Period, on a cost per available seat mile ("CASM") basis; and (ii) per passenger basis;
    - ii.  Maintenance expenses were frequently discussed during Allegiant's conference calls during the Class Period.

---

[16] Allegiant and its executives knew their obsolete planes would require significant maintenance expenses even shortly after acquisition. Bricker explained at the March 2016 Raymond James conference that Allegiant "buy[s] that aircraft with the engine nearly run out. It's got six months [of] life left on it. We'll run out the six months and we'll put in [the] shop and spend the $4 million" on engine maintenance, which "is relatively expensive."

[17] Indeed, Allegiant acknowledged in its 10-Ks during the Class Period that its business could be harmed if the public perceived Allegiant aircraft as less than reliable or unsafe.

Amended Class Action Complaint for Violations of the Federal Securities Laws

iii. Allegiant attributed $9.74 in maintenance and repairs costs out of $93.73 in total operating expenses per passenger in 2015 (10.3%), $9.98 out of $89.15 in 2016 (11.2%), and $9.22 out of $103.70 in 2017 (8.89%);

iv. During the Class Period, Allegiant guided maintenance expenses at $110,000 per aircraft, per month;[18]

v. Major overhauls of aircraft could cost Allegiant hundreds of millions of dollars.

68. As a result, Defendants closely monitored and were aware of Allegiant's safety and maintenance issues and costs, which were core to Allegiant's operations.[19]

**Substantive Allegations**

## VI. ALLEGIANT'S MAINTENANCE CREWS WERE UNDERSTAFFED

69. According to *60 Minutes*, Allegiant's maintenance crew was understaffed and Allegiant personnel were discouraged from reporting mechanical deficiencies with Allegiant aircraft.

70. Throughout the Class Period, Defendants knew or were reckless in not knowing that Allegiant's maintenance facilities were grossly understaffed, and that, consequently, workers were effectively discouraged from accurately reporting mechanical deficiencies.

71. More specifically, Allegiant lacked the labor force and contractors necessary to accommodate the high volume of repairs needed to accurately certify their obsolete planes were airworthy. Due to this type of environment, Allegiant's maintenance crews felt pressured and threatened by superiors to: (i) disregard maintenance items outside the scope of work orders, which ran contrary to

---

[18] Allegiant only had 84 aircraft in service as of December 31, 2016 and 89 as of December 31, 2017.

[19] Indeed, Allegiant stated in its 10-Ks that its "management closely supervises all maintenance functions performed by our personnel and contractors employed by us, and by outside organizations."

1   Allegiant's self-described "normal procedures";[20] (ii) falsely certify that maintenance
2   tasks had been performed; (iii) skip maintenance inspections altogether while
3   reporting they had been performed; and (iv) rush maintenance tasks to keep up with
4   the large work load, which itself could pose a safety hazard.

5   **FE 1**

6       72.     According to FE 1, a Line Maintenance Supervisor, the Sanford, Florida
7   facility was understaffed "at all times" during his employment from July 2017
8   through March 2018. FE 1 said the industry standard was two (2) mechanics per
9   airplane but his facility, at full staffing when no one was absent, had about ½ a
10  mechanic per airplane. Allegiant's fleet was one of the oldest in the nation and
11  required more maintenance than the staff could handle. As a result, Allegiant lacked
12  the manpower necessary to perform maintenance tasks.

13      73.     According to FE 1, the understaffing created a "dangerous" situation.
14  There were "guys who were burning themselves out on overtime, and that's never
15  safe." Some workers were working 80 to 90 hours of overtime in a two-week pay
16  period, the average amount being 40 to 50 hours in that span. "That's 60 hours a
17  week on a safety-sensitive position."

18      74.     FE 1 stated that Allegiant's contract hiring did not nearly make up the
19  difference.

20      75.     FE 1 stated that Allegiant executives knew of the understaffing problem
21  at various points of his employment. The staffing issues had been relayed up the
22  chain on multiple occasions through FE 1, Adams, and Bata.

23      76.     FE 1 explained that the issue was brought up at a Town Hall meeting
24  around September or October 2017. Sanford maintenance employees complained
25  about understaffing at each Town Hall meeting. Town Hall meetings were supposed

26  _____

27  [20] An Allegiant spokeswoman, Kimberly Schaefer, stated in an October 30, 2015
28  article from the *Tampa Tribune* that "repairs [made] outside the scope of the [subject]
    fleet campaign in question [] were logged per normal procedure."

- 22 -

to be held monthly. From July 2017 to March 2018, however, FE 1 recalled there were only four Town Hall events. FE 1 attended two in 2017, including one before Thanksgiving, and one in 2018. Sheldon was present for at least one Town Hall meeting. Toro was present at more than one Town Hall meeting which FE 1 attended.

77.     FE 1 said that Toro personally told FE 1 at one Town Hall meeting around November 2017 that Allegiant was looking into staffing concerns. During Town Hall meetings, Toro often deflected on critical issues such as staffing. He would say, "We'll take that back," or, "Well, we addressed this last time."

78.     According to FE 1, someone directly asked Toro during a Town Hall meeting, "Is Maury aware?", to which Toro replied, "Yes, Maury is aware of the issues we're having."

79.     FE 1 again spoke to Toro around January 2018 about insufficient staffing of maintenance workers.

80.     FE 1 spoke to McCartney around November 2017 about inadequate staffing, to which McCartney replied that Toro and Gallagher were not letting him address the issue.

81.     FE 1 was present at Allegiant's February 2018 leadership conference in Las Vegas where the same understaffing issue was discussed. Gallagher attended the conference. The purpose of the conference was for line supervisors and assistant managers to talk to different departments. According to FE 1, McCartney told FE 1 that his hands were tied. FE 1 would ask how, and McCartney would say, "this comes from way up above me, this is Chris Toro, this is Maury [Gallagher], this is the way things are going to get done." FE 1 recalled McCartney saying, "I know it's not the right way to do things, this is what they want. I can't do anything . . . they won't let me do anything. They won't let me make any changes."

82.     According to FE 1, he received direct confirmation from Toro during a 2017 Town Hall that Allegiant was allocating resources to fund the Sunseeker resort instead of investing in aircraft maintenance. When someone asked why Sanford

- 23 -

1   employees were receiving such a small annual raise, Toro said raises were impacted

2   by "ventures we're trying to go ahead and get paid so we can build this into a better

3   company." A comment was made, "Okay, I understand, the heck with putting

4   airworthy aircraft out, let's just take the money and stick it in a swimming hole," to

5   which Toro replied, "It's not just taking the money and putting it into a hole in the

6   ground."

7   **FE 2**

8       83.     According to FE 2, a Lead Mechanic at Allegiant from November 2012

9   to August 2017, the Company's Sanford, Florida facility suffered from severe

10  understaffing, particularly during 2017. Allegiant hired half the mechanics as was

11  needed given the growth in Allegiant's fleet by that time. FE 2 said that understaffing

12  created "a culture of unsafe behavior because everybody in the facility is so

13  overwhelmed with work. You're only working the most critical items, and that's not

14  the way the maintenance program is designed to be."

15      84.     FE 2 stated that supervisors constantly asked for additional staffing but

16  were rebuffed: "They would scream for it every day until they were told not to ask for

17  more staffing." FE 2 said that Director-level employees gave directives about

18  maintenance.

19      85.     FE 2 stated that Managing Directors told supervisors to order

20  maintenance crews to work faster so airplanes would be ready to fly each morning.

21  According to FE 2, "We hear our base manager complain that the Directors were

22  reaming him for not having planes ready by the morning." FE 2 stated, "Directors

23  were putting extreme pressure on managers and supervisors to have these planes

24  ready at all costs."

25      86.     FE 2 recalled that mechanics were threatened with termination if they

26  did not have planes signed off by the morning. FE 2 recalled one such instance

27  sometime between mid-2015 and the beginning of 2016. FE 2 made quick repairs to

28  get a plane in adequate condition after "basically" being threatened with termination

Amended Class Action Complaint for Violations of the Federal Securities Laws

1    if he did not. FE 2 made an ominous comment: Management favored those who

2    moved metal and penalized those who "tried to do the right thing." FE 2 attributed

3    Allegiant management's ability to coerce maintenance workers into cutting corners

4    because the workers were not unionized until 2018.

5    **FE 3**

6       87.    According to FE 3, who worked as an Aircraft Maintenance Technician

7    at Allegiant from February 2016 to October 2017, Allegiant's Mesa, Arizona facility

8    was understaffed. As a result, mechanics were "overtasked with work," which created

9    a stressful environment. Mechanics were given "an ungodly amount of work to do on

10    one aircraft" but would staff an insufficient number of mechanics on the plane to

11    attempt to complete the tasks. As a result, non-priority work was deferred.

12       88.    FE 3 stated that maintenance technicians would sometimes be pressured

13    to falsely sign off on work they did not consider to be properly repaired or completed.

14    Maintenance "opinions would be tested[.]" He recalled one instance when a

15    Maintenance Controller pushed him to sign off on work he did not believe was done

16    properly.

17       89.    FE 3 said managers often reprimanded mechanics for reviewing

18    components that were outside the scope of the work order, particularly if the repair

19    was serious enough that it required grounding the plane. FE 3 recalled the Base

20    Manager and another supervisor aggressively questioning the reporting mechanics,

21    asking, "Why are you looking at that? Why did you do this?" Some mechanics were

22    "given a talking to" while others were written up.[21] FE 3 stated he "thought they were

23    pretty severe with the scope." He said, "It was tunnel vision. Only work on what's on

24    the [work order] packet."

25       90.    FE 3 stated he had conversations regarding understaffing with various

26    supervisors, often during work breaks, but could not recall when. He stated that

27

28    [21] FE 3 said this usually occurred if the mechanic was doing their own investigation trying to create a problem rather than fix a problem.

- 25 -

1  Allegiant did not seem focused on trying to hire more people for his station. The

2  understaffing was typically an issue during the summer.

3  **FE 4**

4      91.    According to FE 4, an Aircraft Maintenance Technician at Allegiant

5  from January 2016 to November 2016, the Company's Las Vegas, Nevada facility

6  was understaffed with "skeletal crews." Supervisors pressured maintenance workers

7  to cut corners because staffing was insufficient and Allegiant wanted to ensure planes

8  made it to the gates on time each morning.

9      92.    FE 4 stated supervisors pressured maintenance workers to sign off on

10  routine inspections that had not been completed. Orders to skip inspections or to do

11  them quickly were only for "routine" and not "big-risk stuff." For example, FE 4 said

12  supervisors pressured maintenance staff to skip tire pressure checks. Tire checks only

13  took two minutes but it was an important process that would discover whether tires

14  had leaks. Supervisors considered tire-pressure checks routine because "there is

15  hardly ever a problem" with tires. Some maintenance workers would check only two

16  of an airplane's tires. "If two were good, they would sign off on the plane." MD-80s,

17  however, have six tires.

18      93.    FE 4 said FE 4 was aware of some workers falsely asserting on

19  inspection sheets that they had performed cabin-pressure checks. That task took 30

20  minutes to two (2) hours and involved getting the airplane cabin to full pressure and

21  leaving it at full pressure to check for leaks. According to FE 4, "[t]hat got signed off

22  a lot when it wasn't done."

23      94.    FE 4 stated FE 4 personally refused to sign off on inspections unless he

24  had done them fully. Supervisors "would have other guys sign it off. There were a lot

25  of guys who were willing to sign stuff, routine work that wasn't done."

26      95.    FE 4 stated FE 4 and other maintenance workers complained to

27  supervisors of the issue of falsifying inspection records. According to FE 4, "They

28  were just like, get it done, just sign it off and get the plane out." Supervisors

- 26 -

1   threatened maintenance workers with termination if they did not sign off on items.

2   Some workers quit as a result. Others felt more pressure if they had moved to Las

3   Vegas for that job. FE 4 described the position as a "very high-turnover type job."

4   **FE 5**

5         96.     According to FE 5, who was a Supervisor of Maintenance Control for

6   Allegiant from April 2014 to June 2017, the Maintenance-Control Department in Las

7   Vegas was understaffed, creating possible safety hazards by pressuring employees to

8   make quick decisions concerning an aircraft's airworthiness. As a Maintenance

9   Control Supervisor, FE 5 was in charge of handling aircraft problems that arose while

10   aircraft was in operation. The Department was responsible for having line

11   maintenance done on the aircraft and certifying planes were safe to operate. It

12   oversaw Allegiant mechanics and contract mechanics working at airports where

13   Allegiant did not have its own maintenance crew.

14         97.     FE 5 stated, "We were taking a phone call a minute." On a good day,

15   there were three controllers answering phones. Even then, they all experienced task

16   saturation to the point where controllers felt rushed and "could not focus on their

17   job." That environment "potentially compromised safety" because decisions had to be

18   made very quickly. On a bad day, which occurred a handful of times during FE 5's

19   three-year tenure, FE 5 was the only person staffing the maintenance-control

20   department. On those days, FE 5 had to take a portable phone with him to the

21   bathroom because it would continue to ring.

22         98.     After six months, FE 5 told FE 5's supervisor that the workload was so

23   great it created a safety-of-flight issue. The supervisor told FE 5 that he would try to

24   hire additional controllers. FE 5 stated it would be "beyond [his] comprehension that

25   [Gallagher] didn't know" about staffing problems. FE 5 did not believe Gallagher's

26   Directors and Vice Presidents were "sheltering him from the truth."

27

28

Amended Class Action Complaint for Violations of the Federal Securities Laws

99.   FE 5 stated that Gallagher was clearly aware of ongoing media reports about Allegiant's safety problems when news stories appeared because he sent company-wide emails disputing the assertions.

100.   FE 5 left the Company to "distance [himself] from that type of situation." He did not want to blemish his good maintenance record that he earned during a 30-year career.

## VII.   ALLEGIANT MAINTENANCE WORKERS WERE INEXPERIENCED, UNQUALIFIED AND INSUFFICIENTLY TRAINED

101.   According to *60 Minutes*, Allegiant lacked the requisite "infrastructure," to properly maintain their aircraft to ensure its reliability and safeguard passengers.[22]

102.   Throughout the Class Period, Allegiant hired unqualified, inexperienced and/or insufficiently trained maintenance technicians. As a result, this created an environment leading to: (i) experienced mechanics feeling overwhelmed and pressured to somehow complete repairs on time; (ii) mechanics falsely certifying that certain tasks were being completed; and (iii) substandard repairs being made.

**FE 1**

103.   FE 1 said that Allegiant employed many unqualified/inexperienced and/or untrained mechanics throughout his entire employment. The issue of inadequate training was known by all of his supervisors from the beginning of his employment.

104.   FE 1 stated that Allegiant's mechanics were not adequately trained and some could not handle intricate tasks, such as trimming an engine. "There were nights when I'd have no one qualified to do engine trim."

105.   FE 1 stated that many Allegiant maintenance contractors lacked the skill and training to perform necessary tasks. "They really weren't a help at all. They were

---

[22] In this context, infrastructure means sufficient systems and programs to train workers, and to hire and/or retain sufficiently qualified and experienced maintenance workers.

a distraction." By early October 2017, Allegiant had around six contract mechanics but half were not qualified to work on the fleet. Some needed training.

106. FE 1 stated the issue of inadequate training was known by all of FE 1's supervisors from the beginning of FE 1's employment. FE 1 said they would have periodic meetings, with all supervisors and Base Managers, and those concerns were "very visible" and "on the forefront of all of our concerns."

107. FE 1 spoke to McCartney around November 2017 about insufficient training, to which McCartney replied that Toro and Gallagher were not letting him address the issue.

108. FE 1 was present at Allegiant's February 2018 leadership conference in Las Vegas where inadequate training issues were discussed. Gallagher attended the conference. According to FE 1, McCartney told FE 1 that his hands were tied and that Gallagher and Toro would not let him make any changes. McCartney would say that he brought up FE 1's concerns several times but "was told to shut up about it."

109. FE 1 stated that FE 1 heard someone bring up the issue of unqualified and inappropriately trained workers during the September or October 2017 Town Hall meeting. The complaint was met with "corporate whitewash." FE 1 stated that Toro deflected on the issue of maintenance training at a Town Hall meeting, just as he had deflected about staffing. At one meeting, Toro acknowledged that Gallagher was aware of the issues.

110. According to FE 1, FE 1 had conversations with Toro around November 2017 in which Toro said Allegiant would be looking into concerns about staffing and training. FE 1 pleaded with Toro about these issues again around January 2018 as the workers continued struggling.

111. FE 1 said that FE 1 and Bata, the Assistant Base Manager, came up with a plan to put workers with necessary experience through Allegiant's training. Pamela Pollara, Allegiant's Director of Curriculum and Instruction, refused. FE 1 noted that Bata told him how the conversation went: Pollara said, "I'm the training director. I

Amended Class Action Complaint for Violations of the Federal Securities Laws

1    will decide who gets the training." Mechanics "fresh out of school" did not receive

2    suitable training. As FE 1 simply put, "the company did not want to put forth the

3    time, energy and resources to train these people."

4        112.   When FE 1 and King, the Assistant Base Manager who took over for

5    Bata, asked Pollara if she would allow them to put supervisors through the training,

6    she refused.

7        113.   FE 1 noted that FE 1 knew of instances where cards were signed off

8    showing work was completed when in fact it was not. He attributed this to a lack of

9    experience and training. FE 1 stated these instances occurred over a spread-out period

10   of time during his employment. But FE 1 noted this raised a more troubling question:

11   "These are just the instances we know about. How many times did [this occur that]

12   we [do] not know about?"

13       114.   FE 1 stated FE 1 was aware of unqualified individuals submitting false

14   reports concerning an airplane's readiness to fly. FE 1 stated there were "complainers

15   that effectively did not want to work." FE 1 said many tasks could be performed more

16   than one way. But even then, some employees refused to follow direction and instead

17   opted to file an internal Air SMS report to the safety department. FE 1 said some

18   mechanics opted to file an Air SMS. FE 1 characterized these reports as false. FE 1

19   said the false reporting became an issue around November and December 2017, "then

20   January and February [2018] was awful." FE 1 stated that eventually, safety

21   inspectors arrived to meet with FE 1 and King. They explained the situation but their

22   efforts to discipline employees for filing false reports were thwarted by Allegiant's

23   HR department. Allegiant's HR directors, as well as Pollara, refused any effort FE 1

24   or King made to provide corrective counseling (i.e., training) to employees.

25       115.   FE 1 said he spoke directly to Pollara on more than one occasion, though

26   could not recall the time period. He recalled one conference call with Bata and

27   Pollara where Pollara stated: ***We're not going to spend any money on an airplane***

28   ***that's going to be gone next year."***

- 30 -

**FE 2**

116.   According to FE 2, many maintenance workers were inexperienced, underqualified, and undertrained to perform the tasks they were doing.

117.   Half of the workers on a typical night shift "had less than a year of experience." FE 2 stated, "we had a lot of young guys who weren't trained to do the tasks they were hired to do." In some instances, inexperienced maintenance workers would sign a form certifying that an airplane was ready to be flown, even though they "were not qualified to make that call to say, yes, this [airplane] is good."

118.   FE 2 stated that Director level employees gave orders concerning maintenance.

**FE 5**

119.   According to FE 5, new maintenance controllers were not adequately trained, which posed a threat to safety. A poorly trained controller was a safety hazard. "If you don't know the system—how it functions and operates—how can you make a determination if it's operating properly?"

120.   FE 5 stated that, at one point, Allegiant began hiring contractors as maintenance controllers, but they lacked the proper training: "Their level of skill or knowledge left a lot to be desired."

**FE 6**

121.   According to FE 6, a Mechanic and Aircraft Configuration Control Analyst at Allegiant from September 2015 to April 2016, most of Allegiant's mechanics were highly inexperienced and unqualified. FE 6 learned this as soon as FE 6 began working for Allegiant.

122.   FE 6 understood that Allegiant hired inexperienced fresh graduates from a local tech school immediately after they earned certificates to work on aircraft. Allegiant did this to "try[] to get out as cheap as [it] can." The schools, however, did not train their students to work as experienced mechanics on heavy aircraft.

- 31 -

1  "[Allegiant] pick[s] them up for dirt cheap and all they know is what somebody tell[s]
2  them, which is nothing."

3      123.  In his first two weeks on the job, FE 6 saw two botched repair jobs.
4  These mechanics' botched repairs demonstrate they were unqualified, inexperienced,
5  and/or poorly trained by Allegiant.

6      124.  As to the first botched repair involving a fuel leak, FE 6 observed that
7  the workers first did not know to engage a fuel shut-off valve to prevent more fuel
8  from leaking. After the leak was located, the mechanics began to repair equipment at
9  the site of the leak, failing to recognize that fuel drenched large areas of the plane and
10  insulation. When FE 6 showed them the fuel leak had extended to a larger portion of
11  the plane and that the insulation needed to be replaced, his suggestions were ignored.
12  "We're not going to take all that apart," he recalled his co-workers saying. "That's
13  going to take forever." FE 6 said they did not fix the problem but kept trying to put
14  "band aids on it." FE 6 recalled that the fuel leaked because a mechanic used the
15  wrong type of O-ring seal—one for hydraulic oil parts instead of fuel. The O-rings
16  are color-coded to avoid such mistakes. The mechanic used the wrong one anyway.

17      125.  As to the second botched repair involving an eyebrow window located
18  directly above the pilot's ear, FE 6 stated that the mechanic failed to allow the
19  window sealant to cure for 24 hours. Instead, the mechanic tried to short-cut the
20  process by pointing a heat lamp at the window and leaving it unattended. The heat
21  lamp melted the window. FE 6 was shocked: "Whoever did this does not need to be
22  working on an airplane. . . . if he'll do this kind of stuff, what else will he do?"

23      126.  FE 6 stated that FE 6's Manager did not seem to understand the work he
24  was doing. FE 6 believes FE 6 was quickly transferred because FE 6's supervisors
25  did not like FE 6 speaking out about specific issues he observed.

26      127.  FE 6 stated there was no way upper management did not know about all
27  of the mechanical problems in their fleet: "You can't ground an airplane and upper

28

- 32 -

1  management not know. When they ground the airplane, basically they pull their flight
2  permit."

3  **FE 8**

4      128.   FE 8, who worked as a Base Operations Manager at Allegiant from 2010
5  until the summer of 2015, was hired as a "fix-it" person to improve Allegiant's
6  maintenance department. Prior to FE 8's employment, Allegiant was having
7  reliability issues with its fleet and "major compliance failures" in the maintenance
8  department.

9      129.   FE 8 stated that some of Allegiant's major compliance failures were
10  caused by poor maintenance work while others were related to improperly filling out
11  paperwork.

12      130.   In 2011, FE 8 recommended the Company begin to have 3-day training
13  sessions for all employees about policies and procedures, which was standard practice
14  at other airlines. FE 8 never received a response from Allegiant leaders about FE 8's
15  proposal and Allegiant did not start the program when FE 8 was there. Allegiant only
16  had "a very small training staff, three or four people." Allegiant "didn't want to invest
17  in training." FE 8 said that Gallagher "would almost have to be" aware of trainings,
18  as they were one of the directives.

19      131.   According to FE 8, "[w]hen you look back at 2010, 2011, 2012,
20  certainly Maury [Gallagher]" and the directors of maintenance, etc. would have been
21  aware that maintenance workers were not being properly trained. "Training was
22  always an issue. The training manager that left the company, extremely unhappy, he
23  left for a reason."

24      132.   FE 8 stated that in 2011 and 2012, Allegiant hired many newly certified
25  mechanics from tech schools and did not invest enough in their training. Carpenter
26  likely directed this policy.

27      133.   FE 8 stated Allegiant did not have a lot of highly experienced
28  mechanics. Allegiant paid below market hourly rates and had a poorly managed

- 33 -

1  maintenance operation, which contributed to high turnover. According to FE 8,

2  Gallagher was definitely aware of the high turnover, and Bricker was also likely

3  aware. At the time, Gallagher would have learned of this through Carpenter, who was

4  responsible for staffing. According to FE 8, "things like that . . . become very clear

5  through delays[.] We had a daily briefing to report on the status of aircraft. A lot of

6  time Maury was on there. Those things came to light in different ways."

7       134.   According to FE 8, aircraft reliability declined in 2015 and 2016

8  "because [Allegiant] started cutting on the spending."

## VIII. ALLEGIANT HAD A CULTURE WHICH PUT PROFITS BEFORE SAFETY, LAGGING INDUSTRY STANDARDS—ALLEGIANT WOULD PUT DUCKS ON ITS WINGS IF IT COULD

11       135.   According to *60 Minutes*, Allegiant was unsafe and had a poor safety

12  culture that lagged the industry.

13       136.   Throughout the Class Period, Defendants knew, but failed to disclose,

14  that Allegiant's operation was unsafe and that Allegiant's safety culture lagged the

15  industry and put profits over aircraft maintenance, reliability, and, by extension,

16  passenger safety.

17       137.   Plaintiffs incorporate the allegations in Sections VI and VII as evidence

18  that Allegiant ran an unsafe operation and had a culture which put profits over safety,

19  lagging industry standards.

20  **FE 1**

21       138.   According to FE 1, Allegiant's culture put profits over maintenance and

22  safety. FE 1 described the issues concerning inadequate staffing, training and parts

23  related issues (described further below) as "a cultural problem with upper

24  management. If you don't want to toe the line, then they'll just fine a way to purge

25  you out." Those who were vocal about their concerns were pushed out. FE 1 recalled

26  a conversation with the Base Manager, who said that once an employee made too

27  much noise about issues, they would be penalized and terminated. FE 1 said that a

28  Base Manager told FE 1, "I'm just trying to keep my job and toe the line."

139. According to FE 1, Allegiant potentially compromised safety by directing the use of certain "as-removed parts[.]" FE 1 said FE 1 once refused to install a spoiler valve that was "dripping with hydraulic fluid and the heads of the bolts had been ripped off."

140. FE 1 also raised questions about questionable parts in the fall of 2017 with Zack. FE 1 spoke to Zack after experiencing an issue where nine separate com units were found to be defective, even though they all had been tagged, "serviceable." Zack told FE 1 that it was not for him to worry about.

141. FE 1 said FE 1 spoke to McCartney in November 2017 and again at the February 2018 leadership conference about inadequate staffing, training, and questionable parts he was receiving. According to FE 1, "[McCartney] flat-out told me several times, my hands are tied." FE 1 stated that McCartney said this directive came from Toro and Gallagher.

**FE 2**

142. According to FE 2, Allegiant's culture put profits before maintenance and safety. FE 2 said that "management had a culture of rewarding people who moved metal and had the culture of coming down on people who tried to do the right thing." Additionally, the volume of work and understaffing contributed to a "culture of unsafe behavior."

143. According to FE 2, Allegiant potentially compromised safety by continuing to run overheated engines. If an airplane had two engines that had overheated, which could signal the engine needed to be overhauled, they would swap one such engine with an engine operating at a safe temperature from another plane. Allegiant management would send planes with hot engines to Sanford, Florida where temperatures were cooler, instead of to Las Vegas, Nevada. FE 2 stated, "[t]hey were playing crazy games to keep those engines in service and operating to bypass the manufacturers' manuals." That came at a "high risk to passengers" but Allegiant pushed the engines to the limit to avoid an engine overhaul, which was "one of the

- 35 -

1 three biggest costs to an airline." According to FE 2, "Allegiant's management was

2 100 percent aware of the risk they were taking by keeping their old engines on the

3 wing[.]"

4 **FE 3**

5  144. According to FE 3, Allegiant's leadership, particularly Gallagher,

6 cultivated a culture more interested in profits than improving their fleet. FE 3 stated,

7 "I felt like they were trying to be as profitable as possible, doing more with less."

8  145. According to FE 3, Allegiant regularly deferred repairs. When a job card

9 is deferred for a component that was on the plane's Minimum Equipment List, a

10 ticking clock would start for when the work must be completed. Some items on the

11 list require immediate grounding. Other items allow for a specific time period to fix

12 the component. Allegiant maintenance stations at other airports, including those in

13 Florida and Las Vegas, often waited until the 11th hour to make the fix. FE 3 added,

14 "There's always a fine line for doing what's right and doing what's ethical. That line

15 wasn't very well-defined or established."

16 **FE 6**

17  146. According to FE 6, Allegiant valued profits over quality maintenance,

18 which indirectly undermined safety.

19  147. According to FE 6, Allegiant potentially compromised safety by relying

20 on the use of redundancies as an alternative to making repairs. Airplane mechanisms

21 often have redundant functions so that a back-up function will allow a plane to fly if

22 an essential malfunction occurs in flight. Allegiant seemed to rely on that redundancy

23 when making decisions about what to repair. "The pilot can shut the engine off

24 because they have another one. They can fly with only one engine. They won't be

25 fine, they'll be in jeopardy, and they've got to be really careful to get the airplane

26 down, but it's not a total emergency."

27

28

Amended Class Action Complaint for Violations of the Federal Securities Laws

148.   FE 6 said that supervisors were willing to push the envelope to keep flights on schedule, even if it meant rushing mechanics to patch problems instead of properly fixing them. The attitude was, "[t]hat's good enough."

**FE 8**

149.   According to FE 8, Allegiant's culture was "to downplay the stuff associated with spending or costs." Getting Allegiant to approve big costs and investments was "like pulling teeth." The cost cutting message was "driven from Maury. It all came down from him."

150.   According to FE 8, in 2010, Bauer invited FE 8 to a meeting on engines to solicit ideas to keep overheated engines on wings as long as possible. FE 8 was fairly outspoken about Allegiant investing money into the planes. FE 8 was told, "That's not what we do." FE 8 said the culture was not to invest in the engines.

151.   According to FE 8, the Company was slow to invest in recommended upgrades to planes. Plane manufacturers periodically publish recommended upgrades to components. Each new upgrade is numbered in order as "Dash-1, Dash-2, Dash-3, etc." At the time, Boeing's 757 was around Dash-12 or so, but Allegiant was upgrading to Dash-5 or so. The Company eventually upgraded but it was well into a year or more, which was not the industry norm. "I don't consider that reactive at all. I consider that a cultural pushback because they didn't want to spend the money."

152.   According to FE 8, in 2014, FE 8 recommended in a meeting with Gallagher that the Company invest $40 million into an IT project to improve maintenance work and compliance. The IT would have automatically flagged work done incorrectly and/or parts that were incorrectly installed and would not have allowed a mechanic to move forward with a job until the paperwork was filled out correctly. The project was deemed too expensive. "They nearly fell out of their chairs," FE 8 said. FE 8 stated the Company does not have the software written the way it should be done, but spent $20 million trying to piecemeal it. When a colleague

1  made an error and FE 8 corrected him, FE 8 was subsequently disinvited to meetings

2  with Gallagher: "He doesn't like to hear what he doesn't want to hear[.]"

3  **FE 9**

4      153.   According to FE 9, the "general culture of the company was make

5  everything fly and don't worry about the safety thing[.]"[23]Allegiant held monthly

6  reliability meetings to discuss new and ongoing reliability issues and mechanical

7  problems with the fleet. It was attended by upper management in maintenance, tech

8  service employees, those in charge of reliability, and sometimes the then-CFO. FE 9

9  attended only a few meetings and recalled a PowerPoint presentation of issues and a

10  report disseminated to attendees prior to the meeting.

11      154.   Sometime around 2014, FE 9 attended a reliability meeting where a

12  maintenance issue discussed at a prior meeting had not been resolved. FE 9 stated

13  that a few months prior, maintenance identified engine oil leaks due to oil lines being

14  improperly installed into pressure transmitters. In accordance with Allegiant policy,

15  Allegiant issued a campaign bulletin to inspect the entire fleet. A few months later, at

16  the meeting FE 9 attended, someone asked why the bulletin had not yet been issued.

17  The answer was because Allegiant did not have enough oil lines in stock and, if

18  during inspection a problem was confirmed, the plane would have to be grounded

19  until fixed. According to FE 9, Allegiant was behind on their own standard.

20

21      155.   Three weeks after the meeting FE 9 attend, a plane in flight had to shut

22  down an engine due to an improperly installed oil line that had not been inspected.

23  "I'm seeing these women and children getting off [the] plane—they had to land with

24  one engine for no [good] reason at all[.]" FE 9 said the engine manufacturer's manual

25  called to change the engine because oil had been lost. An Allegiant engineer declared

26  the engine had sufficient oil and did not require changing out. "They didn't want to

27  change the engine because it's expensive. They ended up returning it to service."

28

---

[23] FE 9 was a Lead Aircraft Technician from February 2008 to July 2015.

Amended Class Action Complaint for Violations of the Federal Securities Laws

156.   Three weeks later the same engine started shaking and had to be shut down. FE 9 stated the problem was with a bearing, which FE 9 believed was caused by the engine running on no oil. "Watching people come off the plane again, really irritated me. That's when I realized I need to leave the company." FE 9 "saw what they were doing" and "was afraid they were going to hurt somebody after a while." "They were just being reckless. That was a big thing that happened, but there were a million things that happened."

157.   FE 9 stated, "If you're around aviation, I'm sure [Gallagher] knows what's going on. It's pretty obvious when you have planes grounded everywhere and doing emergency landings. It was not a secret."

## IX.   ADDITIONAL MISCONDUCT AND EVIDENCE OF SCIENTER

### A. June 2015 through December 2015

158.   From June 8, 2015 through December 31, 2015, local news outlets reported numerous horror stories of Allegiant aircraft experiencing flight delays, emergency landings, aborted takeoffs, and smoke in the cabin. These stories intensified as Allegiant's maintenances issues seemed to become more prevalent.

159.   For example, the following incidents made headlines from June 8, 2015 through December 31, 2015: [24]

- On June 8, 2015, an Allegiant flight from St. Pete-Clearwater Airport in Florida to Hagerstown, Maryland made an made an emergency landing and deployed evacuation slides after a flight attendant reported smoke and fumes in the cabin shortly after takeoff. The pilot was fired later that year. [25]

---

[24] This list is not exhaustive. It is noteworthy that in these negative press headlines, Allegiant issued statements that the safety of its passengers and crew was its number one priority.

[25] The pilot filed a wrongful termination suit against Allegiant in late 2015. On October 17, 2018, it was reported that Allegiant settled out of court with the pilot, which avoided a trial scheduled to begin that day in Las Vegas, Nevada.

- 39 -

1   • On June 12, 2015, *Fairfield Citizen-News* reported that an Allegiant flight from
2      Las Vegas, NV to Stockton, CA safely returned to its origin point that afternoon
3      due to a "maintenance issue" and "engine issue."
4   • On June 14, 2015, *Idaho Statesman* reported that passengers evacuated onto the
5      wing of their plane after their Allegiant flight from Los Angeles to Boise, ID had
6      landed because they smelled noxious fuel fumes and could not breathe.
7   • On June 18, 2015, the *Tampa Bay Times* reported that Allegiant cancelled six
8      flights at St. Pete-Clearwater Airport just hours after one of its planes made an
9      emergency landing there due to pressurization problems.
10  • On June 24, 2015, the *Tampa Bay Times* reported that Allegiant cancelled another
11     flight from St. Pete-Clearwater International Airport due to an unspecified
12     "maintenance issue."
13  • On June 25, 2015, the *Tampa Bay Times* reported that an Allegiant flight bound
14     for Niagara Falls, N.Y. made an unscheduled landing near Orlando so passengers
15     could be put on another aircraft.
16  • On July 4, 2015, the *Tampa Bay Times* reported that an Allegiant flight made an
17     emergency landing the night before at St. Pete-Clearwater International Airport
18     due to a possible "maintenance issue" with the aircraft.
19  • On July 28, 2015, the *Tampa Bay Times* reported that on July 23, 2015, an
20     Allegiant flight from Las Vegas to Fargo, ND, made an emergency landing at a
21     Fargo airport which was closed. Allegiant reportedly did not know the airport was
22     closed but proceeded to depart from Las Vegas despite being delayed by more
23     than an hour. Even more concerning was that *The Wall Street Journal* reported on
24     July 30, 2015 that the aircraft was piloted by Allegiant executives: Greg Braden,
25     Allegiant's Vice President of Operations, and Michael Wuerger, Allegiant's
26     Director of Flight Safety.
27
28

Amended Class Action Complaint for Violations of the Federal Securities Laws

1 • On August 2, 2015, *The Fresno Bee* reported that an Allegiant flight from Las
2    Vegas to Fresno, C.A. made an emergency landing on Saturday shortly after
3    takeoff because of a reported engine fire.

4 • On August 4, 2015, the *Tampa Tribune* reported that an Allegiant flight from
5    Florida to Virginia was forced to make an emergency landing in North Carolina
6    on Monday after an engine issue. Passengers on the plane reportedly heard a loud
7    bang, followed by a loss of altitude.

8 • On August 29, 2015, the *Tampa Bay Times* reported that an Allegiant flight bound
9    for Illinois from Las Vegas experienced an aborted takeoff when the nose of the
10   aircraft prematurely rose from the runway. A device that moves one of the plane's
11   two elevators—panels on the tail used to climb and descend—had disconnected.

12 • On September 18, 2015, *AP Business News* reported that an Allegiant flight from
13   Bismarck, North Dakota made an unscheduled stop in Utah, short of its Las Vegas
14   destination, for a "possible maintenance issue."

15 • On October 11, 2015, *The Fresno Bee* reported that an Allegiant flight bound for
16   Fresno caught fire Sunday as it prepared to take off from Las Vegas, marking the
17   second time in about two months that an Allegiant flight from Las Vegas to
18   Fresno had been aborted due to mechanical problems with the plane. According to
19   the article, takeoff was aborted and passengers were evacuated through the
20   aircraft's rear stairs.

21 • On December 31, 2015, *Bangor Daily News* reported that an Allegiant flight from
22   Orlando to Bangor, Maine emergency landed in Rhode Island after passengers
23   smelled something "burning" and several passengers noticed the back of the plane
24   was getting warmer during the flight and that they could feel the heat on the walls
25   of the plane. According to the article, four or five firetrucks were there to greet the
26   plane after it stopped in the middle of the runway.

27
28

Amended Class Action Complaint for Violations of the Federal Securities Laws

1  • On December 29, 2015, *The Daily Cardinal* reported that an Allegiant flight from

2     Florida to Wisconsin made an emergency landing in North Dakota after having

3     mechanical issues relating to deicing.

4  • On December 31, 2015, *The Northern Star* reported that an Allegiant flight from

5     Orlando to Cedar Rapids, Iowa, made an emergency landing at a Tennessee

6     airport after reporting an engine problem. This was in addition to another

7     emergency landing on December 24, 2015 at Jacksonville International Airport

8     due to a faulty indicator light.

9        160.   Allegiant executives, including Gallagher, closely monitored aircraft

10  maintenance reporting during this period.

11        Allegiant's 3Q 2015 results on October 21, 2015:

12        **<Q - Dan J. McKenzie>**: Got it. And then, operationally, where are you

13     relative to your goals? Where are you at today? We do you want to be?

14     **<A - Maurice J. Gallagher>**: *Right now, our operations, for instance,*

       *we had a great September. We had a poor June, a poor July.*

15                                                  * * *

16     *I like to comment that we're a bit in the maintenance business more so*

17     *than I'd like to be.*

18        (Emphasis added.)

19        161.   Defendants continued their fraudulent scheme to push down Allegiant's

20  maintenance costs.

21        162.   In 2015, Allegiant blamed the pilot's union and media for overhyping its

22  aircraft maintenance, safety and reliability issues. Defendants falsely reassured

23  investors that these reports were overblown, misleading, and should be discounted

24  because the union had an agenda to secure its first labor contract with the airline.[26]

25

26  ─────────────────

    [26] For example, Allegiant, Gallagher, and Harfst brushed off these union reports as

27  "posturing" by the union as it attempted to negotiate its first contract with Allegiant, a

    "distraction," and the "Teamsters . . . trying everything they can do to make us look

28  bad."

- 42 -

**B. January 2016 through March 2016**

163.   On January 8, 2016, the *Tampa Bay Times* reported that Greg Marino, a formerly retired airline mechanic who worked at Allegiant's facility in Sanford, Florida for just two weeks, quit, because maintenance (i) failed to follow proper procedures in diagnosing aircraft problems; (ii) routinely misused the FAA's minimum equipment list ("MEL") rules; (iii) had a worrisome culture; and (iv) had workers improperly sign off on repairs. This story was run by NBC News, Las Vegas, a few days later on January 14, 2016.

164.   In response to these stories, Allegiant collectively maintained that its airline was safe and denied that this lone mechanic's account provided evidence of systemic maintenance issues:

> Allegiant maintenance practices in all of our bases are part of an FAA-approved program. ***Maintenance is performed in accordance with all aircraft and engine manufacturer recommendations and in accordance with all standards of the airline industry.*** In addition, our maintenance programs are subject to regular internal and external audits to ensure that we are consistently meeting or exceeding standards of excellence.
>
> * * *
>
> There is nothing more valuable to all of us at Allegiant than the safety of our passengers and our crew members. These people are our family, and we will always do everything within our power to keep them safe.
>
> ***For an individual with such limited insight into our operations to make broad, unfounded allegations about the quality of our maintenance practices is an insult to the more than 600 men and women who work hard every day to maintain our fleet. It is an attempt to discredit and disparage these highly-trained professionals who spend each day ensuring the highest level of safety for their fellow team members and our passengers.***
>
> Allegiant maintains numerous channels through which any employee can bring attention to safety concerns, including an Aviation Safety Action Program (ASAP), which is a voluntary FAA program. ASAP offers a systematic and non-punitive method for pilots, flight

- 43 -

attendants, maintenance and dispatch team members to voluntarily identify and report safety concerns.

(Emphasis added.)

165. The very next day, January 15, 2016, Allegiant announced the sudden and unexpected resignation of its COO, Steve Harfst. Gallagher stated "[w]e look forward to continuing his efforts to strengthen our operation." The release acknowledged Allegiant's maintenance issues, stating, "[t]he Company will use this leadership change as an opportunity to refocus on operational needs and areas for improvement. Allegiant is committed to operational excellence and looks forward to continued progress in this area."

166. On January 23, 2016, the *Tampa Bay Times* rehashed recent events involving Allegiant, including that it had five emergency landings in the final week of 2015, one Allegiant plane had four emergency landings in one month, Allegiant's COO had abruptly resigned after 13 months on the job, and a mechanic complained of Allegiant's poor maintenance culture after his two-week tenure at the airline.

167. Following this negative news and Allegiant's COO's resignation, Allegiant held a 4Q 2015 Conference Call on January 27, 2016. The very first question posed concerned recent news headlines regarding Allegiant's safety issues. Bricker responded that Allegiant has a safe operation and Gallagher blamed the Teamsters for the negative news. The conference call states, in relevant part:

> **<Q - Joseph DeNardi>**: Hi. Jude, I'm just wondering, just given your new head as COO, if you could just comment on what the operational challenges you faced in 2015 were and what you plan to do to correct them? And then I think investor struggle a little bit with given some of the headlines that come out trying to decipher between what a real safety issues at the airline and what's maybe overhyped by the media. So, I'm wondering if you could comment on some of that. Are there other safety issues that need to be addressed or is it more subtle than that?

- 44 -

<A - **Jude I. Bricker**>: So, I'm going to start with this safety point. No, there isn't. ***It's a safe operation. Last year, it was a safe operation, and this year is well.***

\* \* \*

Now, your other point was that, are a lot of what you read about us in the press, what's the source of that? Why is it out there? Maybe, Maury, if you want to comment on that?

<A - **Maurice J. Gallagher**>: ***Well, I think, Joe, it's a maybe a simplistic answer but, we are in negotiations with our pilots and particularly the Teamsters have a history of, know this tactic of making sure all of your peccadilloes are out there and available for everybody to see and papers and media – we're a juicy type of story in many cases.*** So every airline has operational issues. And as I tell our people, the systems are set up to deal with problems. . . .But we've invested tremendously in safety systems over the last few years. The FAA has suggested as many as seven voluntary safety systems and we are in all of them. We have a terrific SMS program, if you are familiar with that***. So, you know, as I tell people, this industry, all it ultimately sells is safety. And we are going to be at the forefront of all of those respects. But now as Jude said, we are safe[.]***

(Emphasis added.)

168.   On January 25, 2016, the *Las Vegas Review-Journal* reported that CtW Investment Group, investors in Allegiant, would be working in the coming months to, *inter alia*, convince Allegiant's Board to establish a new standalone safety committee in the wake of numerous operational issues.

169.   According to the article, Gallagher said he was not surprised by CtW's comments due to its affiliation with the Teamsters union: "Allegiant is currently involved in negotiations for a first contract with the International Brotherhood of Teamsters, so it is no coincidence that these allegations have come from CtW, a firm widely known to have close ties to the Teamsters," Gallagher said.

170.   On January 28, 2016, Gallagher doubled-down in his attacks against the Teamsters Union in a letter published in the *Tampa Bay Times*. The letter vehemently

- 45 -

refuted the *Tampa Bay Times*' characterization of Allegiant's maintenance issues in its reporting, and laid blame on the Teamsters for the negative reports. The letter states, in relevant part:

**Safety accusations mislead**

As Allegiant's CEO, I feel I must speak up. The story published on Jan. 23 repeats the faulty premise that something is wrong with Allegiant. Let me be clear: There is not.

As a growing business, we have garnered a new level of attention. That, coupled with contentious labor negotiations with the International Brotherhood of Teamsters, representing our pilots, creates a perfect storm of attacks and accusations. Examining airlines in similar disputes establishes a pattern of Teamsters employing this destructive strategy.

Your paper repeatedly allows individuals affiliated with the Teamsters to manipulate your readers. Chris Moor of the Teamsters Aviation Mechanics Coalition has marketed misleading stories about Allegiant's safety record for months. This supposedly independent third party knows nothing about our operation and has zero credibility given their direct involvement with our labor negotiations. John Goglia, despite his accomplishments, has professional ties to the Teamsters and zero firsthand knowledge of our operation.

Misleading the public about safety is a common tactic of Teamsters. While we expect manipulation from them, we – along with your readers – expect more from you. We welcome scrutiny, but you should scrutinize sources and understand conflicts of interest before printing irresponsible allegations.

Such [misleading] allegations are a disservice to hundreds of committed aviation professionals who maintain and fly our aircraft and who exemplify our culture of safety. Many have been with Allegiant over a decade, far from the mere days worked by a former employee you cite as an expert. Acknowledging someone who spent little time or effort learning our operation and procedures, at the expense of dedicated, long-term Allegiant employees, is insulting.

- 46 -

I am proud of the thousands of aviation professionals who focus each day on our safe operations. I thank our maintenance employees for all their hard work and this community for their continued support.

Maurice J. Gallagher Jr., chairman & CEO, Allegiant Travel Co., *Las Vegas*

(Emphasis added.)

171. On February 1, 2016, the *Las Vegas Review-Journal* reported that Bricker sat down with its editorial board to discuss the highly publicized allegations of Greg Marino, the mechanic who worked at Allegiant's Sanford facility. According to the article, Bricker said he received an internal report on Marino's allegations on January 29, 2016 and concluded that the complaints were unfounded. The article stated that "Bricker said he is convinced that the airline is safe and that the Orlando operations is functioning properly." Bricker suspected the Teamsters Union was behind Marino's allegations.

172. On February 3, 2016, the *Tampa Bay Times* commented on the February 1, 2016 *Las Vegas Review-Journal* article, noting that, when it reached out to Allegiant for a comment, "an Allegiant spokeswoman said the airline will no longer comment to the Times because it believes the newspaper's reporting has been unfair."

173. Then, on March 7, 2016, The Aviation Mechanics Coalition, Inc., a subgroup of the International Brotherhood of Teamsters Airline Division, issued a report stating that from September 2015 through January 2016, Allegiant experienced 98 separate and preventable maintenance issues, including 35 engine issues. The report stated, in conclusory fashion, that Allegiant (i) lacked a process to document equipment failures; (ii) lacked adequate tooling and spare parts maintenance crews do not consistently or accurately follow MEL procedures; (iii) maintenance crews lack adequate experience to repair and dispatch aircraft; (iv) inadequately trains maintenance crews; (v) lacked a process to document equipment failures; (vi) lacked adequate tooling and spare parts; and (vii) had a poor safety culture.

- 47 -

174.   According to the *Tampa Bay Business Journal*, Allegiant responded that same day, openly bashing the report and the Teamsters' manipulative tactics, saying it has "no firsthand knowledge" of Allegiant's operation:

> **The Teamsters Aviation Mechanics Coalition has never inspected a single Allegiant aircraft and has no firsthand knowledge of our operation. The Teamsters currently represent our pilots and have a history of manipulating the media to attempt to exert pressure on contract negotiations. It is irresponsible and reckless for the Teamsters to make unfounded claims regarding safety to the public in order to circumvent mediated negotiations. Allegiant is a safe airline, and our robust maintenance program goes above and beyond manufacturer and FAA recommendations and guidelines.** To insinuate otherwise as a means of gaining leverage at the bargaining table is irresponsible. Furthermore, it is demeaning to the vast network of aviation professionals at Allegiant for whom the safety of our passengers and crew is their life's work.

(Emphasis added.)

175.   Then, on March 9, 2016, just two days after Allegiant had gone on the offensive against the Teamsters and attempted to refute the narrative that Allegiant was unsafe, Gallagher suspiciously sold over 292,200 shares of Allegiant stock at $163.50 for total proceeds of $47,774,700.[27]

176.   During this period, Allegiant blamed the pilot's union and media for overhyping its aircraft maintenance, safety and reliability issues. Defendants falsely reassured investors that these reports were overblown, misleading, and should be discounted because the union had an agenda to secure its first labor contract with the airline.

### C. March 2016 to April 2018

177.   News outlets continued to report that Allegiant's aircraft experienced aborted takeoffs and emergency landings from March 2016 through 2017.

---

[27] Allegiant stated that after the transaction, Gallagher continued to hold "more than 3.3 million shares, which is approximately 20% of the current outstanding shares as of March 10, 2016."

- 48 -

178.   On May 12, 2016, under mounting public pressure, Allegiant stated in a Definitive 14A that two independent directors would regularly meet with operations and maintenance personnel and report back to the Board. Additionally, senior operations personnel would make presentations to the Board at each quarterly meeting.

179.   By July 2016, Allegiant said it would accelerate the acquisition of Airbus A320s to retire its MD-80 fleet by mid-2019 instead of by the end of 2020 or into 2021.

180.   With this accelerated timeline, and in light of Allegiant's low-cost business model, Defendants' fraudulent scheme to reduce maintenance costs became even more critical to Allegiant's profitability.

181.   On September 9, 2016, Allegiant announced that John Redmond would serve as the Company's President, signaling Allegiant's desire to expand its footprint in the hospitality industry.[28] Allegiant was looking for other avenues of growth now that its low-cost aircraft business model seemed to be crumbling.

182.   In December 2016, Gallagher wrote an open letter in advance of the *Tampa Bay Times'* upcoming December 16, 2016 article which Gallagher expected to contain "more of the same, misleading storylines as they have in the past." In the letter, Gallagher reaffirmed his and the Company's commitment to safety, stating he "continue[s] to personally monitor our reliability at St. Pete Clearwater airport to ensure optimal performance[,]" that there "is absolutely no support for the claims made by the *Times* that Allegiant is an unsafe airline[,]" and that "Allegiant operates at the highest levels of safety . . . [which] is and always will be our first priority[.]"

183.   On April 25, 2017, during Allegiant's Q1 2017 conference call, Gallagher and Redmond signaled that Allegiant was considering entering the hotel business.

---

[28] Redmond had many years of experience in the hospitality industry. He served on Allegiant's Board and was a former president and CEO of MGM Grand Resorts.

Amended Class Action Complaint for Violations of the Federal Securities Laws

184.   On August 29, 2017, Allegiant announced it would develop a 22-acre resort in Port Charlotte, Florida. The plan included a 75-room resort hotel, 720 condominium units, several restaurants, bars and retail stores, a marina, and the largest resort pool in North America. Allegiant said the project would "ideal[ly]" cost between $425 and $450 million.

185.   On August 31, 2017, *Bloomberg* reported that Allegiant said it would fund the project with presale deposits, collecting about 30% of a condo's sale price before the unit is completed. Redmond said, "Our cash investment will never be more than something around the cost of a plane[.]" According to the article, not everyone is convinced Allegiant's novel endeavor will succeed, as real estate is a very different business than air service.

186.   On January 31, 2018, during Allegiant's Q4 2017 conference call, Redmond reversed course, stating that financing could be structured with "a 75% to 80% non-recourse debt . . . no pre-sell requirements or the like . . . and the interest rate talks has been sub-6.5%.

187.   Upon information and belief, Allegiant decided to develop the $450 million Sunseeker Resort due to its commitment to the accelerated retirement of obsolete aircraft, which it relied upon.

188.   Defendants' refusal to invest further resources into aircraft it intended to retire, together with Defendants' need to fund its new resort as financing was uncertain, caused Defendants to continue their fraudulent scheme.

189.   During this period, Allegiant continued to blame the media, for overhyping its aircraft maintenance, safety and reliability issues. Defendants falsely reassured investors that these reports were overblown, misleading, and should be discounted.

## X.   DEFENDANTS' FALSE AND MISLEADING ASSURANCES

190.   As of June 8, 2015, Allegiant had adopted a Code of Ethics, amended May 6, 2015, which stated that the Company is required to: (i) remain "***honest, fair***

1   *and accountable in all business dealings*"; (ii) "*provide safe working conditions*" to

2   employees; (iii) "*be a responsible and responsive corporate citizen in a moral,*

3   *ethical and beneficial manner*" to society and the local community; and (iv) "*pursue*

4   *growth and earnings objectives while adhering to ethical standards*" as related to

5   the Company's shareholders (emphasis added.).

6        191.  On June 8, 2015, news outlets reported that Allegiant stated that the

7   safety of its passengers and crew was "always [its] number one priority" in response

8   to an emergency landing for a flight scheduled from St. Pete-Clearwater International

9   Airport to Hagerstown, Maryland.

10        192.  On January 27, 2016, during Allegiant's 4Q 2015 conference call,

11   Defendants Bricker and Gallagher stated the Company's operation was safe last year

12   and this year as well:

13   > [DeNardi] Hi. Jude, I'm just wondering, just given your new head as COO,
14   > if you could just comment on what the operational challenges you faced in
     > 2015 were and what you plan to do to correct them? And then I think
15   > investor struggle a little bit with given some of the headlines that come out
     > trying to decipher between what a real safety issues at the airline and
16   > what's maybe overhyped by the media. So, I'm wondering if you could
17   > comment on some of that. Are there other safety issues that need to be
     > addressed or is it more subtle than that?
18
19   > [Bricker] So, I'm going to start with this safety point. No, there isn't. *It's a*
20   > *safe operation. Last year, it was a safe operation, and this year is well.*
     >                              * * *
21   > [Gallagher] *So, you know, as I tell people, this industry, all it ultimately*
22   > *sells is safety. And we are going to be at the forefront of all of those*
     > *respects. But now as Jude said, we are safe[.]*
23
24   (Emphasis added.)

25        193.  On February 22, 2016, Allegiant filed its 10-K for the fiscal year ended

26   December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants

27   Gallagher and Sheldon. The 2015 10-K also contained signed certifications pursuant

28   to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Gallagher and Sheldon

Amended Class Action Complaint for Violations of the Federal Securities Laws

111

attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

194.   The 2015 10-K emphasized that Allegiant: (i) maintenance technicians were qualified and have appropriate experience; (ii) maintenance technicians undergo comprehensive training provided by Allegiant; (iii) retained and could hire sufficient staff to satisfy its maintenance needs, stating in relevant part:

**Aircraft Maintenance**

We have a Federal Aviation Administration ("FAA") approved maintenance program, which is administered by our maintenance department headquartered in Las Vegas. ***Technicians employed by us have appropriate experience and hold required licenses issued by the FAA. We provide them with comprehensive training and maintain our aircraft in accordance with FAA regulations.*** The maintenance performed on our aircraft can be divided into three general categories: line maintenance, major maintenance, and component and engine overhaul and repair. Line maintenance is generally performed by our personnel. We contract with outside organizations to provide major maintenance and component and engine overhaul and repair. We have chosen not to invest in facilities or equipment to perform our own major maintenance, engine overhaul or component work. ***Our management closely supervises all maintenance functions performed by our personnel and contractors employed by us, and by outside organizations. In addition to the maintenance contractors we presently utilize, we believe there are sufficient qualified alternative providers of maintenance services that we can use to satisfy our ongoing maintenance needs.***

(Emphasis added.)

195.   The 2015 10-K also stated: "We believe our aircraft are, and will continue to be, mechanically reliable."

196.   On April 29, 2016, the Company filed its amended annual report for the fiscal year ended December 31, 2015 on Form 10-K (the "2015 Amended 10-K")

Amended Class Action Complaint for Violations of the Federal Securities Laws

112

with the SEC, which amended the Company's prior 2015 Form 10-K. The 2015 Amended 10-K was signed by Defendants Gallagher and Sheldon. The 2015 Amended 10-K contained signed SOX certifications by Defendants Gallagher and Sheldon attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

197.   The 2015 Amended 10-K referenced its Code of Ethics, applicable to the Company's directors, officers and employees.

198.   The Company's Code of Ethics, amended on May 6, 2015, and available on the Company's website, stated that the Company is required to: (i) remain "*honest, fair and accountable in all business dealings*"; (ii) "*provide safe working conditions*" to employees; (iii) "*be a responsible and responsive corporate citizen in a moral, ethical and beneficial manne*r" to society and the local community; and (iv) "*pursue growth and earnings objectives while adhering to ethical standards*" as related to the Company's shareholders (emphasis added.).

199.   On May 16, 2016, the Company filed Gallagher's letter to shareholders, which highlighted that Allegiant's principles of safety and reliability were at the core of the Company's culture:

> **Our Culture, Our Principles**
> Lastly, but certainly not least, we commend all of our team members. Since our humble beginnings with one aircraft operating between Fresno and Las Vegas, they have been critical to our success. ***Their focus on safety and reliability, as well as providing an affordable travel experience for our leisure customers, continues to be one of the keys to our success.***
>
> ***We have a proven, seasoned model. Our culture has been honed on the principles summarized earlier.*** We are focused on offering our customers a value proposition that exceeds their expectations. We are also focused on creating a positive, interesting and empowering environment for our team members - one that is stimulating, where they can grow and prosper in such a way that they naturally thrive and advance the good of the

organization. Financially, we are focused on profits, growth, and the best financial returns for our shareholders.

(Emphasis added.)

200.  The foregoing emphasized statements were false and misleading because: (1) Allegiant's maintenance department was grossly understaffed, which created an environment where maintenance workers felt pressured and threatened by superiors to (i) disregard maintenance items outside of the scope of a work order, which ran contrary to Allegiant's self-described "normal procedures," (ii) falsely certify that maintenance tasks had been performed, (iii) skip maintenance inspections altogether but report that they had been performed, and (iv) rush maintenance tasks to keep up with the large work load, which itself could pose hazards to safety; (2) Allegiant maintenance technicians were inexperienced and insufficiently trained, which created an environment leading to (i) experienced mechanics feeling overwhelmed and pressured to somehow complete repairs on time; (ii) mechanics falsely certifying that certain tasks were being completed; and (iii) substandard repairs being made; (3) Allegiant had a culture which put profits before safety, lagging industry standards; (4) the aforementioned business practices created an unsafe operation and violated Allegiant's Code of Ethics.

201.  On February 24, 2017, the Company filed its annual report for the fiscal year ended December 31, 2016 on Form 10-K (the "2016 10-K") with the SEC, which provided the Company's annual financial results and position. The 2016 10-K was signed by Defendants Gallagher and Sheldon. The 2016 10-K also contained signed SOX certifications by Defendants Gallagher and Sheldon attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

202.  The 2016 10-K emphasized that Allegiant: (i) maintenance technicians were qualified and have appropriate experience; (ii) maintenance technicians undergo

Amended Class Action Complaint for Violations of the Federal Securities Laws
114

comprehensive training provided by Allegiant; (iii) retained and could hire sufficient staff to satisfy its maintenance needs, stating in relevant part:

**Aircraft Maintenance**

We have a Federal Aviation Administration ("FAA") approved maintenance program, which is administered by our maintenance department headquartered in Las Vegas. ***Technicians employed by us have appropriate experience and hold required licenses issued by the FAA. We provide them with comprehensive training and maintain our aircraft in accordance with FAA regulations.*** The maintenance performed on our aircraft can be divided into three general categories: line maintenance, major maintenance, and component and engine overhaul and repair. Line maintenance is generally performed by our personnel in certain cities of our network and by contractors elsewhere. We contract with outside organizations to provide major maintenance and component and engine overhaul and repair. We have chosen not to invest in facilities or equipment to perform our own major maintenance, engine overhaul or component work. ***Our management closely supervises all maintenance functions performed by our personnel and contractors employed by us, and by outside organizations. In addition to the maintenance contractors we presently utilize, we believe there are sufficient qualified alternative providers of maintenance services that we can use to satisfy our ongoing maintenance needs.***

(Emphasis added.)

203.   The 2016 10-K suspiciously omitted language found in the Company's 2015 10-K: "We believe our aircraft are, and will continue to be, mechanically reliable."

204.   On May 18, 2017, the Company filed Gallagher's letter to shareholders, which highlighted that Allegiant's principles of safety and reliability were at the core of the Company's culture:

Allegiant's net income in 2016 was $219.5 million, an increase of more than 25 times our net income in 2006 when we went public. Over the past 57 quarters of consecutive profitability, including the first quarter 2017, our cumulative net income is in excess of $1.0 billion. ***These***

- 55 -

*unprecedented results were built on our core fundamentals* - cost discipline, flexibility, simplicity and *safety*. Additionally, 2016 will be remembered as a foundational year, setting the stage for an even stronger company in 2019, when we will have completed our transition to a single fleet type - Airbus. We will accomplish this fleet transition by sourcing enough new and used Airbus aircraft to replace our MD80 aircraft fleet. Having an all Airbus fleet will greatly simplify our operations, including improved pilot productivity, better reliability, improved fuel efficiency and an overall up gauge per aircraft.

*   *   *

**Our Culture, Our Principles**

Our team members have been and will continue to be key to our success. Year after year they have made the efforts and investment to grow the Company to our current national footprint. *Their focus on safety and reliability as well as providing a fun travel experience to our leisure customers continues to be one of the keys to our success*.

*We have a proven, seasoned model. Our culture has been honed on the principles summarized earlier* and we are focused on offering our customers a value proposition exceeding their expectations. We are also focused on creating a positive, challenging and empowering environment for our team members - one that is stimulating, where they can grow and prosper in such a way that they naturally thrive and advance the good of the organization. Financially, we are focused on profits, growth, and the best financial returns for our shareholders.

(Emphasis added.)

205. The foregoing emphasized statements were false and misleading because: (1) Allegiant's maintenance department was grossly understaffed, which created an environment where maintenance workers felt pressured and threatened by superiors to (i) disregard maintenance items outside of the scope of a work order, which ran contrary to Allegiant's self-described "normal procedures," (ii) falsely certify that maintenance tasks had been performed, (iii) skip maintenance inspections altogether but report that they had been performed, and (iv) rush maintenance tasks to keep up with the large work load, which itself could pose hazards to safety; (2) Allegiant maintenance technicians were inexperienced and insufficiently trained,

- 56 -

1  which created an environment leading to (i) experienced mechanics feeling
2  overwhelmed and pressured to somehow complete repairs on time; (ii) mechanics
3  falsely certifying that certain tasks were being completed; and (iii) substandard
4  repairs being made; (3) Allegiant had a culture which put profits before safety,
5  lagging industry standards; (4) the aforementioned business practices violated
6  Allegiant's Code of Ethics.

7      206.   On March 1, 2018, the Company filed its annual report for the fiscal year
8  ended December 31, 2017 on Form 10-K (the "2017 10-K") with the SEC, which
9  provided the Company's annual financial results and position. The 2017 10-K was
10 signed by Defendants Gallagher and Sheldon. The 2017 10-K also contained signed
11 SOX certifications by Defendants Gallagher and Sheldon attesting to the accuracy of
12 financial reporting, the disclosure of any material changes to the Company's internal
13 controls over financial reporting, and the disclosure of all fraud.

14     207.   The 2017 10-K emphasized that Allegiant: (i) maintenance technicians
15 were qualified and have appropriate experience; (ii) maintenance technicians undergo
16 comprehensive training provided by Allegiant; (iii) retained and could hire sufficient
17 staff to satisfy its maintenance needs, stating in relevant part:

18     **Aircraft Maintenance**

19     We have a Federal Aviation Administration ("FAA") approved
20     maintenance program, which is administered by our maintenance
21     department headquartered in Las Vegas. ***Technicians employed by us
       have appropriate experience and hold required licenses issued by the
22     FAA. We provide them with comprehensive training and maintain our
23     aircraft in accordance with FAA regulations.*** The maintenance
       performed on our aircraft can be divided into three general categories:
24     line maintenance, major maintenance, and component and engine
25     overhaul and repair. Line maintenance is generally performed by our
       personnel in certain cities of our network and by contractors elsewhere.
26     We contract with outside organizations to provide major maintenance
27     and component and engine overhaul and repair. We have chosen not to
       invest in facilities or equipment to perform our own major maintenance,
28

- 57 -

engine overhaul or component work. ***Our management closely supervises all maintenance functions performed by our personnel and contractors employed by us, and by outside organizations. In addition to the maintenance contractors we presently utilize, we believe there are sufficient qualified alternative providers of maintenance services that we can use to satisfy our ongoing maintenance needs.***

(Emphasis added.)

208.   The 2017 10-K suspiciously omitted language found in the 2015 10-K: "We believe our aircraft are, and will continue to be, mechanically reliable."

209.   The foregoing emphasized statements were false and misleading because: (1) Allegiant's maintenance department was grossly understaffed, which created an environment where maintenance workers felt pressured and threatened by superiors to (i) disregard maintenance items outside of the scope of a work order, which ran contrary to Allegiant's self-described "normal procedures," (ii) falsely certify that maintenance tasks had been performed, (iii) skip maintenance inspections altogether but report that they had been performed, and (iv) rush maintenance tasks to keep up with the large work load, which itself could pose hazards to safety; (2) Allegiant maintenance technicians were inexperienced and insufficiently trained, which created an environment leading to (i) experienced mechanics feeling overwhelmed and pressured to somehow complete repairs on time; (ii) mechanics falsely certifying that certain tasks were being completed; and (iii) substandard repairs being made; (3) Allegiant had a culture which put profits before safety, lagging industry standards; (4) the aforementioned business practices violated Allegiant's Code of Ethics.

## XI.   GALLAGHER'S WELL-TIMED STOCK SALES AND ADOPTION OF A STOCK PLAN SUPPORT A STRONG INFERENCE OF SCIENTER

210.   Gallagher sold $83,073,245.16 in Allegiant securities during the Class Period by executing suspiciously well-timed sales and the timely formation of a

- 58 -

10b5-1 stock trading plan. Upon information and belief, Gallagher sold this stock on undisclosed, inside information.

211.   On March 9, 2016, just two days after Allegiant had attempted to refute the narrative it was unsafe, Gallagher suspiciously sold over 292,200 shares of Allegiant stock at $163.50 for total proceeds of $47,774,700.

212.   Between August 2017 and November 2017, CBS made FOIA requests for Allegiant's maintenance records. Upon information and belief, Gallagher learned that *60 Minutes* was investigating Allegiant and interviewing sources for an unflattering story concerning Allegiant's aircraft maintenance and safety record.

213.   On January 5, 2018, Allegiant announced that Gallagher had set up a 10b5-1 stock trading plan, which it became aware as of December 30, 2017.

214.   Between December 28, 2017 and January 17, 2018, Gallagher sold 200,000 shares of Allegiant stock through a trading plan for total proceeds of $33,232,408.01. Gallagher made the following sales:

| Date of Sale | Number of Shares | Price |
|---|---|---|
| 12/28/2017 | 16,018 | $155.82 |
| 12/29/2017 | 1,800 | $155.00 |
| 1/12/2018 | 71,678 | $165.54 |
| 1/16/2018 | 5,539 | $168.03 |
| 1/16/2018 | 25,023 | $169.21 |
| 1/16/2018 | 30,876 | $170.12 |
| 1/16/2018 | 1,235 | $171.00 |
| 1/17/2018 | 10,894 | $165.36 |
| 1/17/2018 | 24,991 | $166.43 |
| 1/17/2018 | 7,746 | $167.24 |
| 1/17/2018 | 4,200 | $168.36 |

215.   On March 6, 2018, Gallagher sold an additional $2,066,137.15 in Allegiant stock through the exercise of stock options, in the following transactions:[29]

---

[29] Gallagher exercised an employee stock option to buy 12,645 shares at $85.24 per share.

| Date of Sale | Number of Shares | Price |
|---|---|---|
| 3/6/2018 | 11,200 | $163.21 |
| 3/6/2018 | 900 | $164.57 |
| 3/6/2018 | 545 | $165.27 |

216.   On April 15, 2018, CBS's *60 Minutes* the truth was revealed to Allegiant investors concerning Defendants' fraudulent scheme.

217.   In sum Gallagher suspiciously set up a stock trading plan and sold a total of $35,298,545.16 worth of Allegiant stock at artificially inflated prices before *60 Minutes* revealed the truth to Allegiant investors in its April 15, 2018 broadcast.

218.   The broadcast reported that Allegiant objected to the release of certain of its maintenance records that CBS requested pursuant to FOIA. Those objections were only overruled by the FAA after an FAA representative had been interviewed for the broadcast. Neither Allegiant nor Gallagher appeared for an interview.

## XII.   THE TRUTH SLOWLY EMERGES

219.   On April 13, 2018, CBS News announced it would air a *60 Minutes* segment on Sunday, April 15 2018, criticizing the Company's safety and maintenance record.

220.   On this news, shares of Allegiant fell $14.20 per share or over 8.59% to close at $151.05 per share on April 13, 2018.

221.   On April 15, 2018, CBS News aired a *60 Minutes* report revealing that: (i) Allegiant aircraft had a high number of serious mechanical incidents from mid-2015 through October 2017; (ii) Allegiant lacks the infrastructure and personnel to adequately maintain their aircraft; (iii) Allegiant discouraged employees from reporting safety and maintenance issues; and (iv) Allegiant had a poor safety culture. The broadcast also criticized the FAA's oversight of Allegiant. The transcript of the interview provides, in relevant part:

> ALLEGIANT AIR: THE BUDGET AIRLINE FLYING UNDER THE RADAR

- 60 -

*Steve Kroft investigates Allegiant Air, a discount carrier known more for its ultra-low fares than its high record of in-flight breakdowns*

\* \* \*

Allegiant Air is a small, ultra-low-cost carrier based in Las Vegas, that happens to be one of the country's most profitable airlines. But, according to federal aviation records and interviews with pilots, mechanics and industry experts, it may also be the most dangerous.

The airline flew 12 million passengers last year on its 99 planes to 120 destinations from California to Florida. But it's had persistent problems since at least the summer of 2015 when it experienced a rash of mid-air breakdowns, including five on a single day. It was not a fluke.

**Public documents show an alarming number of aborted takeoffs, cabin pressure loss, emergency descents, and unscheduled landings. Yet for the most part, allegiant's difficulties have managed to stay under the radar of the flying public.**

\* \* \*

Allegiant has some of the lowest fares, the least frills, and the oldest fleet in the business. Right now, nearly 30% of its planes are antiquated, gas-guzzling McDonnell-Douglas MD-80s, almost all of them purchased second-hand from foreign airlines. It also has more than its share of angry, traumatized passengers willing to share their experiences.

Dan Mannheim: People are screaming. The stewardess are running up and down the aisles.

Chris: And then the smoke started pouring in out of all the vents you know, started filling the cabin up with smoke.

Shanyl: All I kept thinking was, "Thank God we're on the ground."

For the past seven months, we have been scrutinizing 'service difficulty reports' filed by Allegiant with the FAA. They are official, self-reported records of problems experienced by their aircraft. What we found raised some disturbing questions about the performance of their fleet. **Between January 1st, 2016 and the end of last October, we found more than 100 serious mechanical incidents, including mid-air engine failures, smoke**

Amended Class Action Complaint for Violations of the Federal Securities Laws
121

*and fumes in the cabin, rapid descents, flight control malfunctions, hydraulic leaks and aborted takeoffs.*

John Goglia: Something significant is going on and it should be addressed.

*We shared the reports with John Goglia who has more than 40 years of experience in the aviation industry, including nine years as a presidential appointee to the National Transportation Safety Board. Now retired, Goglia remains a respected figure in the aviation industry and occasionally testifies as an expert witness on safety issues.*

John Goglia: There's another one, engine fire.

*We wanted to know what he thought of Allegiant's 60 unscheduled landings and 46 in-flight emergencies.*

*Steve Kroft: I mean, is that common for an airline of this size?*

*John Goglia: Very, very high for an airline of this size. I hate to make comparisons-- but we've seen that before in airlines that are no longer with us that had experienced a number of accidents and killed a bunch of people. I don't wanna repeat that. So I try to push on Allegiant to-- to-- clean up their operation.*

*Steve Kroft: What do those reports say about Allegiant?*

*John Goglia: Well, just the service difficulty reports say that-- somebody's not paying attention.*

*Steve Kroft: You're a former member of the NTSB. Would you fly on an Allegiant plane?*

*John Goglia: I have encouraged my family, my friends and myself not to fly on Allegiant.*

*We wanted to ask Allegiant and its CEO, Maurice Gallagher about all of this, what they gave us instead was a brief statement from their vice president of operations which says, in part:*

- 62 -

"All of us at Allegiant are proud of our strong safety record, as noted in the most current, comprehensive FAA audit. Safety is at the forefront of our minds and the core of our operations."

* * *

*But John Goglia and other aviation experts we talked to aren't so sure. They believe Allegiant's problems come from the confluence of its aggressive business model and a safety culture they find to be lagging.* The business strategy which has produced 60 straight quarters of profits, occasionally with margins approaching 30 percent, requires the airline to keep costs down and "push the metal" – keep the planes flying as often as possible. But Allegiant's aged fleet of MD-80s, which it is phasing out and is responsible for most of its problems, require a lot of maintenance and reliable parts are hard to come by.

*Steve Kroft: Is there anything that separates the maintenance systems at Allegiant from the ones at the larger carriers?*

*John Goglia: Well, the first and most obvious piece is the lack of infrastructure. They don't have the number of mechanics. And we've seen some problems with the contractors that they've used. We're seeing problems that require-- feet on the ground, people looking at the airplanes when they're being worked on so that these problems are caught during maintenance and not caught by the f-- crew as-- as a surprise and emergency.*

*We found numerous planes with the same recurring issues and others returned to service before they were ready. Like Allegiant Flight 533 last July, which was delayed in Cincinnati on its flight to Las Vegas.*

Mercedes Weller and Dan Mannheim, who says he paid $80 for his roundtrip ticket to Vegas, remember the pilot's announcement as they pushed away from the gate three hours behind schedule.

Mercedes Weller: He came on and he said, "The mechanics have been working on this right engine. We apologize for that. We'll get you up in the air as soon as possible." As we started taxiing, everything was going okay. And then it's, like, as soon as the wheels came up, the engine blew.

- 63 -

Passenger Video: Here we go, we're taking off. Say blastoff! Oh [expletive].

Mercedes Weller: The force of it was so hard that it-- it popped open the cockpit doors. And there was smoke in the cabin and fire coming out of that engine. And I just remember thinking that I would never see my daughter again.

Weller and Mannheim said the plane had to circle at a low altitude on one engine for about 25 minutes while the airport ground crews cleared debris from the runway for an emergency landing.

Dan Mannheim: Everyone turned their phones back on. And I called my family. And-- I pretty much tellin' 'em goodbyes.

Steve Kroft: You thought this was it?

Mercedes Weller: I text my husband. And I said "If something happens, just know that I've been very happy. And I love you."

The plane eventually landed safely back in Cincinnati. For their trouble, Allegiant offered to re-book Mercedes and Dan the next day and gave everyone a $150 voucher.

***But that was not the only problem Allegiant's small fleet encountered last July. There were nine other Allegiant planes that also had to make unscheduled landings during that month. Four of those planes had engine problems, two reported fumes in the cabin, four had instrument or flight control problems. And that's not all.***

***Steve Kroft: Over the course of one weekend in July, Allegiant canceled or rescheduled 11 separate flights leaving Las Vegas, all for mechanical issues.***

***John Goglia: You think that's a big red flag? Yeah--***

***Steve Kroft: Something's wrong***

***John Goglia: Something's wrong.***

- 64 -

*Among the most concerned are the people that have to fly the planes. Daniel Wells, a captain for Atlas Air, with 30 years experience, is president of Teamsters Union 1224 which represents pilots from Allegiant and nine other airlines.* We wanted to know how unusual it was for a small airline with 99 planes to have 25 engine failures or malfunctions in less than two years.

Daniel Wells: Well, I-- I don't have all the data in front of me to compare with other airlines. But I can say that those are extraordinarily high numbers.

*Steve Kroft: Outside the norm?*

*Daniel Wells: Outside the norm for sure. If I come into a career as an airline pilot now, I will go my entire career, maybe 30 years, and never have an engine failure, ever.*

*Steve Kroft: What are Allegiant pilots telling you about their airline?*

*Daniel Wells: What I hear from hundreds of conversations with Allegiant pilots, is the management of Allegiant seems to denigrate the pursuit of safety.*

*Steve Kroft: Why are we unable to talk to any Allegiant pilots?*

*Daniel Wells: Well-- (LAUGH) I think that says volumes about the company. I would love to put up some of the-- Allegiant pilots. But they can't. And they can't because they know that they would be terminated. At the very least, disciplined. And that's just for speaking up about concerns. So I have to speak on their behalf.*

*Captain Wells says they have every reason to fear retaliation considering what happened to one of Allegiant's pilots three summers ago.*

On June 8, 2015, this Allegiant MD-80 jet with 141 passengers aboard had just left St. Petersburg, Florida for Hagerstown, Maryland when a flight attendant informed the pilot that there was smoke in the cabin.

- 65 -

Concerned about a fire, Captain Jason Kinzer and his co-pilot made a quick decision.

\* \* \*

Concerned about a fire, Captain Jason Kinzer and his co-pilot made a quick decision.

\* \* \*

Captain Kinzer landed the plane and was met at the end of the runway by fire and rescue trucks that confirmed his concerns.

\* \* \*

*[With the plane on the ground, the pilot] did what he had been trained to do: he deployed the emergency chutes and evacuated the aircraft, with eight people sustaining mostly minor injuries.*

*The incident drew unwanted attention to Allegiant but nothing compared to what followed six weeks later when the airline abruptly fired Kinzer for his actions.*

\* \* \*

Looking at the FAA's records, you would have to conclude that that is a very optimistic assessment. Go back to August 17, 2015 -- around the time the FAA switched priorities from enforcement to compliance – and you can see the differences in their approach. *Allegiant Flight 436 was leaving Las Vegas full of passengers when it nearly crashed on takeoff. Barreling down the runway, the pilot had trouble controlling the plane. Running out of asphalt, he made a last-second decision to abort, traveling at 120 knots per hour, barely avoiding disaster.*

John Goglia: Something inside him said, "I'm not putting this in the air." And thank God he didn't, because that was-- gonna result in a bad outcome.

*The problem turned out to be a missing cotter pin that holds together essential components necessary for the pilot to fly the plane. John Goglia is a former member of the National Transportation Safety Board.*

*John Goglia: I mean, this is a critical flight control. So this isn't-- isn't fixing a coffee maker. This is fixing a critical flight component and obviously, that wasn't done adequately.*

- 66 -

According to the detailed report from the FAA investigator, Allegiant and its maintenance contractor, AAR, failed to perform procedures that would have caught the error no less than five times. The report called it "a deliberate and systemic act of non-compliance" that had endangered thousands of passengers on more than 200 subsequent Allegiant flights.

The inspector recommended strong enforcement action and maximum fines. But superiors, citing the new compliance philosophy, ignored the recommendations and closed the case.

Loretta Alkalay: Actually, the file called for a much larger investigation, but the FAA just said-- basically letter of correction, which means nothing.

Steve Kroft: So, it wasn't even a slap on the wrist.

Loretta Alkalay: Right.

\* \* \*

*We filed a Freedom of Information request with the FAA asking for more than a year's worth of mechanical interruption summary reports from Allegiant and seven other airlines so we could make a comparison. We received the documents for every airline except Allegiant, which objected to their release.*

Steve Kroft: What do you make of that?

*John Goglia: Well, obviously, they have something to hide.* And you have-- a number of 'em from other airlines, a whole stack from United Airlines. Calls into question why Allegiant is stopping it. You know, is there something there that they don't want to see? Is there something there that the FAA doesn't want you to see, either? So that actually points at both of 'em.

Steve Kroft: Seven other airlines had no problem with us looking at their records.

John Duncan: I appreciate that.

Amended Class Action Complaint for Violations of the Federal Securities Laws

Steve Kroft: Only Allegiant.

John Duncan: I have no idea what their rationale is in that regard.

*Six days after this interview, the FAA overruled Allegiant's objections and produced the documents. They showed, on average, the airline was nearly three and a half times more likely to have mid-air breakdowns than American, United, Delta, JetBlue and Spirit.*

\* \* \*

*But even more disturbing are new allegations from the ranks of Allegiant's own pilots. Their union president, Captain Daniel Wells, says he's concerned that Allegiant is trying to gain a competitive cost advantage by softening safety standards adhered to by the major airlines. That pilots are being told to think twice before declaring costly emergencies. And that Allegiant's maintenance department tries to talk pilots out of reporting problems with their aircraft to avoid delays and keep the planes moving.*

*Daniel Wells: What I hear from the Allegiant pilots are-- they get-- a call from maintenance control, from-- who is-- an agent of the company and says, "Y-- you didn't write anything up, did you?" Meaning you didn't notice any maintenance problems on the airplane. And that's a very clear-- message to send to pilots that the company is discouraging you from-- recording maintenance deficiencies.*

*Steve Kroft: Is that legal?*

*Daniel Wells: No, because our captains are required to report any mechanical deficiencies of an aircraft.*

In response, Allegiant's statement to us says, in part:

"Any employee who fails to report safety-related concerns through available channels is in violation of company policies, and may also be in violation of federal regulations."

*Steve Kroft: The head of the pilots' union told us that Allegiant's maintenance operation is discouraging pilots from reporting mechanical difficulties on the flights. Would that alarm you?*

- 68 -

*John Duncan [Executive Director of Flight Standards at the FAA]: Certainly discouraging pilots from reporting-- legitimate-- maintenance problems-- would concern me a great deal.*

*Steve Kroft: That's against the law, isn't it? I mean--*

*John Duncan: It's certainly against--*

*Steve Kroft: --aren't pilots required to report this?*

*John Duncan: They are. It certainly doesn't meet the safety standards that we would anticipate*

\* \* \*

*Steve Kroft: Do you know anybody in the industry that-- that flies Allegiant?*

*Loretta Alkalay [Former FAA Attorney]: No. (LONG PAUSE) No. And I know that a lot of people talk about how they don't fly Allegiant, so it's very concerning. I know people that worked at the FAA who say they would never fly Allegiant.*

*Steve Kroft: I mean, that's quite an admission. I mean, this just seems like one of those secrets that everybody knows, and then if you have a plane go down, it'll all come out.*

*Loretta Alkalay: You know, if, God forbid, there is an accident, I think there will be a lot of people saying, "Well, we knew. We knew and we did nothing."*

(Emphasis added.)

222.    On this news, shares of Allegiant fell $4.65 per share or over 3% to close at $146.40 per share on April 16, 2018.

223.    On May 9, 2018, the U.S. Department of Transportation, Office of Inspector General announced it would audit how the FAA investigated allegations of "improper maintenance practices" at Allegiant in response to requests from several

- 69 -

1   members of Congress. On this news, shares of Allegiant fell $3.30 per share or over

2   2% to close at $159.10 on May 9, 2018.

### POST-CLASS PERIOD DEVELOPMENTS

4   224.   In a July 12, 2018 conference call with investors, Allegiant stated it still

5   had not decided how to finance its planned Sunseeker resort. Redmond said the

6   Company could secure a recourse or non-recourse loan, or even bring in a partner.

7   Analysts on the call were concerned Allegiant would pledge airline assets to secure

8   funding.

9   225.   Then, on September 13, 2018, Allegiant announced it was considering

10   funding construction costs through cash flow to the tune of $300 million. The

11   Company also announced it was changing its plans to build a 500-room hotel with

12   180 condo units.

### PLAINTIFFS' CLASS ACTION ALLEGATIONS

14   226.   Plaintiffs bring this action as a class action pursuant to Federal Rule of

15   Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who

16   purchased or otherwise acquired the publicly traded securities of Allegiant during the

17   Class Period (the "Class"); and were damaged upon the revelation of the alleged

18   corrective disclosures. Excluded from the Class are Defendants herein, the officers

19   and directors of the Company, at all relevant times, members of their immediate

20   families and their legal representatives, heirs, successors or assigns and any entity in

21   which Defendants have or had a controlling interest.

22   227.   The members of the Class are so numerous that joinder of all members is

23   impracticable. Throughout the Class Period, Allegiant securities were actively traded

24   on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs

25   at this time and can be ascertained only through appropriate discovery, Plaintiffs

26   believes that there are hundreds or thousands of members in the proposed Class.

27   Record owners and other members of the Class may be identified from records

28   maintained by the Company or its transfer agent and may be notified of the pendency

1   of this action by mail, using the form of notice similar to that customarily used in

2   securities class actions.

3        228.   Plaintiffs' claims are typical of the claims of the members of the Class as

4   all members of the Class are similarly affected by Defendants' wrongful conduct in

5   violation of federal law that is complained of herein.

6        229.   Plaintiffs will fairly and adequately protect the interests of the members

7   of the Class and has retained counsel competent and experienced in class and

8   securities litigation. Plaintiffs has no interests antagonistic to or in conflict with those

9   of the Class.

10       230.   Common questions of law and fact exist as to all members of the Class

11   and predominate over any questions solely affecting individual members of the Class.

12   Among the questions of law and fact common to the Class are:

13       •    whether the federal securities laws were violated by Defendants' acts as

14       alleged herein;

15       •    whether statements made by Defendants to the investing public during

16       the Class Period misrepresented material facts about the financial condition,

17       business, operations, and management of the Company;

18       •    whether Defendants' public statements to the investing public during the

19       Class Period omitted material facts necessary to make the statements made, in

20       light of the circumstances under which they were made, not misleading;

21       •    whether the Individual Defendants caused the Company to issue false

22       and misleading SEC filings and public statements during the Class Period;

23       •    whether Defendants acted knowingly or recklessly in issuing false and

24       misleading SEC filings and public statements during the Class Period;

25       •    whether the prices of Allegiant securities during the Class Period were

26       artificially inflated because of the Defendants' conduct complained of herein;

27       and

28

Amended Class Action Complaint for Violations of the Federal Securities Laws

1        •     whether the members of the Class have sustained damages and, if so,
2    what is the proper measure of damages.

3        231.   A class action is superior to all other available methods for the fair and
4  efficient adjudication of this controversy since joinder of all members is
5  impracticable. Furthermore, as the damages suffered by individual Class members
6  may be relatively small, the expense and burden of individual litigation make it
7  impossible for members of the Class to individually redress the wrongs done to them.
8  There will be no difficulty in the management of this action as a class action.

9        232.   Plaintiffs will rely, in part, upon the presumption of reliance established
10  by the fraud-on-the-market doctrine in that:

11        •     Defendants made public misrepresentations or failed to disclose material
12    facts during the Class Period;

13        •     the omissions and misrepresentations were material;

14        •     Allegiant securities are traded in efficient markets;

15        •     the Company's securities were liquid and traded with moderate to heavy
16    volume during the Class Period;

17        •     the Company traded on the NASDAQ, and was covered by multiple
18    analysts;

19        •     the misrepresentations and omissions alleged would tend to induce a
20    reasonable investor to misjudge the value of the Company's securities; and

21        •     Plaintiffs and members of the Class purchased and/or sold Allegiant
22    securities between the time the Defendants failed to disclose or misrepresented
23    material facts and the time the true facts were disclosed, without knowledge of
24    the omitted or misrepresented facts.

25        233.   Based upon the foregoing, Plaintiffs and the members of the Class are
26  entitled to a presumption of reliance upon the integrity of the market.

27        234.   Alternatively, Plaintiffs and the members of the Class are entitled to the
28  presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of*

- 72 -

*the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

235.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

236.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

237.    During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

238.    The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Allegiant securities during the Class Period.

- 73 -

239.   The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

240.   Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

241.   As a result of the foregoing, the market price of Allegiant securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Allegiant securities during the Class Period in purchasing Allegiant securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

242.   Had Plaintiffs and the other members of the Class been aware that the market price of Allegiant securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material

- 74 -

1  adverse information which the Company's and the Individual Defendants did not

2  disclose, they would not have purchased Allegiant securities at the artificially inflated

3  prices that they did, or at all.

4      243.   As a result of the wrongful conduct alleged herein, Plaintiffs and other

5  members of the Class have suffered damages in an amount to be established at trial.

6      244.   By reason of the foregoing, the Company and the Individual Defendants

7  have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder

8  and are liable to the Plaintiffs and the other members of the Class for substantial

9  damages which they suffered in connection with their purchases of Allegiant

10  securities during the Class Period.

11                           **COUNT II**

12       **Violation of Section 20(a) of The Exchange Act**

13              **Against the Individual Defendants**

14      245.   Plaintiffs repeat and reallege each and every allegation contained in the

15  foregoing paragraphs as if fully set forth herein.

16      246.   During the Class Period, the Individual Defendants participated in the

17  operation and management of the Company, and conducted and participated, directly

18  and indirectly, in the conduct of the Company's business affairs. Because of their

19  senior positions, they knew the adverse non-public information regarding the

20  Company's business practices.

21      247.   As officers and/or directors of a publicly owned company, the Individual

22  Defendants had a duty to disseminate accurate and truthful information with respect

23  to the Company's financial condition and results of operations, and to correct

24  promptly any public statements issued by the Company which had become materially

25  false or misleading.

26      248.   Because of their positions of control and authority as senior officers, the

27  Individual Defendants were able to, and did, control the contents of the various

28  reports, press releases and public filings which the Company disseminated in the

- 75 -

1  marketplace during the Class Period. Throughout the Class Period, the Individual

2  Defendants exercised their power and authority to cause the Company to engage in

3  the wrongful acts complained of herein. The Individual Defendants therefore, were

4  "controlling persons" of the Company within the meaning of Section 20(a) of the

5  Exchange Act. In this capacity, they participated in the unlawful conduct alleged

6  which artificially inflated the market price of Allegiant securities.

7       249.   Each of the Individual Defendants, therefore, acted as a controlling

8  person of the Company. By reason of their senior management positions and/or being

9  directors of the Company, each of the Individual Defendants had the power to direct

10 the actions of, and exercised the same to cause, the Company to engage in the

11 unlawful acts and conduct complained of herein. Each of the Individual Defendants

12 exercised control over the general operations of the Company and possessed the

13 power to control the specific activities which comprise the primary violations about

14 which Plaintiffs and the other members of the Class complain.

15      250.   By reason of the above conduct, the Individual Defendants are liable

16 pursuant to Section 20(a) of the Exchange Act for the violations committed by the

17 Company.

18                          **PRAYER FOR RELIEF**

19      WHEREFORE, Plaintiffs demands judgment against Defendants as follows:

20      A.     Determining that the instant action may be maintained as a class action

21 under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the

22 Class representative;

23      B.     Requiring Defendants to pay damages sustained by Plaintiffs and the

24 Class by reason of the acts and transactions alleged herein;

25      C.     Awarding Plaintiffs and the other members of the Class prejudgment and

26 post-judgment interest, as well as their reasonable attorneys' fees, expert fees and

27 other costs; and

28

Amended Class Action Complaint for Violations of the Federal Securities Laws

D.    Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demands a trial by jury.

Dated: October 22, 2018              Respectfully submitted,

**LEVERTY & ASSOCIATES LAW CHTD.**

/s/ Patrick R. Leverty
Patrick R. Leverty, Esq.
Reno Gould House
832 Willow Street
Reno, NV 89502
Telephone: (775) 322-6636
Facsimile: (775) 322-3953
Email: pat@levertylaw.com

*Liaison Counsel for Plaintiffs*

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim, Esq.
*(pro hac vice forthcoming)*
Laurence M. Rosen, Esq.
*(pro hac vice forthcoming)*
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs*

- 77 -

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2018, I electronically filed the foregoing **Amended Class Action Complaint for Violations of the Federal Securities Laws** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

/s/ Patrick R. Leverty

- 78 -