EXHIBIT "1"

EXHIBIT "1"

MARTIN A. MUCKLEROY, ESQ.
Nevada Bar No. 009634
MUCKLEROY LUNT, LLC
6077 S. Fort Apache, Ste 140
Las Vegas, NV 89148
Phone: (702) 907-0097
Direct: (702) 534-6272
Fax: (702) 938-4065
martin@muckleroylunt.com

*Attorney for Plaintiff*

(Additional Counsel on Signature Page)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| MARK FULLENKAMP, derivatively on behalf of ALLEGIANT TRAVEL CO., | Case No. |
| Plaintiff, | |
| v. | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| MAURICE J. GALLAGHER, JR., JOHN T. REDMOND, GREGORY ANDERSON, SCOTT SHELDON, ERIC GUST, CHARLES W. POLLARD, LINDA A. MARVIN, GARY E. ELLMER, and MONTIE R. BREWER, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| ALLEGIANT TRAVEL CO., | |
| Nominal Defendant. | |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Mark Fullenkamp ("Plaintiff"), by and through his counsel, derivatively on behalf of nominal defendant Allegiant Travel Co. ("Allegiant" or the "Company"), submits this Verified Stockholder Derivative Complaint ("Complaint") against certain current and former officers and directors of the Company (collectively defined herein as the "Individual Defendants"), and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings submitted by Allegiant to the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Allegiant; and (iii) other publicly available information, including court filings and media and analyst reports, concerning Allegiant.

## SUMMARY OF THE ACTION

1. This is a stockholder derivative action asserting claims for breach of fiduciary duty and unjust enrichment, brought on behalf of nominal defendant Allegiant, against the Individual Defendants.

2. Allegiant bills itself as a leisure travel company, focusing on providing travel services and products to residents of under-served cities in the United States. The Company offers scheduled air transportation on limited frequency nonstop flights between under-served cities and leisure destinations. As of May 23, 2018, Allegiant operated a fleet of 99 Airbus aircraft. The Company also provides air-related services and products in conjunction with air transportation and third-party travel products, such as hotel rooms, ground transportation, and attractions. Allegiant provides air transportation services through fixed-fee agreements and charter service on a year-round and ad-hoc basis. Further, the Company leases spare engines to a third party and offers management solutions to golf courses.

3. Allegiant was founded in 1997, but quickly went bankrupt. It was resurrected in 2002 by defendant Maurice J. Gallagher, Jr. ("Gallagher"), one of its major creditors, who has an extensive history with low-cost airlines. The Company is based in Las Vegas, Nevada.

4.      Allegiant currently operates the ninth largest commercial airline in the United States and is known as a low-cost or budget airline.  Those low prices came at the expense of skimping on safety, from at least mid-2014 to the present (the "Relevant Period").

5.      Defendant Gallagher's strategy of saving money on safety and maintenance expenses became a public problem for Allegiant in 2015.  Although Allegiant was rated the most profitable airline in 2015, that same year its fleet had to make at least seventy-seven unexpected landings for serious mechanical failures.  On June 25, 2015, five Allegiant planes failed midair within the span of four hours.  Allegiant had a fleet of eighty-six planes and forty-two of them broke down midair at least once in 2015.

6.      During this period, the *Tampa Bay Times* analyzed and reported that federal aviation records revealed that Allegiant's planes were four times more likely to fail during flight than those operated by other major U.S. airlines.

7.      Each of the Individual Defendants has an extensive history in the airline industry and was aware of the importance of proper safety for an air carrier, yet failed to correct these widespread problems in a timely fashion.

8.      While negative news stories about safety failures trickled out from local news sources, the Individual Defendants caused Allegiant to make a series of false and misleading statements regarding its safety procedures and the Company's purported compliance with Federal Aviation Administration ("FAA") regulations.  The statements that safety was the Company's primary concern falsely inflated the price of Allegiant stock.

9.      At the same time, rather than correcting the safety issues at Allegiant, the Individual Defendants instead employed a scheme aimed at minimizing the risk of public disclosure of the safety issues.  Several of the Individual Defendants also sold large quantities of stock during this period, with knowledge that the Company's stock price was artificially inflated.

10.     Although thousands of people were likely exposed to local news stories such as those published by the *Tampa Bay Times*, it was not until CBS News aired a segment on its *60 Minutes* program on April 15, 2018, which was viewed by over 10.4 million people, that the truth

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

reached the masses.  The *60 Minutes* segment featured interviews from airline experts, passenger footage, and commentary from journalists.  It told the story of an airline that insiders refused to fly because of safety concerns – an airline that was willing to compromise the safety of its passengers in exchange for increased profit.

11.   Three of the Individual Defendants sold $2.3 million worth of Allegiant shares, at artificially-inflated prices, just over a month prior to the airing of the *60 Minutes* segment, at a time when they were certainly aware that CBS News was producing the episode about the Company.  CBS News stated that they spent seven months researching and filming the *60 Minutes* segment and although CBS reached out to Allegiant several times during the process, the Company refused to participate in the report.

12.   Following an announcement that the *60 Minutes* segment would air on April 15, 2018, shares of Allegiant stock fell $18.85 per share, or over 11.4%, representing a decline of over $304 million in market capitalization.  In addition to the loss in value and consumer confidence, the safety failures and statements related thereto have also subjected Allegiant to extensive litigation, including a class action for violations of the federal securities laws, captioned *Checkman v. Allegiant Travel Co., et al.*, No. 2:18-cv-3417, pending in the United States District Court for the Central District of California (the "Securities Class Action"); an action brought by a pilot for wrongful termination stemming from an incident in which he evacuated a smoking plane, captioned *Kinzer v. Allegiant Air, LLC and Allegiant Travel Co.*, No. A-15-727524-C, pending in Clark County, Nevada District Court; and a personal injury action brought by an injured passenger, captioned *Kuhn v. Allegiant Travel Co. and Allegiant Air, LLC*, No 2:18-cv-150, pending in the U.S. District Court for the Western District of Pennsylvania.

13.   This derivative action seeks to remedy the Individual Defendants' wrongdoing on behalf of Allegiant and its stockholders.

**JURISDICTION**

14.   The Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332(a)(2) because complete diversity exists between plaintiff and each defendant and the

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

amount in controversy exceeds $75,000. This is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15. The Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this district, or is an individual who has sufficient minimum contacts with this district to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

16. Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) Allegiant maintains its principal place of business in this district; (ii) one or more of the defendants either resides in or maintains executive offices in this district; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district; and (iv) defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

## **PARTIES**

17. Plaintiff is currently an Allegiant stockholder and has continuously been a stockholder of the Company throughout the Relevant Period. Plaintiff is a citizen of Ohio.

18. Nominal defendant Allegiant is incorporated under the laws of the State of Nevada and maintains its headquarters at 1201 North Town Center Drive, Las Vegas, Nevada 89144. The Company's shares are publicly traded on the NASDAQ under the symbol ALGT. The Company's primary function is operating an American low-cost airline, Allegiant Air.

19. Defendant Gallagher has been the Chief Executive Officer ("CEO") and Chairman of the Board of Directors ("Board") of Allegiant since September 2006. He has also been Chairman of Allegiant Air since 2001. Gallagher is named as a defendant in the Securities Class Action. Gallagher is a citizen of Nevada.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

20.     Defendant John T. Redmond ("Redmond") has been the President of Allegiant since 2016 and a director since 2014.  He is a member of the Compensation Committee.  Redmond is a citizen of Colorado.

21.     Defendant Gregory Anderson ("Anderson") has been Allegiant's Principal Accounting Officer since January 2015 and Senior Vice President of Treasury since January 2017.  In those positions, he was responsible for the Company's false and misleading statements that are the subject of the Securities Class Action.  He has worked at Allegiant since January 2010, beginning as a Senior Accountant/Financial Analyst and continuing as the Director of Accounting starting in December 2011.  Anderson is a citizen of Nevada.

22.     Defendant Scott Sheldon ("Sheldon") has been Allegiant's Chief Financial Officer ("CFO") since May 2010 and Chief Operating Officer ("COO") since October 2014.  He was Allegiant's Principal Accounting Officer from 2007 to 2010, the Senior Vice President from 2010 to January 2017, and has held other accounting positions at the Company dating back to 2004.  In his positions as CFO and COO, he was directly responsible for the Company's false and misleading statements that are the subject of the Securities Class Action and he is a named defendant in the Securities Class Action.  Sheldon is a citizen of Nevada.

23.     Defendant Eric Gust ("Gust") has been Allegiant's Vice President of Operations since December 2015.  Gust is a citizen of Nevada.

24.     Defendant Charles W. Pollard ("Pollard") has been a director of Allegiant since 2009.  He is a member of the Audit and Nominating Committees.  Pollard is a citizen of Massachusetts.

25.     Defendant Linda A. Marvin ("Marvin") has been a director of Allegiant since 2013.  She is the Chair of the Audit Committee and a member of the Nominating Committee.  Marvin is a citizen of Nevada.

26.     Defendant Gary E. Ellmer ("Ellmer") has been a director of Allegiant since 2008.  He is a member of Audit, Ethics, Nominating, and Compensation Committees.  Ellmer is a citizen of Missouri.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

27. Defendant Montie R. Brewer ("Brewer") has been a director of Allegiant since October 2009. He is a member of Nominating and Compensation Committees. Brewer is a citizen of Massachusetts.

28. Gallagher, Redmond, Pollard, Marvin, Ellmer, and Brewer are referred to herein as the "Director Defendants." Gallagher, Redmond, Anderson, Sheldon, Gust, Pollard, Marvin, Ellmer, and Brewer are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

29. By reason of their positions as officers, directors, and/or fiduciaries of Allegiant and because of their ability to control the business and corporate affairs of Allegiant, the Individual Defendants owe the Company and its stockholders the fiduciary obligations of loyalty, good faith, candor, and due care and are required to use their utmost ability to control and manage Allegiant in a fair, just, honest, and equitable manner. The Individual Defendants are required to act in furtherance of the best interests of Allegiant and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Allegiant and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

30. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Allegiant, directly and/or indirectly, exercised control over the wrongful acts complained of herein.

31. To discharge their duties, the officers and directors of Allegiant were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Allegiant were required to, *inter alia*:

A.   Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority, complying with all FAA rules and regulations, and disseminating truthful and accurate statements to the SEC and the investing public;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

B.     Conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

C.     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

D.     Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

E.     Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

32.     Each of the Individual Defendants, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith, and a reckless disregard for their duties to the Company and its stockholders.  The Individual Defendants were, or should have been, aware that their conduct posed a risk of serious injury to the Company.

33.     As noted in the Allegiant Travel Company and Subsidiaries Corporate Code of Conduct and Ethics (the "Code"):

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

It is our responsibility to conduct ourselves in an ethical business manner and also to ensure that others do the same.  If any one of us violates these standards, we can expect a disciplinary response, which may rise to the level of termination of any employment or other relationship with the company or legal action.  If any breach of the Code is known to any employee or member of management, you are obligated to report violations in accordance with the procedures set out in this Code.  By doing so, we ensure that the good faith efforts of all of us to comply with the Code are not undermined.

The ultimate responsibility for maintaining our Code rests with each of us.  As individuals of personal integrity, we can do no less than to behave in a way that will continue to bring credit to our Company and ourselves

34.     Under the Code, the Individual Defendants are required "To be honest, fair, and accountable in all business dealings" as follows:

**To our customers:** to provide high quality air transportation and leisure travel services consistent with customer requirements.  To be the best supplier of knowledge management services we can with emphasis on fair competition and long-lasting relationships.

**To our suppliers:** to develop and maintain mutually beneficial relationships based on the principle of fair competition in the marketplace.

**To society and the local community:** to be a responsible and responsive corporate citizen in a moral, ethical and beneficial manner.

**To our shareholders:** to pursue growth and earnings objectives while adhering to ethical standards.

**To our employees:** to provide safe working conditions and an environment characterized by fairness, respect for the individual, dignity and equal opportunity.

35.     Similarly, Allegiant's Audit Committee Charter sets forth the primary duties of the Board's Audit Committee – defendants Marvin (chair), Ellmer, and Pollard.  Those responsibilities include, among other things:

- Oversee the quality and objectivity of the Company's financial statements and the independent audit thereof by, among other things, reviewing and appraising the audit efforts of the Company's independent auditors;

- Oversee that management has maintained the reliability and integrity of the Company's accounting policies and financial reporting and disclosure practices;

9

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- • Oversee that management has established and maintained adequate systems of disclosure controls and procedures and internal controls over financial reporting;

- • Oversee that management has established and maintained processes to assure compliance by the Company with all applicable laws, regulations and corporate policy;

- • Assist the Board oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditors' qualifications and independence, (iv) the performance of the Company's internal audit function and independent auditors; and (v) the Company's overall risk management profile;

- • Review the Company's policies and compliance procedures regarding ethics.

36. Consistent with these functions, the members of the Audit Committee "should encourage continuous improvement of, and should foster adherence to, the Company's policies, procedures and practices at all levels."

## **FACTUAL ALLEGATIONS**

### **A.    The Individual Defendants' Professional Experience in Air Travel**

37. Each member of the Individual Defendants has an extensive history in aviation and/or the airline industry.  They each know that the safe transport of passengers to their destinations is the most important goal of an airline company.  Despite this knowledge, the Individual Defendants have caused or allowed Allegiant to carry on a scheme dating back to at least 2015 in which safety was sacrificed in the name of cost cutting and profits.  This scheme put customers at risk and hurt the Company's reputation and bottom line.

***Defendant Gallagher's History at WestAir and ValuJet***

38. Defendant Gallagher has a long history in the airline industry.  He was a founder of WestAir, which operated as the west-coast commuter and regional airline affiliate of United Airlines from 1978 to 1992.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

39.     In 1992, Defendant Gallagher co-founded ValuJet Airlines ("ValuJet").   Like Allegiant, ValuJet was a low-cost carrier that quickly became notorious for its dangerous cost-cutting measures.  ValuJet exclusively purchased used planes from other airlines, provided sparse training to its employees, and used outside contractors for maintenance and other services.  These tactics helped ValuJet develop a poor reputation for lax safety.  In 1995, the United States Department of Defense refused ValuJet's bid to fly military personnel, citing safety concerns.  On February 14, 1996, the FAA's Atlanta field office sent a memo to the main office in Washington, D.C. suggesting that the FAA ground ValuJet.  ValuJet planes made 15 emergency landings in 1994, 57 in 1995, and 57 from January through May 1996.

40.     The uptick in ValuJet safety issues came to a head on May 11, 1996, when ValuJet flight 592 from Miami to Atlanta International Airport crashed into the Florida Everglades about ten minutes after takeoff, killing all 110 people on board.  The crash was caused by a fire in the cargo compartment which was ignited by improperly-stored hazardous cargo.

41.     Following the crash of ValuJet flight 592, ValuJet was grounded until September 1996 and its deficient safety policies and violations came to light.  One ValuJet plane flew 140 times with a leaky hydraulic system, one flew 31 times with malfunctioning weather radar, and another was allowed to fly despite engine rust that went unnoticed and later caught fire, destroying the plane.  After this news was revealed, the airline never recovered – its fleet and operations were transferred to AirTran Airways between 1997 and 1999.

42.     Despite his direct knowledge of the grave consequences of substandard safety policies, Defendant Gallagher has employed frighteningly similar practices at Allegiant.  Due to his long history in the airline industry, Gallagher had an elevated level of knowledge regarding the importance of implementing and maintaining proper safety controls over an airline.

***Defendant Redmond's History at Menzies***

43.     In addition to his role as President of Allegiant, Defendant Redmond currently serves as a Senior Vice President of Americas at Menzies Aviation plc. ("Menzies"), which provides landside and airside services for airlines at over 200 airports around the world.  Menzies

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

offers third-party staffing for airlines, including a wide array of services such as baggage and ramp handling, passenger greeting and concierge work, cabin cleaning, plane de-icing, transporting cargo, and aircraft refueling.

44.     Due to his long history in the airline industry, Redmond had an elevated level of knowledge regarding the importance of implementing and maintaining proper safety controls over an airline.

**Defendant Anderson's History of Accounting at Allegiant and US Airways**

45.     Defendant Anderson has been an airline accountant since May 2009.  He initially worked as an accountant for US Airways from May 2009 to January 2010, when he moved to Allegiant.  He started at Allegiant as a Senior Accountant/Financial Analyst from January 2010 to December 2011, when he was promoted to Director of Accounting.  In January 2015, he became a Vice President and Principal Accounting Officer and was then promoted to Senior Vice President of Treasury in January 2017.

46.     Due to his extensive history of airline accounting, Defendant Anderson had an elevated level of knowledge regarding the importance to an airline's bottom line of maintaining proper safety procedures.  He was also aware of the consequences associated with issuing false and misleading statements to the investing public.

**Defendant Sheldon's History of Accounting at Allegiant**

47.     Defendant Sheldon has worked in an accounting capacity at Allegiant since January 2004.  He joined the Company as Accounting Manager and was promoted to Director of Accounting in May 2005.  Sheldon was Allegiant's Principal Accounting Officer from 2007 to May 2010.  In that role, he oversaw all accounting, tax, and financial reporting and financial planning and analysis.  He became Senior Vice President in May 2010 and held that role until January 2017.  Recently, he served as Interim CFO from May 26, 2017, to October 24, 2017, and is currently the CFO and COO.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

48.     Due to his extensive history in leadership roles, defendant Sheldon was familiar with the importance of safety to an airline's bottom line and was aware of the consequences of issuing false and misleading statements to the investing public.

***Defendant Gust's History in Airline Safety and Operational Leadership Positions***

49.     Defendant Gust has worked in the airline industry since February 1995 and since that time has been in leadership roles specifically tasked with airline safety and/or operations.  For fifteen years he was the Vice President of Flight Operations at Mesa Airlines – a regional carrier for American Airlines and United Airlines.  Then Gust joined Allegiant as Vice President of Safety and Security in October 2010.  He was promoted to his current role as Allegiant's Vice President of Operations in December 2015.

50.     Due to his tenure in leadership roles responsible for airplane operation and safety, he had an elevated level of knowledge regarding the importance of adequate safety policies.  Additionally, he is directly responsible for overseeing safety procedures at Allegiant.

***Defendant Pollard's History in the Airline Industry***

51.     Prior to joining the Allegiant Board in June 2009, defendant Pollard had a long history in the airline industry.  From 1987 to 1997, Pollard served in senior management positions, including CEO and President, at World Airways, Inc., the oldest U.S. charter airline.  In 1997, he joined Omni Air International, Inc., a passenger charter carrier, where he served in various positions including Managing Director, President, CEO, and Vice Chairman until 2009.  He also served as a director of Air Partner plc until 2014 and AeroMechanical Services Ltd. until 2011 and is currently a director of Aircastle Limited.  Air Partner plc is a private jet charter company.  AeroMechanical Services Ltd. provides real-time data and satellite communications for aircraft operators.   Aircastle Limited acquires, leases, and sells commercial jet aircraft to airlines throughout the world.

52.     Based on Pollard's extensive experience in air travel, he had an elevated level of knowledge regarding the importance of adequate safety policies.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

***Defendant Marvin's History of Accounting at Allegiant and Other Airlines***

53.    From September 1988 to June 1996, Defendant Marvin was involved in the airline industry in various finance and accounting roles with Business Express/Delta Connection and WestAir/United Express.

54.    Defendant Marvin has been with Allegiant since its restructuring in 2001.  Initially, she was CFO of Allegiant from September 2001 to September 30, 2007.  She was also Managing Director and Principal Accounting Officer until September 30, 2007.  Next, she was Executive Officer of Allegiant until December 31, 2007.  She then rejoined the Company as a director on January 29, 2013.

55.    Due to this extensive history accounting for airlines, Defendant Marvin had an elevated level of knowledge regarding the importance of maintaining proper safety procedures on an airline's bottom line.  She also was aware of the consequences of issuing false and misleading statements to the investing public.

***Defendant Ellmer's History with the Airline Industry***

56.    Defendant Ellmer has worked with airplanes for forty-five years.  Starting in 1973, he worked in the U.S. Marine Corps as a mechanic and crew member aboard UH-1 helicopters and as a flight engineer and instructor on KC-130 tanker aircraft.

57.    He entered the commercial airline industry in 1980 and since that time has gained extensive and diverse airline management experience.  Ellmer's prior commercial experience includes a stint as President and COO of Business Express Airlines and maintenance and engineering positions at McDonnell-Douglas and Hughes Helicopter.  He also served as Vice President of Maintenance and Engineering at WestAir Commuter Airlines/Mesa Airlines.  From 1998 to 2002, Ellmer served in various officer positions for American Eagle Airlines, Business Express Airlines, and WestAir Commuter Airlines.  He served as the President and COO of its Executive Airlines and American Eagle Caribbean unit from August 2002 to April 2006.  From April 2006 to August 2006, Ellmer served as Vice President of Business Development for American Eagle Airlines.  He then joined ATA Airlines, Inc. in September 2006 as Senior Vice

14

1    President of Operations and General Manager of Charter.  He has also served as Senior Vice

2    President for Operations of Global Aviation Holdings, Inc. (alternatively named Global Aero

3    Logistics, Inc.) since September 2007 and served as its General Manager of Charter.  Ellmer was

4    responsible for flight and technical operations as well as Global Aviation's charter business.  He

5    served as the COO at ATA Airlines, Inc. from September 2007 to February 2008.  And finally,

6    Ellmer has been a director of Allegiant since May 2008.

7         58.    Due to his extensive experience around planes and in the commercial airline

8    industry, he had an elevated level of knowledge regarding the importance of adequate safety

9    policies.

10   ***Defendant Brewer's History as an Airline Executive***

11        59.    Like the other Individual Defendants, Defendant Brewer has extensive experience

12   in the commercial airline industry.  Early in his career he worked at Northwest Airlines, Republic

13   Airlines, Braniff, and Trans World Airlines.  Brewer then served as a Senior Vice President of

14   Planning at United Airlines.  In that role, he planned and developed over 20 hub operations

15   worldwide, managed low-cost airline operations as President of United Shuttle, and successfully

16   restructured the route networks of three carriers.

17        60.    Next, he joined Air Canada as Executive Vice President of Commercial in April

18   2002.  He served as the chief architect and led the implementation of Air Canada's new business

19   model including the successful simplified fare structure.  He was responsible for all commercial

20   aspects of Air Canada including Air Canada Jazz, Air Canada Jetz, Air Canada Vacations, new

21   businesses, and a strategic direction of network planning, marketing, and scheduling.  He also

22   acted as a key negotiator in the founding of Star Alliance.  Defendant Brewer was the CEO and

23   President of Air Canada from December 2004 to April 1, 2009.

24        61.    In addition to executive experience, Defendant Brewer has also served on a variety

25   of airline and air travel-related boards of directors.  He was a director of Swiss International Air

26   Lines AG from October 2013 until January 2018.  He serves as a member of the advisory board at

27   Everbread Ltd. and Thayer Ventures, two travel technology companies.  He serves as a member of

28
                                              15
                     VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

the Board of Governors of the International Air Transport Association. He serves as the Vice Chairman of the Canadian Tourism Commission. He served as a director of Aer Lingus Group DAC from January 25, 2010 until September 02, 2015. He served as a director at Aer Lingus Limited until September 1, 2015. He served as a director of Air Canada from March 8, 2005 to April 1, 2009. And finally, he has been a director of Allegiant since October 2009.

62. Due to his extensive experience as an executive and director in the commercial airline industry, he had an elevated level of knowledge regarding the importance of adequate safety policies.

### B. Safety Issues at Allegiant

63. Allegiant was initially founded in January 1997 under the name WestJet Express. After a trademark dispute, the Company changed its name to Allegiant Air. The airline received FAA and DOT certification for scheduled and charter domestic operations on June 19, 1998. Allegiant also has the authority for charter service to Canada and Mexico. After two years of operation, Allegiant filed for Chapter 11 bankruptcy protection.

64. Defendant Gallagher was one of Allegiant's major creditors and subsequently gained control of the business. Gallagher restructured the Company to a low-cost model, which focused on smaller markets that larger airlines did not serve.

65. In March 2002, Allegiant emerged from bankruptcy and began to acquire McDonnell Douglas MD-80 aircrafts. From 2002 to 2004, Allegiant flew primarily from thirteen small cities to Las Vegas and offered bundled air and hotel packages.

66. The Company went public in November 2006 and began to expand to additional cities including Phoenix-Mesa, Arizona; Fort Lauderdale-Hollywood, Florida; and Bellingham, Washington. By 2014, Allegiant expanded to additional cities including Grand Rapids, Michigan; Honolulu, Hawaii; Cincinnati, Ohio; and San Diego, California.

67. Allegiant buys its planes second-, third-, or even fourth-hand and currently operates the oldest commercial aircraft fleet in the United States. The current average age of a plane in Allegiant's fleet is twenty-two years. An old fleet is not independently dangerous, but older planes

16

require a greater level of care and maintenance to ensure that they remain safe. Throughout the Relevant Period, the Individual Defendants caused Allegiant to cut corners on required maintenance to reap higher profits. This is the same strategy that Defendant Gallagher employed at ValuJet which eventually led to its demise. The lack of proper maintenance has led to high numbers of emergency landings.

68. In the summer of 2015, Allegiant experienced a series of midair breakdowns. On June 25, 2015, five Allegiant flights were interrupted by midair failures in a four-hour period. Since October 2015, Allegiant has been under close FAA supervision due to this chain of incidents.

69. In 2015, Allegiant planes had to make at least seventy-seven unexpected landings for serious mechanical failures. Allegiant has a fleet of eighty-six planes, forty-two of which had a midair breakdown at least once in 2015. One plane made an emergency landing in Birmingham, Alabama on a flight scheduled from St. Petersburg, Florida to Omaha, Nebraska due to a problem with the air circulation fan. The incident revealed that the same MD-80 plane had at least four serious mechanical failures in the fifteen months prior to the emergency landing.

70. This series of incidents was caused, at least in part, by the fact that Allegiant utilized the oldest fleet in the industry and outsourced maintenance of its planes at many airports.

71. Only three U.S. carriers still use the MD-80 as part of their regular fleet. Allegiant's MD-80s are more than twice as likely to break down as those flown by American Airlines or Delta. Allegiant's MD-80s breakdown approximately 8.2 times per 10,000 flight hours, while American's planes only breakdown 3.4 times and Delta's only 2.4 times.

72. After one of Allegiant's MD-80s aborted takeoff in Las Vegas in 2015, the FAA accidentally sent its unredacted report to the *Tampa Bay Times*. The FAA's report revealed "deliberate and systemic acts of noncompliance" in the airline's maintenance procedure and found that the aircraft had flown 261 flights without a pin part necessary for a safe flight causing an "unacceptable safety risk" and that Allegiant's response was "causal to the flights flown in an unairworthy condition."

73.     In 2015, *Inc.* magazine reported that Allegiant was the most profitable airline in America.   However, the Company's profits were inflated by cost-cutting practices such as maintaining the industry's oldest fleet and skimping on necessary safety and maintenance expenses.

***Flight 864 and the Wrongful Termination of Captain Kinzer***

74.     On June 8, 2015, passengers and crew aboard Allegiant flight 864 from St. Petersburg, Florida bound for Hagerstown, Maryland began smelling smoke in the cabin.   Captain Jason Kinzer, in accordance with his regulatory duty and his common law obligation to provide a high degree of care for the safety of his passengers, declared an emergency to local air traffic control and returned to St. Petersburg airport for an emergency landing.

75.     After landing, Captain Kinzer told Air Traffic Control that the plane would stop and wait for fire rescue to inspect it before taking further action.   Fire rescue reported smoke coming out of the plane's engine and urged the crew to shut the engine down.   Captain Kinzer and his crew shut the engine down and engaged the plane's onboard fire extinguisher.

76.     However, Captain Kinzer and his crew learned that the burning smell had not been resolved.   Captain Kinzer then acted for the safety of his passengers and crew and in accordance with his training and responsibility and ordered the cabin crew to prepare for an evacuation and alerted air traffic ground control.

77.     The identified speaker on the radio channel authorized the evacuation, but one speaker who refused to identify himself or his authority told Captain Kinzer to "hold off your evacuation."   Captain Kinzer and air traffic control asked for the mystery man to identify himself, but he would not, and simply repeated, "I'm telling you not to evacuate yet."

78.     After waiting approximately one additional minute, Captain Kinzer asked one final time for the unidentified speaker to identify himself and when he failed to do so, Captain Kinzer evacuated the plane.

79.     While Captain Kinzer appears from the air traffic control transcript and witness accounts to have acted in the best interests of Allegiant's passengers, Allegiant management took a

18
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

different view of the incident.  On July 23, 2015, Captain Kinzer received a letter of termination from Allegiant's System Chief Pilot due to his evacuation of the smoking aircraft.  The termination letter alleged that Captain Kinzer "ordered an evacuation that was entirely unwarranted and, as a result, your conduct and decision-making on June 8, compromised the safety of your crew and your passengers and led directly to the injuries."

80.    Captain Kinzer filed suit for wrongful termination on December 7, 2015, and the matter, captioned *Kinzer v. Allegiant Air, LLC and Allegiant Travel Co.*, No. A-15-727524-C, is slated for trial on October 17, 2018, in Nevada District Court.  The lawsuit has caused and will continue to cause escalating costs and bad press for the Company.

81.    Following Captain Kinzer's termination, one of his flight attendants, Natalee Negron, wrote an email to Defendant Gallagher that questioned the decision.  Her email read as follows:

> I just feel this undying urge to reach out to you on the topic of what I feel to be the wrongful termination of a Captain.
>
> All other parties that were involved that day were returned to duty with no additional training, which makes me wonder what the Captain did that was so wrong he received the harshest punishment, especially hearing from Flight Ops management that the evacuation went as trained.
>
> I feel as though safety definitely was the deciding factor to evacuate that day.  But I honestly just felt a need to express that a Captain that had safety in the front of his mind is no longer with the Company.  I truly hope that this decision was made with the utmost caution and consideration of the facts.
>
> I truly hope I'm not stepping out of place with this email.  Forgive me if I [am].

82.    Defendant Gallagher forwarded the email to defendant Sheldon, and Allegiant's Vice President of In-Flight Services with a note, "please talk to me."  During the course of Captain Kinzer's lawsuit, Gallagher has claimed that he has no memory of the email or of forwarding it to his executives.

83.    The emergency evacuation garnered great media attention and the Allegiant pilots' union has also stated that the firing was intended by Allegiant management to send a warning that

19
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

the Company would not risk being embarrassed by major safety incidents that could bring light to

the Individual Defendants' broader safety and maintenance failures.

***The CtW Activist Investor Letter***

84.    On January 26, 2016, CtW Investment Group ("CtW"), a large stockholder that

manages approximately $250 billion in pension funds and had a substantial position in Allegiant

stock, sent a letter to the Allegiant Board (the "CtW Letter").  The letter called for the removal of

Defendant Marvin and brought the safety issues and the Board's oversight role in reigning them in

to its direct attention:

> Dear Allegiant Board Members:
>
> At the annual shareholder meeting in June, public shareholders signaled a clear lack
> of confidence in former CFO Linda Marvin's leadership of the Audit Committee.
> Concerned at the Audit Committee's approval of $9.3 million in highly
> questionable related transactions between the company and CEO Maurice
> Gallagher, and troubled by Ms. Marvin's lengthy professional association with
> Gallagher, 47% of public shareholders opposed her re-election.  Recent negative
> publicity over airplane safety and ongoing investigations into in-flight incidents by
> the Federal Aviation Administration lend urgency to Ms. Marvin's swift
> replacement to ensure rigorous, independent oversight of regulatory compliance by
> our Audit Committee; and to the initiation of a broader overhaul of board
> composition and committee structure.
>
> Accordingly, we request that the board immediately: (1) engage an outside search
> firm to recruit new independent directors to replace Ms. Marvin and to expand the
> overall size of our board, (2) reconstitute a majority of the Audit Committee with
> newly recruited directors; and (3) establish a standalone safety committee of the
> board – the prevalent governance practice across the industry. These reforms are
> vital to assuring customers and shareholders of Allegiant's safety and compliance
> procedures, especially given both the company's prodigious growth and reliance on
> using and acquiring older aircraft.
>
> In addition, (4) we request the suspension of all related transactions with CEO
> Gallagher, including the $2.5 million annual sponsorship of his son's NASCAR
> team, until the Audit Committee has been thoroughly overhauled.  It is incredible
> that the current committee – which also includes two other long-time associates of
> CEO Gallagher, John Redmond and Gary Ellmer – can exercise appropriate
> independence and objectivity in assessing transactions which "blur the lines
> between personal and corporate investment," as Institutional Shareholder Services
> put it in recommending against Ms. Marvin.

85.     The CtW Letter included an attack on the independence of Defendant Marvin and criticized her and her cohorts' service on the Audit Committee:

**Former CFO Linda Marvin Lacks the 'Critical Distance' from CEO Gallagher to Serve as Audit Committee Chair and Should Leave the Board**

It may be true that Ms. Marvin's experience as Allegiant's CFO until 2007 "adds valuable knowledge to [the] board," as you state in the proxy, but this comes at far higher costs to the Audit Committee's independence and objectivity. With the committee's primary purpose being to bolster investor confidence in the company's numbers, its legal and regulatory compliance, and related party transactions, shareholders require absolute assurance in the objectivity and independence of its members; even the perception that those qualities are tainted undermine its role. For this reason, it is exceedingly rare to have a former employee, let alone a previous CFO, serving on this key committee.

Our analysis of analysis of the Russell 3000 indicates that there are just six other instances of a former CFO (or CEO) of equal or more recent employment as Ms. Marvin serving on the Audit Committee. And just one of those serves, like Ms. Marvin, as chair of the Audit Committee. Besides the risk of excessive deference to management that comes with any former executive serving as an independent director, having a former CFO head the Audit Committee sets up the awkward situation in which the same individual is responsible for independently overseeing the processes and controls that they may well have put in place as CFO or oversee compliance issues that could have developed under the previous tenure. At a minimum, the risk is in having Ms. Marvin oversee the performance of a former deputy; current CFO Scott Sheldon, we note, served as Director of Accounting during Ms. Marvin's tenure as CFO. Compounding this challenge is the fact that Mr. Sheldon is the nephew of former Allegiant director and long-time business associate of CEO Gallagher, Timothy Flynn; together CEO Gallagher and Mr. Flynn founded ValuJet and WestAir and are partners, along with Audit Committee member John Redmond (see below), in the investment consortium owning our company's headquarters.

Considering Ms. Marvin's extensive professional history with Mr. Gallagher – serving as an executive under Gallagher at WestAir and MPower, in addition to her role as CFO of Allegiant – it is difficult to view her appointment to the board in 2013 stemming from anything else but her longstanding relationship with Gallagher. (Indeed, we note that at least until 2014, they had lived within a mile of each other for over a decade.)

Unfortunately, similar independence concerns attach to Gary Ellmer and John Redmond, two of the three other Audit Committee members. Mr. Ellmer, who like Ms. Marvin has no other public board service, served alongside Mr. Gallagher at WestAir. Mr. Redmond, meanwhile, continues the board's relationship with business partners of CEO Gallagher. Mr. Redmond, like former director Timothy

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Flynn (2006 to 2013), is an eleven percent partner alongside CEO Gallagher (30%) in the limited liability company that owns the company's headquarters and adjacent property.

86.    The CtW further publicly criticized the Board's composition, structure, and policies:

**Board Structure and Practices Have Failed to Keep Pace with Allegiant's Growth and Must be Reformed**

While shareholders have benefited from the company's prodigious growth, as revenue has more than quadrupled since the initial public offering and the company's valuation has grown to more than $3.4 billion, shareholders have been ill-served by the board's failure to concomitantly develop its governance structure to better reflect its changed structure.

Allegiant may have ceased to be a controlled company in 2007, but the board's composition, oversight and responsiveness have failed to keep pace with this critical shift to majority public ownership.  To start, the board needs a more expansive and robust director recruitment process.  Besides the lengthy ties Ms. Marvin and Messrs. Redmond and Ellmer share with CEO Gallagher, outlined above, we note that Montie Brewer was initially recommended to the board in 2009 by CEO Gallagher.  It thus appears that at least four of our five independent directors were identified as candidates by virtue of their relationship to CEO Gallagher.  Moreover, while we think industry experience is vital for a board, with only one member of the board coming from a professional background outside of the industry – and that director being Mr. Redmond –Allegiant needs to dramatically widen the talent pools from which it selects directors. Rather than a strength, the board's concentration of experience is suggestive of a highly constricted recruitment process.

The integrity of this entire process is further undermined by Ms. Marvin and Mr. Ellmer making up two-thirds of the Nominating Committee (Mr. Brewer being the other member), the absence of a designated chair and the committee having met just once in each of the past seven years (2008 – 2014).  We note that according to a 2013 Ernst & Young study, a mid-cap company's nominating committee meets on average 4 times year.  The same study also finds that the average mid-cap board size is ten and for mid-cap airlines is eleven - or in either case almost twice the size of our board. It is clear to us that the board's size, composition and performance are badly in need of an upgrade.

87.    The CtW Letter concluded by recounting the past year's safety issues and called for the creation of a standalone safety committee, which still does not exist two and a half years later:

**F.A.A. Compliance Failures, Safety Scares, Aging Fleet, Heighten Concerns over the Audit Committee and Indicate the Need for a Standalone Safety Committee**

The past year has seen a string of prominent safety incidents involving Allegiant flights, prompting several FAA investigations and a wave of negative publicity for our company (including landing Allegiant in the Wall Street Journal's "Crisis of the week" column).  And last week, we note, COO Steve Harfst abruptly resigned after less than 18 months at the company.

Questions have also been raised over the adequacy of disclosures surrounding regulatory compliance, while the company's own pilots have pointed to a corporate culture where profits come before safety.  The emergency landing in Fargo, ND, in July of an Allegiant flight running low on fuel should be a wakeup call.  The incident not only follows a string of in-flight safety incidences over the prior months, but occurred on a flight piloted by two licensed executives, one being our director of flight safety, and appears to have been wholly avoidable if the pilots had adequately reviewed, as they are required before each flight, an FAA Notice to Airmen, which indicated that the Fargo Airport was closed due to a Blue Angels display.  Besides the emergency itself, Allegiant was criticized in the Wall Street Journal for its public response to the incident, as several "crisis experts" expressed concern at the company's overly defensive posture in addressing passenger and investor concerns over safety, particularly given the rash of incidents on company flights.

As of September 8, 2015, the Las Vegas Review Journal reported 17 "unusual incidents" in 2015 involving Allegiant flights, including emergency landings, flight diversions or aborted takeoffs, while the FAA says it has "several" ongoing regulatory investigations.  The company had a further five emergency landings out of Florida in the last week of the year.

Separately, according to a New York Times article, Allegiant pilots have identified at least 65 incidents in the period from September 2014 to March 2015, where flights were forced to divert, return to gates or abort takeoff because of mechanical or engine problems.  In a report sent to Congress and the F.A.A., the pilots contend that a combination of poorly trained mechanics, insufficient spare parts, and an aging fleet is "creating a dangerous paradigm that could eventually lead to an accident resulting in serious injury and loss of life."

In the same article, the New York Times reported on previously undisclosed problems in the airline's maintenance and training programs identified in 2013 during a routine F.A.A. inspection. Determining the current training was not effective in identifying systemic deficiencies or distinguishing between major and minor repairs, the F.A.A. forced a six-month shut down of the company's training programs and a freeze in new plane deliveries. Although Allegiant's SEC filings routinely warn of the material risks from possible shortages of both pilots and aircraft, there can also be risks from failures to meet regulatory standards.

23

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

> With a key responsibility of the Audit Committee being to ensure that management has established and maintained processes to assure compliance with key regulations impacting the company, particularly those that could have significant impact on the company's financials, these developments heighten the urgency for bolstering the committee's independence from CEO Gallagher. They also underscore the need to establish a board safety committee. Almost all of Allegiant's US peers have standalone committees to oversee management's internal control processes and other activities regarding operational safety and compliance with applicable laws and regulations, rather than subsume the responsibility under the general mandate of the audit committee, which has other significant responsibilities. Indeed, considering that a key element of Allegiant's business model is the reliance on older aircraft, which require more extensive maintenance, a board committee that focuses exclusively on safety would appear long overdue.

9   (Internal footnotes and citations omitted).

10   88.   Despite public warnings from a major activist stockholder, the Individual

11   Defendants opted to keep Marvin and Ellmer on the Audit Committee, failed to reshape or expand

12   the Board, failed to create a Safety Committee, and opted to allow the safety and mechanical

13   failures to continue.

14   ***Additional Safety Incidents***

15   89.   On May 5, 2016, an Allegiant flight from Punta Cana, Dominican Republic bound

16   for Pittsburgh, Pennsylvania experienced severe turbulence and conducted an emergency landing

17   at Fort Lauderdale-Hollywood International Airport in Florida. Seven people were injured by the

18   turbulence, including three passengers and four flight attendants. Two of the passengers

19   experienced head injuries. The incident led to the filing of a lawsuit on February 2, 2018 in the

20   Western District of Pennsylvania. The plaintiff, Lori Kuhn, alleges that Allegiant improperly

21   handled the situation. She was thrown from her seat and hit her head on the ceiling of the plane,

22   and suffered head, neck, and brain injuries. Ms. Kuhn alleges that the plane's radar systems

23   should have detected the turbulence and avoided it, and at the very least, the airline failed with

24   respect to safety procedures because passengers should have been warned and were not. Ms. Kuhn

25   stated that she continues to have medical problems and her suit seeks compensatory damages,

26   costs, and attorneys' fees. The case, captioned *Kuhn v. Allegiant Travel Co. and Allegiant Air,*

27   *LLC*, No 2:18-cv-150 (W.D. Pa.), recently settled for an undisclosed amount.

28

90.     Action News Jacksonville reported on 127 FAA investigations into safety issues on Allegiant flights out of Florida from 2005 to 2016.  The investigations found numerous mechanical failures that caused emergency landings, aborted takeoffs, and flight diversions due to maintenance failures.

91.     On August 17, 2016, Allegiant Flight 436 aborted its take-off from McCarran International Airport in Las Vegas, Nevada due to an un-commanded early rotation at about 120 knots indicated airspeed.  An investigation by the FAA found that maintenance procedures had not been followed, which resulted in a nut becoming detached from an elevator boost cylinder.  The aircraft had made 216 flights in this unairworthy condition and placed passengers, crew, and the airline's reputation at risk each time.

92.     In November 2016, the *Tampa Bay Times* reported on Allegiant's history of midair failures.   The article included an analysis of federal aviation records, which showed that Allegiant's planes were four times more likely to fail during flight than those operated by other major U.S. airlines.  The *Tampa Bay Times* also found the following facts, which Allegiant did not dispute:

- Forty-two of Allegiant's eighty-six planes broke down in mid-flight at least once in 2015. Among them, fifteen were forced to land because of failing engines, nine by overheating tail compartments, and six by smoke or the smell of something burning.

- After certain systems on Allegiant planes fail, the company repairs them and puts the planes back in service, only to see the same systems fail again. Eighteen times last year, key parts such as engines, sensors and electronics failed once in flight, got checked out, and then failed again, causing another unexpected landing.

- Allegiant's jets are an average of twenty-two years old. The average age of planes flown by other carriers is twelve. Experts say planes as old as Allegiant's require the most rigorous maintenance in the industry. But Allegiant doesn't staff its own mechanics at 107 of the 118 airports it flies to.

- Allegiant relies most heavily on McDonnell Douglas MD-80s, an aging model retired by all but two other major U.S. carriers. The company's MD-

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

80s fail twice as often as those operated by American Airlines and three times as often as those flown by Delta.

93.   The failures between January 2015 and September 2016 are illustrated as follows:



Cockpit instruments
**6 times**

Cabin pressure
**9 times**

Engines
**39 times**

Nose landing gear
**7 times**

Tail compartment
**26 times**

Source: Times analysis of records from U.S. DOT and FlightAware

ELI ZHANG, NATHANIEL LASH | Times

94.   Following the *Tampa Bay Times* report, defendant Gallagher admitted, "I can look at what we did (in 2015) and it wasn't acceptable.  I don't disagree with the thrust of your numbers. . . .  We want to be well-known as being reliable and on time, and obviously safe, and that's an important part of our brand.  And we're going to make sure we do those things.  But if you stub your toe, step up and own it and move on."  Gallagher also responded directly to the report by stating, "Well, you have to appreciate, you're breaking pretty new ground here with this stuff.  This industry historically has not talked about safety.  There's no public upside to going out and talking about it."

95.   Defendant Gallagher's responses are contradictory to his public stance throughout 2015.  Previously, Gallagher called such claims "baseless assumptions and accusations" and stated that the story "repeats the faulty premise that something is wrong with Allegiant.  Let me be clear: there is not."

96. Despite Defendant Gallagher's change of tone, Allegiant's safety issues have continued. For instance, on April 8, 2018, an Allegiant plane carrying 155 passengers and six crew slid off a runway in Sioux Falls, South Dakota. Passengers were forced to exit the plane through the rear stairs and go out into the snow before being transported to the terminal in buses.

97. On April 13, 2018, CBS News announced that it would air a segment during *60 Minutes* two days later, criticizing Allegiant's safety and maintenance record. This news caused Allegiant's stock to drop $14.20 or over 8.5%, representing a decline of over $229 million in market capitalization.

98. On April 15, 2018, the *60 Minutes* segment aired during prime time on CBS. The episode was viewed by more than 10.4 million. The segment, titled "Allegiant Air: The Budget Airline Flying Under the Radar," featured Steve Kroft investigating Allegiant, "a discount carrier known more for its ultra-low fares than its high record of in-flight breakdowns." The segment revealed to the American public that: (a) Allegiant's aircraft had a high number of serious mechanical incidents between mid-2015 and October 2017; (b) Allegiant lacks the infrastructure and personnel to adequately maintain their aircraft; and (c) Allegiant discouraged pilots from reporting safety and maintenance issues. The transcript of the *60 Minutes* segment is attached hereto as Exhibit A. It touched on many of the topics explained above, including:

- Allegiant has the oldest fleet in the nation, consisting mainly of MD-80s;

- Allegiant had over 100 serious mechanical failures that continued at least between January 2016 and October of 2017;

  o These included midair engine failures, smoke and fumes in the cabin, rapid descents, flight control malfunctions, hydraulic leaks, and aborted takeoffs;

- Industry experts feel that Allegiant is abnormally unsafe and do not fly it themselves or recommend that friends or family fly on the airline;

- Aviation experts believe that "Allegiant's problems come from the confluence of its aggressive business model and a safety culture they find to be lagging;"

27

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- Allegiant lacks the maintenance infrastructure of larger carriers, has few of its own mechanics, and relies primarily on contractors. Additionally, the Company lacks "feet on the ground" to properly monitor airplane maintenance;

- Many Allegiant planes had recurring issues and others were returned to service before they were ready;

- Allegiant pilots feel that Allegiant management (including the Individual Defendants) seems to denigrate the pursuit of safety, some pilots even feel that Allegiant is trying to gain a competitive cost advantage by softening safety standards adhered to by the major airlines;

- Allegiant pilots also reported management telling them to illegally not record safety issues, the Captain Kinzer is prime example of this type of conduct; and

- The former FAA employee interviewed knows not to fly Allegiant.

99.     The Individual Defendants clearly knew about the widespread safety and maintenance issues plaguing the airline and did nothing. In fact, they took steps to push Allegiant in the direction which led to the *60 Minutes* report and the incidents described within it.

100.     Immediately following the *60 Minutes* report, rather than acting to fix the deficiencies that had been exposed, the Individual Defendants enlisted Defendant Gust to continue to attempt to cover them up. In response to the *60 Minutes* segment, Vice President of Operations Gust issued the following statement on behalf of the Company:

> It is unfortunate and disappointing that CBS 60 Minutes has chosen to air a false narrative about Allegiant and the FAA. Not only do we expect our team members to adhere to all company procedures and policies -- including safety procedures -- but many positions are subject to statutory and regulatory obligations. The violation of those obligations would trigger not only punitive action from Allegiant, but could also result in enforcement action from regulatory agencies, loss of a certification, and even criminal charges. To suggest that Allegiant would engage in the practice of asking team members to violate company and regulatory obligations is offensive and defamatory.
>
> CBS produced a one-sided narrative by cherry-picking interviews and ignoring publicly-available facts. For example, the show's star interviewee, John Goglia, is not an un-biased commentator; he is a paid expert working for a former Allegiant pilot who has sued Allegiant. That pilot, Jason Kinzer, claims that he was wrongfully terminated after an evacuation. In fact, Kinzer was terminated because

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

he unnecessarily evacuated a plane "at great risk to the crew and passengers" even though there "*was no smoke, fire, or an aircraft malfunction,*" and, during a post-flight investigation, he refused to "acknowledge his mistakes" or "demonstrate[] that he was capable of learning and growing from the event going forward." (See Defendants' Revised Motion for Summary Judgment, Eighth Judicial District Court, Clark County, NV, Case No. A-15-727524-C.) Surprisingly, the 60 Minutes presentation of Mr. Kinzer's case omits this publicly-available side of the story.

The FAA exercises rigorous oversight of Allegiant, as they do all airlines operating in the United States. Allegiant complies with all FAA requirements and participates in numerous voluntary safety programs to ensure we operate to the highest standards. Additionally, we expect our team members to follow all company policies and practice strict adherence to FAA regulations and guidelines. Several anonymous, non-disciplinary reporting systems are available through Allegiant as well as through the FAA for team members to report safety concerns. Notably, none of the concerns allegedly expressed by Allegiant team members during the 60 Minutes episode were found to have been reported through any of these appropriate channels.

Allegiant's team members safely operate thousands of flights each week, which will transport more than 14 million passengers this year. We have safely carried nearly 90 million passengers since beginning operations in 2001. Our workforce is made up of more than 4,000 dedicated and hard-working people who wake up every day thinking about how to move our customers safely from one place to another.

Captain Eric Gust is Allegiant's vice president of operations, responsible for the airline's flight operations, safety and security teams. In this role he oversees all system pilots and pilot training operations, regulatory compliance and flight standards, and the safety and security of all operations, team members and passengers.

(Emphasis added).

101.    Several of the claims in Gust's response to the *60 Minutes* report are false. For example, the Air Traffic Control Transcript of the Captain Kinzer incident recounted multiple people viewing or detecting fire and smoke in the cabin, which was caused by an aircraft malfunction. Further, defendant Gust's response did not have the desired effect of lessening the harm to the Company's reputation. Numerous viewers of the *60 Minutes* segment thanked the producers for alerting them to the danger of flying on Allegiant. Some examples of these responses included, but were not limited to:

- @Allegiant Thank God for 60 Minutes, was about to book passage to FtLaudale this summer on your airline but no more, ever, ever-

  ○ Karpus & Trotsky (@LavishPolack) – April 15, 2018

- It really stinks that those of us in rural markets with few travel options can now never fly Allegiant ever again. But thank God that #60minutes is literally saving our lives.

  ○ Rebecca F. Miller (@FlatheadMama) – April 15, 2018

- Welp, won't be flying #Allegiant air. Thanks for the heads up #60minutes

  ○ CheekyChopsNJ TM    (@BitCheekyNJ) – April 15, 2018

- "Please start breathing through your shirts." Welp, not flying @allegiant anymore. #60Minutes

  ○ Chris Clonts (@CClonts) – April 16, 2018

102.    On April 16, 2018, U.S. Senator Bill Nelson from Florida called for an investigation into how the FAA handles Allegiant's safety issues.  Senator Nelson is the top Democrat on the Senate Committee on Commerce, Science and Transportation.

103.    The fallout from the *60 Minutes* report also caused the Department of Transportation's inspector general, in May 2018, to ramp up an investigation of Allegiant and American Airlines that commenced in June 2017.  The review initially focused on the FAA's oversight of American' and Allegiant's maintenance, but Department of Transportation officials stated that initial reviews and requests from Congress members have prompted them to "adjust the scope of this audit."   The inspector general will expand the audit and review the FAA's independent reviews and the complaints it receives from its hotline.

104.    Allegiant's old fleet of planes has continued to cause problems for the Company. On June 14 and 15, 2018, Allegiant cancelled twelve flights to and from St. Pete-Clearwater International Airport due to a delay in receiving new aircraft.  The cancellations continued over several days, and Allegiant came under fire for repaying customers with vouchers worth far less than they originally paid for their flights.  For example, one customer paid $435 for his ticket and only received a $225 voucher.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**C.   Certain Defendants Illegally Sell Allegiant Stock to Reap the Benefit of Material Non-Public Information**

105.   With the knowledge that Allegiant's stock price was artificially inflated and that they caused Allegiant to fail to maintain proper safety and maintenance procedures, Gallagher, Anderson, Sheldon, and Ellmer (collectively, the "Insider Selling Defendants"), in contravention of their fiduciary duties and for their own benefit, illegally sold more than $6.4 million worth of their personally-held Allegiant stock when they were in possession of material non-public information.  Over $2.3 million worth of the sales occurred after the Individual Defendants learned about the subject matter of the *60 Minutes* segment and that it was set to air in the near future.

106.   Defendant Gallagher was aware of material, adverse, and non-public information regarding Allegiant's safety deficiencies and the Company's statements related thereto.  While in possession of this information, Gallagher sold 30,463 shares of Allegiant stock between December 28, 2017, and March 6, 2018, at artificially-inflated prices, for proceeds of approximately $4,838,786.84.  Gallagher sold 12,465 shares for proceeds of over $2 million one month before the *60 Minutes* segment aired.

107.   Defendant Anderson is Allegiant's Principal Accounting Officer and Senior Vice President of Treasury.  Anderson was aware of material, adverse, and non-public information regarding Allegiant's safety deficiencies and the Company's statements related thereto.  While in possession of this information, Anderson sold 3,150 shares of Allegiant stock between May 23, 2017, and March 13, 2018, at artificially-inflated prices, for proceeds of approximately $507,238.77.  Anderson sold 1,650 shares for proceeds of almost $300,000 approximately one month before the *60 Minutes* segment aired.

108.   Defendant Ellmer is a member of the Allegiant Board and Audit, Ethics, Nominating, and Compensation Committees.  Ellmer was aware of material, adverse, and non-public information regarding Allegiant's safety deficiencies and the Company's statements related thereto.  While in possession of this information, Ellmer sold 1,835 shares of Allegiant stock between March 24, 2017, and March 13, 2018, at artificially-inflated prices for proceeds of

1   approximately $283,511.12.  Ellmer sold 120 shares for proceeds of over $21,000 approximately

2   one month before the *60 Minutes* segment aired.

3   109.   Defendant Sheldon is Allegiant's CFO and COO.  Sheldon was aware of material,

4   adverse, and non-public information regarding Allegiant's safety deficiencies and the Company's

5   statements related thereto.  While in possession of this information, Sheldon sold 5,872 shares of

6   Allegiant stock on October 27, 2017, at an artificially-inflated price for proceeds of approximately

7   $807,927.48.

8   110.   The insider sales total over $6.4 million in proceeds and were executed while

9   Allegiant's stock price was artificially inflated due to the unlawful conduct alleged herein.

10   **D.   The Individual Defendants Breached Their Fiduciary Duties**

11   111.   The Company's improper safety and maintenance functions and dissemination of

12   false and misleading statements related thereto were the direct result of the Individual Defendants'

13   breaches of fiduciary duties.  Specifically, as discussed herein, the Individual Defendants' false

14   and misleading statements artificially inflated Allegiant's stock price by misrepresenting and

15   concealing the truth that:  (a) Allegiant lacked adequate systems to ensure its aircraft were being

16   properly maintained; and (b) Allegiant was not operating responsibly and ethically or providing

17   safe working conditions for its employees.

18   112.   The Individual Defendants knew for years about the Company's improper safety

19   and maintenance procedures, yet failed to correct them.  As such, the Individual Defendants knew

20   of the reporting problems but did nothing to rectify or prevent them.

21   113.   First, the Individual Defendants breached their fiduciary duties by knowingly

22   employing improper reporting practices at the Company in violation of applicable regulations and

23   rules, and then knowingly disseminated false and misleading filings resulting therefrom.  Indeed,

24   the Individual Defendants' false and misleading statements, as alleged above, have subjected

25   Allegiant to the Securities Class Action.

26   114.   Second, the above misrepresentations had the effect of artificially inflating

27   Allegiant's stock price, which the Insider Selling Defendants were aware of.  In contravention of

28

their fiduciary duties and for their own benefit, the Insider Selling Defendants unloaded more than $6.4 million worth of their personally held Allegiant stock at artificially-inflated prices.

115.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, the Company has sustained damages, including, but not limited to, costs and expenses incurred in connection with the Securities Class Action, the Captain Kinzer wrongful termination action, the Kuhn personal injury suit, lost ticket sales, and increased regulatory scrutiny.

## DERIVATIVE AND DEMAND ALLEGATIONS

116.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

117.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

118.   Plaintiff is an owner of Allegiant common stock and was an owner of Allegiant common stock at all times relevant hereto.  As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

119.   At the time this action was commenced, Allegiant's Board consisted of six directors:  Gallagher, Redmond, Pollard, Marvin, Ellmer, and Brewer.  These directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute the action for the following reasons:

A.   Demand is futile as to all Director Defendants because as directors of the Company they directly participated in and approved of the Company's lax safety and maintenance procedures, as well as the filing of and dissemination of false and misleading information as alleged herein, and therefore are substantially likely to be held liable for the misconduct complained of herein;

B.   Demand is futile as to all Director Defendants because they face a substantial likelihood of liability for breaching their fiduciary duties for

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

knowingly and deliberately approving the Company's dangerous cost-cutting safety measures despite their multiple decades' worth of knowledge of air travel and the airline industry (as described above). The Director Defendants put profits ahead of the safety of the Company's passengers and crew and in turn endorsed illegal actions;

C.  Demand is futile as to Gallagher because he faces a substantial likelihood of liability as he is named as a defendant in the Securities Class Action, and any investigation of this misconduct could potentially increase his liability in that case, and therefore Gallagher is conflicted from investigating the Company's misconduct and cannot independently consider a demand;

D.  Demand is futile as to Marvin, Ellmer, and Pollard (as well as Redmond as a former member) because as Audit Committee members their purpose, pursuant to the Audit Committee Charter, was to assist the Board in fulfilling its oversight responsibilities with respect to financial reports and other financial information. In this regard, the Audit Committee was to serve on the independent and objective body to oversee, *inter alia*: (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditors' qualifications and independence, (iv) the performance of the Company's internal audit function and independent auditors; and (v) the Company's overall risk management profile. Marvin, Ellmer, Pollard, and Redmond as Audit Committee members and pursuant to the Audit Committee Charter, had the responsibilities to, *inter alia*:

- Oversee the quality and objectivity of the Company's financial statements and the independent audit thereof by, among other things, reviewing and appraising the audit efforts of the Company's independent auditors;

- Oversee that management has maintained the reliability and integrity of the Company's accounting policies and financial reporting and disclosure practices;

- Oversee that management has established and maintained adequate systems of disclosure controls and procedures and internal controls over financial reporting;

- Oversee that management has established and maintained processes to assure compliance by the Company with all applicable laws, regulations and corporate policy;

In performing their duties as Audit Committee members, Marvin, Ellmer, Pollard, and Redmond knew that the Company's financial statements were inaccurate and misleading, yet they knowingly approved the filing and

34

dissemination of the financial statements, and therefore face a substantial likelihood of being held liable for breaching their fiduciary duties;

E.  Demand is futile as to Gallagher and Ellmer because they face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith for engaging in illegal insider trading of Allegiant securities as described herein, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action; and

F.  Demand is futile as to Marvin because she was previously an insider at Allegiant, serving as CFO from 2001 to 2007 and also as a Managing Director, Principle Accounting Officer, and Executive Officer.

## COUNT I

### Against the Individual Defendants
### for Breach of Fiduciary Duty

120.  Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

121.  The Individual Defendants each owed Allegiant and its stockholders the fiduciary duties of loyalty, good faith, candor, and due care in the managing and administering of the Company's affairs.

122.  The Individual Defendants were required to exercise reasonable and prudent supervision over the management, practices, controls, and financial affairs of Allegiant.

123.  The Individual Defendants breached their fiduciary duties owed to Allegiant and is stockholders by willfully, recklessly, and/or intentionally failing to perform their fiduciary duties as set forth above.  They caused the Company to waste valuable assets and unnecessarily expend corporate funds.  They also failed properly to oversee Allegiant's business, rendering them personally liable to the Company.

124.  Each of the Individual Defendants had actual or constructive knowledge that Allegiant was engaging in a scheme to keep safety and maintenance costs low – sacrificing the safety of its customers and crew – in order to achieve high profits.  The Individual Defendants continued to allow the scheme to occur and the weak policies to remain, thereby harming the Company and its customers and crew.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

125.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties of loyalty, good faith, candor, and due care, Allegiant has sustained, and continues to sustain, significant damages.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company

## COUNT II

### Against the Insider Selling Defendants for Breach of
### Fiduciary Duties of Loyalty and Good Faith Regarding Insider Stock Sales

126.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

127.    At the time of the stock sales set forth herein, Gallagher, Anderson, Sheldon, and Ellmer knew, but did not disclose publicly, that the Company had improper safety and airplane maintenance practices, that the Company's stock price was inflated, and that the Company was being scrutinized by the FAA and several investigatory news organizations.  Gallagher, Anderson, Sheldon, and Ellmer made the stock sales described herein on the basis of their knowledge of the material non-public information described herein.

128.    Gallagher, Anderson, Sheldon, and Ellmer's sales of Allegiant common stock based on their knowledge of this material non-public information was a breach of their fiduciary duties of loyalty and good faith.

129.    Since the use of the Company's inside information for their own gain constitutes a breach of Gallagher, Anderson, Sheldon, and Ellmer's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any proceeds Gallagher, Anderson, Sheldon, and Ellmer obtained thereby.

## COUNT III

### Against the Insider Selling Defendants for
### Unjust Enrichment Regarding Insider Stock Sales

130.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

131.     Gallagher, Anderson, Sheldon, and Ellmer were unjustly enriched by the proceeds of their illegal sales of Allegiant common stock, as alleged herein, and it would be unconscionable to allow them to retain the benefits of their illegal conduct.

132.     To remedy Gallagher, Anderson, Sheldon, and Ellmer's unjust enrichment, the Court should order them to disgorge to the Company all proceeds derived from their illegal sales of Allegiant common stock.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Imposing a constructive trust in favor of the Company for the proceeds the Insider Selling Defendants each received from their sales of Allegiant common stock, as alleged herein;

C.     Ordering the Insider Selling Defendants to disgorge to the Company all proceeds derived from their sales of Allegiant common stock alleged herein;

D.     Directing Allegiant to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from reoccurrence of the damaging conduct described herein;

E.     Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

F.     Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury.

DATED:  September 26, 2018                    Respectfully submitted,


__s/ Martin A. Muckleroy____
MARTIN A. MUCKLEROY, ESQ.
Nevada Bar No. 009634
**MUCKLEROY LUNT, LLC**
6077 S. Fort Apache, Ste. 140
Las Vegas, NV 89148
Phone: (702) 907-0097
Fax: (702) 938-4065

*Liaison Counsel for Plaintiff*

**BRAGAR EAGEL & SQUIRE, P.C.**
David J. Stone
Melissa A. Fortunato
Shaelyn Gambino-Morrison
885 Third Avenue, Suite 3040
New York, NY  10022
Telephone:  212-308-5858
Facsimile:  212-486-0462

*Counsel for Plaintiff*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT