# EXHIBIT "2"

# EXHIBIT "2"

1  ROBERT V. PRONGAY (#270796)
   LESLEY F. PORTNOY (#304851)
2  **GLANCY PRONGAY & MURRAY LLP**
3  1925 Century Park East, Suite 2100
   Los Angeles, California 90067
4  Telephone:  (310) 201-9150
   Facsimile:   (310) 201-9160
5  Email: rprongay@glancylaw.com
6
7  BENJAMIN I. SACHS-MICHAELS
   **GLANCY PRONGAY & MURRAY LLP**
8  712 Fifth Avenue
   New York, NY 10019
9  (212) 935-7400
10
11 *Attorneys for Plaintiff*

12          UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF CALIFORNIA
13

| | |
|---|---|
| 14  CHARLES BLACKBURN, Derivatively on Behalf of Nominal Defendant ALLEGIANT TRAVEL COMPANY, | Case No.: |
| 16 | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY** |
| 17                    Plaintiff, | |
| 18          v. | |
| 19 | |
| 20  MAURICE J. GALLAGHER, JR., MONTIE R. BREWER, GARY ELLMER, LINDA A. MARVIN, CHARLES W. POLLARD, and JOHN REDMOND, | **DEMAND FOR JURY TRIAL** |
| 23 | |
| 24                    Defendants, | |
| 25          and | |
| 26  ALLEGIANT TRAVEL COMPANY, | |
| 27 | |
| 28                    Nominal Defendant. | |

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Charles Blackburn, by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Allegiant Travel Company ("Allegiant" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties.

## NATURE AND SUMMARY OF THE ACTION

1. Allegiant is a low-cost passenger airline marketed primarily to leisure travelers in under-served cities.

2. The Company was founded in 1997 as a small regional airline operating in California but has existed in its current iteration since defendant Maurice J. Gallagher, Jr. ("Gallagher") purchased Allegiant out of bankruptcy in 2001. Gallagher took the company public in 2007 and has since significantly expanded its operation. The Company now serves approximately 177 destinations with a 100 jet fleet.

3. Defendant Gallagher has prior relevant experience with several low-cost airlines. Most notably, he was a founder of ValuJet Airlines, Inc. ("ValuJet") and an officer and director. ValueJet was a low-cost airline operating in the United States in the 1990s. ValuJet is known for the crash of Flight 592 in 1996 into the Everglades in Florida, killing all 110 people on board. After the crash, ValuJet's deficient safety practices and repeated maintenance problems came to light and the airline was grounded by the Federal Aviation Administration ("FAA") on June 11, 1996.

4. Fortunately, none of Allegiant's aircraft have yet crashed. However, the Company suffers from systemic safety and maintenance problems similar to those suffered by ValuJet. As detailed herein, since at least 2015, if not longer, Allegiant has had highest rate of emergency landings of any airline in the United States.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

5.    One of Allegiant's primary hubs is the St. Petersburg/Clearwater Airport where it accounts for over 95% of all air traffic.  Allegiant's patronage of the airport has been a boon for the local tourist economy, but the company's safety and maintenance problems have not gone unnoticed.  Indeed, it is difficult to imagine how Allegiant's repeated emergency landings and evacuations at one small airport where it accounts for effectively all air traffic would not raise alarms.

6.    In approximately 2015, the local paper of record in the St. Petersburg/Clearwater area, the *Tampa Bay Times*, began documenting Allegiant's safety and maintenance issues in detail culminating with an award-winning investigative report published on November 2, 2016.  The report, titled "Breakdown at 30,000 Feet," that revealed in startling detail the systemic nature of Allegiant's safety and maintenance problems.  For example, the report revealed that approximately half of Allegiant's aircraft broke down in flight at least once during 2015.

7.    For the public good, any airline must operate subject to adequate safety and maintenance processes to safe guard the lives of its passengers and employees.  A lack of safety and maintenance processes is also bad for business because evacuations and emergency landings cost money and consumers will chose to fly an airline they perceive to be safe over an airline that has a reputation as unsafe.  And, the demise of ValuJet illustrates the peril for an airline with poor safety processes in the event of a crash.

8.    Fortunately for its passengers, employees, and stockholders, Allegiant has not yet experienced a crash.  However, as set forth herein the Company's alarming lack of safe processes and consistent refusal to properly maintain its fleet have raised alarms throughout the commercial airline industry.

9.    The Company's Board and management have at all times known that Allegiant's reputation for safety was material to its prospects and that persistent safety problems would seriously hurt the Company's business.  The Board and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   management were indisputably aware of the "Breakdown at 30,000 Feet report and

2   the Company's repeated safety problems. Defendants publicly stated they were

3   improving the Company's maintenance and safety processes and that the problems

4   were behind them.

5        10.    Then, in April 2018, CBS News aired a report on 60 Minutes detailing

6   the continued safety and maintenance problems at Allegiant. Management had not

7   imposed the types of processes that keep flyers safe at most other U.S. airlines.

8   Instead, knowing of the Company's deficient safety and maintenance, they chose

9   to allow Allegiant to continue operating in a pervasively unsafe manner, putting

10   the Company's employees, customers, and business at risk

11        11.    Plaintiff brings this action to force Allegiant's management to

12   implement adequate safety and maintenance procedures, repay the Company for

13   funds spent due to the safety and maintenance deficiencies, and obtain the

14   clawback of equity and incentive compensation paid to executives who were

15   breaching their fiduciary duties.

16        12.    Plaintiff has not made a demand on the Board of Allegiant because the

17   Company's six-director Board is not independent and faces a substantial likelihood

18   of liability in connection with the wrongdoing alleged herein. Two of the directors

19   are officers of the Company, responsible for implementing the safety and

20   maintenance procedures in their executive capacities. Another director is the

21   former Chief Financial Officer ("CFO") with a twenty-year employment history

22   working for defendant Gallagher. All six of the directors face a substantial

23   likelihood of liability because they knew of the Company's safety and maintenance

24   problems and chose not to correct them.

25                  **JURISDICTION AND VENUE**

26        13.    This Court has jurisdiction over the subject matter of this action

27   pursuant to 28 U.S.C. § 1332 in that Plaintiff and defendants are citizens of

28   different states and the amount in controversy exceeds $75,000 exclusive of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

interest and costs.  Plaintiff is a citizen of Pennsylvania and no defendant is a citizen of that state.

14.    Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of Defendants resides in this District, the Company maintains its principal executive offices in this District, Defendants have received substantial compensation in this district by engaging in activities that had an effect in this district and are directly related to the wrongdoing alleged herein.

## PARTIES

### A. Plaintiff

15.    Plaintiff is a shareholder of Allegiant, has been since April 2015, prior to the events complained of herein, and continues to be.

### B. Defendants

16.    Nominal defendant Allegiant is an entity incorporated under the laws of the State of Nevada maintaining its principal executive offices at 1201 N. Town Center Drive, Las Vegas, Nevada 89144.  Allegiant operates a low-cost passenger airline.  Allegiant stock trades on the Nasdaq exchange under the ticker ALGT.

17.    Defendant Gallagher is the Company's largest stockholder and has served as a director since 2001.  Gallagher has served as Chief Executive Officer ("CEO") since 2003 and Chairman of the Board since 2006.  According to Allegiant's website, Gallagher has been "actively involved in the management" of the Company since 2001, and previously served a director and executive of ValuJet and WestAir Commuter Airlines ("WestAir").  Upon information and belief, defendant Gallagher is a citizen of Nevada.

18.    Defendant Montie R. Brewer ("Brewer") has served as a director of Allegiant since 2009.  Brewer is a member of the Nominating Committee and the Compensation Committee.  Brewer has significant experience working at commercial airlines and previously worked at Northwest Airlines, Republic

4

1     Airlines, Braniff and TransWorld Airlines, United Airlines, and Aer Lingus.  Upon

2     information and belief, defendant Brewer is a citizen of Massachusetts.

3         19.     Defendant Gary Ellmer ("Ellmer") has served as a director of

4     Allegiant since 2008.  Ellmer is a member of the Audit Committee, Ethics

5     Committee, Nominating Committee, and the Compensation Committee.  Ellmer

6     has significant experience working at commercial airlines and was previously

7     employed as the Chief Operating Officer of ATA Airlines and American Eagle

8     Caribbean, American Eagle Airlines, Business Express Airlines, and WestAir.

9     Upon information and belief, defendant Ellmer is a citizen of Missouri.

10        20.     Defendant Linda A. Marvin ("Marvin") has served as a director of

11     Allegiant since 2013.  Marvin is the Chair of the Audit Committee and a member

12     of the Nominating Committee.  Previously, Marvin served as the CFO of Allegiant

13     from 2001 until 2007, and thereafter consulted for the Company until 2008.  As set

14     forth herein, Marvin has worked with and subordinate to defendant Gallagher at

15     various entities for the majority of her professional career.  Upon information and

16     belief, defendant Marvin is a citizen of Las Vegas.

17        21.     Defendant Charles W. Pollard ("Pollard") has served as a director of

18     Allegiant since 2009.  Pollard is a member of the Audit Committee and the

19     Compensation Committee.  Pollard has significant experience working at

20     commercial airlines and previously was employed as the CEO of Omni Air

21     International and served as an executive at World Airways.  Upon information and

22     belief, defendant Pollard is a citizen of Massachusetts.

23        22.     Defendant John Redmond ("Redmond") has served as the President of

24     Allegiant since 2016 and as a director of Allegiant since 2014, and from 2007 to

25     2013.  Upon information and belief, defendant Redmond is a citizen of Colorado.

26        23.     The defendants named in ¶¶ 18 - 23 are sometimes referred to herein

27     as the "Individual Defendants."

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# DEFENDANTS' DUTIES

24.     By reason of their positions as officers, directors, and/or fiduciaries of Allegiant and because of their ability to control the business and corporate affairs of Allegiant, at all relevant times defendants owed Allegiant and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Allegiant in a fair, just, honest, and equitable manner.  Defendants were required to act in furtherance of the best interests of Allegiant and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Allegiant and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

25.     Defendants, because of their positions of control and authority as directors and/or officers of Allegiant, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with Allegiant, each of the defendants had knowledge of material non-public information regarding the Company

26.     To discharge their duties, the officers and directors of Allegiant were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Allegiant were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all

applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## SUBSTANTIVE ALLEGATIONS

**Allegiant's Systemic Safety Problems During 2015**

27.     In April 2015, the union representing Allegiant's pilots released a report listing 65 incidents between September 2014 and March 2015 during which Allegiant aircraft were diverted to another airport, returned to the gate or aborted takeoff due to mechanical problems.

28.     On June 28, 2015, the *Tampa Bay Times* reported that twice that month Allegiant plans had been forced to make emergency landings.

29.     On July 4, 2015, the *Tampa Bay Times* reported that "[f]or the third time in a month, an Allegiant Air flight has been forced to make an emergency landing at St. Pete-Clearwater International Airport."  The articled continued:

But a passenger, University of Miami women's head tennis coach Paige Yaroshuk-Tews, said neither pilots nor flight attendants told passengers that the plane had declared an emergency.

* * *

She became suspicious Allegiant was withholding information about a mechanical problem, she said, especially after the pilot told them they would have to switch to another aircraft before continuing to Punta Gorda.

Yaroshuk-Tews said she asked a flight attendant about mechanical issues. But she said the woman insisted bad weather was to blame.

* * *

Allegiant confirmed that it did not inform passengers of the emergency. "We generally do not inform passengers of declared emergencies," the airline said Saturday evening.

7
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

* * *

An Allegiant flight made an emergency landing at St. Pete-Clearwater on June 17 for what the airline called a "pressurization" issue with the aircraft.

And on June 8, another Allegiant flight made an emergency landing eight minutes after taking off from St. Pete-Clearwater after smoke was seen in the cabin. Passengers disembarked on emergency slides.

30.    On July 23, 2015, an Allegiant flight made an emergency landing at a *closed* airport in Fargo, North Dakota due to a lack of adequate fuel.  According to an article published in the *Tampa Bay Times*:

The Federal Aviation Administration has scolded Allegiant Air for an emergency landing at a closed airport in Fargo, N.D., in a ruling that appears to contradict the airline's statements about the flight.

The FAA issued a reprimand called a "letter of correction" to the Las Vegas-based airline saying the July 23 flight from Las Vegas to Fargo "did not appear to have adequate fuel" for such a trip, according to information released this week.

31.    According to a different article about the July 23, 2015 emergency landing:

At one point, an air traffic controller rebuked the airline for its apparent ignorance of the airport closing, which the Federal Aviation Administration provides notice of far in advance.

32.    On August 3, 2015, the *Tampa Bay Times* reported that "[a]n Allegiant Air flight leaving St. Pete-Clearwater International Airport made an emergency landing Monday in Greensboro, N.C., on its way to Richmond, Va." According to the article:

An engine issue caused the flight with 146 passengers aboard to divert to the Piedmont Triad International Airport in Greensboro, officials with Allegiant Air confirmed. Passengers aboard the flight said they smelled smoke and heard a popping noise before crew members told them they were making an emergency landing.

33.    On August 17, 2015, the *Tampa Bay Times* published an article titled "Allegiant Air aborts flight during takeoff at 138 mph," reporting that:

It was a mechanical failure of an Allegiant Air jet at one of a flight's most-vulnerable moments — takeoff.

Allegiant Flight 436 bound for Illinois was in its takeoff roll on Aug. 17 in Las Vegas traveling 138 mph when the nose of the aircraft

8

prematurely rose from the runway. The pilot pushed the yoke, or control column, fully forward, yet the nose continued to rise.

34. On October 12, 2015, the *Tampa Bay Times* published an article titled "Allegiant Air's problems continue with engine fire in Las Vegas," which reported that:

> LAS VEGAS — A California-bound Allegiant Air flight was evacuated in Las Vegas after an engine caught fire on the tarmac, the second plane fire at the airport in as many months and the latest in a string of issues for the low-fare carrier.
>
> Allegiant Air flight 516 was preparing to take off for Fresno at McCarran International Airport on Sunday afternoon when a fire was reported in the right engine.
>
> * * *
>
> The airline said the pilot aborted takeoff and reported the fire as the plane was rolling down the runway after indications of a mechanical issue. The plane taxied to a remote area and was met by firefighters.

**Defendants Terminate a Pilot for Evacuating an Aircraft with an Engine Fire**

35. On November 13, 2015, a former Allegiant pilot, Jason Kinzer ("Kinzer"), filed a complaint for wrongful termination in the District Court for the Clark County, Nevada against the Company. Having successfully opposed multiple motions to dismiss and for summary judgment filed by the Company, Kinzer's action currently is set for trial on October 17, 2018. According to the complaint, on June 8, 2015, Kinzer was in command of Allegiant Air flight 864 which left St. Petersburg, Florida for Hagerstown, Maryland. The Complaint alleges:

> Shortly after takeoff, as the said flight was climbing to its Air Traffic Control assigned altitude and before it reached five thousand feet, one or more of the cabin crew reported to Captain Kinzer and the first officer that acrid smoke or chemical fumes from an undetectable source was emanating from the rear of the passenger cabin and that it was being detected and inhaled by the passengers as well.
>
> Captain Kinzer, in accordance with his regulatory duty and his common law obligation to provide a high degree of care for the safety of his passengers, declared an emergency to Air Traffic Control and returned for a landing to the St. Petersburg airport, which was still the closest useable airport to his position.

9

After landing and clearing the active runway, Captain Kinzer advised the air traffic ground controller that Flight 864 was going to stop where they were and, having been met at that location by the vehicles and personnel of the St Petersburg Airport Crash/Fire Rescue, (hereinafter "Fire Rescue"), in order to have the Fire Rescue personnel check out the aircraft before proceeding to the terminal… Fire Rescue reported to Captain Kinzer and his First Officer "I'm showing some smoke on your No. 1 engine" and urged the crew to shut it down.

\* \* \*

Captain Kinzer and the First Officer checked with the cabin crew to learn that the acrid burning smell was not resolved and, for the safety of his passengers and crew and in accordance with his training and responsibility, ordered the cabin crew to prepare for an evacuation and notified the air traffic ground controller of that intention.

After Flight 864 reported to the air traffic ground controller of the decision to evacuate, a person who did not identify himself or his authority, over the air traffic control frequency, commanded the cockpit crew to "hold off on your evacuation." The air traffic controller admonished the persons on the frequency that they must identify themselves when using the air traffic control frequency to which there was no response. Captain Kinzer requested an identification of the person making this command to which a response from the unidentified person was a repeat of the command, "I'm telling you not to evacuate yet," without giving the source of authority or reason to make such a command.

After approximately another minute passed, Captain Kinzer asked the unidentified person for the reason why evacuation was being held off and that "We need an answer, please." The air traffic ground controller asked Fire Rescue, "Did you copy that?" to which no one responded. The air traffic ground controller interceded and repeated the request to the unknown caller that Flight 864 needed to know why evacuation was to be delayed to which no identifiable response, reason or authority was given….

\* \* \*

The unauthorized command over the air traffic control frequency, given without adequate identification, citation of authority or reason, attempting to usurp the legal final command responsibility of Captain Kinzer, particularly after an emergency landing due to smoke in the passenger cabin from an unknown source and report of smoke coming out of one of the engines, caused additional alarm on the part of Captain Kinzer for the safety of his passengers and crew and, with the concurrence of his First Officer, ordered an evacuation in accordance with the duty and responsibility imposed upon him by law, his training and the high degree of care with which he was charged.

While personally checking the passenger cabin to assure himself that the passengers were safely evacuated, Captain Kinzer noted that a passenger was still on board saying, "Help me, I cannot walk." He was a paraplegic. Captain Kinzer lifted the disabled passenger out of

10

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

his seat, and with the assistance of one of the flight attendants, carried the passenger to the exit where he could be safely evacuated. Captain Kinzer then rechecked the cabin to ensure personally that all souls were evacuated before he left the plane himself.

Because Captain Kinzer ordered the said evacuation, Allegiant Air corporate management accused him of not taking into primary account "the Company's assets, ground equipment, fuel and the personal time of our employees and customers" above his command responsibility of caring for the safety of his passengers and crew-essentially not placing company profits above safety-and, for that reason, fired him….

36.     On December 4, 2015, according to the *Tampa Bay Times*:

The smell of smoke in the cabin forced an Allegiant Air flight bound for St. Pete-Clearwater International Airport to return to Raleigh-Durham International Airport on Thursday, according to a television report. Officials said Flight 815 had just taken off when the pilots declared an emergency and returned to the airport, according to Eyewitness 11, an ABC affiliate in Raleigh, N.C. The plane landed safely. Allegiant officials said the plane had some kind of mechanical problem.

37.     On January 4, 2016, the *Tampa Bay Times* published an article titled, "Allegiant Air had five emergency landings out of Florida during holiday week," which reported:

One of the five was a Dec. 26 flight that departed St. Pete-Clearwater International Airport bound for Missouri that declared an emergency for an undisclosed "maintenance issue."

The other four flights departed Sanford, northeast of Orlando, from Dec. 24 to Dec. 31 and suffered a variety of mechanical issues.

38.     On January 8, 2016, the *Tampa Bay Times* published an article reporting that:

OCALA — Veteran aircraft mechanic Greg Marino worked at Allegiant Air for just two weeks before he quit because of what he said are the airline's dangerous maintenance practices.

Marino said mechanics at the airline's facility in Sanford often lapsed into bad maintenance habits. He said they failed to follow proper procedure in diagnosing aircraft problems and routinely misused a Federal Aviation Administration program that allowed planes, under some conditions, to fly with inoperative components or systems.

Marino said the airline needlessly delayed repairs in the push to keep planes flying, eroding the margin of safety.

* * *

11

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Emails show that Marino wanted to meet with Allegiant personnel to go over his concerns about the airline's safety culture. But he said Allegiant never took him up on the offer.

"I don't need this," he said. "I don't need the job. It is going to take a crash to get everybody's attention on this baloney. Allegiant has lost control of its product in house. Their maintenance is nothing short of obscene."

**A Stockholder Letter to the Board Sounds the Alarm**

39.    On January 26, 2016, an entity called CtW Investment Group ("CtW"), which manages approximately $250 billion in pension funds, published a letter it had sent to Allegiant's Board.  The letter states in part:

> Dear Allegiant Board Members:
>
> At the annual shareholder meeting in June, public shareholders signaled a clear lack of confidence in former CFO Linda Marvin's leadership of the Audit Committee. Concerned at the Audit Committee's approval of $9.3 million in highly questionable related transactions between the company and CEO Maurice Gallagher, and troubled by Ms. Marvin's lengthy professional association with Gallagher, 47% of public shareholders opposed her re-election. Recent negative publicity over airplane safety and ongoing investigations into in-flight incidents by the Federal Aviation Administration lend urgency to Ms. Marvin's swift replacement to ensure rigorous, independent oversight of regulatory compliance by our Audit Committee; and to the initiation of a broader overhaul of board composition and committee structure.
>
>  Accordingly, we request that the board immediately: (1) engage an outside search firm to recruit new independent directors to replace Ms. Marvin and to expand the overall size of our board, (2) reconstitute a majority of the Audit Committee with newly recruited directors; and (3) establish a standalone safety committee of the board – the prevalent governance practice across the industry. These reforms are vital to assuring customers and shareholders of Allegiant's safety and compliance procedures, especially given both the company's prodigious growth and reliance on using and acquiring older aircraft.
>
> In addition, (4) we request the suspension of all related transactions with CEO Gallagher, including the $2.5 million annual sponsorship of his son's NASCAR team, until the Audit Committee has been thoroughly overhauled. It is incredible that the current committee – which also includes two other long-time associates of CEO Gallagher, John Redmond and Gary Ellmer – can exercise appropriate independence and objectivity in assessing transactions which "blur the lines between personal and corporate investment," as Institutional Shareholder Services put it in recommending against Ms. Marvin.

40.    The letter informed the Board that Marvin, "Lacks the 'Critical Distance' from CEO Gallagher to Serve as Audit Committee Chair and Should Leave the Board," and stated:

It may be true that Ms. Marvin's experience as Allegiant's CFO until 2007 "adds valuable knowledge to [the] board," as you state in the proxy, but this comes at far higher costs to the Audit Committee's independence and objectivity. With the committee's primary purpose being to bolster investor confidence in the company's numbers, its legal and regulatory compliance, and related party transactions, shareholders require absolute assurance in the objectivity and independence of its members; even the perception that those qualities are tainted undermine its role. For this reason, it is exceedingly rare to have a former employee, let alone a previous CFO, serving on this key committee.

Our analysis of analysis of the Russell 3000 indicates that there are just six other instances of a former CFO (or CEO) of equal or more recent employment as Ms. Marvin serving on the Audit Committee. And just one of those serves, like Ms. Marvin, as chair of the Audit Committee. Besides the risk of excessive deference to management that comes with any former executive serving as an independent director, having a former CFO head the Audit Committee sets up the awkward situation in which the same individual is responsible for independently overseeing the processes and controls that they may well have put in place as CFO or oversee compliance issues that could have developed under the previous tenure. At a minimum, the risk is in having Ms. Marvin oversee the performance of a former deputy; current CFO Scott Sheldon, we note, served as Director of Accounting during Ms. Marvin's tenure as CFO. Compounding this challenge is the fact that Mr. Sheldon is the nephew of former Allegiant director and long-time business associate of CEO Gallagher, Timothy Flynn; together CEO Gallagher and Mr. Flynn founded ValuJet and WestAir and are partners, along with Audit Committee member John Redmond (see below), in the investment consortium owning our company's headquarters.

Considering Ms. Marvin's extensive professional history with Mr. Gallagher -- serving as an executive under Gallagher at WestAir and MPower, in addition to her role as CFO of Allegiant – it is difficult to view her appointment to the board in 2013 stemming from anything else but her longstanding relationship with Gallagher. (Indeed, we note that at least until 2014, they had lived within a mile of each other for over a decade.)

Unfortunately, similar independence concerns attach to Gary Ellmer and John Redmond, two of the three other Audit Committee members. Mr. Ellmer, who like Ms. Marvin has no other public board service, served alongside Mr. Gallagher at WestAir. Mr. Redmond, meanwhile, continues the board's relationship with business partners of CEO Gallagher. Mr. Redmond, like former director Timothy Flynn (2006 to 2013), is an eleven percent partner alongside CEO Gallagher

(30%) in the limited liability company that owns the company's headquarters and adjacent property.

41.     The letter urged the Board to suspect related party transactions with defendant Gallagher until a new audit committee could vet the appropriateness of payments:

> Equaling nearly a third of the 2014 Selling, General and Administrative expense (the line item under which many of these costs are recorded) and equivalent to 10% of net income, the $9.3 million in new related transactions with CEO Gallagher disclosed in this year's proxy are both highly material and seemingly at odds with the company's very low cost structure.

> Particularly troubling is the apparently superfluous, tangential nature of many of these transactions to Allegiant's business – indeed, the company refers to several of these as "noncore special projects" – and yet they are potentially valuable personal benefits to CEO Gallagher. Most glaring is the company's sponsorship of CEO Gallagher son's NASCAR career to the tune of $2.5 million and the $2.8 million paid to Alpine Labs, co-founded by CEO Gallagher, for the production of a TV game show filmed on Allegiant flights. Together, these expenses equal 88% of the company's advertising budget. (See appendix for a breakdown of the related transaction concerns.)

> Until a reconstituted Audit Committee is in place to independently and objectively evaluate the merits and terms of these transactions, we request the suspension of all corporate funding of CEO Gallagher's NASCAR team and the production of any further Game Plane episodes. We are not aware of any company disclosures quantifying the returns to these investments and note that on the topic of Game Plane, company VP Brian Davis told the Los Angeles Times that he didn't know whether the game show had played a direct role in boosting the carrier's popularity or profit.

42.     The letter additionally urged the Board to adopt stronger governance:

> Allegiant may have ceased to be a controlled company in 2007, but the board's composition, oversight and responsiveness have failed to keep pace with this critical shift to majority public ownership. To start, the board needs a more expansive and robust director recruitment process. Besides the lengthy ties Ms. Marvin and Messrs. Redmond and Ellmer share with CEO Gallagher, outlined above, we note that Montie Brewer was initially recommended to the board in 2009 by CEO Gallagher. It thus appears that at least four of our five independent directors were identified as candidates by virtue of their relationship to CEO Gallagher. Moreover, while we think industry experience is vital for a board, with only one member of the board coming from a professional background outside of the industry – and that director being Mr. Redmond –Allegiant needs to dramatically widen the talent pools from which it selects directors. Rather than a strength, the board's concentration of experience is suggestive of a highly constricted recruitment process.

14

The integrity of this entire process is further undermined by Ms. Marvin and Mr. Ellmer making up two-thirds of the Nominating Committee (Mr. Brewer being the other member), the absence of a designated chair and the committee having met just once in each of the past seven years (2008 – 2014). We note that according to a 2013 Ernst & Young study, a mid-cap company's nominating committee meets on average 4 times year. The same study also finds that the average mid-cap board size is ten and for mid-cap airlines is eleven - or in either case almost twice the size of our board. It is clear to us that the board's size, composition and performance are badly in need of an upgrade.

43.     Finally, the letter urged the Board to reform the Company's deficient safety process by creating a standalone, Board level safety committee:

The past year has seen a string of prominent safety incidents involving Allegiant flights, prompting several FAA investigations and a wave of negative publicity for our company (including landing Allegiant in the Wall Street Journal's "Crisis of the week" column).  And last week, we note, COO Steve Harfst abruptly resigned after less than 18 months at the company.

Questions have also been raised over the adequacy of disclosures surrounding regulatory compliance, while the company's own pilots have pointed to a corporate culture where profits come before safety. The emergency landing in Fargo, ND, in July of an Allegiant flight running low on fuel should be a wakeup call. The incident not only follows a string of in-flight safety incidences over the prior months, but occurred on a flight piloted by two licensed executives, one being our director of flight safety, and appears to have been wholly avoidable if the pilots had adequately reviewed, as they are required before each flight, an FAA Notice to Airmen, which indicated that the Fargo Airport was closed due to a Blue Angels display. Besides the emergency itself, Allegiant was criticized in the Wall Street Journal for its public response to the incident, as several "crisis experts" expressed concern at the company's overly defensive posture in addressing passenger and investor concerns over safety, particularly given the rash of incidents on company flights.

As of September 8, 2015, the Las Vegas Review Journal reported 17 "unusual incidents" in 2015 involving Allegiant flights, including emergency landings, flight diversions or aborted takeoffs, while the FAA says it has "several" ongoing regulatory investigations. The company had a further five emergency landings out of Florida in the last week of the year.

Separately, according to a New York Times article, Allegiant pilots have identified at least 65 incidents in the period from September 2014 to March 2015, where flights were forced to divert, return to gates or abort takeoff because of mechanical or engine problems. In a report sent to Congress and the F.A.A., the pilots contend that a combination of poorly trained mechanics, insufficient spare parts, and an aging fleet is "creating a dangerous paradigm that could eventually lead to an accident resulting in serious injury and loss of life."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

In the same article, the New York Times reported on previously undisclosed problems in the airline's maintenance and training programs identified in 2013 during a routine F.A.A. inspection. Determining the current training was not effective in identifying systemic deficiencies or distinguishing between major and minor repairs, the F.A.A. forced a six-month shut down of the company's training programs and a freeze in new plane deliveries. Although Allegiant's SEC filings routinely warn of the material risks from possible shortages of both pilots and aircraft, there can also be risks from failures to meet regulatory standards.

With a key responsibility of the Audit Committee being to ensure that management has established and maintained processes to assure compliance with key regulations impacting the company, particularly those that could have significant impact on the company's financials, these developments heighten the urgency for bolstering the committee's independence from CEO Gallagher. They also underscore the need to establish a board safety committee. Almost all of Allegiant's US peers have standalone committees to oversee management's internal control processes and other activities regarding operational safety and compliance with applicable laws and regulations, rather than subsume the responsibility under the general mandate of the audit committee, which has other significant responsibilities. Indeed, considering that a key element of Allegiant's business model is the reliance on older aircraft, which require more extensive maintenance, a board committee that focuses exclusively on safety would appear long overdue.

## Allegiant's Systemic Safety Problems Continue through 2016

44.    On January 27, 2016, the *Tampa Bay Times* published an article titled, "One Allegiant Air plane had four emergency landings within six week," which reported that:

Allegiant Air Flight 815 had just departed North Carolina on Dec. 3 with 94 passengers bound for St. Pete-Clearwater International Airport when an alarming gray haze began to fill the cockpit and passenger cabin.

Pilots declared an emergency, telling the tower to notify fire rescue crews "to roll the trucks." The haze dissipated on landing at Raleigh-Durham, N.C., and the problem was traced to a malfunctioning air-conditioning system.

Mechanics knew the aircraft quite well: This was the fourth emergency landing by the same aircraft in little more than a month.

The emergency landings by the MD-88 — tail number 403NV — occurred from Oct. 25 to Dec. 3 on flights headed to Florida, all after reports of smoke or fumes in the aircraft. Some of the incidents may have been because of the same recurring problem, according to interviews and Federal Aviation Administration records.

The aircraft also made an emergency landing in August due to engine trouble that did not involve a report of smoke.

Industry veterans say such a high number of incidents for one aircraft in such a short period of time is exceptionally rare, and the incidents will undoubtedly raise renewed concern about Allegiant's maintenance operations.

45. On January 23, 2016, the *Tampa Bay Times* published an article titled, "Why did Allegiant Air's second-in-command resign? Likely over safety issues, experts say," which reported that:

More than a week before Allegiant Air's chief operating officer abruptly resigned, John Goglia questioned the airline's response to five emergency landings during the last week of 2015.

* * *

The abrupt resignation of Allegiant chief operating officer Steve Harfst a week ago after just 13 months in the job left some industry watchers questioning whether his was the first head to roll as a consequence of the airline's highly publicized maintenance and operational difficulties during 2015.

46. On February 3, 2016, the *Tampa Bay Times* published an article titled, "Allegiant Air says mechanic's report of lax safety culture unfounded," which reported that "Allegiant Air's new chief operating officer this week said the airline has completed an internal report showing recent allegations raised about the airline's Sanford maintenance operation by a former mechanic were unfounded, according to the *Las Vegas Review-Journal*."

47. On February 4, 2016, the *Tampa Bay Times* published an article titled, "Allegiant Air plane from Orlando blows two tires landing at Pennsylvania airport," which reported that, "Airport officials say two tires under the left wing of an Allegiant Air airplane blew out during a landing at a Pennsylvania airport."

48. On February 12, 2016, the *Tampa Bay Times* published an article titled, "Allegiant flight from St. Pete-Clearwater makes emergency landing in Birmingham," which reported in part:

Passenger Nick Janovsky realized something was amiss with Allegiant Air Flight 872 when he witnessed a scene that seldom occurs on a commercial aircraft cruising at 30,000 feet:

17

1     Flight attendants, looking upset, running in the cabin.

2
    The crew told passengers they were making an emergency landing.
3     Within minutes, the aircraft descended so abruptly and rapidly that
    children in the cabin began to wail. "Everybody was just freaking
4     out," Janovsky said.

5     Flight 872, which departed St. Pete-Clearwater International Airport
    at 8:19 a.m. Friday bound for Omaha, Neb., made an emergency
6     landing in Birmingham, Ala., because the crew noticed an unusual
    electrical odor, Allegiant told reporters. Janovsky said the crew told
7     passengers the emergency was caused by "the smell of an electrical
    fire."

8     The Federal Aviation Administration, which is investigating, said in a
    written statement the crew reported "smoke in the cockpit."
9
    The aircraft, a 27-year-old MD-83, landed safely at Birmingham-
10     Shuttlesworth International Airport with 153 passengers and six crew
    members. No injuries were reported.
11
                              * * *
12
    The plane, he said, shuddered uncomfortably during the rapid descent.
13     At some point, all electricity to the passenger cabin appeared to go
    out. The small fans above passengers' heads stopped working, and
14     even the seat belt sign went out. Flight attendants communicated with
    passengers using handheld megaphones rather than the plane's public-
15     address system.

16     In about 10 minutes, the aircraft landed and stopped on the runway.
    Janovsky said he saw fire trucks and emergency vehicles surround the
17     plane. Passengers, however, were not taken off. The crew said little to
    passengers as they waited for 20 minutes.
18
    "That was a problem," he said. "Everybody assumed the airplane was
19     on fire."

20        49.    On February 16, 2016, the *Tampa Bay Times* published an article

21 titled, "Allegiant cancels flight due to maintenance issue — then the replacement

22 flight is canceled, too," which reported that:

23
    Dawn Turchin decided to cancel a long-awaited vacation to Las Vegas
24     after her Allegiant Air flight — and then the aircraft sent to replace it
    — were both grounded due to maintenance problems.
25
    Flight 427 from Fargo, N.D., to Las Vegas, originally scheduled to
26     depart early Sunday evening, instead left Fargo at 2:09 p.m. EST
    Tuesday.
27        50.    On February 22, 2016, the Individual Defendants caused the

28 Company to file its Form 10-K for 2015 with the SEC. The Form 10-K, which

was signed by defendants Gallagher, Brewer, Ellmer, Marvin, Pollard, and Redmond, disclosed the following in the section titled "Item 1. Business":

**Competition**

The airline industry is highly competitive. Passenger demand and fare levels have historically been influenced by, among other things, the general state of the economy, international events, fuel prices, industry capacity, and pricing actions taken by other airlines. The principal competitive factors in the airline industry are price, schedule, customer service, routes served, types of aircraft, safety record and reputation, code-sharing relationships, and frequent flyer programs.

* * *

**Aircraft Maintenance**

We have a Federal Aviation Administration ("FAA") approved maintenance program, which is administered by our maintenance department headquartered in Las Vegas. Technicians employed by us have appropriate experience and hold required licenses issued by the FAA. We provide them with comprehensive training and maintain our aircraft in accordance with FAA regulations. The maintenance performed on our aircraft can be divided into three general categories: line maintenance, major maintenance, and component and engine overhaul and repair. Line maintenance is generally performed by our personnel. We contract with outside organizations to provide major maintenance and component and engine overhaul and repair. We have chosen not to invest in facilities or equipment to perform our own major maintenance, engine overhaul or component work. Our management closely supervises all maintenance functions performed by our personnel and contractors employed by us, and by outside organizations. In addition to the maintenance contractors we presently utilize, we believe there are sufficient qualified alternative providers of maintenance services that we can use to satisfy our ongoing maintenance needs.

51. The section of the Form 10-K titled "Item 1A. Risk Factors" disclosed:

**Our reputation and financial results could be harmed in the event of an accident or restrictions affecting aircraft in our fleet.**

As of February 1, 2016, our operating fleet consists of 51 MD-80 series aircraft, 26 A320 series aircraft, and five Boeing 757-200 aircraft. All of our aircraft were acquired used and range from 10 to 30 years from their manufacture date at February 1, 2016.

An accident involving one of our aircraft, even if fully insured, could result in public perception that we are less safe or reliable than other airlines, which would harm our business. Further, there is no assurance that the amount of insurance we carry would be sufficient to

protect us from material loss. Because we are smaller than most airlines, an accident would likely adversely affect us to a greater degree than a larger, more established airline.

In-flight emergencies affecting our aircraft, and resulting media attention, could also contribute to a public perception regarding safety concerns and a loss of business.

The FAA could suspend or restrict the use of our aircraft in the event of actual or perceived mechanical problems or safety issues while it conducts its own investigation, whether involving our aircraft or another U.S. or foreign airline's aircraft. Our business could also be significantly harmed if the public avoids flying our aircraft due to an adverse perception of the aircraft we utilize because of safety concerns or other problems, whether real or perceived, or in the event of an accident involving these aircraft.

52.     On February 25, 2016, the *Tampa Bay Times* published an article titled, "Allegiant Air flight aborts takeoff at St. Pete-Clearwater Airport after engine fails," which reported that:

Flight 904, bound for Kansas City, Mo., was rolling down the runway at 3:10 p.m. when its left engine suffered a malfunction called a compressor stall, according to the pilot's communication with the airport tower. This sort of malfunction is caused by abnormal airflow through the engine.

53.     On March 6, 2016, the *Tampa Bay Times* published an article titled, "Allegiant pilots abort takeoff en route to St. Pete-Clearwater, report says," reporting that:

An Allegiant Air flight with service from Fort Wayne, Ind., to St. Petersburg-Clearwater International Airport aborted takeoff Saturday morning due to mechanical problems, an Allegiant official said.

Passengers on the MD-80 jet were told that an engine blew out, WTSP-TV reported.

Flight 891 carried 153 passengers and six crew members Allegiant said.

54.     On March 18, 2016, the *Tampa Bay Times* published an article titled, "Are maintenance problems at Allegiant Air the result of an airline growing too fast?," which reported in part:

David Stuckenberg has flown thousands of hours as an Air Force pilot and a passenger on commercial airliners. He said a flight on Allegiant Air last month was his worst flying experience ever.

The takeoff from St. Pete-Clearwater International Airport aborted at high speed, announced by a loud boom from a failing engine. It took more than three hours for Allegiant to find a replacement plane…

\* \* \*

Some airline safety advocates question whether Allegiant, a budget carrier that flew more than 1.4 million passengers at the Pinellas airport last year, is showing signs of stress caused by its rapid growth, possibly creating a dangerous situation in which it can't keep up with maintenance.

They draw a parallel between Allegiant and ValuJet, the upstart airline whose gaudy expansion troubled the Federal Aviation Administration in the months leading to the 1996 Everglades crash that killed 110 people.

Such comparisons may be particularly uncomfortable for Allegiant, whose CEO, Maurice Gallagher Jr., was ValuJet's co-founder.

"It appears Allegiant is following the same recipe for disaster ValuJet followed," said Mary Schiavo, a former U.S. Department of Transportation inspector general who questioned ValuJet safety and wrote a book on aviation safety, *Flying Blind, Flying Safe*. "The airline is designed as a cash cow. The things that passengers are seeing are indicative of the overall condition of the airline. They're clues. And they're valued clues."

55.    On March 24, 2016, the *Tampa Bay Times* published an article titled, "18 hour ordeal: Passengers on Allegiant Air flight delayed three times at Orlando airport," which reported in part:

The first plane got off the ground Wednesday afternoon but was forced to return to the airport a half-hour later because of a sensor issue.

Passengers were put on a second plane, but they sat on the tarmac and had to return to the gate because of a mechanical problem.

They got on a third plane that had to return to the gate Wednesday night because of cabin lights problems.

56.    On April 29, 2016, the *Tampa Bay Times* published an article titled, "Allegiant Air flight declares emergency in Phoenix after engine failure," which

reported that an Allegiant flight was forced to make an emergency landing in Airzona:

> The failure of the No. 2 engine on Flight 175 occurred immediately after the pilots aborted a landing due to a gust of wind and as they powered up both engines to gain altitude for a "go-around," according to an Allegiant memo on the incident and a recording of air traffic control communications.

57.     On May 12, 2016, the Individual Defendants caused Allegiant to file its definitive proxy statement in advance of the Company's annual meeting of stockholders on June 30, 2016.  The proxy statement solicited stockholder votes to elect each of the Individual Defendants to new terms as directors and conduct other business.  The proxy statement disclosed that Gallagher owned approximately 3.4 million shares of Allegiant stock representing approximately 20.5% of the outstanding shares.

58.     According to the proxy statement, the Board had not created a Safety Committee as urged by CtW in its letter, and defendants Ellmer, Marvin, Pollard, and Redmond continued to serve on the Audit Committee, defendants Brewer, Pollard, and Redmond were members of the Compensation Committee, and defendants Brewer, Ellmer, and Marvin were members of the Nominating Committee.

59.     The proxy statement disclosed that:

**Risk Oversight**

While risk management is the primary responsibility of our management team, our board of directors is regularly involved in the oversight of the most material risks faced by us and monitors areas of risk as a routine board agenda item.  Of the six members on the board, five are independent directors, and each of these five has extensive experience in managing companies in the travel industry.  In particular, four of the independent directors have each served more than ten years in executive or finance positions with airlines.  The other independent director has served more than ten years in executive positions in the resort and casino industry. Bringing this exceptional depth of experience, the board is involved in all critical decisions regarding strategic direction, choice of aircraft, significant aircraft purchase transactions, finance transactions, application of cash to stock repurchases or payment of dividends, fuel hedging

22

opportunities, any merger and acquisition opportunities, and any other material Company decisions outside of the ordinary course of our operations.

*One area of risk oversight relates to our operations and the maintenance and safety of our aircraft. In this regard, we have arranged for two of our independent directors to regularly meet with our operations and maintenance personnel and to report back to the board. In addition, our senior operations personnel make a presentation to the board at each quarterly board meeting. The airline experience of our board allows it to meaningfully participate in the oversight of this risk area.*

Our board committees, which are comprised solely of independent directors, also participate in risk oversight.

The audit committee oversees risks related to our financial reporting and internal controls with quarterly meetings, including private sessions with our outside auditing firm, our internal audit personnel, and management responsible for financial accounting. Audit committee approval is also required for any related party transactions.

(Emphasis added).

60. According to the proxy statement, defendant Gallagher was compensated a total of over $3.5 million in 2015, of which amount was $2.9 million was incentive compensation approved by the Compensation Committee. Defendants Brewer, Ellmer, Marvin, and Redmond were each compensated $218,000 in their roles as directors.

61. The proxy contained the following related party transaction disclosure:

**Related Party Transactions**

Since January 1, 2015, we have been a party to the following transactions in which the amount involved exceeded $120,000 and in which any of our directors or executive officers, any holder of more than 5 percent of our capital stock or any member of their immediate families had a direct or indirect material interest.

During 2015, we made payments totaling $2.9 million to entities owned or *controlled by Mr. Gallagher* ("Adapt") for the building of corporate training content, with a current focus on our operating groups. The fundamental change offered by this effort is to move the majority of our operational training from traditional required classroom offerings based on stipulated time requirements to individualized on-line training based on mastery of the material. In comparison with the traditional approach, the training will be delivered in the same standardized version to all trainees. Once

23

approved by the FAA, new hire team members will be able to complete their initial company required training away from the traditional classroom environment (which could require as many as 136 hours for new hire pilots) thereby substantially reducing our new hire training costs while improving the overall learning outcomes for these students.

The program requires upfront investment to create the high quality training content. But when completed, this approach to training focuses on concept mastery by each student, recognizing individuals learn at varying paces, through different styles. The adaptive teaching approach is designed to ensure the student fully understands each module before moving on to other subjects. The content will also facilitate recurrent training and contribute to cost savings in the same manner as initial training. We have been in regular communication with the FAA about our development of these training programs and we believe our efforts have been well received by the FAA. We have received preliminary approval from the FAA of our first completed course for our MD-80 pilot training and expect final approval for this course shortly. FAA approval for our mastery based training will deviate from their traditional practice of requiring certain minimum classroom times.

Other courses are in process, including our Airbus 319/320 course (which was delivered to us by Adapt for quality assurance in March 2016), inflight training, stations, dispatch and maintenance.

This innovative approach to training is delivered more efficiently on-line versus the traditional classroom approach and is designed to make training more effective via subject matter mastery. Ultimately, we believe we will have a more cost effective training program as well as better training throughout our organization which should contribute to a safer, better operation.

Given the substantial benefits expected from this innovative approach to training, our audit committee approved the engagement of Adapt after analyzing competitive proposals from other vendors. The arrangement is on a cost plus overhead allocation basis so the related party has not, and will not, realize any profit on the related party's dealings with us. In October 2015, our board approved an additional commitment of $3.5 million for this project, which is currently expected to conclude in 2016.

The building where we previously maintained our headquarters was under a lease agreement with an entity owned by a limited liability company in which *Maurice J. Gallagher, Jr. owns a 30 percent interest and John Redmond owns an 11 percent interest*. Neither Mr. Gallagher nor Mr. Redmond ever had the right to direct or participate in the management of the limited liability company. The headquarters' lease was signed in 2007 and went into effect upon completion of the construction in 2008. The lease provided for a ten-year term and the right to terminate after seven years. The lease rate was set at the time of lease execution in 2007 and was determined by our audit committee at that time to have been an arms-length rental rate. All rent payments made to the landlord since 2008 were merely the fulfillment of contractual obligations established when the lease was

24

signed. We exercised our option to terminate the lease for this building effective in May 2015. We sued the landlord in 2015 to determine the amount owed by us on lease termination and to confirm we had the ability to terminate the lease early. In connection with the termination of this lease, we accrued $1.3 million for unamortized expenses which was subsequently paid in January 2016, in settlement of litigation.

Our early termination of the lease and the lawsuit brought against the landlord substantiate that our interactions with this landlord were handled on an arms-length basis.

In 2008, we entered into a second lease agreement for office space used as our training facility which is located in a building adjacent to the location of our previous headquarters. The second building is owned by a separate limited liability company *in which Messrs. Gallagher and Redmond also own a 30 percent and an 11 percent interest*, respectively. As with the first building, neither Mr. Gallagher nor Mr. Redmond have, or ever had, the right to direct or participate in the management of the limited liability company. This office lease was signed in 2008 and has a ten-year term which continues until 2018. Additionally, as of January 2016, payments are no longer being made to a related party entity as the lender has taken possession of the property and exercised rights to have payments made directly to it.

During 2015, we paid approximately $1.2 million to the landlords under these two lease arrangements. With respect to their ownership interests in these entities, Messrs. Gallagher and Redmond have not received any distributions from these entities since 2012 nor do they expect any distributions in the future, as both entities have been through bankruptcy proceedings and rent for the second building is now being paid directly to the lender.

The disinterested members of our board and audit committee determined that the terms of these lease agreements were, when entered into, at least as favorable as we could have received from an unaffiliated third party.

During 2015, we made payments totaling approximately $2.5 million to GMS Racing, LLC, *a company controlled by Mr. Gallagher*, for the sponsorship of an auto race team featuring the Allegiant logo. GMS Racing, LLC competed in the NASCAR Camping World Truck Series and the ARCA Racing Series during this time. In determining whether to approve this sponsorship, our board considered the publicity value generated from the prominent display of the Allegiant name and logo on the GMS Racing vehicles through in-person attendance and television coverage, and the proximity of the race events to markets served by us. The company also believes there is a strong correlation between its customer base and profile and the profile of NASCAR fans. As a result, our audit committee concluded the publicity value more than exceeded the cost of the sponsorship. Despite the perceived value, the sponsorship has been discontinued and no future payments are anticipated in 2016 or after.

During 2015, Game Plane, LLC, a wholly owned subsidiary, paid approximately $0.4 million to Alpine Labs, LLC. Alpine Labs, LLC

partnered with Game Plane, LLC to produce and distribute game shows filmed on our flights, as part of our promotional efforts. *Mr. Gallagher owns a 25 percent interest in*, and is on the managing board of, Alpine Labs, LLC. As a related party transaction, the transaction was approved by our audit committee as being on terms no less favorable to us than could be obtained from unaffiliated third parties. We have always prided ourselves on approaching our business differently. The idea of a game show filmed aboard our flights was intended to generate publicity and name recognition for our company, and interest from our passengers on those flights. We were able to produce these shows on a cost plus overhead basis as a result of our chief executive officer's ownership interest in a production company and as such, the related party did not realize any profit on its dealings with us. We produced two seasons of the show, but no longer believe incremental value is being added by this innovative project. As such, we do not expect any further expenses related to this project in 2016 or after.

All future transactions, including loans, if any, between us and our officers, directors and principal shareholders and their affiliates and any transactions between us and any entity with which our officers, directors or five percent stockholders are affiliated, will be approved by our audit committee and will be on terms no less favorable to us than could be obtained from unaffiliated third parties.

(Emphasis added)

62. On June 1, 2016, the *Tampa Bay Times* published an article titled "Allegiant flight declares emergency at St. Pete-Clearwater airport," reporting that, "An Allegiant Air flight made an emergency landing at St. Pete-Clearwater International Airport Wednesday after suffering a mechanical problem, according to WFLA-Ch. 8."

63. On July 20, 2016, the *Tampa Bay Times* published an article titled, "Pilots: Firing of Allegiant Air pilot for St. Pete-Clearwater emergency landing endangers public," which reported:

Allegiant Air's termination of a pilot who ordered the evacuation of an aircraft last year at St. Pete-Clearwater International Airport endangers the public because other pilots might hesitate in an emergency for fear of being second-guessed.

That is according to pretrial testimony of Allegiant pilots, made public late Monday, in the lawsuit against Allegiant filed by the fired pilot, Jason Kinzer, in Nevada state court. Pilots also said they would have done the same as Kinzer if presented with the same circumstances — evacuate the airplane.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Case 2:18-cv-04758-APG-BNW Document 1 Filed 07/20/18 Page 29 of 54 Page ID #:28

Pilot Cameron Graff testified that Kinzer's dismissal was a warning by the Las Vegas-based airline to its pilots, who were then engaged through their union in bitter contract negotiations with Allegiant.

"It's my opinion that Capt. Kinzer was terminated to quell the pilot group, to silence the pilot group, to … keep the pilots from reporting safety events, emergencies, those type of events," said Graff, a pilots' union leader.

"That type of message I would say is dangerous to the public safety because it puts pilots in a position where they don't report safety issues, they don't report mechanical issues. They may even hesitate at a time they need to evacuate … and having more on their minds that, 'Am I going to be second-guessed for getting these people off the airplane safely? And will I be terminated?'"

That had real world implications last August, according to testimony, when an Allegiant aircraft's elevator — a critical control surface on the plane's tail — jammed during a flight's take-off roll, causing the aircraft's nose to rise prematurely at a speed of more than 130 mph.

The pilot successfully aborted takeoff, later reporting that the aircraft probably would have crashed if it had become airborne.

Allegiant pilot Michael Bastianelli testified in the Kinzer case that he spoke to the pilot who aborted that takeoff.

"He told us his first thought (was) … 'If I initiate this abort, I'm going to get called in for another meeting,'" Bastianelli said. "And he said — he's very upset about that because he lost three to four seconds of time as that thought went through his head, and that ate up an extra thousand foot of runway or so."

**"Breakdown at 30,000 Feet"**

64.    On November 2, 2016, the *Tampa Bay Times* published a major investigative report titled, "Breakdown at 30,000 Feet," which featured the following cover photo and byline:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Thousands of people flew Allegiant last year thinking their planes wouldn't fail in the air.

They were wrong.

65. According to report:

All major airlines break down once in awhile. But none of them break down in midair more often than Allegiant.

A *Tampa Bay Times* investigation — which included a first-of-its kind analysis of federal aviation records — has found that the budget carrier's planes are four times as likely to fail during flight as those operated by other major U.S. airlines.

In 2015, Allegiant jets were forced to make unexpected landings at least 77 times for serious mechanical failures.

* * *

[Allegiant reporters] traveled to Las Vegas and met with Allegiant executives for a series of interviews…The airline did not dispute the newspaper's findings, which included:

- Forty-two of Allegiant's 86 planes broke down in mid-flight at least once in 2015. Among them were 15 forced to land by failing engines, nine by overheating tail compartments and six by smoke or the smell of something burning.

- After certain systems on Allegiant planes fail, the company repairs them and puts the planes back in service, only to see the same systems fail again. Eighteen times last year, key parts such as engines, sensors and electronics failed once in flight, got checked out, and then failed again, causing another unexpected landing.

- Allegiant's jets are, on average, 22 years old. The average age of planes flown by other carriers is 12. Experts say planes as old as Allegiant's require the most rigorous maintenance in the

28

industry. But Allegiant doesn't staff its own mechanics at 107 of the 118 airports it flies to.

- Allegiant relies most heavily on McDonnell Douglas MD-80s, an aging model retired by all but two other major U.S. carriers. The company's MD-80s fail twice as often as those operated by American Airlines and three times as often as those flown by Delta.

\* \* \*

The average U.S. airline has about three unexpected landings caused by mechanical problems for every 10,000 times it flies, the *Times* found.

Southwest had the lowest rate of problems last year. It had about one in 10,000 flights end in an unexpected landing.

JetBlue was in the middle of the pack. It had about three flights end in unexpected landings.

American Airlines had one of the highest rates. It had five.

Allegiant had 12 unexpected landings per 10,000 flights — more than double the next highest airline.

66.     On November 11, 2016, the *Tampa Bay Times* published an editorial titled "Addressing Allegiant's mechanical failures," which stated in part:

Smoke-filled cabins, overheating engines, emergency landings. These are among the recurring problems at Allegiant Air, which brought more than a million passengers through St. Pete-Clearwater International Airport last year and continues to expand. But that success cannot come at the expense of safety. The airline has pledged to improve reliability, a promise that must be fulfilled before tragedy strikes….

\* \* \*

An investigation by the *Tampa Bay Times* found that Allegiant flights are four times as likely as those of other major carriers to make unexpected landings due to midair mechanical problems. The culprits: a push to grow quickly, a business model that relies on old planes, not staffing its own mechanics at out-of-the-way airports and a scattershot maintenance operation.

*Times* reporters documented how the company makes repairs when planes break down and puts them back into service only to see them fail again. Routine maintenance is not properly documented and regular inspections get missed. Older planes are not inherently unsafe, but they do require meticulous upkeep. The record of breakdowns on Allegiant planes suggests that's not happening.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

67.     On November 16, 2016, the *Tampa Bay Times* published a column by defendant Gallagher responding to the *Times*' recent reporting regarding Allegiant's safety issues.  Gallagher wrote, "The *Tampa Bay Times* makes a number of unsubstantiated, incendiary assertions offensive to our highly-skilled team of dedicated professionals in its editorial."

68.     On December 16, 2016, the *Tampa Bay Times* reported that:

An Allegiant Air airplane bound for Punta Gorda was grounded Thursday night after an engine quit working, according to the Federal Aviation Administration.

Allegiant flight 1671, an A320 aircraft, left the Chicago Rockford International Airport in Illinois Thursday afternoon but returned to Rockford at 5:25 p.m. after the pilot reported an engine failure.

69.     On December 21, 2016, the *Tampa Bay Times* published an article titled, "At Allegiant, a board and business model with roots in ValuJet," which reported on links between Allegiant management and the management of ValuJet. ValuJet "broke into the airline industry" in 1993 with a low-cost model that, like Allegiant's relied on acquiring second-hand planes from around the world.  As described by the *Times*: "For three years, the strategy paid off big. ValuJet became one of the most profitable airlines in the U.S.  Then, on May 11, 1996, Flight 592 caught fire and crashed into the Florida Everglades, killing all 110 people on board. The ValuJet name was irreparably tarnished."  The article continued:

For the past 15 years, one of ValuJet's founders, Maurice Gallagher Jr., has been using the same basic business blueprint — relying on used airplanes to fuel rapid growth — to transform Allegiant Air from a tiny charter service into one of the largest carriers in the U.S.

* * *

Former federal aviation experts, including those who investigated the 1996 crash, say Allegiant toes the line between mechanical reliability and profitability in some ways that remind them of ValuJet.

To compare the two airlines, the *Tampa Bay Times* reviewed securities filings and hundreds of pages of federal reports on the deadly crash and interviewed aviation experts, former federal officials and ValuJet and Allegiant employees.

Five key ValuJet figures, including three of the company's four founders, made their way to Allegiant as it emerged out of bankruptcy.

At ValuJet, the company grew so fast that it was not able to hire enough qualified mechanics and inspectors. Under Gallagher's tenure as chief executive officer, Allegiant has expanded to nearly 120 cities, an expansion that even he acknowledged put a strain on its operations.

Like ValuJet did before it, Allegiant built up its fleet with second-hand planes from foreign companies that wound up breaking down more often than those flown by other major carriers.

Before the 1996 crash, ValuJet had a string of mechanical breakdowns, including a 1995 engine explosion on a runway in Atlanta, according to federal investigators and news reports.

Last month, the *Times* used a first-of-its-kind database to show that Allegiant's planes are four times as likely to break down in midair as those flown by all other major U.S. airlines.

* * *

Unable to keep up with rising fuel costs, Allegiant — then a California-based charter service — filed for bankruptcy in December 2000. Gallagher loaned the fledgling company about $2 million and, as its largest creditor, emerged with near total control of the company in 2001.

* * *

After he took over Allegiant, the airline began doing business with other companies that he had a stake in — firms that had little or nothing to do with aviation. Investors questioned many of these deals, saying there is no way to tell whether the arrangement is good for the company or just good for Gallagher.

Securities filings show Allegiant paid at least $26 million to companies in which Gallagher is an investor or manager.

The airline paid at least $15 million to lease its headquarters from real estate companies partly controlled by Gallagher, Timothy Flynn and John Redmond.

Flynn served on the Allegiant board from 2006 to 2013; Redmond is a current board member.

It paid $3.2 million to Alpine Labs, a TV production company co-founded by Gallagher, to produce an on-plane game show.

It paid more than $1 million to sponsor a professional truck racing team controlled by Gallagher. His son, Spencer, is one of the team's seven drivers.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

These transactions were approved by Allegiant's board members but drew criticism from at least one investor. The head of CtW Investment Group, which invests money from union pensions, sent two letters in the past 20 months asking whether the board was truly independent of Gallagher.

One board member, Redmond, did outside business with Gallagher while two others — Gary Ellmer and Linda Marvin — worked with him at a different airline in the past, wrote CtW executive director Dieter Waizenegger.

* * *

The board remains the same, and it has not started its own safety committee.

70. On February 24, 2017, the Individual Defendants caused the Company to file its Form 10-K for 2016 with the SEC. The Form 10-K, which was signed by defendants Gallagher, Ellmer, Marvin, and Redmond, disclosed the following in the section titled "Item 1. Business":

**Competition**

The airline industry is highly competitive. Passenger demand and fare levels have historically been influenced by, among other things, the general state of the economy, international events, fuel prices, industry capacity, and pricing actions taken by other airlines. The principal competitive factors in the airline industry are price, schedule, customer service, routes served, types of aircraft, safety record and reputation, code-sharing relationships, and frequent flyer programs.

* * *

**Aircraft Maintenance**

We have a Federal Aviation Administration ("FAA") approved maintenance program, which is administered by our maintenance department headquartered in Las Vegas. Technicians employed by us have appropriate experience and hold required licenses issued by the FAA. We provide them with comprehensive training and maintain our aircraft in accordance with FAA regulations. The maintenance performed on our aircraft can be divided into three general categories: line maintenance, major maintenance, and component and engine overhaul and repair. Line maintenance is generally performed by our personnel. We contract with outside organizations to provide major maintenance and component and engine overhaul and repair. We have chosen not to invest in facilities or equipment to perform our own major maintenance, engine overhaul or component work. Our management closely supervises all maintenance functions performed by our personnel and contractors employed by us, and by outside organizations. In addition to the maintenance contractors we presently

71.     The section of the Form 10-K titled "Item 1A. Risk Factors" disclosed:

**Our reputation and financial results could be harmed in the event of an accident or restrictions affecting aircraft in our fleet.**

As of February 1, 2017, our operating fleet consists of 47 MD-80 series aircraft, 34 Airbus A320 series aircraft, and four Boeing 757-200 aircraft. All of our aircraft were acquired used and range from 11 to 31 years from their manufacture date at February 1, 2017.

An accident involving one of our aircraft, even if fully insured, could result in public perception that we are less safe or reliable than other airlines, which would harm our business. Further, there is no assurance that the amount of insurance we carry would be sufficient to protect us from material loss. Because we are smaller than most airlines, an accident would likely adversely affect us to a greater degree than a larger, more established airline.

In-flight emergencies affecting our aircraft, and resulting media attention, could also contribute to a public perception regarding safety concerns and a loss of business.

The FAA could suspend or restrict the use of our aircraft in the event of actual or perceived mechanical problems or safety issues while it conducts its own investigation, whether involving our aircraft or another U.S. or foreign airline's aircraft. Our business could also be significantly harmed if the public avoids flying our aircraft due to an adverse perception of the aircraft we utilize because of safety concerns or other problems, whether real or perceived, or in the event of an accident involving these aircraft.

**Allegiant's Systemic Safety Problems Continue During 2017**

72.     On March 4, 2017, the *Tampa Bay Times* published an article titled, "Allegiant Air flight aborts takeoff at St. Pete-Clearwater International Airport," which reported:

A runway at St. Pete-Clearwater International Airport was closed for an hour Saturday morning after an Allegiant Air flight aborted takeoff because of a mechanical problem that left behind debris from the aircraft.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

73. On March 27, 2017, the *Tampa Bay Times* published an article titled, "Allegiant Air flight makes emergency landing due to possible engine fire," which reported:

> An Allegiant Air flight that departed the Orlando area made an emergency landing in Ohio a week ago after the pilot reported a fire in one of the aircraft's engines at 14,000 feet.
>
> Flight 636 with 163 passengers and crew was about 10 minutes from landing in Dayton, Ohio, just before noon when a cockpit warning light indicated a fire in the aircraft's right engine, according to an internal Allegiant memo obtained by the *Tampa Bay Times.*
>
> Pilots immediately deployed the engine's fire-suppression system, telling air traffic controllers, "We have an engine failure and a fire."
>
> "We're declaring an emergency," the pilot said, according to an air traffic control recording of the incident. "We have a right engine fire indication and power loss. So yeah, if we could get to the airport as soon as possible, please."

74. On May 1, 2017, the Individual Defendants caused Allegiant to file its definitive proxy statement in advance of the Company's annual meeting of stockholders on June 29, 2017. The proxy statement solicited stockholder votes to elect each of the Individual Defendants to new terms as directors and conduct other business. The proxy statement disclosed that Gallagher owned approximately 3.4 million shares of Allegiant stock representing approximately 20.4% of the outstanding shares.

75. According to the proxy statement, the Board had not created a Safety Committee as urged by CtW in its letter, and defendants Ellmer, Marvin, Pollard continued to serve on the Audit Committee, defendants Brewer, Pollard, and Ellmer were members of the Compensation Committee, and defendants Brewer, Ellmer, and Marvin were members of the Nominating Committee.

76. The proxy statement disclosed that:

**Risk Oversight**

While risk management is the primary responsibility of our management team, our board of directors is regularly involved in the

oversight of the most material risks faced by us and monitors areas of risk as a routine board agenda item. Of the six members on the board, four are independent directors, and each of these has extensive experience in managing companies in the travel industry, having each served more than ten years in executive or finance positions with airlines. Bringing this exceptional depth of experience, the board is involved in all critical decisions regarding strategic direction, choice of aircraft, significant aircraft purchase transactions, finance transactions, application of cash to stock repurchases or payment of dividends, fuel hedging opportunities, any merger and acquisition opportunities, and any other material Company decisions outside of the ordinary course of our operations.

*One area of risk oversight relates to our operations and the maintenance and safety of our aircraft. In this regard, we have arranged for two of our independent directors to regularly meet with our operations and maintenance personnel and to report back to the board. In addition, our senior operations personnel make a presentation to the board at each quarterly board meeting. The airline experience of our board allows it to meaningfully participate in the oversight of this risk area.*

Our board committees, which are comprised solely of independent directors, also participate in risk oversight.

The audit committee oversees risks related to our financial reporting and internal controls with quarterly meetings, including private sessions with our outside auditing firm, our internal audit personnel, and management responsible for financial accounting. Audit committee approval is also required for any related party transactions.

(Emphasis added).

77. According to the proxy statement, defendant Gallagher was compensated a total of over $3.5 million in 2016, of which amount was $2.9 million was incentive compensation approved by the Compensation Committee. Defendant Redmond was compensated a total of $10.1 million in 2016 in the nearly three months that he served as President. Defendants Brewer, Ellmer, Marvin, and Redmond were each compensated $191,000 in their roles as directors.

78. The proxy contained the following related party transaction disclosure:

**Related Party Transactions**

Since January 1, 2016, we have been a party to the following transactions in which the amount involved exceeded $120,000 and in which any of our directors or executive officers, any holder of more

than 5 percent of our capital stock or any member of their immediate families had a direct or indirect material interest.

During 2016, we made payments totaling $1.7 million to entities owned or controlled by Mr. Gallagher for the building of corporate training content as previously disclosed. We paid $0.2 million for these purposes in first quarter 2017 and do not expect any further payments.

79.     On May 9, 2017, the *Tampa Bay Times* published an article titled, "Allegiant Air flight suffers problem with critical component in April 22 emergency," which reported in part:

An Allegiant Air flight out of Orlando-Sanford International Airport was forced to make an emergency landing on April 22 after it suffered a problem with a critical control surface that caused a worrisome vibration in the aircraft.

Flight 736 took off at 9:13 a.m. headed to Bangor International Airport in Maine with 173 passengers and crew. During the climb out of central Florida, the pilots reported vibrations with the airframe of the McDonnell Douglas MD-80, according to an internal Allegiant memo obtained by the *Tampa Bay Times*.

The crew, the memo said, "had concerns with the elevator control."

The captain of the flight declared an emergency and the flight returned to Orlando-Sanford, where it safely landed at 10:08 a.m. "No immediate corrective actions to policy, procedure or the training program were found to be needed," the email said.

80.     On June 28, 2017, the *Tampa Bay Times* announced that its coverage of Allegiant had won the investigative category of the Gerald Loeb Awards for Distinguished Business and Financial Journalism in New York.

81.     On July 14, 2017, the *Tampa Bay Times* published an article titled, "Allegiant Air flights with no AC caused some passengers to pass out," reporting that:

Midway through a flight to South Bend, Ind., an Allegiant Air plane turned around and headed back to the St. Pete-Clearwater International Airport. The plane's air conditioning wasn't working, and the cabin was too hot to continue, according to Allegiant. By the time it landed in Pinellas County, multiple people had fainted.

"I don't sweat and I was dripping," said Karen Willey, a Bradenton resident aboard the flight.

The incident is one of dozens of Allegiant flights since June 1 that consumers — and an incident report from a local fire and rescue department — say did not have adequate air conditioning for some or all of the flight. It ultimately caused some passengers to pass out.

On June 22, St. Petersburg Fire and Rescue met the Indiana-bound plane at the gate to provide medical attention. According to the agency's incident report, two people were treated for symptoms related to overheating, and both declined to be taken to the hospital. However, Michele Routh, public relations director for the St. Pete-Clearwater airport, said four passengers were treated for heat-related issues

82.     On September 26, 2017, the *Tampa Bay Times* published an article titled, "Allegiant flight makes emergency landing in California after smoke fills cabin," which reported:

FRESNO, Calif. — Smoke filled the cabin of an Allegiant Air jet after it landed at a California airport on Monday, forcing coughing passengers to cover their faces with shirts and firefighters to board the plane, authorities said.

83.     On March 1, 2018 the Individual Defendants caused the Company to file with the SEC its Form 10-K for 2017.  The Form 10-K, which was signed by defendants Gallagher, Ellmer, Marvin, Pollard, and Redmond, disclosed the following in the section titled "Item 1. Business":

**Competition**

The airline industry is highly competitive. Passenger demand and fare levels have historically been influenced by, among other things, the general state of the economy, international events, fuel prices, industry capacity, and pricing actions taken by other airlines. The principal competitive factors in the airline industry are price, schedule, customer service, routes served, types of aircraft, safety record and reputation, code-sharing relationships, and frequent flyer programs.

* * *

**Aircraft Maintenance**

We have a Federal Aviation Administration ("FAA") approved maintenance program, which is administered by our maintenance department headquartered in Las Vegas. Technicians employed by us have appropriate experience and hold required licenses issued by the FAA. We provide them with comprehensive training and maintain our aircraft in accordance with FAA regulations. The maintenance performed on our aircraft can be divided into three general categories:

37

1   line maintenance, major maintenance, and component and engine
2   overhaul and repair. Line maintenance is generally performed by our
    personnel. We contract with outside organizations to provide major
3   maintenance and component and engine overhaul and repair. We have
    chosen not to invest in facilities or equipment to perform our own
4   major maintenance, engine overhaul or component work. Our
    management closely supervises all maintenance functions performed
5   by our personnel and contractors employed by us, and by outside
    organizations. In addition to the maintenance contractors we presently
6   utilize, we believe there are sufficient qualified alternative providers
    of maintenance services that we can use to satisfy our ongoing
7   maintenance needs.

8       84.     The section of the Form 10-K titled "Item 1A. Risk Factors"
9   disclosed:

10      **Our reputation and financial results could be harmed in the event
        of an accident or restrictions affecting aircraft in our fleet.**
11
        As of February 2, 2018, our operating fleet consists of 37 MD-80
12      series aircraft and 53 Airbus A320 series aircraft, of which all but 10
        were acquired used. Our used aircraft range from 11 to 32 years from
13      their manufacture date at February 2, 2018.

14      An accident involving one of our aircraft, even if fully insured, could
15      result in public perception that we are less safe or reliable than other
        airlines, which would harm our business. Further, there is no
16      assurance that the amount of insurance we carry would be sufficient to
        protect us from material loss. Because we are smaller than most
17      airlines, an accident would likely adversely affect us to a greater
        degree than a larger, more established airline.

18      In-flight emergencies affecting our aircraft, and resulting media
19      attention, could also contribute to a public perception regarding safety
        concerns and a loss of business.

20      The FAA could suspend or restrict the use of our aircraft in the event
        of actual or perceived mechanical problems or safety issues while it
21      conducts its own investigation, whether involving our aircraft or
        another U.S. or foreign airline's aircraft. Our business could also be
22      significantly harmed if the public avoids flying our aircraft due to an
        adverse perception of the aircraft we utilize because of safety
23      concerns or other problems, whether real or perceived, or in the event
        of an accident involving these aircraft.

24  **The 60 Minutes Report**

25
26      85.     On April 15, 2018, the CBS News program, "60 Minutes," aired an
27  episode reporting on safety problems at Allegiant. According to CBS News,
28  Allegiant's planes "are nearly three and a half times more likely to have serious in-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

flight mechanical failures than other U.S. airlines." The episode reported in detail on persistent safety problems at Allegiant and a tone at the top that encouraged pilots to illegally conceal mechanical problems and avoid warranted emergency evacuations. According to the report:

> Allegiant Air is a small, ultra-low-cost carrier based in Las Vegas, that happens to be one of the country's most profitable airlines. But, according to federal aviation records and interviews with pilots, mechanics and industry experts, it may also be the most dangerous.
>
> The airline flew 12 million passengers last year on its 99 planes to 120 destinations from California to Florida. But it has had persistent problems since at least the summer of 2015 when it experienced a rash of mid-air breakdowns, including five on a single day. It was not a fluke.
>
> Public documents show an alarming number of aborted takeoffs, cabin pressure loss, emergency descents and unscheduled landings. Yet for the most part, Allegiant's difficulties have managed to stay under the radar of the flying public.

86.     In the report, CBS News interviewed a several aviation safety experts, each of whom opined that Allegiant's safety record was unusually bad and the number of safety incidents the Company reported were unusually high:

> For the past seven months, we have been scrutinizing 'service difficulty reports' filed by Allegiant with the FAA. They are official, self-reported records of problems experienced by their aircraft. What we found raised some disturbing questions about the performance of their fleet. Between January 1st, 2016 and the end of last October, we found more than 100 serious mechanical incidents, including mid-air engine failures, smoke and fumes in the cabin, rapid descents, flight control malfunctions, hydraulic leaks and aborted takeoffs.
>
> John Goglia: Something significant is going on and it should be addressed.
>
> We shared the reports with John Goglia who has more than 40 years of experience in the aviation industry, including nine years as a presidential appointee to the National Transportation Safety Board. Now retired, Goglia remains a respected figure in the aviation industry and occasionally testifies as an expert witness on safety issues.
>
> John Goglia: There's another one, engine fire.
>
> We wanted to know what he thought of Allegiant's 60 unscheduled landings and 46 in-flight emergencies.

Steve Kroft: I mean, is that common for an airline of this size?

John Goglia: Very, very high for an airline of this size. I hate to make comparisons-- but we've seen that before in airlines that are no longer with us that had experienced a number of accidents and killed a bunch of people. I don't wanna repeat that. So I try to push on Allegiant to-- to-- clean up their operation.

\* \* \*

John Goglia: I have encouraged my family, my friends and myself not to fly on Allegiant.

87.    The report stated that CBS News requested an interview from defendant Gallagher but Allegiant would only produce a statement from the Company's vice president of operations, which stated: "All of us at Allegiant are proud of our strong safety record, as noted in the most current, comprehensive FAA audit. Safety is at the forefront of our minds and the core of our operations."

88.    According to the report, Allegiant's safety problems were systemic. The NTSB expert, Mr. Goglia, attributed them to a "lack of infrastructure.  They don't have the number of mechanics…. We're seeing problems that require – feet on the ground…."  CBS News described the situation, including a flight to Las Vegas on which an engine caught on fire shortly after take off:

We found numerous planes with the same recurring issues and others returned to service before they were ready. Like Allegiant Flight 533 last July, which was delayed in Cincinnati on its flight to Las Vegas.

\* \* \*

Mercedes Weller and Dan Mannheim, who says he paid $80 for his roundtrip ticket to Vegas, remember the pilot's announcement as they pushed away from the gate three hours behind schedule.

Mercedes Weller: He came on and he said, "The mechanics have been working on this right engine. We apologize for that. We'll get you up in the air as soon as possible." As we started taxiing, everything was going okay. And then it's, like, as soon as the wheels came up, the engine blew.

Mercedes Weller: The force of it was so hard that it-- it popped open the cockpit doors. And there was smoke in the cabin and fire coming out of that engine. And I just remember thinking that I would never see my daughter again.

Weller and Mannheim said the plane had to circle at a low altitude on one engine for about 25 minutes while the airport ground crews cleared debris from the runway for an emergency landing.

40

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

* * *

Mercedes Weller: I text my husband. And I said "If something happens, just know that I've been very happy. And I love you."

The plane eventually landed safely back in Cincinnati. For their trouble, Allegiant offered to re-book Mercedes and Dan the next day and gave everyone a $150 voucher.

89.    The report stated that, incredibly, Flight 533 was not the only serious safety problem Allegiant had that month: "There were nine other Allegiant planes that also had to make unscheduled landings during that month.  Four of those planes had engine problems, two reported fumes in the cabin, four had instrument or flight control problems."  Over the course of one weekend in during this single month, Allegiant "canceled or rescheduled 11 separate flights leaving Las Vegas, all for mechanical issues."

90.    In another incident, in August 2015, an Allegiant flight leaving Las Vegas full of passengers nearly crashed during takeoff when the pilot was forced to make the last-minute decision to abort because he could not control the plane.  It was subsequently determined that the plane was missing a "cotter pin," which is a "critical flight component" that "holds together essential components necessary for the pilot to fly the plane."  According to a report from an FAA investigator, Allegiant's maintenance processes failed to perform procedures that would have caught the error no less than five times.  The FAA report called it "a deliberate and systemic act of non-compliance" that had "endangered thousands of passengers on more than 200 subsequent Allegiant flights."

91.    Further highlighting the systemic nature of the problems, CBS News interviewed Daniel Wells, a commercial airline captain with 30 years of experience who is the president of Teamsters Union 1224 which represents pilots from Allegiant and nine other airlines.  Mr. Wells stated: "I heard from hundreds of conversations with Allegiant pilots, is the management of Allegiant seems to denigrate the pursuit of safety."  According to the report, Allegiant had prevented

any of its pilots from being interviewed by CBS News and that, according to Mr. Wells, Allegiant's pilots "know they would be terminated…. [a]t the very least, disciplined" if they spoke to the media about the safety issues.

92.  According to the report, in June 2015, an Allegiant flight that had just left St. Petersburg, Florida had to return to the airport due to smoke in the cabin. After landing the plane and ascertaining that the smoke was coming from an engine, the pilot deployed the emergency chutes and evacuated the aircraft.  The Individual Defendants thereafter caused the Company to fire the pilot due to an "evacuation that was entirely unwarranted."

93.  On May 171, 2018, the Individual Defendants caused Allegiant to file its definitive proxy statement in advance of the Company's annual meeting of stockholders on June 28, 2018.  The proxy statement solicited stockholder votes to elect each of the Individual Defendants to new terms as directors and conduct other business.  The proxy statement disclosed that Gallagher owned approximately 3.2 million shares of Allegiant stock representing approximately 19.7% of the outstanding shares.

94.  According to the proxy statement, the Board had not created a Safety Committee as urged  by CtW in its letter, and defendants Ellmer, Marvin, Pollard continued to serve on the Audit Committee, defendants Brewer, Pollard, and Ellmer were members of the Compensation Committee, and defendants Brewer, Ellmer, and Marvin were members of the Nominating Committee.

95.  The proxy statement disclosed that:

**Risk Oversight**

While risk management is the primary responsibility of our management team, our board of directors is regularly involved in the oversight of the most material risks faced by us and monitors areas of risk as a routine board agenda item.  Of the six members on the board, four are independent directors, and each of these has extensive experience in managing companies in the travel industry, having each served more than ten years in executive or finance positions with airlines. Bringing this exceptional depth of experience, the board is involved in all critical decisions regarding strategic direction, choice

42

of aircraft, significant aircraft purchase transactions, finance transactions, the development of a hotel resort, application of cash to stock repurchases or payment of dividends, fuel hedging opportunities, any merger and acquisition opportunities, and any other material Company decisions outside of the ordinary course of our operations.

*One area of risk oversight relates to our operations and the maintenance and safety of our aircraft. In this regard, we have arranged for two of our independent directors to regularly meet with our operations and maintenance personnel and to report back to the board. In addition, our senior operations personnel make a presentation to the board prior to each quarterly board meeting. The airline experience of our board allows it to meaningfully participate in the oversight of this risk area.*

Our board committees, which are comprised solely of independent directors, also participate in risk oversight.

The audit committee oversees risks related to our financial reporting and internal controls with quarterly meetings, including private sessions with our outside auditing firm, our internal audit personnel, and management responsible for financial accounting. Audit committee approval is also required for any related party transactions.

(Emphasis added).

96. According to the proxy statement, defendant Gallagher was compensated a total of over $2.3 million in 2017, of which amount effectively all was incentive compensation approved by the Compensation Committee. Defendant Redmond, who became Allegiant's President in 2017, earned $1.8 million, of which effectively all was incentive compensation. Defendants Brewer, Ellmer, Marvin, and Pollard were each compensated $176,000 in their roles as directors.

97. The proxy contained the following related party transaction disclosure:

**Related Party Transactions**

Since January 1, 2017, we have been a party to the following transaction in which the amount involved exceeded $120,000 and in which any of our directors or executive officers, any holder of more than 5 percent of our capital stock or any member of their immediate families had a direct or indirect material interest.

In December 2017, the Company completed a transaction with ISM Connect, LLC ("ISM"), an entity in which the Company's Chairman and CEO owns a majority interest. In exchange for a noncontrolling

43

minority interest in ISM, the Company licensed the right to use certain portions of its internally developed software, but strictly limited to ISM's digital media signage business. The Company retains all rights in the software without restriction. This interest has been valued at $2.3 million and no subsequent transactions with ISM are expected.

## DAMAGES TO THE COMPANY

98.     As a direct and proximate result of the defendants' conduct, Allegiant has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

(a)     Fees assessed by airports for emergency services;

(b)     Amounts incurred in vouchers and refunds for passengers on aborted and/or emergency landed flights;

(c)     Cost incurred defending and potentially settling the currently pending securities class action;

(d)     Costs incurred responding to repeated FAA investigations and proceedings;

(e)     Any fines that are a result of the Company's violations federal and state law; and

(f)     Incentive compensation paid to executives breaching their fiduciary duties.

99.     In addition, Allegiant's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

100.    The actions complained of herein have irreparably damaged Allegiant's corporate image and goodwill.  For at least the foreseeable future, Allegiant will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

misled the investing public, such that Allegiant's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

101.   Plaintiff brings this action derivatively in the right and for the benefit of Allegiant to redress injuries suffered, and to be suffered, by Allegiant as a direct result of breaches of fiduciary duty by the Individual Defendants.   Allegiant is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

102.   Plaintiff has continuously been a shareholder of Allegiant at times relevant to the wrongdoing complained of and is a current Allegiant shareholder.

103.   Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

104.   As a result of the facts set forth herein, plaintiff has not made any demand on Allegiant's Board to institute this action against the Individual Defendants.   Such demand would be a futile and useless act because Allegiant's Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action

105.   As of the filing of this action, Allegiant's Board consisted of the following six Individual Defendants: Gallagher, Brewer, Ellmer, Marvin, Pollard, and Redmond.    Each of these six directors, a majority, are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action due to the following:

### **Defendants Gallagher, Redmond, Marvin are not Independent**

#### *Gallagher*

106.   Defendant Gallagher is the CEO, Chairman, founder, and largest stockholder of Allegiant.   According to Allegiant's proxy statements, Gallagher is not independent within the meaning of the listing standards of Nasdaq.   Gallagher

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    does not earn a salary as CEO but has earned between $2 million and $3 million

2    per year since 2015 in incentive compensation.  As alleged above and disclosed in

3    the Company's proxy statements, Gallagher's incentive compensation is within the

4    discretion of the Compensation Committee, of which defendants Brewer, Ellmer,

5    and Pollard are members.

6        107.   Additionally, Gallagher's ability to continue in his role as Chairman

7    and CEO, controlling the day-to-day operations of the Company he founded, is

8    dependent on the continued goodwill of his fellow directors, defendants Brewer,

9    Ellmer, Marvin, Pollard, and Redmond, who constitute a majority of the Board and

10   can fire Gallagher at will.

11       108.   Accordingly, Allegiant's Board concedes that Gallagher is not

12   independent and the amount of his significant annual compensation and his ability

13   to continue in his role as Chairman and CEO is completely within the control of his

14   fellow defendants and he could not independently consider a demand to sue them.

15   *Redmond*

16       109.   Defendant Redmond is the President and a founder of Allegiant.

17   According to Allegiant's 2018 proxy statements, Redmond is not independent

18   within the meaning of the listing standards of Nasdaq.  Redmond does not earn a

19   salary as President but was given a $10.1 million-dollar equity grant in September

20   2016 when he was hired as President.  According to the Company's 2018 proxy

21   styatement, "[t]he initial equity grants must be earned by continuing service over

22   the three-year vesting period as there is no acceleration of vesting beyond pro rata

23   in the event of any employment termination or change in control."  Accordingly,

24   Redmond would lose access to unvested portions of his initial equity grant if he

25   ceased to be employed by Allegiant.

26       110.   Additionally, Redmond received $1.8 million in in 2017in incentive

27   compensation.   As alleged above and disclosed in the Company's proxy

28   statements, Redmond's incentive compensation is within the discretion of the

46

1 Compensation Committee, of which defendants Brewer, Ellmer, and Pollard are
2 members

3       111.  Accordingly, Allegiant's Board concedes that Redmond is not
4 independent and amount of his significant outstanding equity awards and annual
5 compensation, as well as his ability to continue in his role President, are
6 completely within the control of his fellow defendants and he could not
7 independently consider a demand to sue them.

8 *Marvin*

9       112.  Defendant Marvin served as CFO of Allegiant from 2001 through
10 2007, during which time Allegiant was controlled by Gallagher.  Defendant
11 Marvin previously served as an executive under defendant Gallagher in two
12 previous positions at WestAir and Mpower Communications Corp. ("Mpower"), as
13 well as during the six years she was CFO of Allegiant.  Gallagher was the principal
14 owner and executive of WestAir and he founded Mpower and served as its CEO
15 and Chairman of the Board.  Marvin worked at Mpower as CFO and a Senior Vice
16 President from 1996 through 2001, and as Controller of WestAir from 1988 to
17 1994.  Accordingly, Marvin worked for Gallagher for seventeen years, the majority
18 of her professional life.  Further, Marvin and Gallagher are friends and have lived
19 within one mile of each other for over a decade.  Marvin's fealty to Gallagher is
20 highlighted by her approval as Audit Committee Chair of the abusive and improper
21 related party transactions detailed above between Allegiant and Gallagher and
22 Redmond.

23       113.  As set forth in the CtW letter excerpted above, as of 2015, only six
24 companies on the Russell 3000, an index of *3,000* corporations, permit a former
25 officer like Marvin to serve as on an Audit Committee, and only *one* of those 3,000
26 companies permits a former officer to serve as the Chair of the Audit Committee.
27 Yet, Marvin serves as the Chair of Allegiant's Audit Committee, and has since
28 prior to 2015.  As a result of this poor governance, as an Audit Committee

1   member, Marvin is responsible for supposed independent oversight of controls and

2   processes that she put in place as CFO.  In particular, because Allegiant has

3   refused to institute a standing Safety Committee, the Audit Committee is the Board

4   Committee with primary oversight of enterprise risks such as those posed by safety

5   problems.   According to the Audit Committee Charter, it is responsible for

6   ensuring that "management has established and maintained processes to assure

7   compliance by the Company with all applicable laws and regulations."

8          114.  Accordingly, defendant Marvin is not independent of defendant

9   Gallagher and would not be able to independently and disinterestedly evaluate a

10  demand to sue him.  Further, Marvin created many of the deficient controls that

11  allowed Allegiant's unsafe operation and she could not disinterestedly and

12  independently evaluate a demand for action to improve those controls because she

13  herself created them.

14  **The Individual Defendants Face a Substantial Likelihood of Liability**

15         115.  As they admitted in their proxy statements, "our board of directors is

16  regularly involved in the oversight of the most material risks faced by us and

17  monitors areas of risk as a routine board agenda item."  Further, in their proxy

18  statements the Individual Defendants specifically acknowledge the materiality of

19  "the maintenance and safety of our aircraft" was such that independent directors

20  "regularly meet with []operations and maintenance personnel and report back to

21  the board."   Defendants also specifically acknowledge that with respect to

22  maintenance and safety of Allegiant's aircraft, "our senior operations personnel

23  make a presentation to the board prior to each quarterly board meeting.  The airline

24  experience of our board allows it to meaningfully participate in the oversight of

25  this risk area."

26         116.  Accordingly, each of the Individual Defendants knew that safety and

27  maintenance of the Company's aircraft were material to its prospects.  Each of the

28  Individual Defendants also knew that between September 2014 and mid-2018, the

1    Company's planes experienced well over one hundred serious safety incidents
2    requiring emergency landings or aborted takeoffs. The Individual Defendants also
3    knew that Allegiant had the highest rate of emergency landings of any airline in the
4    United States.

5        117. Each of the Individual Defendants received the CtW letter, which was
6    addressed to the Board, and detailed the Company's serious safety and
7    maintenance defects. Each of the Individual Defendants knew that the *Tampa Bay*
8    *Times* published a multi-part investigative report detailing the Company's safety
9    problems in November 11, 2016 for which is won an award because the *Times*
10    reporters traveled to Las Vegas and met with Allegiant executives including
11    defendant Gallagher prior to publishing the story.

12        118. Because the Individual Defendants in fact knew that Allegiant was
13    suffering from serious, systemic maintenance and safety deficiencies and
14    consciously chose to allow the Company to continue operating an unsafe fashion,
15    they, they face a substantial likelihood of liability for such conduct, which was not
16    in good faith.

17                  **<u>COUNT I</u>**
18            **<u>Breach of Fiduciary Duty</u>**

19        119. Plaintiff incorporates by reference and reallege each and every
20    allegation set forth above, as though fully set forth herein.

21        120. Each defendant owes and owed to the Company the duty to exercise
22    candor, good faith, and loyalty in the management and administration of
23    Allegiant's business and affairs, particularly with respect to issues so fundamental
24    as proper accounting controls.

25        121. Defendants' conduct set forth herein was due to their intentional or
26    reckless breach of the fiduciary duties they owed to the Company. Defendants
27    intentionally or recklessly breached or disregarded their fiduciary duties to protect
28    the rights and interests of Allegiant.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

122.  In breach of their fiduciary duties owed to Allegiant, defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

123.  In particular, the Individual Defendants knowingly or recklessly permitted the Company's safety and maintenance processes to be materially weak and deficient, and consciously chose not to remedy or improve them.

124.  As a direct and proximate result of defendants' breaches of their fiduciary obligations, Allegiant has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, plaintiff demands judgment on behalf of Allegiant as follows:

A.  Declaring that plaintiff may maintain this action on behalf of Allegiant and that plaintiff is an adequate representative of the Company;

B.  Against all defendants, jointly and severally and in favor of Allegiant for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duty and abuse of control;

C.  Declaring that the defendants have breached and/or aided and abetted the breach of their fiduciary duties to Allegiant;

D.  Directing the defendants to take all necessary actions to reform and improve Allegiant's corporate governance and internal procedures to comply with applicable laws and to protect Allegiant and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's

By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

       1.    a proposal to strengthen the Company's disclosure and financial controls;

       2.    a proposal to strengthen Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

       3.    a provision to permit the shareholders of Allegiant to nominate at least three candidates for election to the Board; and

       4.    a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.    Determining and awarding to Allegiant exemplary damages, including disgorgement of all profits, benefits, and other compensation obtained by defendants, in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

F.    Awarding Allegiant restitution from defendants, and each of them;

G.    Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.    Granting such other and further equitable relief as this Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Dated: July 20, 2018        **GLANCY PRONGAY & MURRAY LLP**

By: *s/ Robert V. Prongay*
Robert V. Prongay
Lesley F. Portnoy
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**GLANCY PRONGAY & MURRAY LLP**
Benjamin I Sachs-Michaels
712 Fifth Avenue
New York, NY 10019
Telephone: (212) 935-7400

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## ALLEGIANT TRAVEL COMPANY VERIFICATION

I, Charles Blackburn, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 7/19/2010

Charles Blackburn

Charles Blackburn