Patrick R. Leverty
**LEVERTY & ASSOCIATES LAW CHTD**
832 Willow Street
Reno, Nevada 89502
Telephone: (775) 322-6636
Facsimile: (213) 322-3953
Email: pat@levertylaw.com

*Liaison Counsel for Lead Plaintiffs and the Class*

[additional counsel listed on signature page]

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| DANIEL CHECKMAN, Individually And On Behalf Of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> ALLEGIANT TRAVEL COMPANY, MAURICE J. GALLAGHER, JR., SCOTT SHELDON, STEVEN E. HARFST, and JUDE I. BRICKER, <br><br> Defendants. | Case No: 2:18-cv-01758-APP-PAL <br><br> <u>CLASS ACTION</u> <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT** |

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ........................................................................ 1

II.   STATEMENT OF FACTS ............................................................................... 3

III.  LAW AND ARGUMENT ............................................................................... 6

  A.   Legal Standard.......................................................................................... 6

  B.   The Complaint Adequately Pleads Falsity with Particularity ................. 7

  C.   The Complaint Adequately Pleads Scienter........................................... 12

    1.   The Complaint's Allegations from Former Employees Support a Strong Inference of
         Scienter as to the Individual Defendants ..................................... 12

    2.   The Core Operations Doctrine Supports a Finding of Scienter ..................... 16

    3.   Gallagher's Well-Timed Stock Sales and Suspicious Formation of a 10b5-1 Trading
         Plan Support a Strong Inference of Scienter ............................... 18

    4.   Gallagher's Unusual Bonus Structure Incentivized Fraud............................. 20

    5.   Unexpected Departure of Key Operations Executive Bolsters Scienter....................... 21

  D.   The Complaint Adequately Pleads Loss Causation ...................................... 21

  E.   The Complaint Adequately Pleads Control Person Liability ......................... 24

IV.   CONCLUSION.................................................................................. 24

i

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,

5

   692 F.3d 34 (2d Cir. 2012) ..................................................................................... 23

6

*Aldridge v. A.T. Cross Corp.*,

7

   284 F.3d 72 (1st Cir. 2002) .................................................................................... 21

8

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,

9

   505 F. Supp. 2d 662 (D. Colo. 2007) .................................................................... 10

10

*Asher v. Baxter Int'l Inc.*,

11

   377 F.3d 727 (7th Cir. 2004) ................................................................................. 23

12

*Berson v. Applied Signal Tech., Inc.*,

13

   527 F.3d 982 (9th Cir. 2008) .............................................................................. 8, 16

14

*Bielousov v. GoPro, Inc.*,

15

   No. 16-CV-06654-CW, 2017 WL 3168522 (N.D. Cal. July 26, 2017) .................. 21

16

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,

17

   866 F. Supp. 2d 223 (S.D.N.Y. 2012) ................................................................... 11

18

*Brown v. China Integrated Energy, Inc.*,

19

   No. CV112559MMMPLAX, 2013 WL 12124124 (C.D. Cal. Apr. 22, 2013) ......... 17

20

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,

21

   856 F.3d 605 (9th Cir. 2017) ................................................................................... 9

22

*City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*,

23

   302 F. Supp. 3d 1028 (N.D. Cal. 2018) ................................................................. 22

24

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,

25

   875 F. Supp. 2d 359 (S.D.N.Y. 2012) ................................................................... 12

26

*Crago v. Charles Schwab & Co.*,

27

   No. 16-CV-03938-RS, 2017 WL 6550507 (N.D. Cal. Dec. 5, 2017) ....................... 7

28

*Cutler v. Kirchner*,
  696 F. App'x 809 (9th Cir. 2017) ............................................................. 21

*Di Donato v. Insys Therapeutics Inc.*,
  No. CV-16-00302-PHX-NVW, 2017 WL 3268797 (D. Ariz. Aug. 1, 2017) ..................... 16, 17

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) .......................................................................... 6

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) .................................................................. 19

*Fosbre v. Las Vegas Sands Corp.*,
  No. 2:10-CV-00765, 2013 WL 5970250 (D. Nev. Nov. 7, 2013) ............................... 12, 14

*Garcia v. Hetong Guo*,
  No. CV-15-1862-MWF-MRWX, 2016 WL 102213 (C.D. Cal. Jan. 7, 2016) .................... 22, 23

*Harris v. Amgen, Inc.*,
  573 F.3d 728 (9th Cir. 2009) ................................................................. 23, 24

*Hayes v. Gross*,
  982 F.2d 104 (3d Cir. 1992) .................................................................. 9

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) ............................................................... 17, 20

*In re Allied Nevada Gold Corp. Sec. Litig.*,
  743 F. App'x 887 (9th Cir. 2018) ............................................................ 13

*In re Am. Apparel, Inc. S'holder Litig.*,
  No. CV1006352MMMRCX, 2013 WL 10914316 (C.D. Cal. Aug. 8, 2013) ...................... 12

*In re Apollo Grp., Inc. Sec. Litig.*,
  No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) ................................... 22

*In re Banc of California Sec. Litig.*,
  No. SACV1700118AGDFMX, 2017 WL 3972456 (C.D. Cal. Sept. 6, 2017) ..................... 7, 8

*In re Barrick Gold Sec. Litig.*,
  No. 13 CIV. 3851 SAS, 2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015) ........................... 24

*In Re CommVault Sys., Inc. Sec. Litig.*,
No. 14-CV-5628 (PGS), 2016 WL 5745100 (D.N.J. Sept. 30, 2016) .......................................20

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ...................................................................................19

*In re DDi Corp. Sec. Litig.*,
No. CV 03-7063 NM, 2005 WL 3090882 (C.D. Cal. July 21, 2005).......................................10

*In re Eletrobras Sec. Litig.*,
245 F. Supp. 3d 450 (S.D.N.Y. 2017).......................................................................................11

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ......................................................................................6, 21, 22

*In re Hienergy Techs., Inc.*,
No. SACV04-1226DOC(JTLX), 2005 WL 3071250 (C.D. Cal. Oct. 25, 2005) ......................14

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005).......................................................................................22

*In re Iso Ray, Inc. Sec. Litig.*,
189 F. Supp. 3d 1057 (E.D. Wash. 2016) ...................................................................................7

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) ...............................................................................6, 15

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014)...................................................................................10, 19

*In re Merck & Co., Inc. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005)...................................................................................................7, 8

*In re Novatel Wireless Sec. Litig.*,
830 F. Supp. 2d 996 (S.D. Cal. 2011) ......................................................................................19

*In re Novatel Wireless Sec. Litig.*,
No. 08CV1689 AJB (RBB), 2013 WL 12144150 (S.D. Cal. Oct. 25, 2013) ...........................24

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010).....................................................................................................23

*In re Oxford Health Plans, Inc.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................. 20

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015) ...................................................... 10

*In re PMA Capital Corp. Sec. Litig.*,
  No. 03-6121, 2005 WL 1806503 (E.D. Pa. July 27, 2005) ....................... 10

*In re Quality Systems, Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ................................................................. 13

*In re Regeneron Pharm., Inc. Sec. Litig.*,
  No. 03 CIV.3111 RWS, 2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) .......... 11

*In re Secure Computing Corp. Sec. Litig.*,
  184 F. Supp. 2d 980 (N.D. Cal. 2001) ..................................................... 18

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
  266 F. Supp. 2d 1150 (C.D. Cal. 2003) ................................................... 18

*In re Signet Jewelers Ltd. Sec. Litig.*,
  No. 16 CIV. 6728 (CM), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ............ 10, 12

*In re Solarcity Corp. Sec. Litig.*,
  274 F. Supp. 3d 972 (N.D. Cal. 2017) ..................................................... 12

*In re Turbodyne Techs., Inc. Sec. Litig.*,
  No. CV9900697MMMBQRX, 2000 WL 33961193 (C.D. Cal. Mar. 15, 2000)....... 17

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002) ................................................................. 19

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ............................................................. 13, 17

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
  No. 2672 CRB (JSC), 2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ............... 21

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) .............................................................. 6, 15

*Limantour v. Cray Inc.*,

    432 F. Supp. 2d 1129 (W.D. Wash. 2006)....................................................................15

*Maverick Fund, L.D.C. v. First Solar, Inc.*,

    No. CV15-1156-PHX-DGC, 2018 WL 6181241 (D. Ariz. Nov. 27, 2018)...........................13

*Mineworkers' Pension Scheme v. First Solar Inc.*,

    881 F.3d 750 (9th Cir. 2018) .................................................................................21

*Mulligan v. Impax Labs., Inc.*,

    36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................................10, 13

*Nathanson v. Polycom, Inc.*,

    87 F. Supp. 3d 966 (N.D. Cal. 2015) ..........................................................................10

*Nguyen v. Radient Pharm. Corp.*,

    No. SA CV 11-0406 DOC, 2011 WL 5041959 (C.D. Cal. Oct. 20, 2011) ...............................7

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,

    320 F.3d 920 (9th Cir. 2003) ......................................................................18, 20, 21

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,

    380 F.3d 1226 (9th Cir. 2004) .................................................................................17

*Reese v. Malone*,

    747 F.3d 557 (9th Cir. 2014) .................................................................................9, 16

*Robb v. Fitbit Inc.*,

    216 F. Supp. 3d 1017 (N.D. Cal. 2016) ......................................................................23

*Ronconi v. Larkin*,

    253 F.3d 423 (9th Cir. 2001) ..................................................................................20

*Ross v. Career Educ. Corp.*,

    No. 12 C 276, 2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) .................................................11

*S. Ferry LP, No. 2 v. Killinger*,

    542 F.3d 776 (9th Cir. 2008) ...........................................................................13, 14, 16

*Schlagal v. Learning Tree Int'l*,

    No. CV 98-6384 ABC (EX), 1998 WL 1144581 (C.D. Cal. Dec. 23, 1998) ...........................18

*Scott v. ZST Digital Networks, Inc.*,

    No. CV 11-03531 GAF JCX, 2012 WL 538279 (C.D. Cal. Feb. 14, 2012) ................................ 7

*Special Situations Fund III QP, L.P. v. Brar*,

    No. 14-CV-04717-SC, 2015 WL 1393539 (N.D. Cal. Mar. 26, 2015) ................................ 12, 16

*Stocke v. Shuffle Master, Inc.*,

    615 F. Supp. 2d 1180 (D. Nev. 2009) ................................ 19

*Takara Tr. v. Molex Inc.*,

    429 F. Supp. 2d 960 (N.D. Ill. 2006) ................................ 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

    551 U.S. 308 (2007) ................................ 13, 20

*United States v. Goyal*,

    629 F.3d 912 (9th Cir. 2010) ................................ 21

*Warshaw v. Xoma Corp.*,

    74 F.3d 955 (9th Cir. 1996) ................................ 8

**Rules**

Fed. R. Civ. P. 12 ................................ 12

1    Lead Plaintiff Charles Brendon and Plaintiff Daniel Checkman ("Plaintiffs") respectfully

2  submit this memorandum in opposition to Defendants'[1] Motion to Dismiss the Amended Class

3  Action Complaint ("Complaint").[2]

4  **I.**     **PRELIMINARY STATEMENT**[3]

5         A deep discount, no frills airline, Allegiant claimed over and again that its aging aircraft fleet

6  was safe, its maintenance staff qualified, competent, and appropriately staffed. On the contrary,

7  throughout the Class Period,[4] Defendants knew or recklessly disregarded that to maintain profitability,

8  the Company operated unsafely, playing "Allegiant roulette" with the lives of its passengers and crew.

9         Between April 13, 2018 and April 15, 2018, CBS News disclosed it would air, and then did air

10  a *60 Minutes* installment, that revealed devastating evidence that Allegiant was operating unsafely,

11  actively encouraging a poor safety culture. The *60 Minutes* report revealed Allegiant suffered from

12  systemic maintenance and safety issues. The report showcased that Allegiant had a high number of

13  serious mechanical incidents from mid-2015 through October 2017, that it lacked the infrastructure

14  and staffing levels to sufficiently maintain its aircraft, and discouraged employees from reporting

15  safety and maintenance issues, which further contributed to its poor safety culture. The report also

16  criticized the Federal Aviation Administration's ("FAA") oversight of Allegiant.

17         On this news, the price of Allegiant common stock fell from an April 12, 2018 close of $165.25

18  to an April 16, 2018 close of $146.40 on relatively heavy trading volume.[5] Allegiant's common stock

19  continued to fall $3.30 per share to close at $159.10 on May 9, 2018 after the U.S. Department of

20

21

---

22  [1] "Defendants" are Allegiant Travel Company ("Allegiant" or "Company"), its Chairman and CEO,
    Maurice Gallagher, its CFO and Chief Operating Officer Scott Sheldon, and former COOs Steven E.

23  Harfst and Jude I. Bricker. Gallagher, Sheldon, Harfst and Bricker are the "Individual Defendants."

24  [2] Plaintiffs cite to the Amended Complaint ("Complaint") as "¶__."

25  [3] Plaintiffs cite to Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint as "D.
    Mem. __."

26  [4] The Class Period is June 8, 2015 through May 9, 2018, inclusive.

27  [5] Over the same time the NASDAQ Composite Index (IXIC) remained virtually unchanged and the
    Dow Jones Transportation Index (DJT) increased by 2.4%.

28

Transportation ("DOT"), Office of Inspector General announced it would audit how the FAA investigated Allegiant's maintenance practices.

Defendants do not assert they were unaware of these unsafe conditions. Instead, they argue the market was aware of Allegiant's safety and maintenance issues. They ignore the Complaint alleges with particularity that during the Class Period, they distorted the market's perception by issuing full-throated denials of the Company's material maintenance and safety problems and discrediting public reports.[6] Next, Defendants focus on their own public opinions about the Company's safe operations, arguing that their opinions are inactionable. Defendants' opinions, however, have no reasonable relationship to the facts on which Defendants could have based those opinions. In addition, the Complaint pleads that throughout the Class Period, Defendants described actual maintenance and safety operations in non-opinion statements about then-current facts such as the qualifications of technicians and the training the Company provided. Their statements of actual fact, the Complaint pleads with particularity were demonstrably untrue and nowhere did Defendants characterize those assertions of fact as opinion.

By reference to particularized allegations from nine former Allegiant maintenance and safety personnel, the Complaint adequately pleads that Defendants were minimally reckless in discrediting reports of safety violations while continuing to assert that its maintenance operations were FAA approved and satisfactory. In addition, mischaracterizing the *60 Minutes* report as merely "a negative journalistic characterization," Defendants ignore the corrective disclosures included certain specifics of material maintenance and safety problems that Defendants had denied or lied about during the Class Period. A loss of 11.4% or over $200 million of market capitalization in mid-April 2018, a period that markets were otherwise steady, however, suffices to plead that upon correction, Allegiant stock experienced materially more than "barely any stock price movement." As such, for the following reasons, the Court will deny Defendants' Motion to Dismiss.

---

[6] Defendants assert that there was "barely any stock price movement" upon the corrective disclosures in mid-April, 2018. As noted above, the markets remained materially unchanged during the same period that Allegiant lost $18.85/share or 11.4% of its value or approximately $200 million in market capitalization based on a public float of 11.06 million shares. Defendants' mischaracterization of the material losses the Class suffered underlies the untenable nature of their entire Motion.

1  **II.     STATEMENT OF FACTS**

2       Allegiant is a small, ultra-low-cost airline. ¶¶57, 65. It achieved industry-defying profitability

3  by buying older jets for a fraction of the cost of new, and operating from under-served cities where it

4  faced less competition. ¶¶2, 25, 56, 67. Older jets, like MD-80's, however, required materially more

5  maintenance than newer aircraft with an attendant increase in cost to operate. ¶¶11, 67.

6       Throughout the Class Period, Defendants boasted about the high quality of Allegiant's

7  maintenance program. For example, in the context of assuring the market they focused principally on

8  "safety and reliability," ¶¶199, 204, such that Allegiant operations were safe, ¶192, Defendants

9  assured the market that Allegiant's "[t]echnicians . . . have appropriate experience" and received

10 "comprehensive training." *E.g.*, ¶¶164 ("highly trained" maintenance staff), 194, 202, 207. More,

11 Defendants claimed to have sufficient staff to meet the Company's "ongoing maintenance needs."

12 ¶¶194, 202, 207. With respect to Allegiant's aircraft, Defendants boasted of mechanical reliability.

13 ¶195. The safety of Allegiant's passengers and crew was "always [its] number one priority." ¶191.

14      These claims of adequate maintenance staff, reliable aircraft, and a culture of safety, however,

15 were materially false. Directly contrary to its claim that its technicians had appropriate experience and

16 the Company provided further "comprehensive training," *e.g.*, ¶207, Allegiant hired unqualified,

17 inexperienced mechanics and failed to train them adequately. ¶¶103-106 ("nights when I'd have no

18 one qualified to do engine trim"). In turn, this created a poor and unsafe maintenance environment

19 where experienced mechanics felt overwhelmed and pressured to somehow complete repairs timely.

20 ¶102. Mechanics falsely certified they completed tasks when they had not, *e.g.* ¶113 (signed cards

21 showing incomplete work as complete, ¶117 (unqualified mechanics certifying completion). These

22 problems created an environment of substandard repairs. *See*, *e.g.*, ¶¶123-25 (botched repair jobs).

23      Further, Allegiant was understaffed, lacking mechanics necessary to perform the high volume

24 of repairs needed to maintain and certify its planes' airworthiness. ¶71. To accommodate, supervisors

25 threatened maintenance to disregard items outside the scope of work orders, ¶89 (reprimanding

26 mechanics), to certify falsely they had performed maintenance tasks, ¶¶88, 93-95, to report as

27 complete maintenance inspections they had skipped altogether, ¶92, and to rush maintenance tasks to

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION
COMPLAINT - Case No. 2:18-cv-01758-APG-PAL

attempt to meet the large work load. *See*, *e.g.*, ¶¶72-73, 87 ("dangerous" conditions and "overtasked with work"), 97, 148 (rushing patchwork solutions as "good enough").

Still further, Allegiant's aircraft were unsafe as Defendants put profits over aircraft maintenance, reliability, and, by extension, passenger safety. ¶¶138-39, 149 (cost cutting message came from Gallagher). Allegiant utilized redundancies in aircraft instead of making repairs, ¶147 (flying with one engine), regularly installing questionably safe parts in aircraft, ¶143 (deploying engines in need of overhaul), and refusing to purchase necessary parts when costs were perceived as too high. ¶¶151 (defying industry norms in delaying manufacturer recommended upgrades), 155-56 (refusal to overhaul engines).

Throughout the Class Period, news reports of potential mechanical issues arose. *See*, *e.g.*, ¶158. Defendants effectively parried these whiffs of safety concerns, however, calming investors by publicly affirming the superiority of Allegiant's maintenance and safety programs. In addition, rather than disclosing the material inadequacy of its maintenance and safety programs, Defendants publicly blamed the pilot's union and media for overhyping aircraft maintenance, safety, and reliability issues, characterizing such news as union "posturing" and the "Teamsters . . . trying everything . . . to make us look bad."[7] ¶162, n. 26.

Indeed, Defendants responded to media reports about a disaffected mechanic, ¶163, lying that the airline was safe, its maintenance crews were "***highly-trained***," and denying this lone mechanic's account provided evidence of the systemic maintenance issues from which the Company suffered. ¶164, 171. But the very next day, Allegiant COO Harfst suddenly resigned. ¶165. Defendants continued to lay blame on the Teamsters. ¶169.

On January 27, 2016, Allegiant's 4Q 2015 conference call, the very first question posed sought Defendants' comments on Allegiant's reported safety issues. ¶167. Bricker said Allegiant had "a safe operation . . . [l]ast year . . . and this year [a]s well." *Id.* Gallagher said Allegiant was "safe" and continued to blame the Teamsters' negotiation tactics on several occasions. ¶¶167, 170.

---

[7] Even then, Defendants closely tracked maintenance. ¶160 (3Q 2015: "Right now, our operations. . . We had a poor June, a poor July . . . in the maintenance business more so than I'd like.").

Then, on March 7, 2016, The Aviation Mechanics Coalition, Inc., a subgroup of the Teamsters, issued a report stating Allegiant experienced a number of preventable maintenance issues from September 2015 through January 2016. ¶173. Allegiant bashed this report and the Teamsters' tactics, stating they had "no firsthand knowledge" of Allegiant's operation. ¶174. The reason for doing so is now clear. Just two days later, Gallagher suspiciously sold Allegiant stock for over $47 million. ¶175.

From March 2016 onward, Allegiant's aircraft continued to experience aborted takeoffs and emergency landings. ¶177. In May 2016, Allegiant reported that two independent directors would regularly meet with operations and maintenance personnel and report back to the Board, while senior operations staff would regularly present to the Board. ¶178. Facing public scrutiny, Allegiant agreed to accelerate the retirement of its obsolete MD-80 fleet; its business model was failing. ¶179.

Faced with the reality that its business model had been uprooted, Allegiant announced plans to develop a $450 million resort in Florida. ¶184. The market has been skeptical, ¶185, even more so when Allegiant failed to secure financing and ultimately considered funding costs through cash flow ¶¶224-25. As confirmed by Former Employees ("FEs"), this drove Allegiant to cut corners on maintenance and mislead investors about the same. ¶82, 188.

Between August 2017 and November 2017, CBS made Freedom of Information Act ("FOIA") requests for Allegiant's maintenance records. ¶212. While Allegiant objected to these requests, it appears Gallagher set up a 10b-5 trading plan and immediately sold over $33 million in stock before the report aired.[8] ¶213-14. Defendants have not bothered disputing this.

Based on Defendants' admissions and allegations from former employees, the Complaint pleads that Defendants knew, or should have known, their statements about Allegiant's maintenance program and their opinions about the airline's focus on safety were false and misleading. In its public disclosures, Defendants stated unequivocally that "our management closely supervises all

---

[8] In mid-December 2018, in response to a FOIA request, the FAA provided to Plaintiffs communications with Allegiant Air, alerting it on October 16, 2017 that CBS News had requested Allegiant's mechanical interruption reports and documents concerning its 2016 Certificate Holder Evaluation Program. That is, Defendants knew-well prior to the end of the Class Period that 60 Minutes sought to run a story on Allegiant. If the Court dismiss the Complaint, Plaintiffs intend to include reference to those documents.

5

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION
COMPLAINT - Case No. 2:18-cv-01758-APG-PAL

maintenance functions. . . ." *See*, *e.g.*, ¶194. Confirming Defendants' admission, witnesses who reported to and interacted with the vice president of maintenance and the managing director of maintenance convey that Gallagher knew of the specific safety and maintenance issues that plagued Allegiant, but took no action to remedy them. ¶¶35, 78-81, 107-110, 141. In 2017 and 2018, witnesses attended Town Hall events in which Sheldon participated during which participants raised and discussed the safety and maintenance issues. ¶¶35, 72, 76. According to others, Gallagher was "very engaged in the airline" and "intimately aware" of mechanical problems. ¶¶42, 44. Allegiant organized its headquarters in an open-concept where senior executives sat with other Company executives, enabling Gallagher to overhear discussions about maintenance issues. ¶44. In addition, Gallagher received three different regularly occurring reports, tracking major incidents due to mechanical problems. *Id*. Gallagher participated in daily conference calls to discuss reliability issues and attended monthly reliability meetings that tech service employees attended to review aircraft maintenance histories. ¶¶44-45.

## III.   LAW AND ARGUMENT

### A.   Legal Standard[9]

The Court will accept the Complaint's well-pleaded factual allegations as true, drawing all reasonable inferences in the light most favorable to Plaintiffs. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008, 1012 (9th Cir. 2018) (reversing dismissal of securities case). "[A] district court ruling on a motion to dismiss is not sitting as a trier of fact . . . [S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for the later stages . . . when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008); *accord In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1260 (N.D. Cal. 2008) ("PSLRA in no way turns FRCP 12 into a trial-type, papers-only proceeding"). Applying these standards makes clear the Court should deny the Motion to Dismiss.

---

[9] To state a claim under Section 10(b) of the Exchange Act of 1934 (the "Exchange Act"), Plaintiffs must allege: (1) falsity; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)-42 (2005). Defendants explicitly challenge falsity, scienter, and loss causation.

**B.    The Complaint Adequately Pleads Falsity with Particularity**

Defendants claim their statements are not false because the Complaint bases falsity on previously disclosed public information. D. Mem. at 2, 8-9 (citing *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 270–71 (3d Cir. 2005)). This cloaked, truth-on-the-market defense is more appropriate for resolution at trial. *Scott v. ZST Digital Networks, Inc.*, No. CV 11-03531 GAF JCX, 2012 WL 538279, at *11–12 (C.D. Cal. Feb. 14, 2012) (denying motion to dismiss where truth may have already entered the market, noting inquiry is too fact intensive to resolve on pleadings). To prevail, Defendants must show that previously disclosed information entered the market with a "degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by" Defendants' allegedly false statements and assurances. *Nguyen v. Radient Pharm. Corp.*, No. SA CV 11-0406 DOC, 2011 WL 5041959, at *7 (C.D. Cal. Oct. 20, 2011) (rejecting truth-on-the-market defense at pleading stage).

In *Charles Schwab*, the court rejected defendants' argument that the truth was previously disclosed, finding plaintiffs demonstrated Schwab's description of the UBS relationship in a customer agreement was misleading from defendants' wording. *Crago v. Charles Schwab & Co.*, No. 16-CV-03938-RS, 2017 WL 6550507, at *5 (N.D. Cal. Dec. 5, 2017). The court in *In re Banc of California Sec. Litig.* rejected defendants' argument that the truth was previously disclosed in a blog, as the truth-on-the-market defense is "intensely fact-specific." *In re Banc of California Sec. Litig.*, No. SACV1700118AGDFMX, 2017 WL 3972456, at *5 (C.D. Cal. Sept. 6, 2017); *see also In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1074 (E.D. Wash. 2016) (rejecting argument that truth was on market where study not projected with sufficient intensity and credibility).

Here, the Complaint pleads the market may have been aware of problems of individual aircraft. Defendants, however, swore these issues did not implicate systemic problems, and that they were scurrilous accusations of a Teamsters Union prone to lying about the employers of its members. This case is analogous to *Schwab*, as Defendants knew or should have known Allegiant's maintenance and safety issues were systemic through 2017, but failed to disclose. *Charles Schwab*, 2017 WL 6550507, at *5. The market did not even become aware of the systemic nature of the safety and maintenance

problems until it absorbed the *60 Minutes* broadcast, a nationally-acclaimed news program transmitted to the public with a degree of intensity and credibility to counterbalance Defendants' misleading impressions. *See, e.g.*, *In re Banc of California Sec. Litig.*, 2017 WL 3972456, at *5.

Contrary to Defendants' contention, *Merck* does not render Defendants' statements inactionable. In *Merck*, the Third Circuit held that a *Wall Street Journal* article containing a simple arithmetical calculation which could have easily been computed months earlier when the news was released, defeated materiality. 432 F. 3d at 269-71. Here, by contrast, CBS analyzed, *inter alia*, Allegiant's technical data filed with the FAA, to then reveal to the market previously ***undisclosed*** systemic maintenance problems plaguing Allegiant through 2017, including that supervisors threatened workers from reporting maintenance issues. Defendants' truth-on-the-market defense fails at this stage of the proceedings.

Contrary to Defendants' claim the Complaint suffers from "puzzle-pleading," D. Mem. at 9-10, it in fact presents a cohesive theory of how and when four sets of statements became actionably false.[10] A statement or omission is misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (internal quotations omitted). "[O]nly if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996).

First, Allegiant stated its "technicians . . . have appropriate experience," Allegiant "provide[d] them with comprehensive training[,]" and could hire "sufficient qualified alternative providers of maintenance services . . . to satisfy . . . maintenance needs," ¶¶194, 202, 207. Allegiant touted its workers as "highly-trained."[11] ¶164. The Complaint pleads this as misleading because Defendants knew, or should have known, Allegiant employed inexperienced technicians, failed to properly train

---

[10] Plaintiffs obviously intended to specifically allege each type of statement was false and inadvertently did not do so. If the Court will not infer from the Complaint how and why these statements are false, Plaintiffs will amend to allege it.

[11] Plaintiffs inadvertently did not allege this statement in the false statements section. Plaintiffs will amend to allege it if the Court will not infer it is false from the Complaint.

8

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION
COMPLAINT - Case No. 2:18-cv-01758-APG-PAL

them, and understaffed their maintenance department, which inexorably contributed to Allegiant's poor safety and maintenance record and emergencies. ¶¶69-71, 101-102, 200, 205, 209.

Second, Allegiant stated in its 2015 10-K—but suspiciously not in any 10-K thereafter—that its "aircraft are, and will continue to be, mechanically reliable." ¶195. The Complaint pleads this as false due to the aforementioned undisclosed maintenance practices, rendering the planes unreliable. ¶¶69-71, 101-102, 158-172, 200, 205, 209. Third, Allegiant's statements in its Code of Ethics, ¶¶190, 198, were false and misleading due to the aforementioned undisclosed maintenance practices.

Fourth, Gallagher stated in letters to shareholders that Allegiant placed its "focus on safety and reliability", had a "proven, seasoned model," and that safety was its "core fundamental." ¶¶199, 204. On conference calls, Bricker and Gallagher assured investors of Allegiant's "safe operation" that was "safe." ¶192. These statements were false for the reasons mentioned above. As public scrutiny intensified over Allegiant's safety record and its business model no longer viable, Defendants sought resort revenue, which further drove them to improperly cut maintenance costs for funding. ¶¶10, 14, 82, 188, 224-25. There is nothing puzzling about Plaintiffs' pleading. Plaintiffs adequately plead falsity.

Defendants argue their statements are inactionable corporate mismanagement claims. D. Mem. at 3, 10-11. Not so. That Defendants mismanaged Allegiant makes them incompetent. That they made material misstatements to investors concerning Allegiant's maintenance programs and opined the airline was "safe" when it was not makes them fraudsters. To the extent Defendants' misstatements concern mismanagement, that mere fact does not absolve Defendants of their duty not to tell material misstatements to the market. *See, e.g., Reese v. Malone*, 747 F.3d 557, 581 (9th Cir. 2014) (reversing dismissal because, though defendants' "actions exemplify corporate mismanagement," the complaint pled a Section 10(b) claim where defendants were "at the very least, deliberately reckless as to the false or misleading nature of their public statements"), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017); *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992) ("[A] complaint . . . allege[s] an actionable misrepresentation if . . . a defendant was aware that mismanagement had occurred and made a material public statement

9

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT - Case No. 2:18-cv-01758-APG-PAL

about the state of corporate affairs inconsistent with the existence of the mismanagement."); *In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 WL 1806503, at *8 (E.D. Pa. July 27, 2005) ("Plaintiffs have plead more than mere mismanagement . . . Plaintiffs alleged that Defendants' statements about the management . . . are misleading . . . giv[ing] rise to a fraud claim[.]").[12]

Defendants contend statements from Allegiant's Code of Ethics and that Allegiant's operation was "safe" and ran a "safe operation" are immaterial as a matter of law, and are therefore "puffery."[13] D. Mem. at 2, 11-12. This is incorrect. An alleged misstatement is not puffery unless it is "***so obviously unimportant*** to a reasonable investor that reasonable minds could not differ on the question of their importance." *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014) (Courts "must exercise great caution . . . [i]n deeming a statement puffery at the motion to dismiss stage").[14] While certain statements, "viewed in isolation, may be mere puffery," those statements become material when (i) used to induce reliance on a representation; (ii) at odds with conduct alleged in the complaint; or (iii) made repeatedly to reassure the investing public about matters important to investors. *E.g.*, *Mulligan*, 36 F. Supp. 3d at 966; *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (Petrobras' statements regarding general integrity and ethical soundness not puffery when repeatedly made); *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 CIV. 6728 (CM), 2018 WL 6167889, at *17

---

[12] Defendants' cited cases are inapposite for failing to allege a misstatement or omission concerning defendants' mismanagement. *See, e.g.*, *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 978 (N.D. Cal. 2015) (allegations "Polycom's board failed to correctly assess adequacy of internal controls—not that it sought to deceive investors about the quality of those controls"—inactionable internal mismanagement); *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 683 (D. Colo. 2007) (similar); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 583-84 (S.D.N.Y. 2014) (failure to perform necessary quality control testing of products was corporate mismanagement issue in absence of misstatement or scienter).

[13] Defendants do not argue, and therefore concede, their statements about Allegiant's "focus on safety", "proven, seasoned model" and that "safety" was Allegiant's "core fundamental" are not opinions or inactionable puffery. ¶¶199, 204. This is because the facts underlying these statements plainly show Allegiant neglected safety for greater profitability, and that its business model was decimated. Thus, these statements are false, and unquestionably material to investors in an airline.

[14] *See also In re DDi Corp. Sec. Litig.*, No. CV 03-7063 NM, 2005 WL 3090882, at *15 (C.D. Cal. July 21, 2005) (rejecting statements were puffery and declining to parse out other puffery at pleading stage).

(S.D.N.Y. Nov. 26, 2018) (employment practices statements in code of conduct actionable where at odds with allegations of sexual harassment in complaint).

First, misstatements in Allegiant's 10-Ks and news articles concerning the experience, training, and understaffing of maintenance workers are not puffery.[15] ¶¶164, 194, 202, 207. *See Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012). In *Bricklayers*, the Court rejected defendants' argument that a deepwater drilling company's statements that it conducted "extensive" training and safety programs was puffery where, years later, the Deepwater Horizon disaster raised serious questions about the company's management, personnel, and equipment failures. *Id.* Here, Defendants' statements were material to investors, particularly where, over several years, news of Allegiant's aborted takeoffs and emergency landings raised serious questions about Defendants' statements concerning maintenance and safety.

Second, Bricker and Gallagher's statements to reassure investors that Allegiant was "safe" and their opposition to critical news reports as biased, as well as Allegiant's reference to its Code of Ethics several times throughout the Class Period, further support a finding those statements are material. *See In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463–64 (S.D.N.Y. 2017) (statements of puffery actionable when made "to reassure the investing public").[16] The fact that analysts consistently asked Defendants questions about Allegiant's safety further demonstrates the materiality of those statements. ¶¶160, 192. *See In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03 CIV.3111 RWS, 2005 WL 225288, at *21 (S.D.N.Y. Feb. 1, 2005) (analyst coverage shows materiality).

Finally, statements in Allegiant's Code of Ethics are contradicted by facts in the Complaint and are therefore material. Allegiant's statement it would "provide safe working conditions" to employees, ¶¶190, 198, is widely refuted by former employees, who complained of dangerously long hours and an unmanageable number of tasks for workers in "safety-sensitive positions." ¶¶73, 83-84,

---

[15] Defendants only explicitly challenge as puffery statements in Allegiant's Code of Ethics, and statements made in response to an analyst's question on a conference call. ¶¶190, 192, 198. *See* D. Mem. at 2, 11-12.

[16] *See also Ross v. Career Educ. Corp.*, No. 12 C 276, 2012 WL 5363431, at *7 (N.D. Ill. Oct. 30, 2012) (statements about college's current status actionable given its "tainted past" and that new assurances could mislead investors).

87, 91, 95-100, 133. Allegiant's turnover increased, resulting in further maintenance problems. Defendants' assurances that Allegiant was properly caring for its workforce are therefore material. *See Signet* 2018 WL 6167889, at \*17. Similarly, Allegiant's statements that it "pursue[d] growth and earnings objectives while adhering to ethical standards," ¶¶190, 198, is directly contradicted by Allegiant's practices of improperly cutting maintenance costs.[17]

Defendants mislead the Court in arguing Sheldon should be dismissed for not making a false statement.[18] D. Mem. at 12. Sheldon signed and certified Allegiant's SEC filings throughout the Class Period as CFO. ¶¶27, 193, 196, 201, 206. On its face, the Complaint alleges Sheldon is a speaker; a "maker" of those statements. *Special Situations Fund III QP, L.P. v. Brar*, No. 14-CV-04717-SC, 2015 WL 1393539, at \*3 (N.D. Cal. Mar. 26, 2015) ("Courts have consistently held that the signer of a corporate filing is its 'maker,' because signing a filing implies 'ultimate control' over its contents.").

## C.   The Complaint Adequately Pleads Scienter

The Complaint's allegations, viewed collectively and holistically, establish Defendants knew, or must have been aware of the misconduct underlying their false and misleading statements.

### 1.   The Complaint's Allegations from Former Employees Support a Strong Inference of Scienter as to the Individual Defendants[19]

---

[17] The same is true for other statements in Allegiant's Code of Ethics, including that Allegiant behaved in an "ethical and beneficial manner," and remained "honest, fair and accountable in all business dealings." ¶¶190, 198.

[18] Defendants argue Harfst should be dismissed for the same reason. D. Mem. at 12-13. Not so. While a difference of opinion exists about the implications of *Janus* on corporate officers, *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1006 (N.D. Cal. 2017) (comparing *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359 (S.D.N.Y. 2012) (2012) with Ninth Circuit district court opinions), district courts in this circuit have adopted a broad reading. Plaintiff asserts that as an officer in the C-suite, Harfst (and Bricker) had sufficient control over and knowledge of both the safety and maintenance issues and the Company's public statements. *E.g.*, ¶162, n.26 (false statement), 167, 171. This Court should not dismiss him (or Bricker) as a primary violator. *See City of Pontiac*, 875 F. Supp. 2d at 374. The Court should not, however, dismiss Harfst (or Bricker) because he is a control person under Section 20(a) of the Exchange Act. *In re Am. Apparel, Inc. S'holder Litig.*, No. CV1006352MMMRCX, 2013 WL 10914316, at \*38–39 (C.D. Cal. Aug. 8, 2013).

[19] The Complaint must state facts raising a strong inference that Defendants acted knowingly or recklessly. *Fosbre v. Las Vegas Sands Corp.*, No. 2:10-CV-00765, 2013 WL 5970250, at \*5 (D. Nev. Nov. 7, 2013). Reckless is "a form of intent rather than a greater degree of negligence. . . .The ultimate

---

12

Defendants misconstrue the Complaint's allegations from the FEs. D. Mem. 13-16. The FE allegations confirm with requisite particularity that circumstances existed belying Defendants' Class Period statements boasting of adequate safety and maintenance processes while denying public concerns about safety incidents.[20] Given the particularity of these allegations, the Court will consider them in determining the adequacy of the Complaint's scienter allegations.

Courts credit allegations attributed to unnamed sources if a complaint pleads facts sufficient to show the witnesses would "be in a position to infer" the facts attributed to them." *Mulligan*, 36 F. Supp. 3d at 963 (question is whether witnesses have enough knowledge regarding facts attributed to them). Here, the Complaint sufficiently describes FE1-FE9 as in positions to possess knowledge of the information they provided. The Complaint alleges job titles, locations, responsibilities, dates of employment, and direct reports. ¶¶35-45. The Complaint, therefore, adequately describes the FEs, enabling this Court to rely on and credit those allegations. *See Maverick Fund, L.D.C. v. First Solar, Inc.*, No. CV15-1156-PHX-DGC, 2018 WL 6181241, at *11 (D. Ariz. Nov. 27, 2018).[21]

---

question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity." *Id.* at *3 (citing *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012). This Court will draw in Plaintiffs' favor all inferences of supporting the adequacy of the Complaint's scienter allegations that "a reasonable person would deem . . . cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). The Court will avoid scrutinizing allegations in isolation in favor of any holistic analysis. *Id.* The scienter inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* (citing *Tellabs*, 551 U.S. at 324). Courts "need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

[20] *In re Allied Nevada Gold Corp. Sec. Litig.*, 743 F. App'x 887, 887 (9th Cir. 2018) (when falsity and scienter may be "strongly inferred from the same set of facts," courts may combine inquiry).

[21] Defendants' assertion concerning whether FE8 worked at Allegiant during the Class Period misstates the law of this Circuit. D. Mem. 16. So long as the Complaint adequately describes FE8— and it does—courts routinely rely on information from former employees from outside the class period tending to "shed light on what a defendant should have known during the class period." *In re Quality Systems, Inc. Sec. Litig.*, 865 F.3d 1130, 1135 (9th Cir. 2017) (crediting statements from witness who "was not at [defendant company] during the Class Period," but who "had personal knowledge of executive-level management's real-time access to" relevant reports).

Contrary to Defendants assertion, D. Mem. 14, the Complaint alleges that during the Class Period, severe safety and maintenance issues pervaded. Considered holistically, the FE allegations, from both different locations and different times before and during the Class Period, corroborate one another, supporting the Complaint's allegations of both falsity and of Defendants' recklessness as to systemic issues of: (i) understaffing;[22] (ii) poor training and inexperience;[23] (iii) false maintenance reporting and high rates of maintenance failures, [24] and, consequently, a poor safety culture.

The Complaint adequately pleads Defendant Sheldon's first-hand knowledge of these pervasive issues. During the Class Period, he attended town hall meetings at which maintenance personnel raised and discussed the systemic safety and maintenance issues the Complaint pleads with particularity. ¶¶16, 72, 76.[25] The Complaint, therefore, adequately pleads his scienter, which is imputed to Allegiant. *Fosbre*, 2013 WL 5970250 *5-6 (citing *South Ferry LP, No. 2*, 542 F.3d at 785–86).[26] Defendants' citation to ¶82, D. Mem. 15, misses its import. The more compelling inference is

---

[22] ¶72-73 (FE1: maintenance staffing in Florida was ¼ industry standard; crisis where personnel worked excessive overtime, affecting maintenance safety); ¶76 (FE1: Sheldon attends town hall discussions about insufficient training); ¶78-81 (FE1: Gallagher aware of staffing issues by Toro and McCartney; Gallagher refuses to address issues); ¶83 (FE3: "severe understaffing" in Arizona, creating a "culture of unsafe behavior"); ¶91 (FE4: understaffing in Las Vegas, "skeletal crews"); ¶¶96-97 (FE5: confirms understaffing in Las Vegas, sometimes limited to one person).

[23] ¶¶107-08 (FE1: Gallagher will not allow McCartney to address training issues); ¶¶116-117 (FE2: maintenance workers unqualified and undertrained and unqualified personnel signed off on airplane readiness); ¶119 (maintenance controllers not trained); ¶¶121, 123-125 (FE6: most mechanics inexperienced and unqualified, repeatedly "botched" repair jobs, refused to utilize correct repair procedures); ¶¶129-130 (FE8: Allegiant "didn't want to invest in training," refused to train to correct poor maintenance practices and improper paperwork); ¶¶149-52 (FE8: Disinvited from meetings with Gallagher after proposing significant maintenance reforms).

[24] ¶¶113-114 (FE1: uncompleted work signed off on as completed, false reports submitted concerning aircrafts' flight readiness); ¶88 (FE3: supervisors pressure maintenance technicians to falsely sign off on work not done properly); ¶¶92-93 (FE4: maintenance workers pressured to sign off on uncompleted routine inspections, including on tire pressure and cabin pressure).

[25] The Court will impute the Individual Defendants' scienter to Allegiant. *Fosbre,* 2013 WL 5970250 *5-6 (citing *South Ferry LP, No. 2*, 542 F.3d at 785-86).

[26] *See also In re Hienergy Techs., Inc.*, No. SACV04-1226DOC(JTLX), 2005 WL 3071250, at *8 (C.D. Cal. Oct. 25, 2005) (imputing corporate officer's scienter to company).

---

14

that either Sheldon attended that meeting, and/or Toro reported the airworthiness comment to Gallagher, as he had numerous times before. [27]¶¶78, 109. Toro's response is a red herring. The Complaint pleads particularized facts that the safety and maintenance issues existed.

Defendants' reference to *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1141 (W.D. Wash. 2006) is unavailing. No question exists that FE1 was well aware of material, systemic safety and maintenance problems at Allegiant. The Complaint details the issues of which he was aware and the Court will consider those allegations as true and not "gossip or innuendo." The only question is whether anyone conveyed those to a Defendant. Sheldon heard remarks concerning understaffing at a town hall. Regardless of whether he investigated and discovered the systemic issues or did not investigate, he is minimally reckless.[28]

In addition, Toro, FE1's indirect supervisor, repeatedly told FE 1 that Gallagher was aware of the safety and maintenance issues, and that Gallagher affirmatively refused to allow the maintenance managers to address them. ¶¶78-81, 107-110, 141. That FE1, or any other FE, did not interact directly with the Individual Defendants is of no consequence. *See In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1243 (N.D. Cal. 2008) ("For pleading purposes, it is not necessary that the source have personal firsthand knowledge in a strict evidentiary sense").

To these specific allegations, the Complaint adds that Gallagher received monthly and weekly reliability reports on Allegiant planes, and attended monthly maintenance meetings, which brought to light emergency landings and aborted takeoffs, and other maintenance and staffing issues. ¶¶16, 44 (daily conference calls to discuss reliability issues), 45 (monthly reliability meetings), 133. After 2016, Allegiant's senior executives reported ongoing maintenance issues at Board meetings, which

---

[27] Toro may have also reported it to Sheldon. *See* ¶35.

[28] Even if the Court considers Toro's denial—which it should not, for the truth of the matter, *Orexigen*, 899 F.3d at 1003—he neither responded, unequivocally, that Allegiant's planes were airworthy, nor denied systemic safety and maintenance issues. He failed to contest that Defendants diverted money from maintenance and safety to other uses. As such, far from "preposterous," D. Mem. 15, the more compelling inference is that Toro defended the Company's priority of diverting resources from safety to Sunseeker rather than denying the diversion.

Gallagher would have attended as Chairman. ¶¶26, 178. Gallagher would have a heightened sensitivity to maintenance issues due to his affiliation with ValuJet, an airliner whose plane crashed as a result of them. ¶¶50-54. Allegiant had an open-concept office layout where Gallagher would hear what his executives and Vice Presidents were saying. ¶44. Former employees confirm the aforementioned issues were reported to directors and vice presidents at Allegiant, including McCartney, Toro, and Carpenter, who, in turn, reported to Gallagher and/or Sheldon. ¶¶35, 44, 78-81, 107-108, 141. It would be absurd to suggest Gallagher and Sheldon were kept in the dark about such pervasive maintenance deficiencies by their very directors and vice presidents who they regularly communicated with, and who FEs confirm knew of the various maintenance issues. As such, the Complaint's allegations as a whole support a strong inference that Defendants acted with requisite fraudulent intent.

### 2.    The Core Operations Doctrine Supports a Finding of Scienter

Further, the Core Operations doctrine supports a strong inference that Defendants acted at least recklessly. *Di Donato v. Insys Therapeutics Inc.*, No. CV-16-00302-PHX-NVW, 2017 WL 3268797, at *15 (D. Ariz. Aug. 1, 2017) (inference that key officers have knowledge of the "core operations" of the company).[29] If a reasonable person would find it "absurd" that a senior manager did know of problems with a core operations of a company, *see Reese*, 747 F.3d at 576 (reversing dismissal holding it "absurd to think" that officer of pipeline company was unaware of the condition of oil pipelines and lack of reliable inspection data), then even in the absence of allegations showing actual knowledge of underlying facts, a court can find scienter allegations adequate, *Berson,* 527 F.3d at 987-89 (reversing dismissal, finding strong inference of scienter where stop-work orders for two contracts represented 80% of company's revenue, indicating top management must have known).[30] The allegations here,

---

[29] The doctrine supports a finding of scienter: (i) when viewed in conjunction with other potentially vague allegations, holistically; (ii) when combined with detailed and specific allegations about management's exposure to factual information within the company; or (iii) on its own, when the nature of the relevant fact is of such prominence that it would be "absurd" to suggest management was without knowledge. *S. Ferry LP, No. 2*, 542 F.3d at 785-86.

[30] *Special Situations Fund III QP, L.P. v. Brar*, No. 14-CV-04717-SC, 2015 WL 1393539, at *5 (N.D. Cal. Mar. 26, 2015) (denying dismissal, finding strong inference that senior managers were aware of DOE warning that multi-million-dollar grant was at risk).

with the foundational claim that safety and maintenance were core—and critical—functions to a budget airline, are stronger than in these cited cases. *See* ¶¶11, 67.

Not only did Defendants claim in SEC filings the certified that they "closely supervise[d]"—not monitored but supervised—"all maintenance functions . . .,"[31] *e.g.*, ¶194, but on January 28, 2016, Defendant Gallagher expressly and publicly refuted allegations of safety concerns, falsely characterizing them as "misleading the public." ¶170.[32] Given that the Individual Defendants closely monitored Allegiant's safety and maintenance processes, the only implication is that Gallagher denied these allegations only after he had thoroughly investigated the claim with respect to a critical company function. Thus, he either knew that his denial was materially false or he recklessly disregarded the material safety and maintenance issues the Complaint details with particularity. Either way, the Complaint adequately pleads his scienter. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) (public statements of success in light of actual failure render strong inference more compelling); *see also In re Turbodyne Techs., Inc. Sec. Litig.*, No. CV9900697MMMBQRX, 2000 WL 33961193, at *19 (C.D. Cal. Mar. 15, 2000) (defendants' immediate denial of allegations contained in research analyst's report was circumstantial evidence sufficient to give rise to a strong inference of scienter) (citations omitted).[33] In context, therefore, the core operations doctrine support a strong inference of scienter.

---

[31] *See Di Donato v. Insys Therapeutics Inc.*, No. CV-16-00302-PHX-NVW, 2017 WL 3268797, at *15 (D. Ariz. Aug. 1, 2017) (finding scienter allegations adequate under core operations theory where it would be absurd for CEO who claimed to have daily meetings about prescriptions for drug representing 98% of company revenue not to have been minimally reckless); *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) (specific allegations about defendants' "detail-oriented management style" bolstered scienter).

[32] Throughout the Class Period, the Individual Defendants also publicly refuted negative safety news articles, demonstrating they were aware of the true cause of Allegiant's reliability issues all along. ¶¶160, 162, 163-64, 166-74, 176, 182. For example, Bricker admitted looking closely into Marino's allegations, rejecting them as unfounded. ¶171. This also supports a strong inference of scienter as to Bricker.

[33] Gallagher and Sheldon certified the accuracy of the statements about the Company's operations in its Forms 10-K, including those assuring investors of the accuracy of statements concerning Allegiant's maintenance and safety practices. ¶¶193, 196, 201, 206. In context, these certifications support a strong inference of scienter *Brown v. China Integrated Energy, Inc.*, No. CV112559MMMPLAX, 2013 WL 12124124, at *10 (C.D. Cal. Apr. 22, 2013); *Howard v. Everex*

17

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT - Case No. 2:18-cv-01758-APG-PAL

### 3. Gallagher's Well-Timed Stock Sales and Suspicious Formation of a 10b5-1 Trading Plan Support a Strong Inference of Scienter

"Suspicious" or "unusual" stock sales by corporate insiders is circumstantial evidence of scienter. *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003). Relevant factors courts consider are: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.*

Gallagher sold over $47.7 million worth of Allegiant stock on March 9, 2016, nearly 9% of his holdings. ¶175. Contrary to Defendants' assertions, no bright-line rule governs the percentage of stock that must be sold for insider trading to be unusual or suspicious. D. Mem. at 19. Here, the high percentage and eye-popping amount conforms to those probative of scienter in other cases. *See In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168–69 (C.D. Cal. 2003) (finding stock sales of 7.6% of personal holdings or $18 million supported scienter).[34] The timing is also suspicious—two days after Allegiant had attacked the Teamsters to refute the narrative that Allegiant was unsafe. ¶175. *See Schlagal v. Learning Tree Int'l*, No. CV 98-6384 ABC (EX), 1998 WL 1144581, at *10 (C.D. Cal. Dec. 23, 1998) (insider sales occurring on heels of optimistic statements or spin are suspicious in timing and evidence the statements were fraudulent when made); *see also In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980, 989–90 (N.D. Cal. 2001) (timing of stock sales shortly after defendants' positive spin "makes them suspicious").

Further, the sale was dramatically out of line with Gallagher's insider selling activity both before and throughout the remainder of the Class Period. Gallagher rarely sold shares in the 35 months preceding the beginning of the Class Period of the same length. *See* Leverty Decl., Ex. 2. Gallagher's only other large sales during the Class Period were made immediately after forming his 10b5-1 trading

---

*Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000) ("When a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true").

[34] *See also Takara Tr. v. Molex Inc.*, 429 F. Supp. 2d 960, 981 (N.D. Ill. 2006) (finding well-timed stock sales of only 1.9% of defendants' holdings provided further support of scienter).

plan in December 2017. *See Am. W. Holding*, 320 F.3d at 939-40 (insider sales probative of scienter when after "extended period of inactivity").[35]

Defendants do not refute, and therefore concede, Gallagher's 10b5-1 plan was formed at a suspicious time—soon after CBS News made FOIA requests for Allegiant's maintenance records, which Allegiant strongly objected to. ¶13, n. 4. Gallagher almost immediately sold stock pursuant to the newly formed trading plan before the *60 Minutes* segment aired. *Id.* Courts in this Circuit and others have held similar conduct as probative of scienter. *See In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1025 (S.D. Cal. 2011) (holding that improper use of a 10b5–1 trading plan is evidence of scienter where defendant sold $2.2 million in shares the day after entering into plan); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1068–69 (C.D. Cal. 2008) (amendments to 10b5-1 plan during class period probative of scienter); *see also See Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 308–09 (2d Cir. 2015) (insider trades pursuant to 10b5-1 trading plan indicative of scienter because scheduled sales occurred close in time to misrepresentations) (citing cases).

Defendants prematurely raise the affirmative defense that the execution of Gallagher's unusually-timed stock sales pursuant to a Rule 10b5-1 plan are not probative of scienter. D. Mem. at 18. Notwithstanding the timing of the plan's formation being indicative of scienter, Rule 10b5-1 trading is a highly factual affirmative defense, improper for resolution at this time.[36] *Stocke v. Shuffle*

---

[35] Defendants take issue with the length of Plaintiffs' class period, arguing it lessens an inference of scienter as to stock sales. D. Mem. at 17. Defendants are wrong because the sales are suspicious in time and size, and inconsistent with prior trading patterns. Defendants' only cited Ninth Circuit case is distinguishable because the Court generally found scienter lacking on the whole, irrespective of stock sales. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085, 1094 (9th Cir. 2002) ("bulk of the alleged adverse facts are generic, subjective, difficult to prove or refute, and could be alleged against almost any company that has experienced a drop in sales revenue").

[36] Defendants' cited cases are distinguishable. *Glaser* and *In re IAC/InterActive Sec. Litig.* are arguably no longer good law to the extent inconsistent with the Second Circuit's holding in *Blanford*, that a 10b5-1 trading plan "provides no defense to scienter allegations . . . where executives enter into a trading plan during the Class Period" and the complaint alleges an improper purpose. 794 F.3d 297 at 309; *see also In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014) (plaintiffs did not allege facts to "even remotely suggest that [defendant] entered into the [10b5-1] Plan 'strategically'[.]"), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

*Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009) (refusing to consider "10b5-1 trading plan" defense on motion to dismiss).

Defendants go outside the pleadings to assert scienter is negated because none of the other Individual Defendants purportedly sold Allegiant stock during the Class Period, and Bricker and Sheldon supposedly increased their holdings. D. Mem. at 17-18. As a legal matter, the absence of suspicious insider sales by certain Individual Defendants would not negate scienter.[37] *See Am. W. Holding Corp.*, 320 F.3d at 944 ("[T]he lack of stock sales by a defendant is not dispositive."). As a factual matter, Sheldon and Bricker did in fact sell Allegiant stock during the Class Period.[38] *See* Leverty Decl., Exs. 1 and 3 (various sales). Defendants Bricker and Sheldon's "increased holdings" were due to grants and options, for which they paid nothing. Bricker and Sheldon were otherwise net sellers. *See* Leverty Decl., Exs. 1 and 3 (no "purchases"). Cashless acquisitions do not rebut the inference of scienter. *See In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (rejecting defendants' attempt to negate scienter using increased "options"); *In Re CommVault Sys., Inc. Sec. Litig.*, No. 14-CV-5628 (PGS), 2016 WL 5745100, at *8 (D.N.J. Sept. 30, 2016) (same).[39]

### 4.    Gallagher's Unusual Bonus Structure Incentivized Fraud

"[M]otive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325; *see also Howard v. Everex Sys. Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (motive "may [] be considered as circumstantial evidence of" scienter). Gallagher had a substantial and highly unusual incentive to inflate Allegiant's stock price. He received absolutely nothing in salary, and his cash bonus, which was tied to Allegiant's "operating margin," was 82.4% of his total compensation in 2015—four times his 2014 compensation. ¶8; Leverty Decl.,

---

[37] Indeed, insider selling is not at all required to plead scienter. *See Tellabs*, 551 U.S. at 325.

[38] Plaintiffs could not locate any reported insider purchases or sales by Harfst.

[39] Defendants contend the exercise of expiring stock options does not contribute to scienter. D. Mem. at 18. The Court should consider those sales as evidence of scienter because "[s]tock options should be considered in calculating the percentage of shares sold unless the insider could not have exercised them." *Ronconi v. Larkin*, 253 F.3d 423, 435 n.25 (9th Cir. 2001) (considering the "total number of shares and options"); *see also Am. W. Holding Corp.*, 320 F.3d at 938 (finding "eligibility for stock options" sufficient to plead motive and scienter).

1   Ex. 4, at 3, 5. By making misstatements in 2015 and beyond, Gallagher was motivated to inflate

2   Allegiant's earnings. *See Am. West*, 320 F.3d at 944 (motive to defraud based on bonuses).[40]

3        **5.      Unexpected Departure of Key Operations Executive Bolsters Scienter**

4        Resignations of senior officers may support a strong inference of scienter. *In re Volkswagen*

5   *"Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 66281

6   (N.D. Cal. Jan. 4, 2017) (citation omitted). Harfst's sudden departure bolsters scienter. This is so

7   because Harfst was responsible for Allegiant's operations, ¶28, directly responded to negative news

8   concerning Allegiant's safety, ¶162, n.26, and his resignation came just days after a mechanic's

9   revelations became public, ¶165, implying Defendants knew of undisclosed issues that Harfst and

10  others were aware. ¶165. *See Bielousov v. GoPro, Inc.*, No. 16-CV-06654-CW, 2017 WL 3168522, at

11  *7 (N.D. Cal. July 26, 2017) (scienter "bolstered" by "the resignation of [defendant] as GoPro's

12  president").

13       **D.      The Complaint Adequately Pleads Loss Causation[41]**

14       The Complaint alleges as partial disclosures CBS' April 13, 2018 announcement of its

15  upcoming exposé on Allegiant's maintenance and safety practices, CBS' April 15, 2018 *60 Minutes*

16  Broadcast, and the DOT's announcement concerning its audit of the FAA's improper oversight of

17  Allegiant's "improper maintenance practices." ¶¶17-19. Each discloses a piece of formerly

18  undisclosed information, indicating the safety and maintenance issues were not a random set of

19  circumstances but systemic through 2017. ¶¶18, 69, 101, 135. These disclosures related directly to the

20  ────────────────

21  [40] *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("When financial incentives . . . go

22  far beyond the usual arrangements of compensation . . . they may be considered among other facts to
    show scienter.") (cited with approval by *United States v. Goyal*, 629 F.3d 912, 919 (9th Cir. 2010).

23  [41] To plead loss causation, Plaintiffs need only provide enough "detail to give [the] defendants . . .

24  notice of [his] loss causation theory, and give [] some assurance that the theory has a basis in
    fact." *Cutler v. Kirchner*, 696 F. App'x 809, 811 (9th Cir. 2017). The inquiry is whether a subsequent

25  public disclosure "revealed or at least suggested the truth" and whether that revelation "was a
    substantial factor in causing a decline in the security's price." *Id.* Plaintiff must only allege at least

26  one undisclosed material fact caused the decline in the company's stock price. *Mineworkers' Pension
    Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). Plaintiffs need only "raise a reasonable

27  expectation that discovery will reveal evidence of loss causation." *In re Gilead*, 536 F.3d 1049, 1057

28  (9th Cir. 2008) (internal quotations omitted).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION
COMPLAINT - Case No. 2:18-cv-01758-APG-PAL

misrepresentations alleged by Plaintiffs, and resulted in substantial declines in Allegiant's stock price. ¶¶220, 222, 223. *City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1046 (N.D. Cal. 2018). Defendants make three principal arguments that the Complaint fails to plead loss causation. Defendants are wrong on each point.

First, Defendants argue the CBS Broadcast is a journalistic characterization of previously disclosed facts, failing to reveal a single new, undisclosed fact.[42] D. Mem. at 3, 20. Defendants, however, ignore Ninth Circuit case law holding that a corrective disclosure may be adequate even if it relies solely on publicly available information, so long as the new corrective disclosure brought to light an implication of such information of which the market was not aware. *See In re Gilead,* 536 F.3d at 1053–54. For example, in *Garcia v. Hetong Guo*, No. CV-15-1862-MWF-MRWX, 2016 WL 102213, at *9–12 (C.D. Cal. Jan. 7, 2016) (denying motion to dismiss on loss causation grounds), defendants argued a June 5th GeoInvesting reply could not qualify as a corrective disclosure because it revealed "nothing 'new' to the market in light of the initial May 28th GeoInvesting Report that was published one week prior." *Id.* at *10. The court held the June 5th reply was a corrective disclosure because it contained "a more comprehensive analysis of the alleged fraudulent conduct," including "new information" regarding the "analysis of deficiencies and new facts asserted in Lentuo's May 29th Press Release." *Id.* at *11. The court held in the alternative that, even assuming no new facts were alleged in the June 5th reply, the court could not dismiss on these grounds as this fact-intensive issue was "better addressed at trial and not on a Rule 12(b)(6) motion to dismiss." *Id.* at *11 (relying on *In re Apollo Grp., Inc. Sec. Litig.*, No. 08-16971, 2010 WL 5927988, at *1 (9th Cir. June 23, 2010)).

Plaintiffs' loss causation claims are stronger than the plaintiff in *Garcia*. Here, the *60 Minutes* Broadcast exposed new, undisclosed systemic maintenance issues which CBS only learned through

---

[42] Defendants' repeated argument that the CBS Broadcast is not a corrective disclosure because it relied on public records from the FAA, repeated what had been said in prior newspaper articles, and offered critical commentary from supposed experts, D. Mem. at 2, 8-9, 20-21, is the "truth on the market" defense, "more appropriately resolved by trial than by a motion to dismiss." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1036 (S.D. Cal. 2005) (denying motion to dismiss).

22

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT - Case No. 2:18-cv-01758-APG-PAL

analyzing technical and difficult-to-obtain documents Allegiant filed with the FAA through 2017,[43] in addition to investigations and interviews with the head of the pilot's union and FAA experts/officials. *60 Minutes* also revealed, *inter alia*, new information that Allegiant was actively discouraging its employees from reporting maintenance issues. ¶18. CBS' ability to connect the dots to reach this conclusion based on "new, news" goes far beyond a simple "characterization of previously disclosed facts."[44] *See Garcia*, 2016 WL 102213, at *9–12. Indeed, if, as Defendants suggest, none of the disclosures contained "new news," then "it is hard to understand the sharp drop in the price of [Allegiant's] stock" on unusually high volume and in response to each of the corrective disclosures. *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004). At minimum, the issue is too fact-intensive to resolve on a motion to dismiss. *See Garcia*, 2016 WL 102213, at *11.

Second, Defendants' argument that the 3% drop following the second partial disclosure is "insignificant" as a matter of law is without merit.[45] As Defendants' cited case states, a decline in stock price must be "statistically significant." *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009). Whether a drop in a stock's price is statistically significant will vary depending on the average range for that particular stock. *Id*. at *5 (finding stock drops between 0.79% and 2.71% insignificant

---

[43] Defendants cannot seriously suggest the "public records" CBS relied upon from the FAA were publicly available as to defeat loss causation. CBS only obtained these FOIA-requested documents over Allegiant's objections and after CBS took the incredible step of interviewing an FAA official for its *60 Minutes* segment, after which the FAA reportedly overruled those objections. ¶221, p. 68:3.

[44] Defendants' Second Circuit case is distinguishable because there, the court held that a *Wall Street Journal* article simply summarizing prior public statements of a company's accounting with a negative characterization was not new, news. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512–13 (2d Cir. 2010).

[45] Defendants argue in a footnote the declines in Allegiant's stock price were caused by disclosures unrelated to the alleged fraud, and that the stock's rebound ten days later after reporting positive earnings on day 10 somehow negates loss causation. D. Mem. at 21, n. 48. These arguments are inappropriate at this stage. *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1033 (N.D. Cal. 2016) ("Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage."); *see also Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012) (holding it inappropriate at motion to dismiss stage to offset price recovery when the court does "not know whether the price rebounds represent the market's reactions to the disclosure of the alleged fraud or whether they represent unrelated gains"). Allegiant's stock after the CBS Broadcast remained depressed for over a week. *See* Leverty Decl., Ex. 5. Defendants do not challenge the 2% drop on May 9, 2018 as immaterial.

because they were typical for the company in question "in the days prior and subsequent to the alleged corrective disclosure"). By contrast, Allegiant's stock movement on April 16, 2018 is significant because: (i) in the ten days prior to and after the first corrective disclosure, there were no other stock drops greater than 3% except April 17, 2018, as the market continued to digest the *60 Minutes* report; and (ii) the trading volume on April 16, 2018 was 1.05 million shares, unusually high for Allegiant— over six times the average daily trading volume during the Class Period (160,952 shares). *See* Leverty Decl., Ex. 5. This supports loss causation. *In re Barrick Gold Sec. Litig.*, No. 13 CIV. 3851 SAS, 2015 WL 1514597, at *14 (S.D.N.Y. Apr. 1, 2015) (stock drop of 3.2% with heavy trading volume sufficient for alleging loss causation).

Third, Defendants argue the 8.59% stock drop on April 13, 2018 and the 2% drop on May 9, 2018 are not actionable because they do not reveal fraud. D. Mem. at 21-22. A corrective disclosure need not be a "mirror image" or "fact-for-fact" disclosure, or otherwise specifically reveal the entirety of the fraud. Rather, to establish loss causation, the disclosure need only reflect *part* of the "relevant truth"—that is, the truth obscured by the fraudulent statements—by revealing "***some aspect*** of the alleged fraud." *In re Novatel Wireless Sec. Litig.*, No. 08CV1689 AJB (RBB), 2013 WL 12144150, at *4 (S.D. Cal. Oct. 25, 2013) (emphasis added). These drops are actionable. Plaintiffs have adequately plead these partial disclosures because they reveal Allegiant's improper safety and maintenance practices as related to the *60 Minutes* report. ¶¶219, 223. Plaintiffs adequately plead loss causation.

E.     **The Complaint Adequately Pleads Control Person Liability**

Defendants' only Section 20(a) control person liability argument is that Plaintiffs failed to plead a primary violation of Section 10(b) claim against any Defendant. D. Mem. at 22. As Plaintiffs have adequately pleaded an underlying violation, a Section 20(a) violation has been established.

IV.   <u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety. If the Court grants any of Defendants' motion, Plaintiffs respectfully request leave to amend. *Harris v. Amgen, Inc.,* 573 F.3d 728, 737 (9th Cir. 2009) (dismissal without leave to amend improper unless "clear" complaint could not be saved).

24

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION
COMPLAINT - Case No. 2:18-cv-01758-APG-PAL

1  Dated: January 22, 2019                Respectfully submitted,

2

3                                         **LEVERTY & ASSOCIATES LAW CHTD.**

4                                         /s/Patrick R. Leverty
                                          Patrick R. Leverty, Esq.
5                                         Reno Gould House
                                          832 Willow Street
6                                         Reno, NV 89502
                                          Telephone: (775) 322-6636
7                                         Facsimile: (775) 322-3953
8                                         Email: pat@levertylaw.com

9                                         *Liaison Counsel for Plaintiffs and the Class*

10                                        **THE ROSEN LAW FIRM, P.A.**
11                                        Laurence M. Rosen, Esq.
                                          Phillip Kim, Esq.
12                                        Zachary Halper, Esq.
13                                        275 Madison Avenue, 34th Floor
                                          New York, New York 10016
14                                        Telephone: (212) 686-1060
                                          Fax: (212) 202-3827
15                                        Email: lrosen@rosenlegal.com
16                                        Email: pkim@rosenlegal.com
                                          Email: zhalper@rosenlegal.com
17
18                                        *Counsel for Plaintiffs and the Class*

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION
COMPLAINT - Case No. 2:18-cv-01758-APG-PAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 22, 2019, I electronically filed the foregoing **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

/s/Patrick Leverty
Patrick Leverty

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION
COMPLAINT - Case No. 2:18-cv-01758-APG-PAL