MARK F. FERRARIO, ESQ.
Nevada Bar No. 1625
JACOB D. BUNDICK, ESQ.
Nevada Bar No. 9772
**GREENBERG TRAURIG, LLP**
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002
Email: ferrariom@gtlaw.com
        bundickj@gtlaw.com

DANIEL J. TYUKODY, ESQ.
Admitted *Pro Hac Vice*
COLIN W. FRASER, ESQ.
Admitted *Pro Hac Vice*
**GREENBERG TRAURIG, LLP**
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone: 310.586.7723
Email: tyukodyd@gtlaw.com
       frasercw@gtlaw.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DANIEL CHECKMAN, Individually and On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ALLEGIANT TRAVEL COMPANY, MAURICE J. GALLAGHER, JR., SCOTT SHELDON, STEVEN E. HARFST, and JUDE I. BRICKER,<br><br>Defendants. | Case No: 2:18-cv-01758-APG-PAL<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>*[Filed concurrently with: (1) Reply in support of Motion to Strike, and (2) Opposition to Plaintiffs' Request for Judicial Notice]* |

    Defendants Allegiant Travel Company ("Allegiant" or the "Company"), Maurice J. Gallagher, Jr. ("Gallagher"), Scott Sheldon ("Sheldon"), Steven E. Harfst ("Harfst"), and Jude I. Bricker ("Bricker") (collectively, the "Individual Defendants" and along with Allegiant, "Defendants"), by and through their

undersigned counsel of record, respectfully submit this Reply in support of their Motion to Dismiss Plaintiffs' Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Amended Complaint" or "AC").

This Reply is made upon the papers and pleadings on file herein, the attached points and authorities, and such oral argument as the Court may entertain at the hearing on this matter.

DATED this 21st day of February, 2019.

**GREENBERG TRAURIG LLP**

By: */s/ Jacob D. Bundick*
MARK F. FERRARIO, ESQ.
Nevada Bar No. 1625
JACOB D. BUNDICK, ESQ.
Nevada Bar No. 9772
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135

DANIEL J. TYUKODY, ESQ.
Admitted *Pro Hac Vice*
COLIN W. FRASER, ESQ.
Admitted *Pro Hac Vice*
**GREENBERG TRAURIG, LLP**
1840 Century Park East, Suite 1900
Los Angeles, CA 90067

*Counsel for Defendants*

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

LV 421291557v3

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Plaintiffs' Opposition ("Opposition" or "Opp.") to Defendants' Motion to Dismiss ("Motion" or "MTD")[1] only confirms that this is one of the most frivolous securities class actions imaginable, and that the Amended Complaint ("AC") should be readily dismissed pursuant to the Reform Act's statutory requirements, and Supreme Court and Ninth Circuit precedent interpreting those statutes.

The core theory of fraud is that a major American airline, highly regulated by the FAA, was indifferent to safety, put unsafe aircraft into the skies, and lied about it over the course of three years. The supposed lies consist of statements like Allegiant ran a "'safe operation,'" was "'safe'" (Opp. at 9, quoting ¶ 192), and "had 'a safe operation … [l]ast year … and this year [a]s well'" (Opp. at 4, quoting ¶ 167).

Let one thing be clear: if you do not believe you are running a safe airline, you have no business putting planes in the sky. Allegiant believed what it said about running a safe airline during the class period, and believes it today. While the AC describes some highly publicized incidents involving Allegiant flights, most of which occurred early in the three-year class period, it does not allege there was ever a serious injury or loss of life at any time during the class period. The AC also does not assert that the FAA, which the AC acknowledges enforces maintenance and safety "*standards that apply to all airlines*" (¶ 4), believed Allegiant to be unsafe. Plaintiffs do not object to the Court taking judicial notice of the FAA's response to CBS's Broadcast, which was that its review of Allegiant "*did not find any systemic safety or regulatory problems*, but did identify a number of less serious issues, which Allegiant addressed."[2]

Regarding the Broadcast itself, the Opposition tacitly acknowledges that it did not reveal anything materially different from the three years of headlines that take up so much of the AC (*see, e.g.,* ¶ 159). The Opposition asserts that "CBS analyzed" publicly available service difficulty reports "filed with the FAA" (Opp. at 8), and was able to "connect the dots" (Opp. at 23), making this case indistinguishable

---

[1] Capitalized terms have the same meaning as defined in the MTD. As with the MTD, all emphasis in this brief has been added unless otherwise indicated, and internal citations in quoted cases have been omitted.

[2] Fraser Decl. (ECF No. 48), ¶ 10, Ex. 8. (cited in MTD at 8 n.14).

from *In re Merck & Co. Sec. Litig.*, 432 F. 3d 261, 270-71 (3d Cir. 2005), where the Third Circuit held that a plaintiff's pleading based on a similar "analysis" performed by the *Wall Street Journal* did not even state an actionable false statement. The immaterial stock price drop of less than 3% following the Broadcast is further evidence that the it merely recycled old news. The Opposition also acknowledges that the AC's approach to pleading lacks the specificity required under the Reform Act, claiming that this was a matter of "inadverten[ce]" and requests the Court to "infer from the Complaint how and why these statements are false" (Opp. at 8 n.10), which is not permissible. *See infra* at § II.A.2.

With respect to scienter, a case based upon the proposition that a major U.S. airline lied when it said it cared about safety has a steep hill to climb in order to to satisfy the "cogent and compelling" pleading standard mandated by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). That hill gets steeper when the AC acknowledges that senior Allegiant executives piloted those aircraft, and that Allegiant's CEO owned roughly 20% of the Company throughout the class period, and was thus highly incentivized to run a safe airline for the very reasons Plaintiffs suggest. Beyond these purely economic issues is the moral responsibility Allegiant had (and has) to its flight crews and the millions of passengers who fly it every year. The idea that Allegiant was indifferent to safety is patently absurd and the very opposite of "cogent and compelling."

The AC offers two things in support of its pleading a cogent and compelling case, neither of which satisfies Ninth Circuit standards: (i) the allegations of nine Former Employees (the "FEs"); and (ii) allegations of suspicious trading during the class period by Gallagher. As to the FEs, stripped of their hyperbole, they support the proposition that Defendants paid close attention to safety, with everything else sounding in the nature of corporate mismanagement allegations offered in the context of a protracted labor dispute. Regarding insider trading, the AC only asserts that Gallagher traded during the class period, and as pointed out in the Motion, Plaintiffs did not provide the Court with certain critical information required under Ninth Circuit law in order to determine whether these class period sales were suspicious in either amount or timing.³ Recognizing that flaw, Plaintiffs improperly attempt to

---

³ *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) ("[I]nsider trading is suspicious only when it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.' Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history.").

supplement the AC with their Request for Judicial Notice ("Plaintiffs' RJN"), and its attached Leverty Declaration, to add information about Gallagher's pre- and post-class period sales. Not only is this procedurally improper,[4] but substantively these new allegations only support the proposition that there was nothing unusual about Gallagher's class period sales. Even more outrageous is Plaintiffs' attempt to use their RJN to add allegations of class period sales by Bricker and Sheldon, neither of whom is alleged to have traded in the AC. As with Gallagher, nothing about these sales comes close to satisfying Ninth Circuit pleading standards, and Plaintiffs had it right the first time when they disregarded them.

Regarding loss causation, the fact that Plaintiffs need to utilize a three-day trading period to allege a material drop in price is itself telling, and Plaintiffs' attempt to expand their original class period (from the original date of April 13, 2018 to May 9, 2018 in the AC) only reveals that Allegiant's stock quickly recovered from its post-Broadcast price, demonstrating a pattern that undermines an adequate pleading of loss causation.

## II. ARGUMENT

### A. Plaintiffs Fail to Plead an Actionable False Statement or Omission.

#### 1. The Opposition Tacitly Acknowledges That the Broadcast Contained No New Information.

In *Merck,* the Third Circuit held that a *Wall Street Journal* analysis of public information concerning Merck's accounting practices could not form the basis of there even being a false statement, because "the efficient market hypothesis suggests the market made these basic calculations months earlier." *Merck,* 432 F.3d at 270-71.[5] When pressed regarding how this case—which features *three years* of headlines regarding Allegiant that the Broadcast largely repeated—is distinguishable from *Merck*, all the Opposition could come up with was, "Here, by contrast CBS analyzed … data filed with

---

[4] *See Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013) ("[A] plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion."); *Schneider v. Cal. Dep't of Corr.,* 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss."); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1068 n.27 (C.D. Cal. 2008) (declining to address insider trading accusations made in opposition to motion to dismiss that were not alleged in the complaint).

[5] The Third Circuit did not even consider it necessary to examine scienter and loss causation in *Merck* in light of its conclusion that the efficient market theory meant the plaintiffs did not even plead an actionable false or misleading statement. *Merck,* 432 F.3d at 271 n.9.

the FAA, to reveal to the market previously **undisclosed** systemic maintenance problems … including that supervisors threatened workers from reporting maintenance issues." Opp. at 8 (emphasis in the original). But the Opposition never says what those "**undisclosed'** problems actually were, or how they differed from what the market already knew. CBS's analysis of the publicly available incident reports only showed that Allegiant's aging fleet of MD-80's had a higher rate of mechanical difficulties than competing airlines which employed newer aircraft, a point that was conveyed in the three years of news articles and television broadcasts that make up much of the AC and that could not have been lost on the efficient market. According to the Opposition, CBS had the ability to "connect the dots" (Opp. at 23) but "situations in which the pertinent facts are obfuscated in such a way, or are of such complexity, as to require someone to connect the dots for a bewildered market represent a very rare type of securities-fraud case, and would not be the rule." *In re Apollo Grp., Inc. Sec. Litig.,* No. 04-cv-2147, 2008 WL 3072731, *3 (D. Ariz. Aug. 4, 2008), *rev'd on other grounds* 2010 WL 5927988 (9th Cir. Jun. 23, 2010).[6]

      While the Opposition says that a new fact revealed by the Broadcast was that Allegiant "threatened workers from reporting maintenance issues" (Opp. at 8), the Broadcast itself does not support that assertion. The closest it comes is an interview with the head of the Teamsters union who offers his hearsay-based, speculative belief that Allegiant's maintenance department "'discourage[ed]'" such reporting. That is far different than a "threat," and the Opposition ignores Allegiant's response to this speculation, which was reported in the Broadcast itself: "'Any employee who fails to report safety-related concerns through available channels is in violation of company policies and may also be in violation of federal regulations.'" ¶ 222 at p. 68.

      The fact that the AC fails to plead an actionable false or misleading statement under *Merck* (and similar cases) is not a truth-on-the-market defense. The truth-on-the-market paradigm is illustrated by the *Iso Ray* case cited in the Opposition, which concerned whether the publication of a complex clinical lung cancer treatment study in a paid subscription journal, just 24 hours before defendants' allegedly misleading press release, could constitute information sufficiently disclosed to the market. *In*

---

[6] *See also In re Bank of Am. AIG Disclosure Sec. Litig.,* 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013), *aff'd,* 566 Fed.Appx. 93 (2d Cir. 2014) (dismissing securities claims where allegedly withheld information had been disclosed in the *New York Times* and other media).

*re Iso Ray, Inc. Sec. Litig.,* 189 F. Supp. 3d 1057, 1073-74 (E.D. Wash. 2016). This is a very different case where the AC alleges *three years of headlines* in major U.S. newspapers and television broadcasts (*e.g.*, ¶¶ 158-59, 163, 166, 168-74, 177, 182) about an issue that the AC says was "the very first question" asked by analysts (¶ 167, *see also* ¶¶ 67, 192).

### 2. Plaintiffs' "Four Sets of Statements" Do Not Articulate a False or Misleading Misstatement or Omission.

The Opposition acknowledges the AC's failure to plead an actionable false statement with the Reform Act's required particularity, calling it a matter of "inadvert[ance]" and suggesting that perhaps the Court could just "infer from the Complaint how and why these statements are false." Opp. at 8 n.10. The "particularity" pleading requirement comes directly from the statute,[7] so it is hard to understand how it could have been inadvertently overlooked, and the favorable inference Plaintiffs request from the Court is impermissible.[8]

But before turning to the "four sets of statements" it is worth examining the standard by which the Opposition says the AC should be judged, quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) for the proposition that, "[O]nly if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." Opp. at 8. *Warshaw* is a **pre-Reform Act case** that the Ninth Circuit evaluated under the pre-Reform Act pleading standards,[9] and it has no relevance today. Instead, after *Tellabs* a court is required to determine the most plausible inferences arising from a pleading,[10] and in the Ninth Circuit a court is required to draw "all reasonable inferences to be drawn from the complaint, including those *unfavorable* to the plaintiff." *Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir. 2002); *see also id.* at 896 ("To accept plaintiffs' argument that

---

[7] *See* 15 U.S.C. § 78u-4(b)(1)(B) ("[T]he complaint shall specify each statement alleged to have been misleading, [and the] reasons why the statement is misleading . . . with particularity.").

[8] *See In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1089 (N.D. Cal. 2003) (refusing to "infer by innuendo that [Defendant] violated federal securities laws" where "Plaintiffs have scattered throughout the SAC every statement that could plausibly be considered actionable under the most superficial analysis without taking pains to filter out those that are either inherently not actionable or those that cannot be actionable under the theories that Plaintiffs assert.")

[9] *See Warshaw,* 74 F.3d at 960 (applying "the specificity requirements of Rule 9(b)," not the heightened pleading standard applicable under the Reform Act, when reviewing the district court's decision in a pre-Reform Act case).

[10] *Tellabs,* 551 U.S. at 314 (requiring inferences from pleading to be "more than merely plausible or reasonable—[they] must be cogent and at least as compelling as any opposing inference of nonfraudulent intent")

the court is required to consider only inferences favorable to their position would be to eviscerate the PSLRA's strong inference requirement ….").

### a. Statements from Allegiant's Class Period Form 10-Ks About Technician Training and Skills.

The first set of statements wherein "Allegiant stated its '[t]echnicians . . . have appropriate experience,' Allegiant 'provided them with comprehensive training[,]' and could hire 'sufficient qualified alternative providers of maintenance services … to satisfy … maintenance needs,' ¶¶194, 202, 207" (Opp. at 8) come directly from Allegiant's Form-10 Ks issued during the class period. As discussed in the Motion, not only does the AC fail to adequately plead what was false about them, but the FE allegations actually support the proposition that Allegiant did indeed hire FAA certified technicians and did train them. *See* MTD at 9-10. The Opposition tries to "improve" on the AC by saying that Defendants "affirm[ed] the *superiority* of Allegiant's maintenance and safety programs" (Opp. at 4), but the AC itself does not allege that Allegiant claimed "superiority"—only FAA compliance.

The assertion that "Allegiant touted its workers as 'highly trained' ¶ 164" (Opp. at 8) comes from Allegiant's response to a *Tampa Bay Times* article that featured a mechanic who quit after just two weeks on the job, in the context of which Allegiant said, "For an individual with such limited insight into our operations to make broad, unfounded allegations about the quality of our maintenance practices is an insult to the more than 600 men and women who work hard every day to maintain our fleet. It is an attempt to discredit and disparage these highly-trained professionals …." ¶ 164 (Plaintiffs' emphasis deleted). How or why this statement is supposed to be false is a mystery, as this is another area where Plaintiffs say they "inadvertently" did not include this in the false statements section of the AC, but would still like the Court to "infer it is false." Opp. at 8 n.11. But that would not be a fair inference at all, as it appears that the nine FEs considered themselves to be "highly trained professionals." Is the "cogent and compelling" inference that the Court is supposed to draw that the nine FEs were "highly trained professionals," but the nearly 600 remaining employees were not?

Plaintiffs are correct that because the AC alleges that Sheldon signed the Form 10-Ks, as to them alone he qualifies as a speaker under *Janus Cap. Grp., Inc., v. First Deriv. Traders*, 564 U.S. 135

(2011), but because the Opposition can point to nothing about those 10-K statements that was false, the case against Sheldon must be dismissed.[11]

### b. The Deletion of a Line from Allegiant's 2015 Form 10-K.

The second "category" consists of a single statement from Allegiant's 2015 10-K, that "'[w]e believe our aircraft are, and will continue to be, mechanically reliable.'" Opp. at 9 (quoting ¶ 195, which itself quotes the 2015 10-K). What supposedly makes this category different from the one discussed above is the fact that the "mechanically reliable" line got dropped from subsequent Form 10-Ks. From this supposedly "suspicious[]" deletion the Court is apparently supposed to infer that Allegiant was making a tacit admission in subsequent Form 10-Ks that it no longer believed its aircraft were safe and reliable. This is not a legally tenable position. *See, e.g., Welgus v. Triinet Group, Inc.*, No. 15-cv-03625, 2017 WL 6466264, *8 (N.D. Cal. Dec. 18, 2017) ("[I]f the law viewed a company's editing or removal of language from an SEC filing as a tacit admission that the language was false when made, 'no public company would ever remove disclosures from its filings.'"). Moreover, the AC is replete with numerous instances of Allegiant making statements after 2015 to the effect that it believed it employed reliable and safe aircraft. *See, e.g.*, ¶¶ 192-94.

### c. Allegiant's Code of Ethics.

The third category consists of statements from Allegiant's Code of Ethics (Opp. at 9, 11–12), but the law is clear that a commitment to a "code of ethics is inherently aspirational," *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 685–86 (D. Colo. 2007), and that statements in a code of ethics assuring "safety in the work place" are not actionable, *In re Andarko Petroleum Corp. Class Action Litig.*, 957 F. Supp. 2d 806, 820 (S.D. Tex. 2013). The Opposition takes issue with a statement in the Code of Ethics that Allegiant "would 'provide safe working conditions,'" which is said to be false because some of the FEs said they worked "dangerously long hours and [had] and unmanageable number of tasks" Opp. at 11. But the referenced Code of Ethics provision is clearly directed to worker safety on the job (¶ 190), whereas the FEs are alluding to passenger safety.

---

[11] It remains the case that Harfst is not a speaker under *Janus* and therefore he must be dismissed notwithstanding Plaintiffs' attempt to keep him in via invocation of the discredited group pleading doctrine. Opp. at 20 n.18 (referencing ¶ 162 n.26 which says that "Allegiant, Gallagher, and Harfst brushed off [] union reports"); *see In re New Century*, 588 F. Supp. 2d 1206, 1224 (C.D. Cal. 2008) ("[G]roup pleading is no longer viable under the PSLRA").

####       d.       Gallagher's Statements About Safety.

The last category consists of statement by Gallagher that Allegiant placed its "focus on safety and reliability," had a "proven, seasoned model," and that it was a "safe operation" that emphasized safety as a "core fundamental." Opp. at 9. As discussed in the Motion, there is nothing alleged in the AC that contradicts these statements, and in fact plenty to support it, including (i) daily conference calls, monthly reliability meetings, quarterly Town Hall events, and annual leadership conferences to discuss staffing, reliability, and mechanical issues;[12] (ii) participating in all "seven voluntary safety systems" suggested by the FAA (¶¶ 164, 167); (iii) appointing "two independent directors [to] regularly meet with operations and maintenance personnel and report back to the Board" (¶ 178); and (iv) accelerating the replacement of Allegiant's remaining MD-80's with newer Airbus models (¶ 179).

The Opposition's contentions that "Defendants do not assert they were unaware of these unsafe conditions" (Opp. at 2), and that "the only implication is that Gallagher denied these [safety] allegations only after he had thoroughly investigated the claim" (Opp. at 17) are absurd. The more plausible inference is that Defendants simply do not agree with Plaintiffs' premise that conditions were unsafe, and that Gallagher's denials reflected his informed opinion that Allegiant ran a safe operation.

Plaintiffs also say that Allegiant's "business model was no longer viable," and that as a result "Defendants sought resort revenue, which further drove them to improperly cut maintenance costs for funding" (Opp. at 9), but the AC concedes that Allegiant is "one of the country's most profitable airlines" with a "business strategy which has produced 60 straight quarters of profits" (¶ 211). The "resort revenue" allegation comes entirely from FE 1's absurd conclusion based upon his overhearing the uninformed "water cooler talk" of an uninformed person, and as discussed below, the Opposition says it no longer believes what the AC alleges on this topic. *See infra* at § II.B.1.

### B.   Plaintiffs Fail to Plead "Cogent and Compelling" Facts Establishing a "Strong Inference" of Scienter.

#### 1.   The Former Employee Allegations Offer Nothing of Relevance.

The Opposition concedes that the FEs were far removed from senior management, and "did not interact directly with the Individual Defendants." Opp. at 15. Thus, their allegations lack any persuasive

---

[12] *See* ¶¶ 35, 44, 76, 81-82, 106, 108-09, 141, 152-54.

force under *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981 (9th Cir. 2009), which requires not just that confidential witnesses be identified by where and when they worked, but also that their statements reflect "sufficient reliability and personal knowledge [that] must themselves be indicative of scienter." *Id.* at 995. That is what is missing here.

As referenced above, the daily conference calls, quarterly meetings, Town Hall events and the like that the FEs collectively discuss actually support the proposition that Allegiant's senior management paid a great deal of attention to airline safety and maintenance. The severity of any particular FE allegation is usually inversely proportional to how long that person was employed at Allegiant, a point best evidenced by FE 1, who worked at Allegiant for all of six months. During that short time, FE 1 allegedly "came up with a plan" regarding who should be trained and how, throughout the Company, and was dismayed when the executive in charge of training said it was that person's job to decide those issues. ¶ 111. FE 1 complains about "complainers" who filed maintenance reports that prevented aircraft from flying (¶ 114), which would seem to run against Plaintiffs' theory that Allegiant discouraged such reporting.

Although the Opposition speaks in the plural (Opp. at 5), as pled in the AC, FE 1 is the sole source for the contention that the planned Sunseeker Resort in Florida had anything to do with safety and maintenance issues. This occurred in the context of an outside contractor complaining about receiving a small annual raise at a Town Hall meeting, which that unnamed person then tied to the planned Sunseeker Resort, leaping to the conclusion that the resort would result in Allegiant skimping on maintenance. In the AC, it is alleged that FE 1 received "direct confirmation" from his supervisor (Toro) that "Allegiant was allocating resources to fund the Sunseeker resort instead of investing in airline maintenance." ¶ 82. However, after the Motion pointed out that Toro is quoted in the AC as disagreeing with the contractor's fundamental premise, the Opposition does an about face, and now claims that the "more compelling inference" is that Toro was "defend[ing] the Company's priority of diverting resources from safety to Sunseeker." Opp. at 15 n.28. So the whole idea of Toro providing "direct confirmation" supporting FE 1's speculations is apparently not something the Opposition can support, and the most cogent and compelling inference is that FE 1 has an uninformed opinion.

/ / /

Every large organization will have someone like FE 1, who after a short time on the job comes to believe he or she knows more than anyone else; or like FE 8, the non-class period former employee who became annoyed when Allegiant rejected his $40 million proposal to solve a problem, in favor of a $20 million solution that FE 8 believes was not as good. ¶ 152. At most, the FE allegations amount to inactionable assertions of corporate mismanagement offered in the context of a long-running labor dispute. *See, e.g.,* ¶ 86 (FE 2 attributing various issues to the fact that "workers were not unionized until 2018").

### 2. The Alleged Class Period Trades Do Not Satisfy Ninth Circuit Standards.

The best evidence of the insufficiency of the AC's insider trading allegations is the Opposition's improper attempt to supplement the AC with new facts offered in Plaintiffs' RJN. Defendants' Motion pointed out that the AC gave no indication of Gallagher's trading history before the start of Plaintiffs' overly long class period, thus making it impossible for the Court to determine whether Gallagher's class period trades were out of line with his prior practices. *See, e.g., In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1068 (C.D. Cal. 2008) (no inference of scienter from sale of $848.6 million in stock where complaint failed to include prior sale history or total holdings). Plaintiffs' procedurally improper attempt to supplement the AC to cure this flaw should be disregarded, but even if considered it does not help them. The AC alleges that Gallagher sold 292,200 shares during the three-year class period. The improper attempt to supplement shows that Gallagher sold 215,646 shares after the end of the class period—obviously fairly close to his class period sales—and sold 302,470 shares during the period preceding the class period (i.e., from June 2010 until March 2016)—obviously also fairly close to his class period sales. *See* Leverty Decl., Ex. 2.

Nor is there an adequate allegation that the timing or amounts of Gallagher's sales raise any red flags. Gallagher's first sale is said to be suspicious only because it occurred two days after Allegiant defended itself from the Teamster's attacks. Opp. at 18 (referencing ¶ 175). But there is no indication that Gallagher had any undisclosed market-moving information when he made these sales. Plaintiffs seem to believe that every time Allegiant defended itself against a Teamsters Union attack, that created a new false statement which cannot be the law. Nor do Defendants "concede" (Opp. at 19) that Gallagher's Rule 10b5-1 plan was formed at a suspicious time. No one knew whether or when CBS would choose to run a story, or if it did run something what it would say. There is no evidence that the FOIA request was connected to the

adoption of the plan, and the amounts sold—6.3% under the combined Rule 10b5-1 sales (see MTD at 19)—are not suspicious under any Ninth Circuit standard. *See Wozniak v. Align Techs., Inc.*, No. 09-3671, 2011 WL 2269418, *14 (N.D. Cal. Jun. 8, 2011) ("The Ninth Circuit has held that typically 'larger sales amounts' than 37% of a defendant's holdings are necessary to support scienter."). The same is obviously true of Gallagher's first sale which amounted to 8.6% of his holdings, and his third and final sale which amounted to a mere 0.43%.[13]

As for Bricker and Sheldon, who the AC does not allege sold during the class period, Plaintiffs' attempt to add to the AC is even more improper. In fact, the proffered RJN shows they increased their ownership stake over the class period (including vested options, which *do* count in the Ninth Circuit),[14] and Plaintiffs make no attempt to argue that the percentages or the timing of their sales were suspicious. Plaintiffs had it right the first time when they ignored them. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994) ("Officers' minimal sales of stock [] negates an inference of scienter.").

      **C.**      **Plaintiffs Fail to Plead Loss Causation.**

How the Opposition frames the loss causation issue is revealing: Referring to the Broadcast, Plaintiffs say, "On this news, the price of Allegiant common stock fell from an April 12, 2018 close of $165.25 to an *April 16, 2018 close of $146.40* on relatively heavy trading volume. Allegiant's common stock *continued to fall … to close at $159.10 on May 9, 2018* after the U.S. Department of Transportation ('DOT'), Office of Inspector General announced it would audit how the FAA investigated Allegiant's maintenance practices." Opp. at 1. There are two things to focus upon: First, in order to manufacture a stock price drop that could arguably be called "material," Plaintiffs found it necessary to measure the period from April 12 (when it was announced that there would be a *60 Minutes* broadcast about Allegiant but no one knew what it would say, which cannot be the revelation of a "fraud" under *Dura Pharm, Inc. v. Broudo,* 544 U.S. 336, 345

---

[13] Plaintiffs cite two cases (one outside the Ninth Circuit) to argue that "[t]here is no hard-and-fast rule as to how much stock a defendant must sell before he or she can be found to have acted with scienter" (Opp. at 18), but both involved admitted revenue recognition or accounting deception, which is not the case here. *See In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) (sale of 7.6% of holdings created inference of scienter when combined with admission to lying about revenue recognition practices); *Takara Tr. v. Molex Inc.*, 429 F. Supp. 2d 960, 981 (N.D. Ill. 2006) (sale of 1.9% of holdings "d[id] not negate the possibility" of insider trading given concealment of millions in accounting errors).

[14] *See Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1192 (D. Nev. 2009) ("The Ninth Circuit considers [vested options] when evaluating stock sales to determine scienter").

(2005)) to avoid the fact that the price drop on March 16 following the actual Broadcast was immaterial. Second, it is self-evident that going from $146.40 on April 16, to $159.10 on May 9, is not an instance of a price "continue[ing] to fall," but rather evidence of a price recovery that puts this case more in the line of *Metzler Inv. v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th 2008) ("modest 10%" post-disclosure drop failed to plead loss causation where the stock price "quickly recovered").

The immaterial, less than 3% price drop that occurred after the Broadcast reflected the fact that the market had already absorbed the issues the AC says had been identified in numerous media since 2015. *See In re Omnicom Group, Inc. Sec. Litig,* 597 F.3d 501, 512 (2d Cir. 2010) (*Wall Street Journal* article that included experts analyzing Omnicom's accounting practices and corporate transactions, supposedly resulting in 25% stock-price drop, was merely a "negative characterization of already-public information" and thus did not satisfy the loss causation requirement).

## III. CONCLUSION

The AC is a textbook example of the kind of case Congress intended to eliminate at the pleading stage. Its core theory of fraud—that a major American airline lied when it said it cared about safety—is preposterous and cannot be cured by amendment, making a dismissal with prejudice appropriate.

DATED this 21st day of February, 2019.

**GREENBERG TRAURIG LLP**

By: /s/ *Jacob D. Bundick*
MARK F. FERRARIO, ESQ.
Nevada Bar No. 1625
JACOB D. BUNDICK, ESQ.
Nevada Bar No. 9772
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135

DANIEL J. TYUKODY, ESQ.
Admitted *Pro Hac Vice*
COLIN W. FRASER, ESQ.
Admitted *Pro Hac Vice*
**GREENBERG TRAURIG, LLP**
1840 Century Park East, Suite 1900
Los Angeles, CA 90067

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of February, 2019, a true and correct copy of the foregoing **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** was submitted for filing with the Clerk of the Court using the Odyssey eFileNV Electronic Service system and served on all parties with an email address on record, pursuant to Administrative Order 14-2 and Rule 9 of the N.E.F.C.R.

The date and time of the electronic proof of service is in place of the date and place of deposit in the U.S. Mail.

                                             */s/ Andrea Flintz*
                                        An employee of Greenberg Traurig, LLP