**THE ROSEN LAW FIRM, P.A.**
Jacob A. Goldberg (*pro hac vice*)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19012
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com

*Lead Counsel for Plaintiffs*

**LEVERTY & ASSOCIATES LAW CHTD.**
Patrick R. Leverty
832 Willow Street
Reno, Nevada 89502
Telephone: (775) 322-6636
Facsimile: (213) 322-3953
Email: pat@levertylaw.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| CHARLES BRENDON and DANIEL CHECKMAN, Individually And On Behalf Of All Others Similarly Situated, | Case No. 2:18-cv-01758-APG-BNW |
| Plaintiffs, | |
| v. | |
| ALLEGIANT TRAVEL COMPANY, MAURICE J. GALLAGHER, JR., SCOTT SHELDON, STEVEN E. HARFST, and JUDE I. BRICKER, | |
| Defendants. | |

**DECLARATION OF JACOB A. GOLDBERG IN SUPPORT OF PLAINTIFFS': (1) CONSENTED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) UNOPPOSED MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO PLAINTIFFS**

- 1 -

I, JACOB A. GOLDBERG, declare as follows pursuant to 28 U.S.C. §1746:

1. I am a partner at The Rosen Law Firm, P.A. ("Rosen Firm"), court-appointed Lead Counsel for Lead Plaintiff Charles Brendon and Named Plaintiff Daniel Checkman ("Plaintiffs") and the proposed Settlement Class,[1] and am admitted to appear *pro hac vice* before this Court. I have personal knowledge of the matters I declare herein. I do not intend, in any way whatsoever, to waive attorney-client privilege or attorney work product protection in anything I declare herein.

2. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, I submit this declaration in support of Plaintiffs':(1) Consented Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement; and (2) Unopposed Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Award to Plaintiffs.

I. **PRELIMINARY STATEMENT: THE REASONABLE RECOVERY ACHIEVED**

3. Plaintiffs and Lead Counsel achieved the $4,000,000 all cash Settlement after they: (a) investigated Allegiant Travel Company ("Allegiant" or "Company") and the Individual Defendants, including reviewing publicly available information, to initiate the action; (b) retained a private investigator and financial expert regarding damages, market efficiency, price impact, and loss causation, drafting the operative Amended Class Action Complaint For Violations of The Federal Securities Laws ("Amended Complaint") (Dkt. No. 34); (c) successfully opposed Defendants' motion to dismiss and motion to strike; and (d) participated in arms'-length negotiations to resolve the Action.

4. The Amended Complaint asserts violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5 against Defendants.  The Amended Complaint alleges that during the Settlement Class Period, Defendants made materially false and misleading statements about the safety and maintenance practices of Allegiant's airplanes.

5. In my opinion and the opinion of the team of lawyers at my firm who worked on this case, the Settlement is a fair, reasonable, and adequate result for the Settlement Class. Plaintiffs and

---

[1] The capitalized terms to which I refer are the same as those the Stipulation and Agreement of Settlement defines. (Dkt. No. 70-1). For example, I refer to the class the Court preliminarily certified for settlement purposes as "Settlement Class." (Dkt. No. 73, ¶2).

1  Lead Counsel achieved the Settlement after successfully parrying Defendants' motion to dismiss and
2  engaging in arms'-length negotiations. When Settlement discussions began, Lead Counsel,
3  experienced securities class action practitioners, understood the strengths and weaknesses of
4  Plaintiffs' cases and were able to use this experience to reach this favorable settlement.

5  6.  According to Cornerstone Research, *Securities Class Action Settlements: 2018 Review
6  and Analysis*, that I attach hereto as **Exhibit 1**, the $4 million Settlement Amount represents a
7  recovery of over 9% of Plaintiffs' estimated damages of $44.19 million. This recovery is in-line with
8  settlements of similar size. Cornerstone Research concluded for securities class actions with damages
9  between $25 million and $75 million, between 2009 and 2017 the median settlement as a percentage
10 of damages was 7.6% and for 2018 was 9.9%.

11 7.  Plaintiffs and Lead Counsel support the Settlement as it provides the Settlement Class
12 with a guaranteed recovery while avoiding the risks associating with protracted, complex litigation.

13 8.  As I discuss in more detail in Section V, *infra*, Plaintiffs faced the risks that they would
14 fail to (a) achieve class certification and maintain it through a verdict, (b) defeat Defendants'
15 anticipated summary judgment motion, (c) prevail at trial, and (d) defend any favorable verdict on
16 post-trial motions and appeal. At summary judgment and trial, for example, Plaintiffs risked failing
17 to prove the elements of scienter, *i.e.*, that during the Settlement Class Period Defendants did not act
18 with the required state of mind, and loss causation, *i.e.*, adequately linking Defendants' misconduct
19 to the decline in the market price for Allegiant securities, or to establish the Settlement Class's full
20 damages. More, summary judgment and trial will require the presentation of expert testimony about
21 aircraft maintenance, loss causation, and damages, risking multiple battles of experts that may
22 confound the jury. Accordingly, in the absence of a settlement, the risk existed that the Settlement
23 Class could have recovered nothing or an amount significantly less than the negotiated Settlement.

24 9.  Plaintiffs and Lead Counsel considered these issues in deciding to settle the Action
25 for $4 million. Considering all the circumstances and risks both sides faced if litigation continued,
26 both Plaintiffs, for themselves and the Settlement Class, and Defendants concluded that settlement
27 on the terms upon which they agreed was in their respective best interests.

28 10. Lead Counsel and Local Counsel, Leverty & Associates Law Chtd. ("L&A" and

collectively, "Plaintiffs' Counsel"), prosecuted this Action on a contingent basis and advanced all litigation expenses, shouldering completely the risk of failure.

11. The Court should grant Lead Counsel's 25% fee application of the Settlement as it is fair and reasonable. Lead Counsel's efforts, at their financial risk, conferred a benefit on the Settlement Class. This fee request is within the range of fee percentages frequently awarded in this type of action. Additionally, Plaintiffs' Counsel in total expended 602.84 hours of attorney and other professional time and $28,078.85 in out-of-pocket expenses necessary to litigate this complex action. Thus, the Court should reimburse Plaintiffs' Counsel for these litigation expenses.

12. The Court should also consider a payment to each Plaintiff of $5,000 to compensate them for their efforts including the time each dedicated to litigating the Action on behalf of the Settlement Class. This request aligns with similar requests in other district courts in the Ninth Circuit.

## II. FACTUAL BACKGROUND

### A. Summary of Plaintiffs' Claims

13. Allegiant operates a low-cost airline called Allegiant Air serving small to mid-size cities in the United States. Amended Complaint ¶2. The Amended Complaint alleges that Defendants made false and misleading statements to the market regarding the safety and maintenance practices of Allegiant Air.

14. On April 13, 2018, CBS News announced it would air a *60 Minutes* segment criticizing Allegiant's safety and maintenance record. On this news, Allegiant's share price fell over 8.5%. ¶17. On April 15, 2018, the *60 Minutes* segment aired, reporting on alleged deficiencies in Allegiant's infrastructure and maintenance procedures. On this news, the stock price fell another 3%. ¶18. Finally, on May 3, 2018, the U.S. Department of Transportation, Office of the Inspector General, announced it would audit how the Federal Aviation Authority investigated "allegations of improper maintenance practices." ¶19.

15. Defendants deny the accuracy of Allegiant's portrayal in the *60 Minutes* broadcast, maintaining that Allegiant's safety and maintenance practices fully complied with all FAA requirements and that they spoke truthfully to the market about safety and maintenance practices at Allegiant.

DECLARATION OF JACOB A. GOLDBERG IN SUPPORT OF PLAINTIFFS': (1) CONSENTED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) UNOPPOSED MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO PLAINTIFFS

## III.    PROCEDURAL HISTORY

16.    On April 24, 2018, plaintiff Checkman initiated this action in the United States District Court for the Central District of California. (Dkt. No. 1).

17.    On June 25, 2018, Brendon filed a motion for appointment as lead plaintiff and approval of his selection of the Rosen Firm as lead counsel for the Class. (Dkt. No. 12). By Order dated July 16, 2018, Judge John F. Walter granted Brendon's motion. (Dkt. No. 21). On September 11, 2018, Judge Walter granted the Parties' stipulation and proposed order to transfer the action to the United States District Court for the District of Nevada. (Dkt. No. 27). Upon moving the case to this Court, the Rosen Firm affiliated with L&A as local Nevada Counsel.

18.    On October 22, 2018, Plaintiffs filed the Amended Complaint (Dkt. No. 34), alleging violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC") on behalf of a class of all purchasers of Allegiant securities between June 8, 2015 and May 9, 2018, both dates inclusive.

19.    On December 7, 2018, Defendants moved to dismiss the Amended Complaint, filed a request for judicial notice in support of their motion to dismiss, and moved to strike sections of the Amended Complaint. (Dkt. Nos. 45-48). On January 22, 2019, Plaintiffs opposed Defendants' motion to dismiss and motion to strike, (Dkt. Nos. 51-52), and filed their own request for judicial notice. (Dkt. No. 53). On February 21, 2018, Defendants filed their reply memorandum in further support of their motion to dismiss and their motion to strike as well as their opposition to Plaintiffs' request for judicial notice. (Dkt. Nos. 55-57). On February 28, 2019, Plaintiffs filed their reply in further support of their request for judicial notice. (Dkt. No. 58).

20.    On September 9, 2019, the Court granted in part and denied in part Defendants' motion to dismiss, sustaining the Amended Complaint against all Defendants but Harfst for whom the Court granted dismissal. (Dkt. No. 64). On September 10, 2019, the Court denied Defendants' motion to strike. (Dkt. No. 65). While Defendants' motion to dismiss and motion to strike were pending, the Parties began settlement negotiations and ultimately agreed to this Settlement.

21.    On December 31, 2019, Plaintiffs' filed the Consented Motion for Preliminary Approval of Proposed Class Action Settlement ("Preliminary Approval Motion") (Dkt. No. 68). On

DECLARATION OF JACOB A. GOLDBERG IN SUPPORT OF PLAINTIFFS': (1) CONSENTED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) UNOPPOSED MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO PLAINTIFFS

January 8, 2020, the Court held a hearing on the Preliminary Approval Motion and entered the Order Granting Plaintiffs' Motion for Preliminary Approval of Class Action Settlement ("Preliminary Approval Order") on January 14, 2020 (Dkt. No. 73).

### IV. PLAINTIFFS COMPLIANCE WITH THE PRELIMINARY APPROVAL ORDER AND REACTION OF THE SETTLEMENT CLASS TO DATE

22. Pursuant to and in compliance with the Preliminary Approval Order, the Court-appointed Claims Administrator, Strategic Claims Services ("SCS") mailed the Postcard Notice to potential Settlement Class Members, published Summary Notice of Pendency and Proposed Class Action Settlement ("Summary Notice") in *Investor's Business Daily* and on *GlobeNewswire*, and posted at a URL it dedicated to this Settlement the Notice of Pendency and Proposed Settlement of Class Action, ("Long Notice") and the Proof of Claim and Release Form ("Proof of Claim"). *See* Declaration of Josephine Bravata Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections ("Bravata Decl." or "Bravata Declaration"), attached hereto as **Exhibit 2**.

23. The Notice[2] described the claims Plaintiffs asserted, providing an overview of the litigation, the Settlement's terms, the request for attorneys' fees of no more than one-third of the Settlement Fund, reimbursement of expenses up to $40,000, and an Award to Plaintiffs of $5,000 each. The Notice further explains the rights of and process for Settlement Class Members filing a claim, objecting to the Settlement, or requesting exclusion from the Settlement Class. The Long Notice, attached to the Bravata Declaration as Exhibit D, includes the comprehensive Plan of Allocation, detailing how SCS, under the Rosen Firm's direction, will divide and distribute the Net Settlement Amount.

24. To ascertain the members of the Settlement Class to whom SCS distributed Notice, first, Allegiant provided SCS with a shareholder list from its transfer agent. SCS then contacted 1,312 nominees, including 714 banks and brokerage companies as well as 598 mutual funds, insurance companies, pension funds, and money managers. Bravata Decl. ¶4. From the names it received, SCS

---

[2] "Notice" means collectively the Long Notice, Summary Notice, and Postcard Notice.

- 6 -

DECLARATION OF JACOB A. GOLDBERG IN SUPPORT OF PLAINTIFFS': (1) CONSENTED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) UNOPPOSED MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO PLAINTIFFS

mailed 44,881 Postcard Notices to potential Settlement Class Members. Additionally, a nominee informed SCS that it emailed 4,126 of its customers informing them of the Settlement and providing a link to the Notice and Proof of Claim on SCS's website. *Id*. ¶6. Upon request from 62 potential Settlement Class Members, SCS emailed them with direct links to SCS's website. *Id*. at n. 2.

25. On January 27, 2020, SCS published Summary Notice electronically over *GlobeNewswire* and in print in *Investor's Business Daily*. *Id*. at ¶9.

26. SCS also maintains and posted to a Settlement-dedicated URL a summary of the Settlement, the Long Notice, Proof of Claim, Stipulation, and the Preliminary Approval Order. *Id*. at ¶11.

27. Pursuant to the Preliminary Approval Order, Settlement Class Members have until April 23, 2020 to request exclusion or to submit objections to any aspect of the Settlement including awarding of fees and expenses. *Id*. at ¶¶12-13. To date, SCS, counsel, and it also appears the Court have not received any objections and only one potential Settlement Class member requested exclusion. *Id*. The exclusion request does not trigger the termination threshold in ¶80 of the Stipulation. If we receive any objections or further exclusion requests, we shall address them in Plaintiffs' reply papers in further support of Final Approval.

## V.  PLAINTIFFS FACED RISKS IN THIS ACTION IF LITIGATION CONTINUED

### A. The Risk of Establishing Liability and Damages

28. Prior to reaching the Settlement, Plaintiffs, through Lead Counsel, reviewed publicly available documents, gathered information from their investigator, and retained consultants and experts to theorize about market efficiency, price impact, and loss causation. Despite Plaintiffs and Lead Counsel's belief that Plaintiffs' claims were meritorious, they realize that protracted litigation resulted in no guaranteed recovery. Plaintiffs faced risks and obstacles to achieving a greater recovery were the case to continue. Plaintiffs and Lead Counsel considered these challenges prior to and during settlement negotiations.

29. To prevail on their Exchange Act claims, Plaintiffs would have had to prove: (1) a material misrepresentation or omission; (2) scienter, *i.e.,* a wrongful state of mind; (3) a connection

with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) "loss causation," *i.e.*, a causal connection between the material misrepresentation and the loss. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (citation omitted).

30. As an initial matter, Plaintiffs in securities cases must prove their cases primarily through Defendants' documents and testimony and expert testimony. Defendants' testimony is often hostile and expert testimony difficult to present. These circumstances present atypical and material obstacles beyond many non-complex cases.

31. Plaintiffs would have had to establish that Defendants made actionable, materially false or misleading statements or material omissions. Defendants would likely raise at summary judgment and trial that Plaintiffs cannot prove actionable misstatements or omissions, particularly that the class period statements about Allegiant's safety and maintenance procedures were material in light of the information that was already public.

32. Even if they overcame Defendants' falsity and materiality arguments, Plaintiffs faced the risk of failing to prove intent to deceive, that Defendants acted with knowledge of or with recklessness for the alleged falsity of their statements and omissions. A defendant's state of mind in a securities case is often difficult to prove for lack of direct evidence or an admission. Defendants would attempt to show that they sincerely and reasonably believed the material truth of their public statements regarding Allegiant's safety and maintenance measures. The state of the law on such issues is also very complex and evolving. Accordingly, difficult factual and legal challenges confronted Plaintiffs in connection with proving scienter. How a jury would interpret and apply these facts to the law was uncertain.

33. While Plaintiffs believe they could amass evidence to prove that Defendants made materially false and misleading statements and omissions regarding Allegiant's safety and maintenance operations with scienter, if the Court or a jury were to accept Defendants' arguments, the Settlement Class would recover nothing.

34. Although the Court properly held that Plaintiffs adequately pled loss causation, it noted that this is different from proving loss causation. (Dkt. No. 63, citing *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) ("A plaintiff does not…need

to *prove* loss causation in order to avoid dismissal; but the plaintiff must properly allege it."). If litigation were to continue, Plaintiffs anticipate Defendants would assert a "truth-on-the market" defense to argue that the alleged corrective disclosures did not reveal any new information, but rather the public was already aware of Allegiant's maintenance and safety issues. Further, Defendants would likely argue that the stock drops alleged in the Amended Complaint did not result from the disclosure of new information, but rather confounding factors.

35. Plaintiffs also faced challenges to establishing damages at trial. First, a jury would need to accept Plaintiffs' expert's testimony over Defendants' expert's testimony to arrive at a damages figure. Even if a jury favored Plaintiffs' expert, Plaintiffs still faced the challenge to ensure that as many class members as possible submit their claim form to recover the total damages. This would be a significant undertaking and a risk that class members would not timely submit a claim at trial to recover the full amount of damages.

36. Accordingly, loss causation and the technical aspects of damages would require expert testimony and analysis, as well as fact evidence. Because establishing these elements would involve a "battle of experts," issues for the jury to sift through and weigh, the outcome of summary judgment and trial was and remains remain significant hurdles to recovery.

**B.     Risks of Proceeding to Summary Judgment, Trial, and Appeals**

37. If Plaintiffs failed to reach the Settlement, they would have to survive Defendants' motion – or motions – for summary judgment. Summary judgment would pose material risks for the Settlement Class. Plaintiffs would have to demonstrate to the Court that a genuine issue of material fact existed as to each element of its securities claims. Defendants would undoubtedly bolster their motion for summary judgment with any exculpatory evidence that arose during merits discovery. Here, risks existed at summary judgment that the Court could have determined as a matter of law that: the alleged misstatements were not false; that alleged misstatements were immaterial; and/or that loss causation could not be established.

38. Plaintiffs would face evidentiary risks at trial. For example, documents Defendants would produce and the testimony of current and former Allegiant employees, including Defendants, could significantly undermine the Amended Complaint's allegations and the Court or jury would

ultimately determine that Plaintiff failed to satisfy every element of their claims. Additionally, given a securities action's complexity requiring expert testimony, there were significant risks of jury confusion that would render them incapable of reaching a verdict for Plaintiffs.

39. Even if Plaintiffs prevailed on liability on any of their claims and the jury awarded damages, Defendants would likely appeal the verdict and award. The appeals process would likely span several years, during which time the Settlement Class would receive nothing. In addition, an appeal would carry with it the risk of reversal, in which case the Settlement Class would receive no recovery despite having prevailed at trial.

40. Without the Settlement, Plaintiffs faced multiple procedural hurdles and significant merit-based risks involved with protracted litigation. Plaintiffs and Lead Counsel considered each of these risks when agreeing to the Settlement.

### C. The Risk of Failing to Maintain Class Certification Through Trial

41. At the time of settlement, Plaintiffs had yet to move for class certification. To do so, Plaintiffs would have to retain an expert to opine on market efficiency – a costly undertaking. While Plaintiffs believe they would have prevailed in a contested class certification motion, given *Halliburton Co. v. Erica P. John Fund Inc.,* 134 S. Ct. 2398 (2014), Defendants would likely have argued and presented expert testimony seeking to demonstrate a lack of price impact on Allegiant's securities' prices on relevant days during the Class Period. This would result in a "battle of experts," which may have identified issues that would have to be deferred to the merits stage. Accordingly, even if Plaintiffs prevailed on class certification, Defendants would likely have continued to challenge market efficiency for Allegiant's securities, as well as the presumption of reliance through all subsequent stages and before the jury.

42. Even if Plaintiffs were successful at class certification, decertification before or after trial also remained a risk as a class certification order may be altered or amended before a final judgment. The Settlement avoids this risk.

### VI. THE PLAN OF ALLOCATION

43. As provided in the Long Notice, SCS will distribute the Net Settlement Fund according to the Plan of Allocation the Court preliminarily approved (Ex. D to the Bravata Decl. at

4). The Plan of Allocation was designed to distribute the Net Settlement Fund equitability and rationally. Lead Counsel developed the Plan of Allocation with a damages consultant. Plaintiffs and Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to distribute the Net Settlement Fund among Authorized Claimants.

44.     The Plan of Allocation provides for the Net Settlement Fund's distribution among Authorized Claimants on a *pro rata* basis based on "Recognized Loss" formulas tied to liability and damages. The formula considers the amount of alleged artificial inflation in the prices of Allegiant publicly traded common stock. Plaintiffs' consulting damages expert analyzed the movement in the prices of Allegiant securities and took into account the portion of the price drops allegedly attributable to the alleged fraud.

45.     Pursuant to the Plan of Allocation, SCS, under Lead Counsel's direction, will calculate each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Loss compared to the aggregate Recognized Losses of all Authorized Claimants. Calculation of Recognized Loss will depend upon several factors, including the dates Authorized Claimants purchased the securities, whether the securities were sold during the Class Period, and if so, when.[3]

46.     In sum, the proposed Plan of Allocation, developed with Plaintiffs' damages consultant, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants. Accordingly, Plaintiffs and Lead Counsel respectfully submit that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

---

[3] After SCS completes the claims administration process, giving rejected claimants the opportunity to contest the rejection of their claims, Plaintiffs will file a motion seeking the Court's approval of the Claims Administrator's findings and authority to distribute the Net Settlement Fund. Pursuant to the Stipulation, the Claims Administrator will continue to distribute the Net Settlement Fund to Authorized Claimants until it is no longer economically feasible to do so. Stipulation. ¶66. At that point, Plaintiffs will seek the Court's approval to donate the remainder to an appropriate not-for profit charitable organization. *Id*.

- 11 -

DECLARATION OF JACOB A. GOLDBERG IN SUPPORT OF PLAINTIFFS': (1) CONSENTED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) UNOPPOSED MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO PLAINTIFFS

VII.     **PLAINTIFFS' COUNSEL'S APPLICATION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD TO PLAINTIFFS IS REASONABLE**

    A.     **Consideration of Relevant Factors Justify an Award of a 25% Fee**

47.     For its efforts on behalf of the Settlement Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis. As explained in the Memorandum of Points and Authorities in Support of Plaintiffs' Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Award to Plaintiffs, ("Fee Brief"), courts within the Ninth Circuit recognize that the percentage-of-recovery method is the prevailing and appropriate method of determining attorneys' fees.

48.     The Notice stated that Lead Counsel would seek up to one-third of the Settlement Fund. Bravata Decl., Exs. A, C-D at 1. Lead Counsel seeks a fee award of 25% of the Settlement Fund. For the reasons I discuss below and in the accompanying Fee Brief, such award is fair and appropriate.

        i.     **The Favorable Settlement Achieved**

49.     The Settlement Plaintiffs achieved on behalf of themselves and the Settlement Class is a factor courts consider in granting a fee awards. Plaintiffs' damages expert estimated that maximum damages was approximately $44.19 million. The Settlement will compensate Settlement Class Members for approximately 9% of estimated maximum damages. Considered in view of the substantial risks and obstacles to recovery if the Action was to continue through summary judgment, to trial, and through likely post-trial motions and appeals, the $4 million Settlement is fair, reasonable, and adequate.

50.     This recovery was the result of thorough investigative efforts, motion practice, and settlement negotiations. As a result of this Settlement, Settlement Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of a settlement.

        ii.     **The Risks and Complexities of Contingent Class Action Litigation**

51.     From the outset, Lead Counsel understood that it was embarking on a complex,

expensive, and lengthy litigation with no guarantee of compensation for their investment of time and money the case would require. In undertaking that responsibility, Lead Counsel dedicated sufficient resources to the Action's prosecution, covering out-of-pocket the costs that this required. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel received no compensation during the course of the Action but have spent 602.84 hours of time for a total lodestar of $416,515.75 and have incurred $28,078.85 in out-of-pocket expenses in prosecuting the Action for the benefit of the Settlement Class.

52. Lead Counsel also bore the risk that it would fail to recover on behalf of Plaintiffs and the class. Even with competent efforts, success in contingent-fee litigation, such as this, is never assured, and counsel risked receiving nothing and failing to recover the monies it expended out-of-pocket.

53. Lead Counsel knows from their experience that the commencement of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels. Lead Counsel is cognizant of hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, changes in the law during the pendency of the case, a judge's or jury's decision following a trial on the merits resulted in no class recovery or fees for attorneys.

54. Proceeding to summary judgment, trial, or appeal requires counsel to outlay and to bear material costs and to dedicate considerable uncompensated time. The fees that courts award in successful cases cover material overhead expenses incurred during litigation.

55. Courts have repeatedly found that appointing experienced firms such as the Rosen Firm to serve as class counsel is in the public interest, enabling private enforcement of the federal securities laws and regulations. Private enforcement of the federal securities laws occurs only if investors obtain a semblance of parity in representation with that available to corporate defendants. To realize this public policy, courts should award fees that will adequately compensate private plaintiffs' counsel, taking into account the enormous risks undertaken with a clear view of the

economics of a securities class action. *See* Fee Brief, §I.D.4. fn 6.

56.     As discussed in greater detail above, this case was fraught with significant risk factors concerning liability and damages. Plaintiffs' success was by no means assured. Were this Settlement not achieved, and even if Plaintiffs prevailed at trial, Plaintiffs and Lead Counsel faced potentially years of costly and risky appellate litigation against Defendants, with ultimate success far from certain and the prospect of no recovery significant. It is also possible that a jury could have found no liability or no damages. Lead Counsel therefore respectfully submits that based upon the considerable risk factors present, this case involved a very substantial contingency risk to counsel.

### iii.   Lead Counsel's Efforts and the Lodestar Cross-Check

57.     Throughout the pendency of the Action, Lead Counsel focused on advancing the litigation to achieve the best outcome for the Settlement Class, whether through settlement or trial, by the most efficient means necessary.

58.     I attach hereto as **Exhibits 3 and 4** declarations from Plaintiffs' Counsel, submitting them in support of the request for an award of attorneys' fees and payment of litigation expenses. *See* Declaration of Jacob A. Goldberg of The Rosen Law Firm, P.A. Concerning Attorneys' Fees and Expenses ("Rosen Firm Fee Decl.") and the Declaration of Patrick R. Leverty of Leverty & Associates Law Chtd. Concerning Attorneys' Fees and Expenses ("Leverty Fee Decl.").

59.     Included in the Rosen Firm Fee Decl. and Leverty Fee Decl. are schedules detailing the amount of attorney and professional support staff time spent on the litigation and the lodestar calculations, *i.e.,* their hours multiplied by their billing rates. As explained in each declaration, they were prepared from contemporaneous daily time records regularly prepared and maintained by the respective firms

60.     The hourly billing rates of Plaintiffs' Counsel here range from $425 to $975 for attorneys. The hourly rates for attorneys and professional support staff included in these schedules are reasonable and in line with firms in the New York City, Philadelphia Metro area, and Reno, Nevada markets.

61.     Plaintiffs' Counsel have collectively expended 602.84 hours in the prosecution and investigation of the Action comprised of 577.14 hours for Lead Counsel and 25.7 hours for Local

- 14 -

DECLARATION OF JACOB A. GOLDBERG IN SUPPORT OF PLAINTIFFS': (1) CONSENTED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) UNOPPOSED MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO PLAINTIFFS

Counsel. *See* Rosen Firm Fee Decl. at ¶6 and Leverty Fee Decl. at ¶6. The resulting collective lodestar is $416,515.75 comprised of $405,593.25 for Lead Counsel and $10,922.50 for Local Counsel. *Id*. Pursuant to a lodestar "cross-check," the requested fee of 25% of the Settlement Fund ($1,000,000) results in a lodestar multiplier of 2.4, which does not include any time that will necessarily be spent from this date forward administering the Settlement, preparing for and attending the Settlement Hearing, assisting Settlement Class Members, and moving for a distribution order.

### iv. The Skill Required and Quality of the Work

62. Lead Counsel is an experienced and skilled securities litigation law firm. The Rosen Firm's resume, attached as Exhibit A to the Rosen Firm Fee Decl., describes the experience of the Rosen Firm's attorneys involved in this litigation. As the firm resume demonstrates, the Rosen Firm has been appointed in numerous securities class actions throughout the country and has achieved impressive recoveries for investors. The Rosen Firm's recent notable achievements include securing a $250 settlement for Alibaba Group Holding Ltd. investors, the largest U.S. securities class action settlement against a Chinese issuer. Thus, the Settlement Class has benefited from Lead Counsel's experience and considerable time and effort to this case which helped achieve the Settlement.

63. Courts around the country have recognized the Rosen Firm's experience and competence. *See Yedlowski v. Roka Bioscience, Inc.*, No. 14-CV-8020-FLW-TJB, 2016 WL 6661336 at *21 (D.N.J. Nov. 10, 2016) ("[The Rosen Firm] is highly experienced in the complex field of securities fraud class action litigation"); *Knox v. Yingli Green Energy Holding Co. Ltd.*, 136 F. Supp. 3d 1159, 1165 (C.D. Cal. 2015) ("The Rosen Law Firm is 'highly qualified [and] experienced' in securities class actions"); *In re Nature's Sunshine Prod., Inc.*, No. 2:06-CV-267 TS, 2006 WL 2380965, at *2 (D. Utah Aug. 16, 2006) (the Rosen Firm is "qualified, experienced and able to vigorously conduct the proposed litigation.").

64. Accordingly, the Settlement Class was represented by skilled and able counsel who should be reimbursed for their efforts.

### B. Request for Litigation Expenses

65. Plaintiffs' Counsel seeks payment from the Settlement Fund of $28,078.85 in litigation expenses Plaintiffs' Counsel reasonably and necessarily incurred in connection with

- 15 -

commencing and prosecuting the claims against Defendants. Of this amount, the Rosen Firm incurred $26,654.88 in out-of-pocket expenses and L&A incurred $1,423.97 in out-of-pocket expenses. These amounts are reflected in the books and records of each firm. *See* Rosen Fee Decl. and Leverty Fee Decl.

66. From the beginning of the case, Plaintiffs' Counsel was aware that they might not recover any expenses. Thus, Plaintiffs' Counsel was motivated to, and did, take steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

67. Plaintiffs' Counsel seek reimbursement of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, financial expert fees, investigator fees, travel costs, legal and factual research, press release and notice to class member fees, postage fees, and court filing and *pro hac vice* fees.

68. All of the litigation expenses incurred, which total $28,078.85, were necessary to prosecute this litigation.

### C. Award to Plaintiffs

69. Plaintiffs seek an award for the time, effort, and oversight each dedicated to this litigation. The Private Securities Litigation Reform Act of 1995 ("PSLRA") empowers courts to approve such requests. Each seeks $5,000. I attach hereto as **Exhibits 5 and 6** the Declaration of Charles Brendon ("Bredon Decl.") and the Declaration of Daniel Checkman ("Checkman Decl."), outlining the participation of Plaintiffs in securing this result for the Settlement Class.

### VIII. SETTLEMENT CLASS' REACTION TO THE FEE AND EXPENSE REQUESTS AND AWARD TO PLAINTIFFS

70. Of the over 44,000 Postcard Notices SCS mailed to potential Settlement Class Members advising them of the fees, expense reimbursement, and awards Plaintiffs intended to seek, as of the date of this Declaration, no member of the Settlement Class has objected. If a member of the Settlement Class objects prior to the April 23, 2020 deadline for objections, Lead Counsel will respond to any objections received in its reply papers in further support of the fee request.

- 16 -

DECLARATION OF JACOB A. GOLDBERG IN SUPPORT OF PLAINTIFFS': (1) CONSENTED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) UNOPPOSED MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO PLAINTIFFS

## IX. CONCLUSION

71. In view of the recovery to the Settlement Class and the substantial risks of this litigation, the Rosen Firm believes that the Settlement is fair, reasonable, and adequate and respectfully requests the Court finally certify the Settlement Class, approve the Notice to the Settlement Class, approve the Settlement as fair, reasonable, and adequate, and approve the Plan of Allocation.

72. Further, the Rosen Firm believes that attorneys' fees of 25% of the Settlement Fund, reimbursement of $28,078.85 in out-of-pocket expenses, and Awards to Plaintiffs of $5,000 each are fair and reasonable under Fed. R. Civ. P. 23 and the PSLRA. As such, the Rosen Firm respectfully requests the Court approve them.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 16, 2020 at Jenkintown, PA.

/s/*Jacob A. Goldberg*
Jacob A. Goldberg

DECLARATION OF JACOB A. GOLDBERG IN SUPPORT OF PLAINTIFFS': (1) CONSENTED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) UNOPPOSED MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that on April 16, 2020, I electronically filed the foregoing **DECLARATION OF JACOB A. GOLDBERG IN SUPPORT OF PLAINTIFFS': (1) CONSENTED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) UNOPPOSED MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO PLAINTIFFS** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

/s/*Jacob A. Goldberg*
Jacob A. Goldberg

- 18 -

DECLARATION OF JACOB A. GOLDBERG IN SUPPORT OF PLAINTIFFS': (1) CONSENTED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) UNOPPOSED MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT EXPENSES, AND AWARD TO PLAINTIFFS